IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____ )
BLUE OCEAN INSTITUTE, et al.,           )
                                        )
              Plaintiffs,               )
                                        )
         v.                             )        No.  1:06-CV-01869-HHK
                                        )
CARLOS M. GUTIERREZ, et al.,            )
                                        )
              Defendants.               )
_____ )

PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION
TO COMPEL COMPLETION OF THE ADMINISTRATIVE RECORD

Stephen E. Roady
D.C. Bar. No. 926477
Jennifer C. Chavez
D.C. Bar No. 493421
Earthjustice
1625 Massachusetts Avenue, N.W.
Washington, D.C.  20036
202-667-4500 Tel; 202-667-2356 Fax

Counsel for the Plaintiffs

Dated:  March 12, 2007

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1


I. COMPLETION OF THE ADMINISTRATIVE RECORD IS IMPORTANT
  TO ALLOW THOROUGH JUDICIAL REVIEW OF THE DECISION BY
  THE FISHERIES SERVICE TO DENY PROTECTION FOR THE BLUEFIN.......................3

    A.  The Administrative Record is Not Complete and Must be Made Complete.. ...................3

    B.  The Record Must Include Specific Evidence Considered by the Service.........................7


II. THE SERVICE HAS UNLAWFULLY RESTRICTED THE RECORD BY
   RELYING UPON AN IMPERMISSIBLY NARROW INTERPRETATION
   OF WHAT CAN BE DEEMED "CONSIDERED" AS PART OF ITS DECISION ..............11


III. THE SERVICE LACKS AUTHORITY TO ASSERT UNILATERALLY
    THAT RELEVANT MATERIALS ARE NOT PART OF THE RECORD .........................16


CONCLUSION ......................................................................................................................17

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION
TO COMPEL COMPLETION OF THE ADMINISTRATIVE RECORD**

The Defendants ("Fisheries Service" or "Service") have unlawfully filed an incomplete

administrative record in this case that impairs the ability of this Court to review their refusal to

protect the critically depleted population of western Atlantic bluefin tuna ("bluefin") in the Gulf

of Mexico.[1] As filed, the record omits key documents (including meeting notes and emails) that

would illuminate the relevant factors considered – or ignored – by the defendants when they

decided to deny the Plaintiffs' ("Blue Ocean") June 2005 Petition to protect spawning bluefin in

the Gulf.  The Fisheries Service Opposition to the Plaintiffs' Motion to Compel Completion of

the Administrative Record ("Opp.") fails to justify these omissions.  Indeed, as Blue Ocean

explains in this Reply, the Defendants' Opposition provides additional reasons that support

granting the Motion.  Blue Ocean therefore respectfully requests that its Motion be granted.

**INTRODUCTION**

The Fisheries Service relies upon the following contentions: (1) the record is complete

and is entitled to a "presumption of regularity" (Opp. at 5-7); (2) it has no duty to include in the

record "every communication or scrap of paper in the agency's files" (Opp. at 7-10); (3)  the

record contains the reasoning supporting its decision (Def. Opp. at 10-12); (4) the materials

sought by Blue Ocean were neither directly nor indirectly considered by the decision-maker

(Opp. at 12-14); (5) emails and "internal deliberative documents" are not properly part of the

record (Opp. at 15-16); (6) the documents sought by Blue Ocean are protected by the

"deliberative process privilege" and their production would allow a probing of the Service's

---

[1]  The Fisheries Service has admitted that "the spawning stock biomass of western Atlantic bluefin tuna is at its lowest recorded level."  Def. Answer at ¶ 2.  In addition, the World Conservation Union (IUCN) has listed the bluefin as "critically endangered" – meaning that it is "facing an extremely high risk of extinction in the wild in the immediate future."  *See* http://www.iucnredlist.org/search/details.php/21864/all

"mental processes" (Opp. at 16-21); (7) it is "irrelevant" that the materials sought by Blue Ocean are relevant to the decision (Opp. at 21-23).[2]

These contentions are meritless. First, completion of the record is important to ensure thorough judicial review of the Service's decision to deny protection for the bluefin. Moreover, Blue Ocean has provided information sufficient to overcome any presumption that the record is complete; it does not seek "every scrap of paper" and instead has identified relevant materials necessary to allow this Court to conduct a careful review of the Service's decision. Nor does the record provide the underlying explanation or evidence for the Service's decision not to protect the bluefin despite its precarious population status. Second, the Service's interpretation of "directly or indirectly considered" is impermissibly narrow; emails and other documents can be included in the record – they contain relevant facts and the Fisheries Service has not properly asserted that they are privileged. Finally, the law does not allow the Service unilaterally to decide that documents which were before it and are clearly "relevant" to its decision can nonetheless can be excluded from judicial review; that determination is for this Court.

This is the third effort in the past two years by the Service to limit an administrative record and frustrate a thorough review by the Federal courts of fishery management decisions. Federal district courts in Oregon and Texas have already rejected this ploy – refusing to allow the Service to shield its decision-making process from judicial review under circumstances that

---

[2]  The Defendants also contend that no "extra-record" evidence should be considered here (Opp. at 24-31). However, Blue Ocean is not seeking to include extra-record evidence; instead, it is moving to include in the record documents that were generated by the Service itself during its decision-making process and that were therefore part of the materials that were directly or indirectly considered by the Service in denying Blue Ocean's June 2005 Petition. Thus, this Motion is one to complete the record with materials that have always been part of the record but were omitted when the Defendants assembled that record; it is not a Motion that seeks to add "extra-record" materials. Nor is it a Motion to "supplement" the record with materials generated outside the Service. For this reason, as Blue Ocean catalogues throughout this Reply, many of the cases cited by the Defendants simply are not relevant. *See, e.g., Nat'l Wilderness Institute v. U.S. Army Corps of Engineers,* 2005 WL 691775 (D.D.C. 2005) (effort by plaintiffs to supplement the record with outside studies that were not generated by the agency).

are strikingly similar to the ones presented here.  This Court should reach the same conclusion in

this case, and direct the Service to complete the administrative record.

I.    **COMPLETION OF THE ADMINISTRATIVE RECORD IS IMPORTANT TO ALLOW THOROUGH JUDICIAL REVIEW OF THE DECISION BY THE FISHERIES SERVICE TO DENY PROTECTION FOR THE BLUEFIN**

The Fisheries Service now concedes that the administrative record in this case lacks

certain relevant materials it developed during review of the Blue Ocean June 2005 Petition.  As

stated in the declaration of the agency official with responsibility for species such as bluefin tuna

(attached to the Service's Opposition): "Notes of telephone conversations, informal notes of

meetings and discussions, and other documents that reflect internal staff deliberations or policy

recommendations were not included in the administrative record."  Declaration of Alan

Risenhoover ("Risenhoover Decl.") at ¶ 6.   This declaration also reveals that "[t]he record does

not include raw data, such as raw computer data or individual logbook reports." *Id*. at ¶ 4.  It is

precisely these kinds of materials that are necessary to allow this Court to conduct a thorough

review of the decision by the Service to deny the Blue Ocean Petition that sought protection for

the depleted bluefin population.

A.  **The Administrative Record is Not Complete and Must be Made Complete**

Blue Ocean demonstrated in its Memorandum in Support of its Motion ("Pl. Mem."), and

the Service now apparently concedes (see Risenhoover Decl. at ¶ 6), that the record is devoid of

materials containing details as to how the Service made the decision to deny the June 2005

Petition.  Pl. Mem. at 8-11.  Blue Ocean will demonstrate in its briefing on the merits that the

denial of its Petition violates the Magnuson-Stevens Fishery Conservation and Management Act,

the National Environmental Policy Act, and the Administrative Procedure Act.  Nonetheless, the

Court will be better able to determine the magnitude of the unlawful, arbitrary, and capricious

nature of the Service's decision to deny protection for spawning bluefin by reviewing agency records of (a) staff discussions, meetings, and policy recommendations, (b) analyses of vital factual and technical issues, and (c) evaluations of the efficacy of protecting depleted bluefin from being killed on their spawning grounds.  *See, Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971) (courts should conduct a searching and careful inquiry into agency decisions to determine whether relevant factors were considered or whether the agency made an error in judgment); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 48 (1983) (agency action is arbitrary and capricious when it fails to consider important factors and fails to articulate a rational connection between the facts and the choices it makes); *Ethyl Corp. v. Environmental Protection Agency,* 541 F. 2d 1, 36 (D.C. Cir. 1976) (close scrutiny of the evidence educates the court about matters relied upon and discarded, questions addressed or bypassed, and choices made).  All such discussions, recommendations, analyses, and evaluations are missing from the record as currently constituted.

This is not the first time that the Service has impermissibly endeavored to limit judicial review of its decision-making process.  As Blue Ocean has explained, within the past year the Federal court in the Southern District of Texas flatly rejected a similar effort in *Coastal Conservation Assoc. v. Gutierrez*, Nos. H-05-1214 & H-05-2988 (S.D. Tex., decided March 12, 2007).  *See* Pl. Mem. at 13 and February 17, 2006 Order attached thereto as Exhibit 2.  Not surprisingly, the Service attempts to avoid the ruling in the *Coastal Conservation* case, arguing that the case was "wrongly decided" and that the ruling is distinguishable because it involved a challenge to agency Guidelines that were not used to assemble this record.  Opp. at 5 n.2.

First, whether or not the Service intentionally followed the Guidelines (as the evidence suggests was required) when assembling the record filed here,[3] this record plainly reflects the same approach that was held invalid in the *Coastal Conservation* ruling, insofar as it omits emails and notes of internal agency discussions.  The Guidelines expressly directed Service officials not to include such materials in the administrative record.  See Exhibit 2, NOAA Fisheries Guidelines for Administrative Agency Records, at 7 ("E-Mails should not be included in an AR").  Here, the Service argues that it enjoys unfettered discretion to exclude from the record even documents that were before it at the time of its decision and are relevant to this case.  Opp. at 21-23 (stating, *inter alia,* that "[r]elevance is irrelevant.").   This position, too, reflects the same approach that the ruling in *Coastal Conservation* held to be invalid; it arrogates discretion to the Service to determine whether or not to include relevant documents – documents which were before it at the time of its decision – in the administrative record.  See Exhibit 2 at 4 ("A document may be relevant, but not significant to the agency's decision. . . . If a document is not significant, it should not be included in the AR.").

In short, whether the Service intentionally followed the Guidelines or not, the incomplete nature of the record here reflects the same impermissible approach embodied in those Guidelines that was rejected in *Coastal Conservation*.   Under these circumstances, where the gaps in the record flow directly from the approach that has already been rejected in the *Coastal*

---

[3] The evidence shows that the Guidelines were in full force and effect at the time the Service compiled this record, and further establishes that agency officials were required during that time to implement the provisions of those Guidelines.  According to the Risenhoover Declaration, the Service put these Guidelines into effect in March of 2005 and did not withdraw them until February of 2007.  Risenhoover Decl. at ¶ 7.  The Policy Directive cited in the Risenhoover Declaration states that agency officials "have the responsibility to implement the provisions of the administrative records guidelines" that were "issued effective March 2005."  *See* National Marine Fisheries Service Policy Directive 30-123, attached as Exhibit 1 (located at the web site referenced in the Risenhoover Declaration at ¶ 7). The Service filed the record with this Court on January 12, 2007, before it withdrew the Guidelines, at a time when the Guidelines were in effect.  Given that the Guidelines were in effect when this record was assembled, and in light of the Policy Directive that ordered Service officials to implement those Guidelines while they were in effect, the Service's claim that it did not follow those Guidelines when assembling this record is open to question.

*Conservation* case – which held unlawful the Service's failure to provide to the court "documents and materials directly or indirectly considered by agency decision-makers, including evidence that is contrary to the decision-maker's decision" (*Coastal Conservation* Order at 3-4) – remains highly relevant.

The Service's additional contention that *Coastal Conservation* case was simply "wrongly decided" also is not well-founded.  The court in *Coastal Conservation* carefully followed established law that requires the administrative record to be complete, and concluded that the lack of record documents evidencing a debate among agency staff about the assessment of fish populations was sufficient to show that the record was incomplete.  *See Coastal Conservation* Order at 3-4.  Again, this ruling is directly applicable here, where the record is missing precisely the same kinds of discussions and debates among staff that were omitted in that case.[4]

In truth, the only difference between *Coastal Conservation* and this case is that the depleted fish species is different.  In that case, the record was missing staff discussions about the nature of the red snapper population and efforts to protect it – here the record is missing staff discussions about the nature of bluefin tuna mortality and the effect of protecting bluefin; in the words of the responsible Fisheries Service official, the record does not include "documents that reflect internal staff deliberations or policy recommendations."  Risenhoover Decl. at ¶ 6.  The important similarity between the two cases is that in both, the Service impermissibly attempted to limit careful judicial review of its decision-making process.  In short, the ruling in *Coastal Conservation* is directly applicable.

---

[4]  Defendants suggest incorrectly that the *Coastal Conservation Association* court relied merely upon Plaintiffs' "characterizations" concerning a debate among scientists.  Def. Opp. at 5 n.2.  In fact, as in this case, in *Coastal Conservation* the Plaintiffs pointed to specific documents in the record that established the existence of debated issues, and argued that the record should be completed with materials related to the resolution of those issues.  *See* Brief in Support of Plaintiffs' Motion to Compel Completion of the Administrative Record, filed in *Coastal Conservation Association* on December 16, 2005, attached as Exhibit 3, at 10-11.

**B.    The Record Must Include Specific Evidence Considered by the Service**

The Service repeatedly mischaracterizes Blue Ocean's Motion as a request for "every scrap of paper" from the agency's files.  *See, e.g.*, Opp. at 7, 9, 10.  To the contrary, the Motion merely seeks an order directing the Service to comply with the law; to do so the Service must include in the record all evidence it considered – either directly or indirectly, in reaching its decision to deny protection for depleted bluefin.  *See, e.g, Citizens to Preserve Overton Park*, 401 U.S. at 420 (judicial review of agency action must be based on "the full administrative record that was before the [agency] at the time [it] made [its] decision"; *James Madison Ltd. v. Lutwig,* 82 F. 3d 1085, 1095 (D.C. Cir. 1996) (same).[5]

Moreover, far from seeking the indiscriminate production of material, the Blue Ocean Motion papers identified several key issues that were the subject of staff discussions related to the decision to reject its June 2005 Petition.  *See* Pl. Mem. at 8-11.  These discussions included consideration of the vitally important fact that bluefin mortality is being under-reported in the Gulf of Mexico, and evaluation of the question whether the Service should establish a process for valuing different species or life stages of fish differently when deciding whether they should be protected.  *Id; see* AR Doc. E17 at 9 (stating that logbook data "may underestimate" bluefin bycatch but neglecting to examine the effects of that underestimation on the decision whether to close certain areas to fishing); AR Doc. E20 at 7 (noting that staff discussed the question of differentially valuing species or life stages).  These discussions are likely to have included consideration of evidence that both supported and contradicted the final agency decision to reject

---

[5]  Its mischaracterization of the nature of the Blue Ocean Motion leads the Service to rely upon cases that are wholly inapposite.  *See, e.g., TOMAC v. Norton*, 193 F. Supp. 2d 182, 194-95 (D.D.C. 2002) (effort to engage in discovery under FRCP 56(f) aimed at showing bad faith agency conduct in order to add documents to the record).

the Blue Ocean Petition to protect spawning bluefin, but they are missing from the record here.

They should, therefore, be included in the record to allow careful review of that decision.[6]

The information contained in AR Doc. E17 illustrates the need to include this kind of information in the record. That document recognizes that logbook data "may underestimate" the number of bluefin being killed as unintended catch ("bycatch") by fishing vessels in the Gulf, but further suggests that it is acceptable to treat that possibility as a neutral factor because "the relative effects" of various fishing closure options is "comparable across alternatives."  Id. at 9. This determination – contained in a Service memorandum dated August 29, 2006 – deals with a question of central importance to the legality of the Service decision to deny the Blue Ocean Petition to protect bluefin spawning in the Gulf of Mexico.

There is no question that the spawning stock of bluefin "is at its lowest recorded level." See Def. Answer at ¶ 2.  This means that the total number of these fish is hovering at a precariously low level; in fact, bluefin have been listed as "critically endangered" by the World Conservation Union because they are "facing an extremely high risk of extinction in the wild in the immediate future."  *See* http://www.iucnredlist.org/search/details.php/21864/all Under these circumstances, when AR Doc. E17 recognizes that logbook data "may underestimate" the number of bluefin being killed as unintended catch ("bycatch") by fishing vessels in the Gulf, but chooses nevertheless to take what appears to be a completely neutral position with respect to that fact in its analysis, it is important to ascertain the basis on which it justified that conclusion. Absent any basis in the record for this determination, the Service's

---

[6] In its haste to mischaracterize the focused nature of the Blue Ocean Motion, the Service has completely failed to address a case cited by the Plaintiffs that requires agencies to include in the administrative record materials that are likely to contain evidence contrary to the decision: *Washington Toxics Coalition v. United States Dept. of the Interior,* No. C04-1998C (W.D. Wash. June 14, 2005), attached as Exhibit 1 to Pl. Mem., at 3-4.  The ruling in *Washington Toxics Coalition* therefore stands unrebutted as authority for the proposition that materials reflecting these discussions must be included in the record.

action on this point flies in the face of established science, which demonstrates that continuing to

kill fish when the population of the affected species is already highly depleted is problematic and

adversely affects the chances of the population to recover.[7]

Moreover, with the filing of the Risenhoover Declaration as part of its Opposition, the

Service has brought this challenge to its bluefin decision squarely within the holding of another

recently-decided case that required it to complete the record, *National Wildlife Federation v.*

*National Marine Fisheries Service*, CV 01-640-RE & CV 05-23-RE (D. Ore. 2005). In that case,

the Service again tried unsuccessfully to shield its decision-making process from careful judicial

review. In an effort to justify submitting an incomplete administrative record, it filed a

declaration stating that "internal drafts of memoranda or decision documents that were not

prepared for review outside of NOAA" were not included in that record. *See National Wildlife*

*Federation* Opinion and Order dated March 3, 2005, attached as Exhibit 4, at 3. The declaration

also stated that those withheld documents "contain information or opinions that were either

captured by documents that are included in the Administrative Record or which do not form the

basis for" the agency decision. *Id.* The court held that the declaration was sufficient to establish

that materials considered by the Service had not been included in the administrative record, and

that the record therefore was incomplete. *Id.* at 4-5. Accordingly, it required the Service to add

those materials to the record. *Id.* at 5.

The court's ruling in *National Wildlife Federation* should apply here to require the

Fisheries Service to complete the record. Indeed, this case presents an even more compelling

situation for requiring the Service to complete the record than was the case in *National Wildlife*

---

[7] The Service refers to a discussion contained in AR Doc. E12 at page E-25 (apparently contending that it adequately responds to the under-reporting of bluefin mortality) and asserts that this passage needs no further explanation. Opp. at 11. However, that discussion includes the unexplained conclusion that the Service "cannot place more value on one species over another species." AR Doc. E12 at E-30. Thus, it hardly contains evidence supporting the Service decision not to protect the depleted and critically endangered bluefin.

*Federation*.  There, the Service official claimed that the withheld materials did not "form the basis for" the agency determinations. Id. at 3.  Here, the Risenhoover Declaration makes no such claim; instead, it simply states that "notes of telephone conversations, informal notes of meetings and discussions, and emails, and other documents that reflect internal staff deliberations *or policy recommendations* were not included in the administrative record."  Risenhoover Decl. at ¶ 6 (emphasis added).  It further states that "[t]he record does not include raw data, such as raw computer data or individual logbook reports."  Id. at ¶ 4.  It would strain credulity to suggest that the Service did not review data and staff policy recommendations in the course of its decision-making process in response to the Blue Ocean Petition.  Thus, it is reasonable to infer that the materials excluded from this record, unlike those excluded in *National Wildlife Federation*, were actually relied upon or reviewed by Service officials as part of the decision-making process on that Petition.[8]

Moreover, here the Service attempts to justify its exclusion of notes and emails by arguing that "the agency's conclusions, and its supporting reasoning for its positions, are properly set forth in the record."  Opp. at 10.  This argument ignores settled law; the Service cannot rest merely on its conclusions and reasoning, but must file a complete administrative record that contains the evidentiary basis for those conclusions.  *See, Citizens to Preserve Overton Park v. Volpe*, 401 U.S. at 420 (1971) (courts should conduct a searching and careful inquiry into agency decisions to determine whether relevant factors were considered or whether the agency made an error in judgment); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. at 48 (1983) (agency action is arbitrary and capricious when it fails to consider

---

[8]  For this reason, it does not avail the Service to rely upon cases that refuse to include documents in the record that were not considered by agency decision-makers.  *See* Opp. at 12, *citing, e.g, Pacific Shores Subdivision California Water District v. United States Army Corps of Engineers*, 448 F. Supp. 2d 1, 4 (D.D.C. 2006).

important factors and fails to articulate a rational connection between the facts and the choices it

makes); *Ethyl Corp. v. Environmental Protection Agency,* 541 F. 2d at 36 (D.C. Cir. 1976) (close

scrutiny of the evidence educates the court about matters relied upon and discarded, questions

addressed or bypassed, and choices made). Therefore, contrary to the suggestion of the Service

(Opp. at 10-12), the administrative record as currently constituted does not contain the full story

of the agency reasoning supporting its decision.[9]

As Blue Ocean demonstrated in its Motion papers, all evidence relied upon directly or

indirectly by the agency is required to be included in a properly-constituted administrative

record. *See* Pl. Mem. at 5-8. The Risenhoover Declaration strongly supports the conclusion that

evidence relied upon by the Service in its decision to deny the Blue Ocean Petition is not

currently included in the record. The Court should therefore require the Service to include that

evidence in the record here; it should order that the materials identified in paragraphs 4 and 6 of

the Risenhoover Declaration be placed in the record.

## II. THE SERVICE HAS UNLAWFULLY RESTRICTED THE RECORD BY RELYING UPON AN IMPERMISSIBLY NARROW INTERPRETATION OF WHAT CAN BE DEEMED "CONSIDERED" AS PART OF ITS DECISION

The Fisheries Service contends that its staff discussions, policy recommendations, emails,

and related materials of the type identified in the Risenhoover Declaration are properly excluded

from the record here because the law in this Circuit somehow takes a more restrictive view than

do other Circuits in determining whether such materials were "directly or indirectly considered"

by the decision-maker. Opp. at 12-14. In particular, the Service asserts that emails and "similar

---

[9] The Fisheries Service cites to four other documents from the administrative record that it asserts contain its "analysis" underlying the decision to deny the Blue Ocean Petition. Opp. at 12. Not one of them contains any analysis: (1) AR Doc. D3 is a cryptic table that appears to contain no relevant information; (2) AR Doc. E1 is another table whose only relevant phrase is "May want to think of other ways to reduce BFT bycatch in Gulf"; (3) AR Doc. E2 contains the following question: "Why aren't we closing Gulf for BFT" and states the bald conclusion that closing fishing in the Gulf "could increase" bluefin discards (AR Doc. E2, last page); (4) AR Doc. E5 states only that "[r]edistribution of effort models predicted increases in bycatch of BFT."

internal deliberative documents" are not properly made part of the record in this Circuit.  *Id*. at

15-16.   These arguments are not correct.

 As Blue Ocean demonstrated in its Motion papers, this Circuit follows Supreme Court

precedent, and joins other Circuits, in insisting upon a close review of the full record – most

particularly in cases where technical matters are involved.  *See* Pl. Mem. at 5-6, *citing, inter alia,*

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) and *Ethyl Corp. v.*

*Environmental Protection Agency*, 541 F. 2d 1, 36 (D.C. Cir. 1976).  Many cases in this district,

therefore, have concluded that agencies cannot avoid including material in the record simply by

asserting that the material was not reviewed or relied upon by the decision-maker.  *See* Pl. Mem.

at 7, *citing Ad Hoc Metals Coalition v. Whitman*, 227 F. Supp. 2d 134, 139 (D.D.C. 2202) and

*Envt'l Defense Fund v. Blum,* 453 F. Supp. 650, 661 (D.D.C. 1978).[10]  In short, contrary to the

suggestion of the Service, staff discussions and policy recommendations that were relied upon

directly or indirectly by it in arriving at the decision to deny the Blue Ocean Petition should be

included in the record here.  *See* Pl. Mem. at  6, *citing, inter alia, Int'l Longshoremen's Assoc. v.*

*National Mediation Bd.,* 2006 WL 197461 at * 3 (D.D.C. 2006).

 The Service further contends that "emails and similar internal deliberative documents"

are not properly included in administrative records. Opp. at 15-16.  It endeavors to sidestep the

ruling in *Coastal Conservation Assoc. v. Gutierrez*, Nos. H-05-1214 & H-05-2988 (S.D. Tex.

---

[10]  Defendants rely on *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Commission*, 751 F. 2d 1287,
1326-27 (D.C. Cir. 1984) for the proposition that courts do not "ordinarily" review pre-decisional materials.  Def.
Opp. at 9-10.  *San Luis Obispo* was decided several years before *Esch v. Yeutter*, 876 F. 2d 976, 991-993 (D.C. Cir.
1989), which provided a more detailed analysis of the question of supplementing the administrative record and
concluded that numerous exceptions allow the record to be supplemented – including with pre-decisional materials.
*Id*.  These exceptions include where the agency failed to adequately explain its action or failed to consider relevant
factors.  *Id.*  Not surprisingly, in light of *Esch v. Yeutter's* detailed consideration of the question, many rulings in this
Circuit, including *Ad Hoc Metals*, allow for pre-decisional review.  As discussed earlier in this Reply, the
Risenhoover Declaration and the specific record documents already identified by Blue Ocean show that the record
here is missing staff discussions and policy recommendations relied upon by the Service that would help explain the
decision by the Service and illuminate whether the Service examined relevant factors in reaching that decision.

2007) (*see* Pl. Mem. at 13 and Order attached thereto as Exhibit 2) – where the court expressly

ordered production of emails and other internal deliberative materials relating to the development

of a fishery management decision – by asserting that the law in this Circuit is more stringent.

*Id.* However, as explained in the seminal case of *Esch v. Yeutter,* 876 F. 2d 976, 991-993 (D.C.

Cir. 1989), this Circuit allows review of pre-decisional deliberations for a number of reasons,

including situations where the agency action is not adequately explained in the record or where

the agency failed to consider factors relevant to its decision.

Indeed, in the case chiefly relied upon by the Service, *Ad Hoc Metals Coalition v.

Whitman*, 227 F. Supp. 2d 134 (D.D.C. 2002), Opp. at 15-16, the court relied upon a review of

internal agency email messages in deciding to require certain pre-decisional deliberative

materials to be included in the administrative record.  *Ad Hoc Metals*, 227 F. Supp. 2d at 138-

139.  While the court in that case ultimately decided not to require various other agency emails to

be included in the record, that decision in no way suggests, as the Service contends, that this

Circuit flatly prohibits including emails and other internal agency materials in the record.[11]  In

fact, in another recent Fisheries Service case in this district, Judge Ellen S. Huvelle relied upon a

review of agency emails to conclude that the Service was in violation of the law.  *Oceana v.

Evans,* 2005 WL 555416, at *41 (D.D.C. Mar. 9, 2005).

Moreover, the Service properly concedes that this Circuit allows internal agency

deliberative documents to be included in the administrative record where such documents

contain "factual information not otherwise in the record."  Def. Opp. at 17 n.5, citing *National*

---

[11]  In support of this position, the Service relies, first, on a D.C. Circuit case decided sixty years ago, *Norris & Hirshberg, Inc. v. SEC*, 163 F. 2d 689, 693 (D.C. Cir. 1947).  Opp. at 15.  *Norris* is hardly the leading pronouncement on the subject of the power of the courts to take a close look into agency decisions of the type at issue here.  Instead, the Supreme Court's much more recent rulings emphasize that the judiciary is obliged to conduct a "searching and careful" inquiry into the record to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park, Inc., v. Volpe*, 401 U.S. 402, 420 (1971).

*Courier Ass'n v. Board of Governors,* 516 F. 2d 1229, 1242 (D.C. Cir. 1975). The Risenhoover

Declaration acknowledges that Service staff discussions and policy recommendations are not

currently included in the record here. Risenhoover Decl. at ¶ 6. In addition, Blue Ocean has

identified several documents included in the record that suggest these discussions must have

addressed intensely factual issues (such as the number of bluefin actually killed by fishing in the

Gulf of Mexico). *See, e.g.* Pl. Mem. at 8-11. It is, therefore, plausible to assume that the

materials omitted from this record include factual information not otherwise addressed there. All

such materials belong in this record.[12]

In a last effort to prevent these materials from being included in the record, the Service

complains that their inclusion would violate the "deliberative process privilege" and constitute an

impermissible probing of the "mental processes" of the agency. Def. Opp. at 16-21. This

assertion misses the point of administrative record review. Even while courts focus on an

agency's final decision, the information considered and discussed by agency staff members prior

to that decision may be crucial to the court's inquiry into whether the "agency decision was

rational and based on consideration of the relevant factors." *Avoyelles Sportsmen's League,* 715

F. 2d 897, 904-05 (5th Cir. 1987) (internal quotation omitted); *see Ethyl Corp. v. Environmental

Protection Agency,* 541 F. 2d at 36. Courts can, and often do, make determinations that turn on

an internal agency discussion or opinion because that discussion or opinion has revealed

something about the *final* decision. *See, e.g., Sierra Club v. Babbitt,* 15 F. Supp. 2d 1274, 1281

(S.D. Ala. 1998) (court found APA violation based on evidence that agency had ignored

---

[12] The Service argues that Blue Ocean must first "prove that such documents exist" before it can have them included in the record. Opp. at 17 n. 5. This is not correct. Their identification in the Risenhoover Declaration is sufficient proof to include them in the record. *See National Wildlife Federation v. National Marine Fisheries Service*, CV 01-640-RE & CV 05-23-RE (D. Ore. 2005), Order attached as Exhibit 3.

concerns of experts); *see also  e.g., Southwest Ctr. for Biological Diversity v. Bureau of Reclamation,* 143 F.3d 515, 522-23 (9th Cir. 1998); *Oceana v. Evans,* 2005 WL 555416, at *41 (D.D.C. Mar. 9, 2005) (reviewing internal Fisheries Service emails and concluding that the agency had not complied with the requirement to minimize bycatch of certain fish species).

This approach does not mean that a court is reviewing the earlier opinions or discussion itself.  Rather, it is simply considering the evidence "before the agency at the time the decision was made" to determine whether that decision was supported.  *James Madison Ltd.,* 82 F.3d at 1095.  Thus, excluding what defendants call "pre-decisional" discussions from the record would deny the Court information that is necessary for a competent review of the agency's decision and which could determine the outcome of the case.  *See, Washington Toxics Coalition v. United States Dept. of the Interior,* No. C04-1998C (W.D. Wash. June 14, 2005), attached as Exhibit 1 to Pl. Mem., at 3-4.

Nor can the agency avoid its obligation to create a complete record by claiming that its internal deliberations should be protected from public view to encourage candor in future discussions.[13]  If the agency wishes to withhold documents on the basis of deliberative process or any other legal privilege, it should submit a privilege log detailing the reasons why each

---

[13] The cases cited by the Service in support of this proposition are not persuasive.  For example, *Kansas State Network, Inc.* v. FCC, 720 F. 2d 185, 191 (D.C. Cir. 1983) simply repeats the general notion that was followed prior to *Esch v. Yeutter,* 876 F. 2d 976, 991-993 (D.C. Cir. 1989) – that courts normally limit their inquiry into pre-decisional agency deliberations.  Other cases relied upon by the Service cut directly against its position. Thus, in *AMFAC Resorts, LLC v. U.S. Dept. of Interior,* 143 F. Supp 2d 7 (D.D.C. 2001), the court stated "most basically, a complete administrative record should include all materials that 'might have influenced the agency decision' and not merely those on which the agency relied in its final decision."  Id. at 12.  Furthermore, while the *AMFAC* court noted that "deliberative intra-agency memoranda and other such records are ordinarily privileged, and need not be included in the record" (id. at 13) it also stated that "if the agency decisionmaker based his decision on the work and recommendations of subordinates, those materials should be included" in the record. *Id.*  Here, the Risenhoover Declaration indicates that staff policy recommendations are not in the record; under *AMFAC,* they are properly included in the record so long as they might have influenced the decision of the Service.  In any event, the Service fails to rebut the abundant case law that supports Blue Ocean's request.  *See, e.g., Miami Nation of Indians*, 979 F. Supp. 771, 776 (N.D. Ind. 1996) (ordering inclusion of drafts, notes, comments, and internal communications in record); *Southwest Ctr. for Biological Diversity v. Bureau of Reclamation*, 143 F.3d 515, 522-23 (9th Cir. 1998) (court reviewed drafts included in administrative record in ruling on summary judgment); *Greenpeace v. NMFS*, 55 F. Supp. 2d 1248, 1265 (W.D. Wash. 1999) (court considered draft in evaluating ESA compliance).

document may be withheld.  *See Miami Nation of Indians*, 979 F. Supp. at 778-79; *Nat'l Wildlife Fed'n,* Nos. 01-640-RE & CV 05-23-RE, at 5-7, attached as Exhibit 3 (considering whether documents could be excluded from the record on the basis of attorney-client privilege).

## III.    THE SERVICE LACKS AUTHORITY TO ASSERT UNILATERALLY THAT RELEVANT MATERIALS ARE NOT PART OF THE RECORD

The Service finally trots out the idea that it enjoys unbridled authority to determine to exclude from the administrative record even materials that were before it when it was making the decision to deny the Blue Ocean Petition and that plainly are relevant to the case: "Relevance," says the Service, "is irrelevant" when it is deciding whether or not to include materials in the record for review by this Court.  Opp. at 21.  This arresting proposition ignores governing law.

The most fundamental problem with the Service's position that it enjoys unfettered power to determine the scope of the record here is this: it is this Court's role, not the agency's, to be the final arbiter of what information bears upon the lawfulness of the decision to deny the Blue Ocean Petition.  *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420 (1970).  This Circuit has made it abundantly clear that it does not "hear cases merely to rubber stamp agency actions."  *Natural Resources Defense Council v. Daley,* 209 F. 3d 747, 755 (D.C. Cir. 2000) (rejecting the Fisheries Service argument that it was entitled to deference with respect to its scientific judgments in fishery management decisionmaking).  Therefore, courts review agency decisions based on the "whole" record that was actually before the agency so that they can weigh whether the decision was rational, cogently explained, and based on consideration of the relevant factors.  *Id. at 755-56, citing Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 48; *Citizens to Preserve Overton Park,* 401 U.S. at 420; *Ethyl Corp. v. Environmental Protection Agency,* 541 F. 2d at 36. And the "whole" record must contain all materials the agency referred to, relied upon, or considered, directly or indirectly, in arriving at its decision.  *See, Int'l Longshoremen's Assoc. v.*

16

*National Mediation Board,* 2006 WL 197461 *3 (D.D.C. 2006).  Those are the materials Blue

Ocean seeks to have included in the record here.

**CONCLUSION**

For each of the foregoing reasons, the Blue Ocean Institute respectfully requests that this

Court compel the Fisheries Service to produce a complete administrative record of all relevant

documents (such as draft reports, minutes, meeting notes, emails, and records of telephone

conversations that reflect staff discussions and policy recommendations) that were directly or

indirectly considered by the Service during the development of its decision to deny Blue Ocean's

June 2005 Petition to protect the critically depleted population of bluefin tuna.


Dated:  March 12, 2007


                                        Respectfully submitted,


                                        /s/  Stephen E. Roady
                                        _____
                                        Stephen E. Roady
                                        D.C. Bar. No. 926477
                                        Jennifer C. Chavez
                                        D.C. Bar No. 493421
                                        Earthjustice
                                        1625 Massachusetts Avenue, N.W.
                                        Washington, D.C.  20036
                                        202-667-4500 Tel; 202-667-2356 Fax

                                        Counsel for the Plaintiffs


17

Department of Commerce ♦ National Oceanic & Atmospheric Administration ♦ National Marine Fisheries Service

| |
|---|
| ***NATIONAL MARINE FISHERIES SERVICE POLICY DIRECTIVE 30-123***<br>***JUNE 1, 2005*** |
| ***Administration and Operations*** |
| ***ADMINISTRATIVE RECORDS GUIDELINES*** |
| **NOTICE:** This publication is available at: http://www.nmfs.noaa.gov/directives/. |
| **OPR: F/P** (A.Gautam)    **Certified by:** Certified by F/P (M. Holliday)<br>**Type of Issuance:** Renewed 07 |
| ***SUMMARY OF REVISIONS:*** |

Introduction.  All regions, science centers, and most headquarters offices of the National Marine Fisheries Service (NMFS) are involved in the promulgation of regulations. Development of policy that leads to rulemaking generates information and decisions that constitute an administrative record of the process.  Proper documentation of these steps and associated data on which decisions are based is a fundamental part of the public policy responsibilities of the Agency. The purpose of issuing guidelines for administrative recordkeeping is to ensure efficient and effective compliance and implementation by NMFS of the applicable law and regulations on administrative records.

Objective.  Ensuring consistent, complete and compliant administrative records of Agency policy and regulatory decisions is an essential function of a resource management agency.

Authorities and Responsibilities.  This directive establishes the following authorities and responsibilities:

Directors of regions, centers and headquarters offices have the responsibility to implement the provisions of the administrative records guidelines found in Procedural Directive 30-123-01.

Measuring Effectiveness.  The NMFS Deputy Assistant Administrator for Regulatory Programs shall periodically assess the compliance with and utility of the Administrative Records Guidelines, and implement remedial actions with the Directors or changes to the guidelines, using the Policy Directives process, as circumstances dictate.

References.   A Procedural Directive(30-123-01) was issued effective March 2005 to implement this policy.  PD 30-123-01 was archived in Feb 07 pending an update of the procedure.

___/S/_____June 1, 2005__
William T. Hogarth, Ph.D.                      Date
Assistant Administrator
  for NOAA Fisheries

Exhibit 1

NMFSPD 30-123 [June 1, 2005]

Attachment 1
**GLOSSARY OF REFERENCES AND SUPPORTING INFORMATION**

***References***
NMFS Procedural Directive 30-123-01, *NOAA Fisheries Guidelines for Agency Administrative Records*

# NOAA FISHERIES

## Guidelines for
## Agency Administrative Records

March 2005

# Table of Contents

I. INTRODUCTION ..................................................................................................1

II. ADMINISTRATIVE RECORDS ........................................................................1

    A. Documents to Include in an Administrative Record......................................4

    B. Documents Not to Include in an Administrative Record ..............................6

    C. Organizing and Indexing an Administrative Record for Litigation..............9

    D. Potential Consequences of Incomplete Administrative Record in Litigation . . . . . . .10

    E. Interplay between FOIA and an AR...........................................................10

III. FEDERAL RECORDS REQUIREMENTS ......................................................11

IV. FREEDOM OF INFORMATION ACT .............................................................12

APPENDIX A. Magnuson-Stevens Act Administrative Records .................................14

## I. INTRODUCTION

NOAA Fisheries keeps records for three separate purposes. First, the agency must maintain records to protect the public interest in government documents and materials. Second, the agency for its own business purposes, and occasionally for public viewing, keeps a docket of information relating to a specific decision. Third, when a NOAA Fisheries decision is challenged in court, the agency must produce a subset of these documents to the court.

The Guidelines focus primarily on aiding NOAA Fisheries program managers and record officers in the latter type: producing for a court accurate, reliable and complete administrative records that support agency decisions, records often subject to production under tight deadlines. The discussion of administrative records is followed by a brief description of the federal record laws, which require maintenance of records other than those included in administrative records, and the Freedom of Information Act, which applies to all federal records whether or not they are included in an administrative record.

## II. ADMINISTRATIVE RECORDS

The term "administrative record" can be used to mean a compilation of documents[1] that the agency maintains to track its decision-making process, or it can mean the subset of those documents that is compiled and produced to a court to demonstrate the decision-making process and the basis for a final agency decision.[2] The Guidelines will use "administrative record" (AR)

---

[1]   The legal term for all agency materials is "records." "Records" are defined in 44 U.S.C. § 3301 as:

> all books, papers, maps, photographs, machine readable materials, or other documentary materials, regardless of physical form or characteristics, made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government or because of the informational value of data in them. Library and museum material made or acquired and preserved solely for reference or exhibition purposes, extra copies of documents preserved only for convenience of reference, and stocks of publications and of processed documents are not included.

To avoid confusion of the term "record" with the term "administrative record", these Guidelines use the word "documents" to refer to individual records, specifying as necessary records other than paper documents.

[2]   As discussed in Section III below, agencies are required to create and retain documents in order to recognize and protect the public's interests in government records.

1

to refer to the record produced for litigation, and "docket" to describe the record maintained by the agency to document the development of a specific agency decision.[3]   Many documents that would not be included in an AR should still be maintained in a docket, and pursuant to federal record-keeping requirements.   This section of the Guidelines focuses on producing ARs for litigation.

When an agency decision is challenged, the Administrative Procedure Act (APA)[4] provides that a court review an agency's action to determine if the decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.   Most cases challenging agency decisions are decided on summary judgment, that is, without a trial in which there is witness testimony.  The AR is the government's "evidence" in the case, evidence that would otherwise be gathered through presentation of witnesses and exhibits to the court.  The court therefore relies solely on the agency's AR to determine the legal adequacy of the particular agency action being challenged.   Accordingly, the agency should present an AR that demonstrates compliance with procedural requirements and the full rationale for the agency's decision.

Neither the APA nor any of NOAA's statutes or directives provide further guidance on the specific contents of an AR.  The content has been addressed, however, in numerous court decisions.  These guidelines have been adapted from those decisions and guidance provided from the Environmental Protection Agency,[5] Department of Justice, and NOAA's Damage Assessment and Restoration Program.[6]

The AR first must document the process the agency used in reaching its final decision in order to show that the agency followed required procedures.  For NOAA actions, procedural requirements include the notice and comment provisions of the APA, the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act), the National

---

Whether a document should be retained for agency record keeping is a different consideration from whether it should be included in an administrative record.  Generally, an administrative record is a small subset of all documents on any particular topic.

[3]   Note that the agency generates documents, such as minutes of Leadership Council and other committee meetings, that do not relate to a specific agency decision.   While the agency would not include them in a docket, as the term is used in these Guidelines, or in an AR, the agency may need to retain such documents pursuant to broader record-keeping requirements.

[4]   Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

[5]   Development and Management of Administrative Records, Carrie Wehling, Marilyn Kuray, Mark Stein, May 2002, presentation at EPA's OGC National Counseling Attorneys' Conference.

[6]   National Resource Damage Assessment (NRDA) Administrative Record Procedures Manual, NOAA Damage Assessment and Restoration Program, August 2001.

2

Environmental Policy Act (NEPA),[7] the Regulatory Flexibility Act,[8] the Information Quality Act,[9] the Coastal Zone Management Act,[10] and the Endangered Species Act (ESA).[11] While an AR need not demonstrate compliance with procedural policies in executive orders, such as in Executive Orders 12866 and 13132, this information should be maintained as part of the agency's docket for a decision.

The AR must also explain and rationally support the agency's decisions. The AR must show the agency has met the legal standards and criteria found in applicable laws, regulations, and relevant agency policies (e.g., Consultation Handbook: Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act, March 1998). When use of the "best available science" is required, the AR generally must contain documents that address and analyze this topic. Particularly, the AR should document consideration of opposing points of view, and provide a thorough explanation as to why the preferred course of action was adopted. This information should be addressed in NEPA documents, preambles to final regulations, and when appropriate, ESA section 7 biological opinions.

In order to ensure the AR is a contemporaneous record of the agency's decision-making process (and to avoid misplacement of documents), a program manager should create a docket once consideration of a decision begins, and should compile and organize documents as they are generated or received. Program managers should not wait until litigation is filed to begin a docket for the decision. When a lawsuit is filed, program managers should work closely with NOAA General Counsel in reviewing documents in the docket to determine which of the documents in the docket should be included in the AR. Taking great care in compiling a complete AR for a lawsuit is critical for the agency. Having a complete, organized docket ready when a lawsuit is filed will greatly enhance the agency's ability to compile a complete AR.

## A. Documents To Include In An Administrative Record

Documents to include in an AR for a lawsuit will include paper documents, but may also include other means of communication or ways of storing or presenting information. Data files, graphs, charts and photos may also be included in some cases. The following two threshold principles can be used in evaluating whether to exclude a document from an AR: (1) relevance; and (2) significance. (These guidelines are also useful for determining what should be included in a docket.) If a document is either irrelevant or insignificant, it should not be included in the AR.

---

[7] 42 U.S.C. § 4341.

[8] 5 U.S.C. § 601 *et seq.*

[9] Pub. L. No. 106-554, § 515

[10] 16 U.S.C. § 1451 *et seq.*

[11] 16 U.S.C. § 1531 *et seq.*

**Relevance**

NOAA Fisheries should evaluate only relevant documents for inclusion in ARs.  A document is relevant if it relates to the agency decision that is being challenged, i.e., it has a logical connection to the matter under consideration.  Relevant documents are documents that establish background or context for the agency's action, as well as documents that oppose or support the agency's final action.  Relevant documents also include documentation of procedural requirements, such as NEPA and RFA analyses, as well as the agency's substantive decision.

Because relevancy determinations can be difficult, and will affect the content of the AR and therefore the defense of the case, these determinations should be made in consultation with the NOAA General Counsel, who may also consult with Department of Justice attorneys assigned to the case.

**Significance**

A document is significant if it bears directly on the substantive issues examined by the agency while undertaking its decision-making process relating to the final action.  If a document contains information and deliberations relied on by the decision-maker (or incorporated by reference in documents relied on by the decision-maker), then the document is significant.  Significant documents are a subset of relevant documents.  A document may be relevant, but not significant to the agency's decision.

The concept of significance is important to AR preparation due to the potentially vast numbers of documents that might contribute in some way to the agency's decision in a particular case.  There is no statutory, regulatory, or judicial principle that "more is better" for an AR; indeed, the judicial review process often suffers from unduly large ARs filled with large quantities of marginal or insignificant documents that do not bear on the decision under review.  If a document is not significant, it should not be included in the AR.

Electronic documents provide a good example of the issue of significance.  In the electronic information age, huge numbers of electronic documents are created, transmitted and stored.  These documents are largely of an informal and individual nature – one employee making a comment to other employees about some aspect of a pending decision.  Such communications are rarely, if ever, transmitted to the decision-maker and should be excluded from an AR.  See discussion of E-Mails, Section II.B. below.  Even if a document is both relevant and significant, it may still not be appropriate for inclusion in the AR.  Set forth below are guidelines for what documents should, and should not be, included in an AR.

4

**The following kinds of information should be included in the AR:**

- Relevant, significant documents relied on by the decision-maker, or incorporated by reference in documents relied on by the decision-maker, whether or not those documents support the final agency decision.

- Any AR that supports earlier decisions, if relevant; the agency must include the index of such an earlier AR, and then determine whether to include all, some or none of the documents.

- Relevant, significant background documents that help explain the context in which the decision was made.

- Relevant policies, guidelines, directives, and manuals where central to decision; these should be cited, and incorporated by reference as appropriate, but not included.

- Comments the agency received during the public review process from other agencies and the public, and the agency's responses to those comments.

- Reference documents (any document or scientific literature cited in any pertinent decision document (e.g., NEPA analyses)) must be identified in the AR index; the agency determines whether to include all or part of the document in the record.

- Summaries of relevant, significant meetings with members of the public to discuss the agency's proposed action; when prepared minutes of such meetings have been provided to the decision-maker, those minutes should be included in the AR. (Note that all such meetings should be documented to avoid the appearance of improper ex parte contact, regardless of whether that documentation is included in an AR.)[12]

- The final decision document (most agencies use a "decision memorandum") signed by the agency official with delegated authority to make a decision on behalf of the agency. In the case of external ESA consultations under Section 7(a)(2), the final decision document is the biological opinion or a determination that an action will not affect, nor is it likely to adversely affect, a listed species. In the case of the Magnuson-Stevens Act, it is the final decision document accompanying implementing regulations.

---

[12]An outside party seeking to provide substantive oral comments to NOAA Fisheries Service respecting the merits of a decision should be requested to provide a written record of their comments. If oral comments are nonetheless received, a summary of the oral communication (written by NOAA Fisheries Service) should be prepared for inclusion in the AR. All meetings between NOAA Fisheries Service and non-Executive branch parties to discuss a pending decision must likewise be on the record with a written summary of the meeting prepared for the AR. The summary must include a description of arguments and information presented by the outside party.

All documents in an AR should be dated, with authorship indicated. Undated, unattributed documents are less likely to be appropriate because it is difficult to tell how they fit into the agency's decision-making process. Similarly, documents prepared for signatures should be signed, and copies of the signed versions of the documents placed in the AR.

Different decision-making procedures and different types of decision documents are used depending on which statute is being applied. Different processes can result in ARs that differ, sometimes considerably, in the number of documents involved. Still, the goals of the AR remain the same - - to show the agency followed required procedures, and to show its substantive decision is rational and is supported by the evidence before the agency. Therefore, when assembling the AR, program managers should consider: (1) what procedures were required, what procedures were followed and how they were documented; and (2) what was the basis for the agency's choice of actions and how it was documented. Appendix A provides background on the preparation of an AR for Magnuson-Stevens Act actions.

## B. Documents Not To Include In An Administrative Record

### Documents not in existence until after the agency decision.

Documents not in existence at the time of the agency decision must be excluded from the AR. Program managers should consult with NOAA General Counsel if there are subsequent documents that nevertheless may be relevant to a lawsuit, as in the case of a legal challenge to an ongoing agency action, or failure to act.

### Personal notes

Personal notes, such as an individual's notes taken at a meeting or journals, maintained by an individual for his or her own use, should not be included in an AR.[13] If those notes contain information relevant to an agency action, staff should include that information in the final decision document or supporting documents accompanying the final decision document through the approval process.

### Drafts

The AR should not include internal "working documents"or "working drafts." Working documents are those that relate to routine administrative operations (such as fax cover sheets). Working drafts are draft decision documents, draft regulations or drafts of official agency work products (e.g., biological opinions or permits) that are circulated within the agency. Working

---

[13] These documents -- as well as drafts, privileged documents, and E-Mails -- may contain information demonstrating development of agency policy and decisions. Therefore, even though these documents should not be included in an AR, the agency may be required to retain these documents in dockets or in other record-keeping systems pursuant to the Federal Records Act. See Section III below.

drafts sometimes contain unique information. For example, a draft may contain and explain a change from an earlier draft, or a draft may contain significant handwritten notes. Working drafts of this type should be retained as part of the agency's record-keeping requirements. For purposes of an AR, unique information contained in these drafts should be summarized in the decision memorandum, which would be placed in an AR in lieu of the working drafts themselves.

**Protected Documents**

Protected documents are those the government is prohibited from disclosing. Protected documents include those containing information protected by the Privacy Act or other statute, and those documents that are confidential as a result of a court order. As a general rule, protected documents are not included in an AR. Exceptions exist, however, such as when protected documents contain critical factual information supporting the agency's decision. In that case, those documents should be identified in the index to the AR, but not produced to the reviewing court or other parties to the case. Protected documents should not be revealed to the parties or their attorneys without a court order, but may potentially be reviewed a court.

**Privileged Documents**

Privileged documents are those the government may choose to withhold. Relevant privileges and prohibitions against disclosure include, but are not limited to, attorney-client documents (including legal memoranda prepared by agency counsel); attorney-work products; and documents reflecting the agency's internal deliberative process. Privileged documents should not be included in the AR.

The agency's "mental processes" – the healthy internal discussions reflecting staff viewpoints – are ultimately not relevant to a court's decision as to whether the agency followed the law in its final decision. The deliberative process privilege and attorney-client communication privilege protect these healthy discussions so that the participants will feel that they can be candid. Excluding these documents from the AR maintains the court's proper focus on the agency's decision and supporting information. In exchange, however, the decision document presented to the decision-maker must be robust in summarizing and presenting the factual and policy support for a recommended decision.

**E-Mails**

E-Mails should never be used as the formal agency documentation of decision or as support for the agency's decision. Generally, the decision-maker himself or herself rarely sees any of the E-Mails. Therefore, E-Mails should not be included in an AR. If an E-Mail contains factual information or analysis relied on to make an agency decision, then the content of that E-Mail should be included in the final decision document, or supporting memoranda relied on by the decision-maker (or incorporated by reference in documents relied on by the decision-maker). While this requires additional work from program staff, this practice will eliminate non-related E-Mail correspondence that is often intertwined with decision-making correspondence in the AR.

Even though E-Mails should not be included in an AR, they may still constitute a federal record, or be the subject of a FOIA request, and therefore staff should always consider their use of E-Mail carefully. E-Mails are both overused and misused as a form of communication among agency staff. E-Mail is intended for official and authorized purposes. E-Mail messages are not private and could possibly be used in court as evidence. A sloppy or ill-considered or even humorous E-Mail in the course of conducting or commenting on the agency's business could be released in response to a FOIA request or circulated outside the agency. Once that happens, the E-Mail is public.

Moreover, "chain" E-Mails are a particularly ineffective way to discuss and resolve important substantive issues. These types of E-Mails often invite inappropriate commentary from one or more of the participants, quickly become impossible to follow (or to know where they begin or end), and, as various headers are deleted, can leave quite misleading impressions as to who said what to whom, when, and why. In addition, it is impossible to control their distribution.

E-Mail problems can be avoided by using a different method of communication such as a telephone or face-to-face meetings. For example, if staff find that they need to write more than a few lines in an E-Mail, they could use the telephone, or set up a meeting, and have a conversation instead. As noted above, if an important topic needing elaboration is being discussed in E-Mail, staff should follow-up the E-Mail discussion with preparation of a formal memorandum that would be appropriate for submission to the decision-maker and inclusion in the AR. Formal decision documents such as a "Decision Memorandum" should be used to document the agency's decision and rationale. Once the information in the E-Mail has been summarized in a decision memorandum, the E-Mail may be discarded, unless the agency's general record-keeping obligations require its retention.

## C. Organizing and Indexing an Administrative Record for Litigation

A court reviews the agency action based on the AR before the agency at the time the decision was made. The AR is the agency's evidence that its decision and decision-making process comply with relevant statutory and regulatory requirements. All agency findings and conclusions and the bases for them must appear in the AR. A complete AR allows the court to determine the agency's decision meets the appropriate APA standards and other relevant laws.

The following are the common steps in compiling an AR for litigation.

- Review the docket compiled as the decision was being made, and determine which documents should be included in the AR.

- Organize the documents to be included in the AR in a logical and accessible way in chronological order and/or by topic.

- Separate documents that do not fit into a chronological order by category (e.g., internal policies, references, guidelines, handbooks, or manuals).

- Prepare an index to the AR. The index should identify each document (or other material)

Exhibit 2

by date and type and include the title and/or a brief description of the document or material.

- Provide the proposed AR to the NOAA case attorney. The NOAA case attorney will review to see if additional documents should be included or if there are irrelevant, insignificant, protected or privileged documents that should be excluded.

- Once the AR is final, the AR and index must be certified as the official and complete record of the decision, first by someone who is familiar with the AR and second, by one of the officials authorized to certify ARs under the seal of the Department of Commerce.

- Consult with the NOAA case attorney to determine next steps for making the AR available to the court and the parties to the lawsuit.

- In some instances, the court will accept for filing the certified index of the AR, in lieu of filing the AR itself. Copies of the documents in the AR are then made available to the parties to the litigation for inspection and copying. Selected portions of the AR are included as exhibits to the parties' summary judgment motions. This approach should be NOAA's preferred mode.

- If the court will not accept a certified index in lieu of the complete AR, consult with the NOAA case attorney concerning the proper format for submitting the AR to the court and parties. Many courts have local rules that specify particular formats. These rules are not uniform. For example, some courts will accept 3-ring binders, while others will not. Some courts require Bate-stamping of each page, other courts do not. At the present time, most courts will not accept an electronic AR but others require one.

- Very large ARs present special problems if the court will not allow NOAA to file a certified index of the AR in lieu of the AR itself. In that instance, if a voluminous document is part of the AR, that one document could be described in the AR index, not included in the AR filed with the court, and the court advised that it is "available upon request." If this approach is taken, staff must ensure that the document is indeed available and a copy can be supplied upon request.

- When the original AR is in final form and the index and certification are complete, it is ready to be copied. The case attorney will determine how many copies are needed. If the AR must be filed with the court, there will be at a minimum one for each party and intervener in the case, one or more for the Justice Department, and one or more for the court. The NOAA case attorney will provide the necessary addresses, and the program manager will ship the copies of the AR.

D.  Potential Consequences of an Incomplete Administrative Record in Litigation

Agencies can best determine what information was presented to a decision-maker, and accordingly, the agency is in the best position to certify what its AR is for any decision.  If a court deems an AR incomplete, the court may allow the agency to provide additional documents, or to submit affidavits.  Once the government supplements the AR with affidavits or testimony, however, the opposing party may attempt to depose program staff and/or submit additional affidavits or testimony even though such actions are rarely appropriate under the APA.  The court may allow discovery when a party has proffered sufficient evidence suggesting bad faith or improprieties that may have influenced the decision-maker.  Discovery could include written interrogatories to the agency or depositions of agency personnel.

**E.  Interplay between FOIA and an AR**

Sometimes potential plaintiffs prepare for litigation by seeking agency documents with a Freedom of Information Act (FOIA) request, either before filing a lawsuit or at the same time.  See Section IV for a discussion of FOIA.  Responding to a FOIA request differs from preparing an AR.  Preparing an AR requires consideration of all of the factors discussed above.  FOIA requests, however, are usually broadly worded and can include requests for documents that NOAA might view as irrelevant or insignificant to the decision at issue.  Because of this, responding to a FOIA request generally involves providing all documents on a topic, other than privileged or protected documents, regardless of relevance or significance to a particular agency decision.  It is important to note that if a document is released pursuant to a FOIA request, any privileges that might have applied will have been waived.  Thus, the agency may not be able to assert privileges with respect to that document in any other circumstance.

It is critical therefore that program staff consult with NOAA GC whenever a FOIA request is received that seeks administrative record materials and that relates to a final action that the agency has taken or will take.  Agency staff should consult with NOAA GC prior to releasing those documents and inadvertently waiving those privileges.

**III.  FEDERAL RECORDS REQUIREMENTS**

The federal records statutes recognize and protect the public's interests in government documents and other materials, regardless of whether the agency needs such documents and materials for an AR or a docket.  Agencies are required by law to make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency.  In addition, each agency must develop a records management system in which records must be properly stored and preserved, available for retrieval, and subject to appropriate approved disposition schedules.  As noted above, agencies will retain many records in its record management system that would not be appropriate for inclusion in an AR or a docket.

10

"Records" are defined in 44 U.S.C. § 3301 as:

> all books, papers, maps, photographs, machine readable materials, or other
> documentary materials, regardless of physical form or characteristics, made or
> received by an agency of the United States Government under Federal law or in
> connection with the transaction of public business and preserved or appropriate
> for preservation by that agency or its legitimate successor as evidence of the
> organization, functions, policies, decisions, procedures, operations, or other
> activities of the Government or because of the informational value of data in
> them. Library and museum material made or acquired and preserved solely for
> reference or exhibition purposes, extra copies of documents preserved only for
> convenience of reference, and stocks of publications and of processed documents
> are not included.

Federal records requirements are found in 44 U.S.C. Chapter 29 (44 U.S.C. §§ 2901-2909,
"Records Management by the Archivist of the United States and by the Administrator of General
Services"), Chapter 31 (44 U.S.C. §§ 3101-3107, "Records Management by Federal Agencies"),
and Chapter 33 (44 U.S.C. §§ 3101-3107, "Disposal of Records"). These laws are administered
by the National Archives and Records Administration (NARA), the General Services
Administration (GSA), and each federal agency, including NOAA. NARA has promulgated
extensive implementing regulations at 36 C.F.R. Subchapter B (Parts 1220 (General Provisions),
1222 (Creation and Maintenance of Federal Records), 1228 (Disposition of Federal Records),
1230 (Micrographic Records Management), 1232 (Audiovisual Records Management), 1234
(Electronic Records Management), and 1236 (Management of Vital Records)). The NARA
Records Management Handbook is at:
http://www.archives.gov/records_management/publications/disposition_of_federal_records/
The NOAA Records Management Guide is at:
http://www.rdc.noaa.gov/~foia/asdhome/recguide-rev.htm.

Requirements for E-Mail management are at 36 C.F.R. Part 1234. They are found at:
http://ecfr.gpoaccess.gov/cgi/t/text/textidx?c=ecfr&sid=81c67f5d7fac7487acfa6b86cdceabc&tpl
=/ecfrbrowse/Title36/36cfr1234_main_02.tpl

The Department of Commerce E-Mail policy is at http://www.rdc.noaa.gov/~foia/asdhome/rec-
email-rev.htm. According to the current DOC policy, all E-Mails that meet the definition of a
federal record, above, should be printed (including the essential transmission data) and filed with
related paper records. Even though E-Mails may need to be included in a records management
system, E-Mails are not to be included in an AR as documentation of agency compliance. As
noted above, if staff wishes to present information to the decision-maker or to document
compliance with a procedural requirement, staff should include that information in the final
decision document or a supporting document presented or made available to the decision-maker.

For records management purposes, "working files" or "working drafts," should not be retained
unless they were circulated outside of the agency for official purposes, or if such documents
contain unique information necessary to understanding the agency's action or policy formulation
(see 36 C.F.R. § 1222.36(c)). Therefore, once drafts cease to be useful, they should be discarded

11

unless (1) they have been circulated outside the agency for public or other agency comment, or, (2) they contain annotations that are significant and relevant to the agency's decision-making process.

Drafts are sometimes useful to staff for tracking the development of a record (for example, a fishery management plan) over time, and as a future reference for material that may not appear in the final record such as handwritten formatting, editing or instructional comments. Drafts used for these purposes, however, are not "federal records" and should therefore not be placed in a records management system; they should be discarded as soon as their usefulness is past.

## IV. FREEDOM OF INFORMATION ACT

The Freedom of Information Act (FOIA) mandates public access to government records under certain circumstances. It requires that "each agency, upon any request for records which (A) reasonably describes such records and (B) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person" (5 U.S.C. § 552(a)(3)(A)). There are nine exemptions that allow the agency to withhold a record from release to the public (5 U.S.C. 552(b)). The nine exemptions are:

(1) national defense or foreign policy records that have been properly classified;

(2) internal agency personnel rules and practices;

(3) matters exempted from disclosure by a federal statute;

(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(5) inter- or intra- agency memorandums or letters that would not be available by law to a party other than a party in litigation with the agency;

(6) personnel, medical, and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(7) certain records compiled for law enforcement purposes;

(8) records pertaining to regulation or supervision of financial institutions; and

(9) geological and geophysical information concerning wells.

FOIA defines "record" as any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format. 5 U.S.C. 552(f)(2). The Supreme Court has fashioned a two-part test for determining what constitutes agency records under FOIA. "Agency records" are records that are (1) either created or obtained by an agency, and (2) under agency control at the time of the FOIA

12

request. "Agency records" are distinguished from "personal records" which are not subject to FOIA. "Personal records" are generally records maintained by agency personnel for their own use and not made a part of the agency filing system.

There is a formal system for receiving and responding to FOIA requests. Decisions as to whether to release records under FOIA are not made by the individual employees who generated or are in possession of the records. Rather, any decision to withhold NOAA Fisheries records is made through the formal process, and culminates in a decision by the Assistant Administrator for Fisheries, which may be appealed to the Department of Commerce General Counsel. Further, it is critical to consult with NOAA GC before releasing documents pursuant to a FOIA request that pertain to a final or an anticipated decision that has been or could be challenged.

Records managers should be aware that once a FOIA request is received, agency records that are responsive to the request may not be discarded, even if they are records that would normally not be part of an AR and otherwise <u>discarded</u> in the ordinary course of business.

For further information on FOIA, consult the U.S. Department of Justice's Office of Information and Privacy <u>Freedom of Information Act Guide & Privacy Act Overview</u>, May 2004.

For further information on processing FOIA requests to NOAA Fisheries, please refer to the NOAA FOIA Web site at <u>http://www.ofa.noaa.gov/~foia/</u>. The Web site contains detailed information on FOIA fees, appeals, policies, and training, among other things.

**APPENDIX A. Magnuson-Stevens Act Administrative Records**

An AR for a Magnuson-Stevens Act action (decision), although it may comprise many volumes, is relatively easy to conceptualize, because agency actions under the Magnuson-Stevens Act generally follow a well-established public process through the Fishery Management Councils (Council). NOAA Fisheries has also formalized a consistent set of internal procedures for agency decision-making. In addition, the substantive standards and legal tests for fishery management actions are relatively clear, and are spelled out in the Magnuson-Stevens Act and implementing regulations in the form of required and discretionary contents of FMPs, National Standards, and other specific legal requirements that should be addressed in the agency's decision documents. Fishery management actions must also comply with "other applicable law." The AR must therefore demonstrate compliance with other applicable law including, but not limited to, NEPA, the RFA (if the action is accompanied by proposed and final rulemaking), the Paperwork Reduction Act (if the action contains an information request), the ESA, Indian tribal treaty fishing rights, and the Coastal Zone Management Act.

Although the fishery management process is complex, most steps require Federal Register notices, preparation and distribution of formal Council and/or NOAA Fisheries documents, and a formalized process for obtaining and responding to public comments. NOAA Fisheries and the Council should have appropriate filing and indexing systems, with electronic indexing technology to facilitate identifying and assembling the hard copy AR and index. Even with electronic filing and indexing systems, however, staff knowledgeable about the challenged decision must be involved in compiling the AR to ensure it is accurate and complete.

A typical AR index for Magnuson-Stevens Act action falls into the following categories. Documents within each category should be arranged in chronological order.

1. Administrative Record Index and Certification

2. Fishery Management Plan and Amendments – this section of index includes the original FMP and its numerous amendments, plus related EISs and EAs if they are relevant to the case.

3. Federal Register Notices and Regulations – this section contains all FR notices that are relevant to the action, except for meeting notices which appear in a later section; it also contains regulations applicable to the fishery, and the notices of proposed and final rulemaking for the challenged action, if there are implementing regulations.

4. Agency Decision Documents – this section includes decision documents, including the final agency Decision Memorandum.

5. Agency Outgoing Correspondence – this section includes communications from the agency to a variety of outside parties including the Council and its subgroups, fishery industry representatives, members of the public, "Distribution" and

"Interested Parties," and to the states for purposes of Coastal Zone Management Act review).

6.    Meeting Announcements – this section contains all Federal Register notices of meetings of the Council and its subgroups, as well as the Council's own meeting notices.

7.    Council Development Documents – this section of the index should include agendas, minutes, and other records related to the work of the Council.  This section of the AR should be arranged in chronological order, by Council meeting date.  For each meeting, the AR should include the proposed agenda and the minutes, and all records from the Council briefing book (and supplemental records that are distributed at the Council meeting) that relate to the particular issue being litigated.  In the record description in the index, the AR should include the Council document number (e.g., "Ad Hoc Committee Report C4a") in order to make sure the paper trail is complete when the documents are compared against the numbered items in the Council's meeting agenda (e.g., Council Meeting of June 18-19, 1996, Agenda Item C. Salmon Management, 4. Plan amendments, a. Report of Ad Hoc Committee).

8.    Council Newsletters - this section of the AR should contain, in chronological order, the newsletters that the Council distributes soon after each Council meeting.

9.    Cassette Tapes of Council Meetings -- these are noted in the index as "Available Upon Request," and they occasionally have to be produced for the AR.

10.   Council Comments – this section of index contains communications by the Council's Chairman and Executive Director to NOAA Fisheries and others concerning the issue that is being litigated.

11.   Comments from Other Government Agencies – this section contains comments received from other federal agencies (such as State, Interior, and EPA), and state and local governments.

12.   Public Comments – this section of the AR index should contain all written public comments received during the development of the action, and notes of meetings held between NOAA Fisheries and members of the public regarding the action.

13.   References (this section contains citations to relevant reference materials such as maps, technical guidance documents, technical reports, scholarly works, issue papers, and other relevant materials that don't fall into one of the other categories) should be identified in the AR index, but the agency may determine whether to include none, part or all of any reference document.  A note of caution about references: the agency's case cannot be built by simply including reference

materials that might support the agency's position after the fact. Before reference documents are useful, they have to be at least mentioned (but preferably discussed, analyzed, and conclusions drawn from them) in the agency's decision documents.

As to any NOAA Fisheries' internal documents, those documents generated by agency personnel as comments on the action as it is being developed and finalized may be appropriate for including in the docket to satisfy federal record-keeping requirements, but should not be included in an AR. Information in those documents should be included in decision documents presented to the decision-maker.

When a Magnuson-Stevens Act lawsuit is served on a federal agency, the agency generally has 45 days within which to file both its answer to the petition and its AR with court. This is an extremely short deadline. Using NOAA Fisheries' and the Council's existing filing systems (which are largely consistent with the document categories for ARs that are listed above), and using NOAA Fisheries' electronic file index, the agency should be able to meet deadlines.

Exhibit 3

IN THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| _____ )<br>COASTAL CONSERVATION )<br>ASSOCIATION, et al., )<br> )<br>    Plaintiffs, )<br> )<br>    v. )<br> )<br>CARLOS GUTIERREZ, in his official )<br>capacity as Secretary of the United States )<br>Department of Commerce, et al., )<br> )<br>    Defendants. )<br>_____) | No. H-05-CV-1214 |

and consolidated case

| | |
|---|---|
| _____ )<br>GULF RESTORATION NETWORK and )<br>THE OCEAN CONSERVANCY, )<br> )<br>    Plaintiffs, )<br> )<br>    v. )<br> )<br>CARLOS GUTIERREZ, in his official )<br>capacity as Secretary of the United States )<br>Department of Commerce, and the )<br>NATIONAL MARINE FISHERIES )<br>SERVICE, )<br>    Defendants )<br>_____) | No. H-05-CV-2988 |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
TO COMPEL COMPLETION OF THE ADMINISTRATIVE RECORD**

DATED: December 16, 2005

Exhibit 3

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................3

I.      MSA Procedures for Halting Overfishing and Accomplishing Rebuilding ......................3

II.     Defendants' Approach to Addressing Overfishing and Rebuilding Red...........................3
        Snapper

ARGUMENT .........................................................................................................................5

I.      NMFS Must File the Complete Administrative Record,
        Not Simply the Official Rulemaking Documents and
        Records Reviewed By the Decision Maker ...................................................................5

II.     Completion of the Record Is Essential to this Court's Review of
        Plaintiffs' Claims In this Case ......................................................................................8

III.    Defendants' Own Record Submission Demonstrates Its Deficiencies ...........................11

IV.     Previous Agency Practice Further Reveals the Record's Deficiencies ..........................16

CONCLUSION.....................................................................................................................17

Exhibit 3

INTRODUCTION

This motion seeks to compel completion of an administrative record that is so incomplete
it will hamper effective judicial review of defendants' unlawful failure to protect and rebuild the
depleted red snapper population in the Gulf of Mexico.  The incomplete administrative record is
the product of a recent National Marine Fisheries Service ("NMFS") internal policy on record
compilation that flies in the face of established case law on review of agency decisions under the
Administrative Procedure Act ("APA").  Regardless of any internal policy, defendants must
produce the "whole record" for this Court's review, not the heavily edited version they have
produced thus far.

This case challenges a June 2, 2005 final rule implementing Amendment 22 to the
Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico ("Amendment
22").  In this rule, defendants (the Secretary of Commerce and NMFS) have chosen to continue a
long history of failure to comply with their duty under the Magnuson-Stevens Fishery
Conservation and Management Act ("MSA") to halt the overfishing of red snapper in the Gulf of
Mexico and to rebuild the overfished population of red snapper to a healthy, sustainable level.

The Amendment 22 final rule is both late and inadequate.  It is late – fully six years late –
because the MSA required defendants to halt the overfishing of red snapper and to establish a
plan to rebuild the depleted red snapper population not later than June 1999.  It is inadequate
because it fails to prevent overfishing and fails to establish the required rebuilding plan for red
snapper.  Defendants have further compounded their failure to protect red snapper by failing to
adequately analyze significant alternatives to halt overfishing and rebuild red snapper, in
violation of the National Environmental Policy Act ("NEPA").

Exhibit 3

The process by which defendants prepare fishery management plans (and plan amendments) designed to address the red snapper problem involves numerous and often complicated interactions between NMFS and the Gulf of Mexico Fishery Management Council ("Gulf Council" or "Council").  Among other activities, the process includes periodic stock assessments that estimate the population of red snapper and frequent meetings between the Council and NMFS.  In addition, the process typically includes numerous formal and informal communications within and between the Council, the Southeast Regional Office of NMFS, and NMFS headquarters.  The volume of materials generated during this process and relied upon to various degrees by defendants is significant.  These materials include reports, minutes, meeting notes, emails, records of telephone conversations, and related items.

In this case, defendants have filed an administrative record that in no way documents this extensive decision-making process.  It is devoid of any communications among and between NMFS staff and the staff of the Council, or any other parties, relating to the development of the NMFS plan to end overfishing and rebuild the red snapper population.  Indeed, it is limited almost entirely to official decision documents.  Effective judicial review in this case will be hampered unless this Court orders defendants to complete the administrative record by adding all materials generated through the development of Amendment 22, which purports to establish the red snapper rebuilding plan and accompanying regulations that are the subject of this litigation. Accordingly, the plaintiffs in these consolidated cases respectfully request this Court to compel defendants to file the complete administrative record without delay.

Exhibit 3

<u>BACKGROUND</u>

I. <u>MSA Procedures for Halting Overfishing and Accomplishing Rebuilding</u>

The MSA establishes a system for conserving and managing fish stocks in the exclusive economic zone of the United States, which extends from the boundaries of state waters to 200 miles offshore. The MSA creates eight regional fishery management councils and charges them with preparing fishery management plans ("FMPs"), which must provide for management and conservation of particular species or groups of species. The Gulf Council manages fisheries in the Gulf of Mexico. Where fish stocks are identified as overfished or as "approaching an overfished condition," section 304 of the MSA establishes firm deadlines for preparing FMPs that will halt or prevent overfishing and rebuild the affected fish stocks. 16 U.S.C. § 1854(e).

The MSA requires NMFS to publish an annual Report to Congress that identifies fisheries that are overfished or approaching an overfished condition. 16 U.S.C. § 1854(e)(1). After a fishery has been identified as overfished by NMFS or the Secretary of Commerce, the MSA requires the appropriate fishery management council to develop a rebuilding plan for that fishery within one year. 16 U.S.C. § 1854(e)(3). If the appropriate fishery management council does not submit a rebuilding plan within this timeframe, the MSA requires the Secretary of Commerce to prepare a rebuilding plan within nine months. 16 U.S.C. § 1854(e)(5). Thus, the MSA anticipates that a rebuilding plan will be in place within at most 21 months after a fishery has been declared overfished.

II. <u>Defendants' Approach to Addressing Overfishing and Rebuilding Red Snapper</u>

The Gulf Council and NMFS have managed red snapper under a Reef Fish Fishery Management Plan since 1984. The defendants first declared red snapper to be "significantly overfished" in 1989 and formally declared red snapper to be overfished under the MSA in a

Exhibit 3

Report to Congress in 1997.  Every year since 1997, the defendants have confirmed that the red

snapper population is in a continuously overfished condition and that red snapper are also being

subjected to continuous overfishing. In its most recent stock assessment for red snapper in 2005,

NMFS reaffirmed that the red snapper population was overfished and undergoing overfishing.

See AR Vol. 2 at 588-89 (2005 SEDAR & Red Snapper Review Consensus Report).[1]

     Halting overfishing of red snapper and rebuilding the red snapper population to a

sustainable level in the Gulf of Mexico requires one fundamental thing: killing fewer fish.  There

are two major sources of red snapper mortality in the Gulf: (1) bycatch of juvenile red snapper in

the shrimp fishery; and (2) direct catch of red snapper (including discards) in the commercial and

recreational fishery.   Thus, the MSA requires NMFS to implement measures that (1) reduce

shrimp fishery bycatch or (2) reduce commercial and recreational directed catch, or both, in a

sufficient amount to halt overfishing and rebuild the population.   Defendants have done neither.

     As explained above, after red snapper was identified as overfished in the 1997 Annual

Report to Congress, the MSA required promulgation of a rebuilding plan within 21 months of the

snapper's identification as overfished.  See 16 U.S.C. § 1854(e)(3); 16 U.S.C. § 1854(e)(5).

Therefore, the deadline for the Council to prepare a legally adequate plan for rebuilding the red

snapper population was September 1998, and the ultimate deadline for promulgation of a legally

sufficient rebuilding plan for red snapper was June 1999.  Neither the Council nor NMFS met

these deadlines.

     It was not until May 2001 that the Council submitted a proposed red snapper rebuilding

plan to NMFS.  After NMFS disapproved that plan as inadequate, NMFS and the Council drafted

Amendment 22 to the FMP in 2003-2004. See generally AR Vol. 6 at 2680-2940; Vol. 7; Vol. 8

---

[1]    Administrative record documents are cited as follows: "AR Vol. __, Doc. __ [where

Exhibit 3

at 3831-4177, 4200-4236.  After several meetings and negotiations between the Council and

NMFS, the Council approved Amendment 22 in May 2004, sending the Amendment and

accompanying regulations to NMFS for final review.  AR Vol. 8, Doc. (h) at 4176.

After several months of negotiations between the Council and NMFS, and following

deliberations within NMFS, NMFS approved Amendment 22 on October 27, 2004, and advised

the Gulf Council of that approval by letter. AR Vol. 9, Doc. (gg) at 4614.  NMFS then published

notice of a proposed rule to implement Amendment 22 on November 23, 2004. 69 Fed. Reg.

68119 (Nov. 23, 2004).  AR Vol. 9, Doc. (mm) at 4643.  Under the timeline provided in the

MSA, that rule was required to be issued not later than February 7, 2005.  See 16 U.S.C. §

1854(c)(7) (Secretary shall promulgate final regulations within 30 days after the end of the

comment period).  Instead, NMFS delayed the final rule for several months.  Following internal

deliberations, it eventually published the final rule implementing Amendment 22 on June 2,

2005.  70 Fed. Reg. 32266 (June 2, 2005). AR Vol. 9, Doc. (uu) at 4660.

ARGUMENT

I.       NMFS Must File the Complete Administrative Record, Not Simply the Official
         Rulemaking Documents and Records Reviewed By the Decision Maker.

NMFS has submitted a one-sided record that does not reveal its decision-making process.

Consisting of six three-ring binders, this record omits all staff communications, as well as

internal NMFS reviews and analyses leading to the final rule that purports to address the red

snapper problem.  While the defendants have dubbed this meager collection of official

documents the "administrative record," these documents far fall short of a legally adequate

administrative record.

---

specified], at [page] __."

Exhibit 3

This case is based upon the Administrative Procedure Act ("APA"), under which a court may hold unlawful and set aside final agency action, findings, and conclusions that are arbitrary, capricious, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).  Judicial review of APA claims is conducted on the basis of the record that was before the agency at the time the decision was made.  See, e.g., FPC v. Transcontinental Gas Pipe Line Corp., 423 U.S. 326, 331 (1976).  The administrative record must be "the whole record" that was actually before the agency, as opposed to a carefully culled record compiled by agency lawyers to defend the final result in subsequent litigation.  See 5 U.S.C. § 706; Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 420 (1971).

The Fifth Circuit has noted that courts should "'immerse' themselves in the evidence in the administrative record in order to determine whether the 'agency decision was rational and based on consideration of the relevant factors.'"  Avoyelles Sportsmen's League v. Marsh, 715 F.2d 897, 904-905 (5th Cir. 1987) (quoting Ethyl Corp. v. EPA, 541 F. 2d 1 at 36 (D.C. Cir. 1976)).  The Ninth Circuit has emphasized:

> The "whole record" includes everything that was before the agency pertaining to the merits of its decision.  An incomplete record must be viewed as a "fictional account of the actual decision-making process." . . . If the record is not complete, then the requirement that the agency decision be supported by "the record" becomes almost meaningless.

Portland Audubon Soc'y v. Endangered Species Comm., 984 F.2d 1534, 1548 (9th Cir. 1993) (citations omitted); see Louisiana Envtl. Soc'y v. Dole, 707 F.2d 116, 122 (5th Cir. 1983) ("Judicial review is based on the entire administrative record.").  "The 'whole' administrative record, therefore, consists of all documents and materials directly or indirectly considered by agency decision makers and includes evidence contrary to the agency's position."  Thompson v. Dep't of Labor, 885 F.2d 551, 555 (9th Cir. 1989) (citations omitted) (emphasis in original);

Exhibit 3

Exxon Corp. v. DOE, 91 F.R.D. 26, 34 (N.D. Tex. 1981); James Madison Ltd. v. Ludwig, 82

F.3d 1085, 1095 (D.C. Cir. 1996).

At its core, the arbitrary and capricious standard "focuses on the rationality of the

decisionmaking process rather than the rationality of the actual decision." Olenhouse v.

Commodity Credit Corp., 42 F.3d 1560, 1575 (10th Cir. 1994); Grand Canyon Air Tour Coalition

v. FAA, 154 F.3d 455, 468 (D.C. Cir. 1998); U.S. v. Garner, 767 F.2d 104, 116-17 (5th Cir.

1985). Accordingly, the record must necessarily include drafts, internal communications, notes,

and pertinent studies before the agencies. See, e.g., Ohio Valley Envtl. Coalition v. Whitman,

2003 WL 43377 at *5 (S.D. W.Va. 2003) ("the administrative process is precisely one of initial

proposals, comments, compromise, revisions and final drafts . . . the materials produced in this

process are typically part of the administrative record"); Miami Nation of Indians, 979 F. Supp.

771, 776 (N.D. Ind. 1996) (ordering inclusion of drafts, notes, comments, and internal

communications in record); see also Southwest Center for Biological Diversity v. Bureau of

Reclamation, 143 F.3d 515, 522-23 (9th Cir. 1998) (court reviewed drafts included in

administrative record in ruling on summary judgment); Greenpeace v. NMFS, 55 F. Supp.2d

1248, 1265 (W.D. Wash. 1999) (court considered draft in evaluating ESA compliance).

Furthermore, defendants cannot properly limit the administrative record to documents

that the officially designated decisionmaker personally read and relied on. Courts have

consistently rejected arguments that documents generated during the decisionmaking process can

be excluded from the record because the agency did not ultimately "rely" on such information.

See Fund for Animals v. Williams, 245 F. Supp.2d 49, 55 (D.D.C. 2003); Miami Nation of

Indians, 979 F. Supp. at 777 ("a document need not literally pass before the eyes of the final

agency decision maker to be considered part of the administrative record") (quoting Clairton

Exhibit 3

Sportsmen's Club v. Penn. Turnpike Comm'n, 882 F. Supp. 455, 464 (W.D. Pa. 1995)); Envtl.

Defense Fund v. Blum, 458 F. Supp. 650, 661 (D.D.C. 1978) (improper "to exclude from

consideration pertinent material submitted as an integral part of the rulemaking process or

otherwise located in EPA's own files" even if agency did not rely on it).

       In sum, because judicial review requires courts to closely examine the record, the

agency's attorneys cannot categorically exclude from the record whole classes of documents that

memorialize and make transparent the decision-making process, and in essence pick and choose

what the Court will see.  "Rather . . . the Court must look to all the evidence that was before the

decision-making body" at the time it made its decision.  Exxon Corp. v. Dep't of Energy, 91

F.R.D. 26, 32-33 (N.D. Tex. 1981); Chemical Mfrs. Assoc. v. U.S. EPA, 870 F.2d 177, 197 (5th

Cir. 1989).  Illustrative is Sierra Club v. Babbitt, 15 F. Supp. 2d 1274, where the court "searched

the Administrative Record thoroughly" in determining whether the agency had complied with its

own internal guidelines. Id. at 1281-82.

II.    Completion of the Record Is Essential to this Court's Review of Plaintiffs' Claims In
       this Case

       Plaintiffs are asking this Court to determine whether the defendants' actions in approving

Amendment 22 and its implementing regulations to end overfishing and rebuild the red snapper

stock are arbitrary and capricious, an abuse of discretion, or contrary to law, in violation of the

MSA, NEPA, and APA.  For this Court to evaluate whether NMFS' action in this case was the

product of rational decision-making and based on substantial evidence, it is essential that the

administrative record consist of the "whole record" created during the decision-making process.

Citizens to Preserve Overton Park, 401 U.S. at 420.  How the agency dealt with evidence that

runs contrary to its decision is especially critical in APA arbitrary and capricious review.

Accordingly, NMFS cannot exclude from the record documents generated or received during the

Exhibit 3

rulemaking or related processes that undercut the findings and decisions made.  See Thompson, 885 F.2d at 555.

The development of Amendment 22, and indeed any fishery management plan, is a lengthy process involving the coordination of numerous interests and players, the interpretation of large amounts of scientific data, and ultimately, a number of decisions about what management measures are necessary to comply with the MSA.  Records of agency communications, notes, and emails play a fundamental role in understanding what happened during the years it took to develop, propose, and finalize Amendment 22 and its implementing regulations.  Indeed, to the extent that records exist of staff discussions, analyses of crucial factual and technical issues, and evaluations of the likelihood that recommended management measures would succeed, they go to the heart of the inquiry whether the decision can be deemed arbitrary, capricious, or contrary to law.  Yet these documents are missing from the record produced by defendants in this case.

As one example of the type of exchange clearly missing from this record, there was a robust debate among scientists, NMFS staff, and Council members and staff during the red snapper stock assessment process that occurred during, and influenced the rulemaking process for, Amendment 22.  Indeed, defendants include in the record parts of the official stock assessment documents,[2] yet omit any communications explaining the import of this new information on the development of the Amendment 22 regulations.  See AR Vol. 2 at 572 (The

---

[2]      The "Index to Administrative Record" filed by the defendants includes some of the 2004-05 red snapper stock assessment documents, but the final Stock Assessment Report for red snapper included in the administrative record, at AR Vol. 2, Doc. (f), at 572, does not include for the Court any of the report's appendices.  See list at Id. at 576.  Moreover, while the defendants' "Index to Administrative Record" notes that "documents referenced in these reports are incorporated by reference," it does not include these documents in the administrative record. The Court should require inclusion of all these documents as part of a complete administrative

Exhibit 3

Red Snapper Stock Assessment Report). Furthermore, although the 2005 Red Snapper Stock Assessment directly addresses the rebuilding plan (Amendment 22), noting that the current stock assessment "indicates that the goals of this policy [Amendment 22] may not be met," AR Vol. 2 at 589, the administrative record lacks any internal agency discussion and debate over the efficacy of Amendment 22 in light of this assessment.[3]

Another example of the types of exchanges missing from the record are those related to decisions on how much to reduce bycatch and how much to reduce directed catch, decisions that are central to designing a lawful rebuilding plan. The record produced by the defendants simply lacks any of the internal discussions, analyses, and evaluations of factual and technical issues that would be contained in email exchanges and agency meeting notes on these decisions. These records are crucial to understanding the decision-making process and determining whether the final rebuilding plan reflects an arbitrary choice that violates both the MSA and the APA. See Washington Toxics Coalition v. United States Dept. of the Interior, No. C04-1998C (W.D. Wash. June 14, 2005) (Exhibit 1); Nat'l Wildlife Fed'n v. NMFS, No. CV 01-640-RE and No. CV 05-23-RE (D. Or. March 3, 2005) (Exhibit 2); accord, Sierra Club v. Babbitt, 15 F. Supp. 2d 1274, 1281 (S.D. Ala. 1998) (court's examination of administrative record revealed that agency had ignored concerns of experts and had therefore violated the APA).

---

record in this case.

[3] The record items relating to the stock assessment process (termed by NMFS "SEDAR 7") are particularly relevant to the question whether NMFS acted arbitrarily and capriciously in approving Amendment 22 and its implementing regulations. For example, NMFS concluded that bycatch reduction devices installed in the shrimp fishery were only 12% effective, rather than the 40% to 50% effectiveness rate previously assumed and relied upon by Amendment 22. See AR Vol. 2, Doc. (e) at 564, 569 (referencing document: SEDAR7-DW-38 1999-2003 North-Central and Western Gulf BRD Performance Report to SEDAR. Daniel G. Foster, NOAA Fisheries). However, documents such as this one, and any discussion, analysis or evaluation of such data that was available to the NMFS during the decision-making process, are not included in the record.

Exhibit 3

Finally, defendants have withheld from the record any agency documents pertaining to their compliance with NEPA. The record is devoid of the internal discussions that reveal the possible impacts of the proposed rule, assessments of alternatives, the impact of scientific uncertainties in EPA's red snapper stock assessments on the selection of alternatives, and the controversial nature of the alternatives related to how much to reduce bycatch in the shrimp fishery as opposed to lowering the TAC in the directed fishery. NMFS cannot properly exclude such discussions from the record; doing so masks the rule's impacts and prevents the full disclosure that NEPA requires.

In sum, this Court can decide the claims presented here only upon review of the full body of information before the defendants: "Even though an agency decision may have been supported by substantial evidence, where other evidence in the record detracts from that relied upon by the agency we may properly find that the agency rule was arbitrary and capricious." Am. Tunaboat Ass'n v. Baldrige, 738 F.2d 1013, 1016 (9th Cir. 1984). Indeed, "[r]eview of less than the full administrative record might allow a party to withhold evidence unfavorable to its case..." Walter O. Boswell Mem'l Hosp. v. Heckler, 749 F.2d 788, 792 (D.C. Cir. 1984). See also Mar. Mgmt. Inc. v. United States, 242 F.3d 1326, 1335 & n.14 (11th Cir. 2001) (finding bad faith in government's failure to include contrary evidence in the administrative record). However characterized, the defendants have failed to file the complete administrative record in this case, and should be ordered to do so.

III.    Defendants' Own Record Submission Demonstrates Its Deficiencies

NMFS presents as the preamble to the "administrative record" filed with this Court an internal guidance memo from March of 2005 that sets forth in detail the types of documents it has included and excluded from the record in this case. NMFS' guidance directly contradicts

Exhibit 3

both established case law and Department of Justice guidance based on that case law.  This Court

must adhere to the basic principles of APA review and compel production of the "whole record"

regardless of NMFS' newly minted attempt to avoid transparency in its decisionmaking.

Among other things, this new NMFS guidance provides that: "[electronic] documents are

largely of an informal and individual nature – one employee making a comment to other

employees about some aspect of the pending decision. Such communications are rarely, if ever,

transmitted to the decision-maker and should be excluded from an AR."  Exhibit 3 "NOAA

Fisheries Guidelines for Agency Administrative Records" at 4.[4]  Regarding emails in particular,

the guidance states: "Generally, the decision-maker himself or herself rarely sees any of the E-

Mails.  Therefore, E-Mails should not be included in an AR [administrative record]."  See Ex. 3

at 7.

This guidance is directly in conflict with established case law about APA review.  As

noted above, drafts, notes, comments and internal communications such as emails are properly

part of an administrative record.  Miami Nation, 979 F. Supp. at 776.  The Court reviews the

"rationality of an agency's decision making process rather than the rationality of the actual

decision."  Id. (quoting Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1575 (10th Cir.

1994).  Documents such as emails need not "pass before the eyes of the final agency decision

maker to be considered part of the administrative record."  Clairton Sportsmen's Club, 882

---

[4]      As noted above, this "guidance" document was included by defendants in the
administrative record at Volume 1, immediately prior to the Index.  However, the document is
not included in the Index, does not have any Bates stamp, and therefore plaintiffs are unclear
how to cite to this document or whether defendants intend for it to be considered an
administrative record document.  We include it here as an exhibit for the Court's convenience.

F.Supp. at 465. As such, NMFS' reliance on its guidance in developing the administrative record in this case was inappropriate.[5]

The agency's guidance document also categorically excludes all documents it deems not both "relevant" and "significant." Ex. 3 at 4-5. NMFS defines "significant" documents, and thus those that can be included in an administrative record as documents that "contain information and deliberations relied on by the decision-maker." Id. at 4. However, courts have found that relevant information that was not relied upon by decision-makers in reaching a final decision are, in fact, properly part of an administrative record as they are "an integral part of the rulemaking process." Envtl. Defense Fund v. Blum, 458 F. Supp. 650, 661 (D.D.C. 1978) (noting that the agency may not "skew the 'record' for review in its favor by excluding" documents which are pertinent to the proceeding). Because the court must review the rationality of NMFS' decision-making process, rather than the rationality of the final decision, it is crucial that the record include items that NMFS' guidance has excluded as not "significant."

The new NMFS guidance also takes the view that "[e]ven if a document is both relevant and significant, it may still not be appropriate for inclusion in the AR." Ex. 3 at 4. This attempt to arrogate authority to strip the record of relevant and significant documents is a breathtaking departure from settled law. While certain relevant documents can be omitted from the record if they are deemed privileged (although they should be listed in a privilege log), those that were relevant and significant to NMFS' decision-making process must be included in the record before the Court. See e.g. Blum, 458 F. Supp. at 661.

---

[5]     NMFS guidance does note that emails "could possibly be used in court as evidence." See Ex. 1 at 8. That admission is certainly consistent with established case law. However, the guidance document then states that "E-Mail problems can be avoided by using a different method of communication such as a telephone or face-to-face meetings." Id.

Exhibit 3

As shown above, NMFS' guidance and the record in this case fly in the face of

established case law on the adequacy of administrative records required for APA review.

Furthermore, since at least 1999, the United States Department of Justice ("DOJ") guidance to

federal agencies on the topic of "Compiling The Administrative Record" has stated that agencies

should include the following in the administrative record:

> (a) "all documents and materials prepared, reviewed, or received by agency personnel and used by or available to the decision-maker, even though the final decision-maker did not actually review or know about the documents and materials."
> (b) "factual information or data."
> (c) "communications the agency received from other agencies and from the public, and any responses to those communications."
> (d) "documents and materials that contain information that support or oppose the challenged agency decision." (emphasis in original)
> (e) "technical information, sampling results, survey information, engineering reports or studies."
> (f) "memorializations of telephone conversations and meetings, such as a memorandum or handwritten notes, unless they are personal notes."

See Exhibit 4, DOJ FOIA Response (Nov. 10, 2005), "Guidance to Federal Agencies on

Compiling The Administrative Record," dated January 1999, at ¶ 3(b).[6]  With respect to the

electronic communications and emails that the recent NMFS guidance explicitly excludes, the

DOJ guidance provides: "Documents that are to be included in the administrative record should

not be limited to paper but should include other means of communication or ways of storing or

presenting information, including e-mail, computer tapes and discs, microfilm and microfiche."

See Ex. 4, at ¶ 3(a) (emphasis added).

NMFS' position, as articulated in its March 2005 guidance and embodied in the meager

administrative record the agency has thus far produced for this case, would ignore longstanding

DOJ policy on administrative record development and eradicate decades of administrative law.

---

[6]     Based on this FOIA response provided last month to Oceana, Inc. (not a party to this case), plaintiffs believe that the Department of Justice continues to follow this 1999 policy.

Exhibit 3

Although an agency can attempt to withhold documents on the basis that they are subject to a

legal privilege, to do so it must submit a privilege log identifying specific documents that have

been withheld and laying out specific grounds for the assertion of privilege with respect to each

and every document. Even then, the plaintiffs are entitled to challenge those privilege

determinations, and a court may find that those documents must be produced for the purposes of

pending litigation. See Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 861-62 (D.C.

Cir. 1980) (agency bears burden of proving privilege which can be overridden by litigation

needs); accord Miami Nation of Indians, 979 F. Supp. at 778-79 (although drafts and internal

deliberations are generally part of the administrative record, agency may prove deliberative

process privilege applies to discrete documents upon a particularized showing that interests in

confidentiality outweigh need for document for judicial review). Defendants' attempt to

withhold these documents at the outset by excluding whole classes of documents from the

administrative record, without even reaching the issue of a privilege log, simply cannot stand.[7]

In sum, the NMFS guidance has led to the compilation of an incomplete record because it

fails to present the Court with the "whole" administrative record. The "whole" administrative

record should include "all documents and materials directly or indirectly considered by agency

decision-makers and includes evidence contrary to the agency's position." Exxon Corp. v. DOE,

91 F.R.D. 26, 33 (N.D. Tex. 1981). As in Exxon, the "incompleteness is evident from the

record's face." Id. at 34.[8] The agency guidance document makes clear its intent to categorically

exclude certain records such as emails and "non-significant" documents (as defined by the

---

[7]     Defendants have thus far listed only six documents as privileged. The plaintiffs reserve
their right to challenge this listing, as well as any additional list produced by defendants when
defendants complete the record.
[8]     Plaintiffs do not seek "supplementation" of the record, but rather seek to have NMFS
complete the current inadequate record. See e.g. Miami Nation, 979 F. Supp. at 777.

Exhibit 3

agency), even though such records are relevant and not privileged. This guidance cannot stand. NMFS must now be required to complete the record in this litigation so that the Court has before it "the full administrative record" that was part of the decision-making process. <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 420 (1971).

IV.    <u>Previous Agency Practice Further Reveals the Record's Deficiencies</u>

In other challenges to NMFS' fishery management decisions, courts have relied on precisely the kind of internal debate that has been omitted from this record to find defendants' actions unlawful. For example, the court in <u>Oceana v. Evans</u>, 2005 WL 555416 (D.D.C. 2005) (Exhibit 5) quoted from internal staff email to support its conclusion that NMFS had failed to comply with the MSA requirement to establish record keeping for bycatch and to minimize bycatch. Id. at *41. The court in <u>Oceana v. Evans</u> was able to review the agency action carefully because, consistent with the case law and the DOJ guidance, the record in that case included notes, comments, and emails generated during development of a final rule.

As in this case, <u>Oceana v. Evans</u> involved a challenge to the legality of an amendment to a fishery management plan that took years to complete. <u>Id</u>. at *1. As here, in that case the defendants worked with a regional fishery management council over the course of several years to formulate and revise the plan. <u>See generally</u> Administrative Record Index (delineating Council and NMFS efforts to formulate a red snapper rebuilding plan since 1997 and Amendment 22 in particular since early 2003). Like here also, the process involved several meetings of the regional council as well as public hearings and discussions within NMFS and between NMFS and the relevant fishery management council. Yet, unlike here (where defendants have produced six binders of record materials), the defendants filed an administrative record in the <u>Oceana</u> case that totaled over eighty volumes, which included  emails and other

Exhibit 3

staff communications both within NMFS and between NMFS and the regional council.  <u>Oceana</u>,

2005 WL 555416 at *8. These types of communications are exactly the types of documents

normally included in an administrative record, and which are critical to a full understanding by

the Court of the legal claims presented.  They should be included in the record here.

CONCLUSION

Because the defendants have failed to file a complete record, the plaintiffs respectfully

request that this Court compel defendants to produce a complete administrative record within 30

days.  The plaintiffs also request leave for the parties to present a new summary judgment

briefing schedule for the Court's approval subsequent to production of the whole record, because

it will not be possible for the plaintiffs to review the substantial number of documents omitted

from the record and prepare such a motion prior to the current February 16, 2006 due date.

<u>Dated</u>: December 16, 2005

Respectfully submitted,

/s/ with permission by Stephen E. Roady
_____
Mary W. Carter
TBA No. 03926300
Southern District of Texas Bar No. 7811
Blackburn & Carter
4709 Austin
Houston, TX     77004
713-524-1012
Fax 713- 524-5165
Local Counsel for Gulf Restoration Network and
The Ocean Conservancy

Exhibit 3

s/ Stephen E. Roady

_____

Stephen E. Roady
D.C. Bar. No. 926477
Jennifer C. Chavez
D.C. Bar No. 493421
Earthjustice
1625 Massachusetts Avenue, N.W.
Washington, D.C. 20036
202-667-4500 Telephone; 202-667-2356 Fax
Co-Counsel for the Gulf Restoration Network

s/ with permission by Stephen E. Roady

_____

Robert B. Wiygul
Waltzer & Associates
178 Main Street, Suite 103
Biloxi, Mississippi 39530
228-374-0700 Telephone
Co-Counsel for the Gulf Restoration Network

s/ with permission by Stephen E. Roady

_____

Marianne C. Cufone
Gulf Restoration Network
338 Baronne Street
Suite #200
New Orleans, LA 70112
504-525-1528 Telephone; 504525-0833 Fax
Of Counsel for the Gulf Restoration Network

s/ with permission by Stephen E. Roady

_____

Coby Dolan
D.C. Bar. No. 483237
Sierra Weaver
D.C. Bar No. 488560
The Ocean Conservancy
2029 K Street, NW
Washington, D.C. 20006
202-429-5609 Telephone; 202-872-0619 Fax
Counsel for The Ocean Conservancy

Exhibit 3

s/ with permission by Stephen E. Roady

_____

Robert G. Hayes
Ball Janik
1455 F. Street NW
Washington, D.C.  20005
202-638-3307
Co-Counsel for Coastal Conservation Association

Exhibit 3

CERTIFICATE OF SERVICE

On this 16th day of December, 2005, I hereby certify that the foregoing *Plaintiffs'
Motion to Compel Completion of the Administrative Record, Brief in Support of Plaintiffs'
Motion to Compel Completion of the Administrative Record, and Proposed Order* has been
served upon the following via e-mail by the Notice of Electronic Filing or served via United
States first-class mail where noted:

Jimmy Anthony Rodriguez
P.O. Box 7369
Washington, DC 20044-7369
202-305-0342
Fax: 202-305-0275
Email: jimmy.rodriguez@usdoj.gov
*For Sec. Gutierrez, NMFS, and NOAA*

Bruce H Cahn
Ball Janik LLP
101 SW Main Street
Ste 1100
Portland, OR 97204
503-228-2525
Fax: 503-226-3910
Email: bcahn@bjllp.com
*For Coastal Conservation Association*

Charles Stephen Kelley
Mayer Brown et al
700 Louisiana
Ste 3600
Houston, TX 77002
713-221-1651
Fax: 713-224-6410 fax
Email: ckelley@mayerbrownrowe.com
*For Coastal Conservation Association*

Robert G Hayes (via U.S. mail)
Ball Janik
1455 F St., NW
Suite 225
Washington, DC 20005
202-638-3307
*For Coastal Conservation Association*


_____s/_____
Emily Robinson
Litigation Assistant
Earthjustice
erobinson@earthjustice.org

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NATIONAL WILDLIFE FEDERATION, IDAHO
WILDLIFE FEDERATION, WASHINGTON
WILDLIFE FEDERATION, SIERRA CLUB,
TROUT UNLIMITED, PACIFIC COAST
FEDERATION OF FISHERMEN'S
ASSOCIATIONS, INSTITUTE FOR
FISHERIES RESOURCES, IDAHO RIVERS
UNITED, IDAHO STEELHEAD AND SALMON
UNITED, NORTHWEST SPORTFISHING
INDUSTRY ASSOCIATION,  SALMON FOR ALL,
COLUMBIA RIVERKEEPER, AMERICAN RIVERS,
INC., FEDERATION OF FLY FISHERS, and NW
ENERGY COALITION,

CV 01-640-RE (Lead Case)
CV 05-23-RE
(Consolidated Cases)


OPINION AND ORDER

                    Plaintiffs,

        and

STATE OF OREGON,

                    Intervenor-Plaintiff,


                vs.

NATIONAL MARINE FISHERIES SERVICE,


                    Defendant,

        and

NORTHWEST IRRIGATION UTILITIES,
PUBLIC POWER COUNCIL, WASHINGTON
STATE FARM BUREAU FEDERATION,
FRANKLIN COUNTY FARM BUREAU

Page 1    -  OPINION AND ORDER

FEDERATION, GRANT COUNTY FARM
BUREAU FEDERATION, NORTHWEST
REQUIREMENT UTILITIES, PACIFIC
NORTHWEST GENERATING COOPERATIVES,
INDUSTRIAL CUSTOMERS OF NORTHWEST
UTILITIES, ALCOA, INC., and INTERNATIONAL
ASSOCIATION OF MACHINISTS & AEROSPACE
WORKERS,

               Intervenor-Defendants.

---

COLUMBIA SNAKE RIVER IRRIGATORS
ASSOCIATION and EASTERN OREGON
IRRIGATORS ASSOCIATION

               Plaintiffs,

      vs.

DONALD L. EVANS, in his official capacity
as Secretary of Commerce, NOAA
FISHERIES, and D. ROBERT LOHN,
in his official capacity as Regional Director
of NOAA Fisheries,

               Defendants.

REDDEN, Judge:

     The matters before the court are the motions of plaintiffs National Wildlife Federation,

et. al (#746) and intervenor-plaintiff State of Oregon[1] (#750) to Complete the Administrative

Record for the 2004 Biological Opinion (2004BiOp) issued by defendant on November 30, 2004.

*Amici* Yakima, Nez Perce, Umatilla, and Warm Springs Tribes ("Tribes") also support plaintiffs'

motion. Defendant and intervenor-defendant State of Idaho oppose the motion.

    **1.  <u>Administrative Record</u>.**

     On January 28, 2005, defendant filed the Administrative Record ("AR") pertaining to its

consultation with action agencies[2] regarding the effect of Federal Columbia River Power System

---

    [1]  The State of Oregon's motion relies on the arguments made by plaintiffs in support of their
motion.

    [2]  The action agencies are the Bonneville Power Administration, Army Corps of Engineers, and
Bureau of Reclamation. They operate dams along the Columbia River and Lower Snake River under the
auspices of the FCRPS..

Page 2  - OPINION AND ORDER

(FCRPS) operations on endangered and threatened salmon species. Plaintiffs assert the

Administrative Record ("AR") filed with the court is incomplete.  Plaintiffs contend the

Declaration of Robert Lohn, defendant's Regional Administrator of the Northwest Region, who

describes what is included in the AR, establishes that materials that should be included in the AR

have been improperly excluded.  Lohn's Declaration states in relevant part:

> 3.  This Administrative Record is comprised of those documents
> available to me setting forth 1) the procedure NOAA Fisheries
> followed in its ESA § 7(a)(2) consultation with the FCRPS Action
> Agencies to ensure that NOAA used the best science available,
> 2) the factors and science considered by NOAA Fisheries for this
> BiOp, and 3) the basis for NOAA Fisheries' ESA conclusions
> based on those factors and the available science.
>
> 4.  All remaining documents in NOAA's possession that may relate
> to this biological opinion but are not contained in the
> Administrative Record generally are internal drafts of memoranda
> or decision documents that were not prepared for review outside of
> NOAA and communications among my staff and with other
> federal employees that were created during the formative stages of
> the documents that are included in the Administrative record.
> They contain information or opinions that were either captured by
> documents that are included in the Administrative Record or which
> do not form the basis for the determinations in the BiOp.  For this
> reason I do not consider them to properly be part of the
> Administrative Record.

(Emphasis added).

Plaintiffs contend Lohn's declaration leaves them "and the Court to guess at what

documents and material have been withheld."  In particular, plaintiffs contend Lohn's statement

in paragraph 4 that materials "which do not form the basis for the determinations in the BiOp"

were excluded from the Administrative Record establishes presumptively that the AR is

incomplete.

Defendant asserts (1) it "has the right to designate the record on which it relied," (2) the

designation is presumed to be regular; (3) plaintiffs have not established "they come within any

of the authorized exceptions that allow the introduction of "extra-record evidence," and (4) the

federal court should not take on the role of "creating a new record" that is "different from that

provided by the agency."

Page 3  - OPINION AND ORDER

Defendant-Intervenor State of Idaho asserts it is just as interested in obtaining a complete AR as plaintiffs.  Idaho, however, asserts plaintiffs have failed to make a strong showing to rebut the presumption of regularity in defendant's compilation of the AR filed with the court.

An AR should include those materials "that were before the agency at the time the decision was made." Fund for Animals v. Williams, 245 F. Supp.2d  49, 55 (D. D.C. 2003).  The record must include all documents and materials that the agency "'directly or indirectly considered.'"  Id.;  Thompson v. Dep't of Labor, 885 F.2d 551, 555 (9th Cir. 1989); Water Land Exchange Project v. Dombeck, 47 F. Supp. 2d 1196, 1205 (D. Or. 1999).

"The agency may not skew the record in its favor by excluding pertinent but unfavorable information.  Nor may the agency exclude information on the grounds that it did not rely on the excluded information in its final decision. On the other hand, an agency may exclude arguably relevant information that is not contained in the agency's files but that may be available from third parties.  In addition, an agency generally may exclude material that reflects internal deliberations." Fund for Animals, 245 F. Supp.2d at 55.

"Although an agency may not unilaterally determine what constitutes the [AR], the agency enjoys a presumption that it properly designated the [AR] absent clear evidence to the contrary."  Id;  Bar MK Ranches, 994 F.2d at 739-40 ( the AR enjoys the same presumption of regularity afforded to other established administrative procedures); Amfac Resorts, 143 F.Supp.2d at 12 (noting the "standard presumption" that the agency designated the AR properly); Zeneca Inc. v. Shalala, 1999 WL 728104, at *3 (D. Md. Aug.11, 1999) (observing that the AR enjoys a presumption of regularity).

Here the court agrees with plaintiffs and the State of Oregon that Lohn's statements strongly suggest materials that were before the agency and considered by the agency, though not forming "the basis for the determinations in the BiOp," have been excluded from the AR.  The court concludes Lohn's statements in paragraph 4 of his declaration are sufficient, standing alone, to rebut the presumption of regularity.  The court reads his statements to expressly acknowledge materials were excluded from the AR because Lohn did not rely on them in formulating the determinations for the 2004BiOp.  A reasonable interpretation is that the

exclusions included documents that were considered by the agency, but not relied on to support the BiOp's ultimate determinations.

Moreover, the court concludes that neither plaintiffs nor this court are seeking to insert "extra-record" materials in the AR or to create a "new record." The goal is to establish a complete record of the consultation between defendant and the action agencies, including both the positive and negative (if any) recommendations pertaining to the ultimate no-jeopardy opinion. Accordingly, the court concludes the AR, as now filed, is incomplete.

At oral argument, Mark Eames, defendant's agency counsel, advised the court that defendant has an index of approximately 500 documents, and an additional 300 documents that are not indexed, that fall within the type of materials Lohn excluded from the AR. The court orders defendant to add the 500 indexed documents to the AR no later than 5:00 p.m. on March 14, 2005. After those documents have been reviewed, a determination will be made whether defendant must prepare the 300 unindexed documents for possible inclusion in the AR.

## 2.    <u>Attorney-Client Privilege</u>.

Defendant has identified 15 categories of documents that have been withheld from the AR based on attorney-client privilege. Plaintiffs assert defendant has failed to meet its burden of establishing the attorney-client privilege applies, because the description of the privileged documents is inadequate. Plaintiffs urge the court to conduct an *in camera* review to determine if the documents listed by defendant are privileged.

A party asserting the attorney-client privilege has the burden of establishing the relationship and the privileged nature of the communication. <u>Ralls v. United States</u>, 52 F.3d 223, 225 (9th Cir.1995). "The attorney-client privilege protects confidential disclosures made by a client to an attorney in order to obtain legal advice, ... as well as an attorney's advice in response to such disclosures." <u>United States v. Chen</u>, 99 F.3d 1495, 1501 (9th Cir. 1996).

 A government agency, like a business organization, may assert the attorney-client privilege. <u>Coastal States Gas Corp. v. Dep't of Energy</u>, 617 F.2d 854, 863 (D.C.Cir.1980). Hence, "[i]n the governmental context, the client may be the agency and the attorney may be the agency lawyer." <u>In re Lindsey</u>, 148 F.3d 1100, 1104 (D.C. Cir.1998) (internal citations omitted).

Page 5  - OPINION AND ORDER

A communication between an attorney and an agency must be confidential in order to be protected by the attorney-client privilege. Coastal States Gas Corp., 617 F.2d at 863. The communication must have been intended to be confidential at the time it was made and that confidentiality must have been maintained since the disclosure. *Id*. A communication is "confidential" if it is communicated: (1) with the intention that the attorney will not disclose its contents; and (2) for the purpose of securing legal advice or services. Eugene Burger Mgmt. Corp. v. United States Dep't of Housing and Urban Dev., 192 F.R.D. 1, 5 (D.D.C.1999).

"When the client is by nature a group [such as a government agency], the courts have agreed that the privilege should not be defeated by some limited circulation beyond the attorney and the person within the group who requested the advice. The test ... is whether the agency is able to demonstrate that the documents, and therefore the confidential information contained therein, were circulated no further than among those members of the organization who are authorized to speak or act for the organization in relation to the subject matter of the communication. The purpose of the privilege is limited to protection of confidential facts. If facts have been made known to persons other than those who need to know them, there is nothing on which to base a conclusion that they are confidential." Wyoming v. Dep't of Agriculture, 239 F. Supp. 1219, 1230 (D. Wyo. 2002), citing Coastal States Gas Corp., 617 F.2d at 863.

"In sum, when a governmental agency is asserting the attorney-client privilege, the confidentiality element will be satisfied only if the documents in question were circulated among those agency employees who are authorized to speak on the matter dealt with in the documents; if circulated to a larger group of individuals, the privilege does not apply because the agency did not maintain the confidentiality of the information." *Id.*

Here, the court agrees that the documents identified in the privilege log should be reviewed *in camera* to determine if they are indeed protected from disclosure in the AR by the attorney-client privilege. At oral argument, the court and the parties agreed it would be appropriate for another federal judge in this district to accomplish that task. The Honorable Garr M. King has agreed to undertake the *in camera* review.

Page 6  - OPINION AND ORDER

Accordingly, the court orders defendant to deliver under seal to Judge King all documents included in defendant's privilege log no later than 5:00 p.m. on March 8, 2005.

IT IS SO ORDERED.

DATED this 3rd day of March, 2005.


/S/   James A. Redden
James A. Redden
United States District Judge