# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| BLUE OCEAN INSTITUTE, et al., | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) No.  1:06-CV-01869-HHK JMF |
|  | ) |
| CARLOS M. GUTIERREZ, et al., | ) |
|  | ) |
| Defendants. | ) |

_____)

## MEMORANDUM OF PLAINTIFFS BLUE OCEAN INSTITUTE
## AND CARL SAFINA IN SUPPORT OF THEIR MOTION
## FOR SUMMARY JUDGMENT

STEPHEN E. ROADY
D.C. Bar. No. 926477
JENNIFER C. CHAVEZ
D.C. Bar No. 493421
Earthjustice
1625 Massachusetts Avenue, N.W.
Washington, D.C.  20036
202-667-4500 Telephone
202-667-2356 Fax
Attorneys for the Plaintiffs

November 19, 2007

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................2

I.  Life History and Population Trend of Western Atlantic Bluefin Tuna.......................…......2

II.  Statutory and Regulatory Structure for the Management of Bluefin.................................4

III. Defendants' Management Failures in the face of a Declining Bluefin Population..................7

IV. Plaintiffs' Petition to Protect Spawning Bluefin ...........................................................11

ARGUMENT ....................................................................................................14

I.  STANDARD OF REVIEW AND STANDING.....................................................................14

II.  THE FISHERY SERVICE DECISION TO REJECT THE PETITION TO
    PROTECT THE SPAWNING POPULATION OF BLUEFIN TUNA WAS
    ARBITRARY AND CAPRICIOUS ..........................................................................15

    A.    The Fisheries Service Ignored Key Facts About the Life History of the
          Bluefin and the Nature of the Bluefin Fishery in the Gulf of Mexico. .................18

    B.    The Fisheries Service Relied Arbitrarily Upon a Fatally Flawed Model
          and Failed to Explain How it Informed the Decision to Reject the Petition..........23

III. THE FISHERIES SERVICE VIOLATED THE MSA REQUIREMENTS TO
    PREVENT OVERFISHING, MINIMIZE OR AVOID BYCATCH, AND RELY
    UPON THE BEST AVAILABLE SCIENCE....................................................... 27

    A.    The Fisheries Service Has Violated National Standard One By Failing to Prevent
          Overfishing of Western Atlantic Bluefin Tuna and By Failing to Ensure
          Rebuilding of the Overfished Bluefin Population ...............................................28

          1.    The Defendants Have Failed to Prevent Overfishing of
                Bluefin And Have Also Failed to Ensure Optimum Yield
                in the Bluefin Fishery...................................................................................29

          2.    The Defendants Have Flouted the Recommendations of ICCAT and
                Violated the Rebuilding Requirements of the MSA .................................31

    B.    The Fisheries Service Violated National Standard Two By Failing to Rely
          on the Best Scientific Information Available In Deciding Not to Protect
          Spawning Bluefin in the Gulf of Mexico ...................................................33

C.    The Fisheries Service Violated National Standard Nine By Failing to
Minimize Bluefin Bycatch in the Gulf of Mexico ...............................................36

IV. THE FISHERIES SERVICE VIOLATED THE NATIONAL ENVIRONMENTAL
POLICY ACT ............................................................................................................39

A.    The FEIS Failed to Analyze Adequately the Possible Impacts
of the Closure Requested in the Petition...................................................................40

B.    The FEIS Failed to Present a Clear Analysis of the Environmental Impacts of
Alternatives to the Closure Requested in the Petition ...........................................42

C.    The FEIS Failed To Evaluate the Cumulative and Long-term Effects of
Denying the Closure Requested in the Petition ......................................................43

CONCLUSION ...................................................................................................................45

**INTRODUCTION**

This case presents perhaps the last best chance to save one of the most valued big fish species that lives in United States ocean waters – the western Atlantic bluefin tuna – from population collapse and commercial extinction.

Western Atlantic bluefin tuna (hereinafter "bluefin" or "BFT") are top predators that serve a vital function in the ocean ecosystem. Because they are highly prized as sushi, they can sell for tens of thousands of dollars apiece. As a result, they have been fished relentlessly for the past three decades while their population has declined by more than 80%. Fishing pressure on bluefin is now at its highest point ever, while the bluefin population is at the lowest recorded level in its history. Defendants, the Secretary of Commerce and the National Marine Fisheries Service ("Fisheries Service" or "NMFS"), have followed this inexorable depletion of the bluefin population for many years, but have consistently ignored their legal duty to protect the bluefin.

In particular, for nearly thirty years, defendants have failed to act on their knowledge that the key to saving western Atlantic bluefin is to protect their spawning grounds in the Gulf of Mexico, where bluefin return annually in the early spring. Instead, despite the undisputed importance of the Gulf to the recovery and survival of bluefin, the defendants have allowed longline fishermen to continue to kill spawning bluefin there in significant numbers. Fishermen kill these highly valuable fish "incidentally" in the Gulf as "bycatch" while the longline fleet is purportedly looking to catch other fish species.

This case grows out of the latest refusal by the defendants to protect spawning bluefin in the Gulf of Mexico. In June of 2005, the plaintiffs filed a Petition requesting that defendants comply with their legal duties to prevent overfishing and minimize bycatch, and close the pelagic (open ocean) longline fishery in the bluefin spawning area in the Gulf during spawning season.

*See* "Petition for Immediate Rulemaking to Protect Spawning Atlantic Bluefin Tuna in The Gulf of Mexico" dated June 8, 2005 (hereinafter "Petition") attached as Exhibit A; AR D1.[1]  In October 2006, defendants rejected that Petition.  Instead, defendants adopted a Fishery Management Plan that arbitrarily adheres to the *status quo*, allowing spawning bluefin to continue to be killed in the Gulf, despite all indications that these measures have consistently proven insufficient to preserve the depleted bluefin population.  Unless this Court promptly orders the defendants to grant the Petition and protect western Atlantic bluefin tuna on their spawning grounds in the Gulf of Mexico during the spawning season that will begin in the early spring of 2008, the already critically depleted bluefin population could collapse.

## BACKGROUND

### I.    Life History and Population Trend of Western Atlantic Bluefin Tuna

Bluefin tuna (*thunnus thynnus*) are both important ocean predators and staggeringly valuable commodities.  Bluefin are among the largest, most wide-ranging, and fastest of animals. They can grow to average sizes of 400-500 pounds, with some giants reaching more than 10 feet in length and weighing as much as 1500 pounds.  *See* Carl Safina, *Bluefin Tuna in the West Atlantic: Negligent Management and the Making of an Endangered Species,* 7 Conservation Biology 229, 229 (1993), Exhibit B.  Torpedo-like in shape and possessed of a specialized musculature that includes fins which retract into slots during high-speed acceleration, bluefin reportedly can swim at speeds of 50 miles per hour.  *Id.*  Because they possess a highly developed circulatory exchange system, bluefin are uniquely suited to thrive in both temperate and colder waters.  These remarkable physical attributes allow western Atlantic bluefin to range thousands of miles, from Labrador south to the Gulf of Mexico and at least as far as Brazil.  *Id.*

---

[1] Plaintiffs will cite administrative record documents as "AR  [document designation] at [page]."

Two separate populations of Atlantic bluefin overlap on North Atlantic Ocean foraging grounds and migrate to independent spawning areas located in the Gulf of Mexico and Mediterranean Sea. These populations do not mix in their respective spawning grounds and are thus genetically separate from one another. *See* Barbara A. Block, et al., *Electronic Tagging and Populations Structure of Atlantic Bluefin Tuna*, 434 NATURE 1121, 1123 (2005); AR G7 (HEREINAFTER "NATURE"). This case concerns management of the western Atlantic bluefin population only; it does not address the separate population of bluefin tuna that migrates throughout the east Atlantic Ocean and spawns in the Mediterranean Sea. Western Atlantic bluefin spawn in the Gulf of Mexico annually, primarily during the months of March through June, and then spend much of their early years foraging off the east coast of the United States and Canada. *See id.* at 1121-27.

Demand for bluefin during the past twenty years—largely in Japan but also increasingly in the U.S.—has driven their commercial market value to astronomical levels; the finest giant bluefin have fetched prices as high as $117 per pound – or $83,000 a fish. *See* Carl Safina, *Song for the Blue Ocean* 14 (1999). Fishing pressure to catch these supremely commercially valuable fish has triggered a precipitous decline in the population of western Atlantic bluefin. As depicted in the following graph, the reproductive population of western Atlantic bluefin (termed the "spawning stock biomass") has declined by 80% since 1975. International Commission for the Conservation of Atlantic Tunas ("ICCAT"), Report of the Standing Committee on Research and Statistics 51 (2006) (hereinafter "2006 ICCAT SCRS Report"), *available at* http://www.iccat.es/Documents/SCRS/SCRS%202006%20ENG.pdf.



*Id.* at 56.

In short, it is undisputed that the population of western Atlantic bluefin tuna has declined

dramatically.  Defendants in fact admit that "the spawning biomass of western Atlantic bluefin

tuna is at its lowest recorded level."  Answer at ¶ 2.  Moreover, in their most recent annual report

to Congress on the status of fish populations, defendants have classified western Atlantic bluefin

as both "overfished" and as being subject to ongoing "overfishing."  National Marine Fisheries

Service Report on the Status of the U.S. Fisheries for 2006, at 25 (2007). Exhibit C.  In light of

their precarious condition, the World Conservation Union (IUCN) has listed the bluefin as

"critically endangered" – meaning that it is "facing an extremely high risk of extinction in the

wild in the immediate future."  *See* http://www.iucnredlist.org/search/details.php/21864/all

## II.    Statutory and Regulatory Structure for the Management of Bluefin

The bluefin tuna fishery is subject to both domestic and international regulation.  On the

domestic front, the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16

U.S.C. §§ 1801-83, establishes a system for conserving and managing fish populations in the

exclusive economic zone of the United States, which generally extends from the boundaries of

state waters to 200 miles offshore.  The MSA requires defendants to prepare Fishery

Management Plans ("FMPs") concerning "any highly migratory species fishery," *id.* § 1854(g)(1) that is within the geographical area of authority of more than one of several regional fishery management councils. *Id.* § 1852(a)(3). The bluefin fishery falls under this description. *See id.* §1802(20). Defendants are regulating bluefin under a 2006 FMP that addresses several "Highly Migratory Species" jointly (the "HMS FMP").

Like all FMPs and their implementing regulations, the 2006 HMS FMP must adhere to ten "national standards" set forth in the MSA. *See id.* § 1851(a). This case focuses on defendants' violations of three of these standards: National Standards One, Two, and Nine.

National Standard One of the MSA requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery . . . ." *Id.* § 185l(a)(1). The statute defines "overfishing" as "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." *Id.* § 1802(29). "Optimum" in terms of yield from an overfished fishery, such as the bluefin fishery, is defined as the amount of fish which "provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery." *Id.* § 1802(28)(C).

National Standard Two of the MSA requires that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2). In 2004, the National Research Council of the National Academy of Sciences conducted a detailed review of this requirement and recommended that the defendants ensure that "scientific reports should explicitly identify the level of uncertainty in results, provide explanations of the sources of uncertainty, and assess the relative risks associated with a range of management

options." *Improving the Use of the "Best Scientific Information Available" Standard in Fisheries Management*, National Research Council 4-6 (2004) at 8.

National Standard Nine of the MSA imposes upon defendants a separate duty to "avoid or minimize bycatch" and "minimize the mortality of bycatch which cannot be avoided." 16 U.S.C. § 1853(a)(11). The National Standard Nine guidelines state that bycatch may "impede efforts to protect marine ecosystems and achieve sustainable fisheries" by increasing the uncertainty as to the amount of fish killed by fishing activity and by precluding "more productive uses of fishery resources." 50 C.F.R. § 600.350(2)(b).

In addition to domestic regulation under the MSA, bluefin are subject to regulation by the International Commission for the Conservation of Atlantic Tunas ("ICCAT") because some bluefin spend part of their lives in international waters. ICCAT manages Atlantic bluefin tuna as distinct western and eastern populations, separated by a management boundary at the 45° W meridian. 2006 ICCAT SCRS Report, at 126. ICCAT establishes bluefin quotas for each member country; thus United States fishermen are limited to catching the amount of western Atlantic bluefin allocated to this country's quota by ICCAT. ICCAT also makes more general recommendations for managing bluefin. Of particular interest for this case, in 1982 ICCAT recommended that all directed fishing targeting bluefin be banned in the Gulf of Mexico in order to protect spawning bluefin. ICCAT, New Regulations for the Atlantic Bluefin Tuna Catch 2 (1982), *available at* http://www.iccat.es/Documents/Recs/compendiopdf-e/1982-01-e.pdf.

ICCAT established a plan to address overfishing of bluefin in 1981 that was designed to halt the population decline and rebuild the stock of both western and eastern bluefin. *See* ICCAT 2006 SCRS Report at 57. However, despite the imposition of "Total Allowable Catch" ("TAC") quotas for the past 25 years pursuant to this ICCAT "rebuilding plan," the population of western

Atlantic bluefin has declined consistently.  The latest report of ICCAT scientists notes this decline, and observes that "western bluefin tuna may be less resilient to fishing than previously thought."  ICCAT 2006 SCRS Report at 57.  In this report, ICCAT scientists also express significant concern that the potential for rebuilding western Atlantic bluefin is "less clear" than it has been in earlier years of the plan, and report that "current regulations may be insufficient to achieve the [rebuilding] objectives."  *Id.* at 57, 58.

The Atlantic Tunas Convention Act ("ATCA") is the federal statute that – along with the MSA – provides authority to the Fisheries Service to manage bluefin tuna in conformance with quotas established by ICCAT.  *See* 16 U.S.C. § 971.  ATCA provides that the defendant Secretary of Commerce shall promulgate regulations that are "necessary and appropriate" to carry out the recommendations of ICCAT that establish the western Atlantic bluefin quota for the United States fishing fleet.  *See id.* § 971d(c)(1)(A).  In addition, ATCA requires that such regulations "shall, to the extent practicable, be consistent with fishery management plans [FMPs] prepared and implemented under" the MSA.  *Id.* § 971d(c)(1)(C).  ATCA also provides that no such regulations "may have the effect of increasing or decreasing any allocation or quota of fish or fishing mortality level" set by ICCAT.  *Id.* § 971d(c)(3).  Inasmuch as ICCAT has for 25 years recommended that no directed fishing for bluefin be allowed to take place in the Gulf of Mexico, it has effectively allocated no bluefin quota in the Gulf for United States tuna fishermen and has set the targeted fishing mortality level for bluefin there at zero.

III.    **Defendants' Management Failures in the face of a Declining Bluefin Population**

For more than thirty years, scientists, staff, and policy officials within NMFS have been aware of a precipitous decline in the population of western Atlantic bluefin tuna.  Yet the

defendants have repeatedly failed to halt the steady decline in the bluefin population. The following points summarize milestones in this thirty-year history:

- In 1975, defendants proposed to list the bluefin as threatened under the Endangered Species Act,[2] but then withdrew that proposal after ATCA became law.[3]

- In 1981, defendants noted that <u>high prices paid for incidental catches of bluefin tuna</u> <u>"encouraged many U.S. fishermen to consider pursing them as a target species."</u> 46 Fed. Reg. 8012, 8013 (Jan. 26, 1981). "Concerned that <u>the resource [was] not strong enough to</u> <u>withstand additional heavy fishing pressure,</u>" defendants prohibited directed longline fishing for bluefin in the Gulf of Mexico and set an "incidental catch" limit for bluefin in the Gulf.[4]

- In 1982, ICCAT formally recommended a ban on directed fishing for bluefin on bluefin spawning grounds in the Gulf of Mexico.[5]

- Later in 1982, the Fisheries Service significantly reduced the quota for incidentally caught bluefin for the Gulf, <u>expressing concern that the bluefin being killed with longline</u> <u>gear in the Gulf "are spawning adults" and that "minimizing their capture, therefore, may</u> <u>contribute to increasing stock size.</u>"[6]

- Notwithstanding this key 1982 finding, in 1983 the defendants dramatically <u>increased</u> the allowance for "incidental catch" of bluefin.[7]

- During the late 1980s and early 1990s, commercial demand for bluefin spiked and the price of these fish skyrocketed. The result was "the development of a directed fishery in the Gulf," despite the previously adopted incidental catch regulations.[8] In 1988, <u>defendants recognized that their "incidental catch" provisions for bluefin "may have</u> <u>permitted a directed fishery for Atlantic bluefin tuna in the Gulf of Mexico, contrary to</u> <u>the intent of the regulations and the United States' obligations" to ICCAT.</u>[9] Accordingly, defendants sought comments on whether to "close all or a portion of the Gulf of Mexico to longline gear during a specified spawning season."[10]

---

[2] 40 Fed. Reg. 14767, 14767 (Apr. 2 1975) ("the scientific consensus . . . is that the data presently available are inadequate to positively determine the status of the Atlantic bluefin tuna stocks, but the data convincingly indicate that adult (or spawning) Atlantic bluefin tuna stocks are substantially reduced in number from previous years").
[3] 40 Fed. Reg. 33978 (Aug. 13, 1975).
[4] 46 Fed. Reg. 8012, 8013 (Jan. 26, 1981).
[5] ICCAT, New Regulations for the Atlantic Bluefin Tuna Catch 2 (1982), *available at* http://www.iccat.es/Documents/Recs/compendiopdf-e/1982-01-e.pdf.
[6] 47 Fed. Reg. 17086, 17089 (Apr. 21, 1982).
[7] *See* 48 Fed. Reg. 27745, 27751-52 (June 17, 1983) (increasing quota allocated to the incidental take of bluefin by the longline fishery from 44 st to 145 st). A "short ton" or "st" is 2,000 pounds, or 907 kilograms.
[8] 56 Fed. Reg. 10227, 10228 (Mar. 11, 1991). *See also* 53 Fed. Reg. 10415, 10415 (Mar. 31, 1988) (noting that existing incidental take provisions "may have permitted a directed fishery for Atlantic bluefin tuna in the Gulf of Mexico, contrary to the intent of the regulations and the United States' obligations" to ICCAT").
[9] 53 Fed Reg. 10415, 10415 (Mar. 31, 1988).
[10] *Id.*

- In 1992, <u>defendants rejected a proposal to close the Gulf of Mexico during bluefin spawning season.</u>[11] Instead, defendants adopted new incidental catch regulations that required "specified amounts of other species to be landed as a condition for landing an incidental bycatch of Atlantic bluefin tuna" and prohibited "retention of Atlantic bluefin tuna harvested from the Gulf of Mexico except for vessels permitted in the Incidental Catch category."[12]  In so doing, <u>defendants created a class of fishermen who would be allowed to "incidentally" – i.e., on purpose – catch spawning bluefin in the Gulf.</u> Defendants further noted that "if this measure is proven to be ineffective," "more stringent measures," would be considered in a future rulemaking.[13]

- In 1994, <u>defendants learned that their "incidental catch" approach was "causing an increase in bluefin discard and waste"</u> when ICCAT scientists reported that  the spawning population of western Atlantic bluefin had declined 24% in the period 1990-1991,[14] Nevertheless, the defendants again declined to institute a closure for longline fishing in the Gulf, and merely tinkered with their "incidental take" provisions.[15]  Again, defendants stated that "more stringent measures, such as area or season closures" could be considered in future rulemaking, should the incidental take provisions prove ineffective at limiting bycatch.[16]

- In 1999, in a consolidated HMS FMP, <u>defendants adopted a measure to close an area off the Mid-Atlantic Bight to longline fishing during the month of June to minimize bluefin bycatch</u>.  This closure, although not directed toward protecting spawning fish, <u>reduced dead discards of bluefin tuna.</u>[17]

- Following another decade of steady and significant decline in the bluefin population, in 2002 defendants again recognized that "[d]espite efforts to alter target catch requirements and adjust geographic management areas, <u>bycatch and discards of [bluefin tuna] by U.S. pelagic longline vessels have continued.</u>"[18]  Once again, however, the defendants did not close longline fishing in the Gulf of Mexico bluefin spawning area; instead, they merely continued to fiddle with the number of "incidentally caught" bluefin that could be retained and sold.[19]

---

[11] The proposed closure was rejected "because the location of the spawning areas within the Gulf of Mexico varies from year to year."  57 Fed. Reg. 365, (Jan. 6, 1992).  However, as a result of nearly a decade of electronic monitoring of bluefin tuna, scientists have been able to describe a more precise bluefin spawning area.  *See Nature* 1123 fig. a (G-7).  Accordingly, the grounds for rejecting the proposed closure in 1992 are no longer valid.

[12] 57 Fed. Reg. 365, 365 (Jan. 6, 1992).

[13] 57 Fed. Reg. 365 at 369.

[14] 59 Fed. Reg. 2813, 2814 (Jan. 19, 1994).

[15] 59 Fed. Reg. 2813, 2814 (Jan. 19, 1994).  *See also* 59 Fed. Reg. 17723 (Apr. 14, 1994).

[16] 50 Fed. Reg. 2813, 2814.

[17] *See* 67 Fed. Reg. 78404, 78406 (Dec. 24, 2002) ("The available data, based on logbooks submitted by fishermen, indicate a substantial decline in BFT bycatch throughout the year, indicating the closed area may be effective at reducing dead discards.").

[18] 67 Fed. Reg. 78404, 78405-06 (Dec. 24, 2005).

[19] *Id.*

In summary, between 1975 and 2002, the defendants repeatedly recognized that: (1) bluefin were spawning in the Gulf of Mexico; (2) the bluefin population has declined and continues to decline; and (3) the effort to manage the bluefin population by way of "incidental catch" had not only failed, but had encouraged a *de facto* directed fishery for bluefin in the Gulf, in violation of both ICCAT and U.S. policy. They expressed concern over these facts, but consistently failed to take effective steps to halt the bluefin population decline.

Remarkably, defendants abandoned any pretense of protecting the bluefin in the Gulf in their 2002 rulemaking. Rather than aiming to <u>reduce</u> mortality due to dead discards, the 2002 regulations ignored solid evidence that the bluefin population was in serious decline, and focused instead on the fact that U.S. fishermen were not catching the full ICCAT quota allocated for bluefin. Thus, the Service concerned itself with the fact that restrictive incidental catch limits required longline fishermen to discard incidentally caught bluefin. *Id.* at 78406. Acting on this misplaced concern, since 2002 NMFS has sacrificed the long-term future of both the western Atlantic bluefin population, and fishermen who catch bluefin, in order to protect the short-term income of longline fishermen in the Gulf.

The current regulations thus allow fishers in the Gulf to continue killing spawning bluefin tuna.[20] The latest report filed by the defendants with ICCAT shows that 51 metric tons of bluefin – roughly 200 fish – were killed in the Gulf in 2006. Annual Report of the United States to ICCAT, NOAA Fisheries (2007), Exhibit D; *see also* Safina Decl. ¶ 11. Moreover, based on

---

[20] The regulations currently in effect provide that for all geographic areas:

>One large medium or giant BFT per vessel per trip may be landed, provided that at least 2,000 lb (907kg) of species other than BFT are legally caught, retained, and offloaded from the same trip and are recorded on the dealer weighout slip as sold. Two large medium or giant BFT per vessel per trip may be landed, provided that at least 6,000 lb (2,727 keg) of species other than BFT are legally caught, retained and offloaded from the same trip and are recorded on the dealer weighout slip as sold. Three large medium or giant BFT per vessel per trip may be landed, provided that at least 30,000 lb (13,620 kg) of species other than BFT are legally caught, retained, and offloaded from the same trip and are recorded on the dealer weighout slip as sold.

50 C.F.R. § 635.23(f)(1) (2006).

initial indications from observer data designed to cover all longline vessels fishing in the Gulf <u>during just two months</u> between mid-April and mid-June of 2007, more than 100 bluefin were killed.  Safina Decl. ¶ 12.

Indicative of the steep bluefin population decline is that United States fishers have been unable to catch the quota allocated to them for the past four years.  They failed – by a wide margin – to catch their quota of western Atlantic bluefin in 2004, 2005, and 2006.  ICCAT 2006 SCRS Report at 57.  Thus far in 2007, this downward trend continues. *Id.*; *see* Memorandum from Brad McHale to Margo Shulze Haugen, Landings of Large Medium and Giant Atlatnic [sic] Bluefin Tuna (Nov. 9, 2007), Exhibit E.  In addition, anecdotal reports reflect that very few bluefin younger than age 3 have been seen in U.S. waters during 2007 – this suggests that there may have been a near total collapse of the entry of sub-adult bluefin ("recruitment") into the western Atlantic population.  In short, western Atlantic bluefin tuna simply are disappearing from United States ocean waters.  *See* Safina Decl. ¶¶ 2-4.

**IV.     Plaintiffs' Petition to Protect Spawning Bluefin**

In the spring of 2005, electronic tagging studies of bluefin tuna conclusively identified a spawning "hot spot" for Atlantic bluefin tuna in the northern Gulf of Mexico.  These scientific data published in the journal *Nature* confirmed that spawning-age western Atlantic bluefin tuna were present in United States waters of the Gulf of Mexico during the months of January through June, and that they were spawning there, particularly during the period between March and June. *See* Nature, AR G7, at 1121-1127.  The *Nature* article found that, even in the case of highly controlled scientific tagging, bluefin that are hooked on longlines tend to die in high percentages, even if they are released.  *Id.* at 1123 ("In the [Gulf of Mexico] slope waters, scientific longlining . . . was conducted from pelagic longline vessels . . . and frequently resulted in bluefin tuna

mortalities."). Consequently, the paper concluded that a limited time-area closure of the pelagic longline fishery where it overlaps with the bluefin spawning area would eliminate this often fatal bycatch of spawning bluefin. *Id.* at 1126.

Relying on this new evidence, and in an effort to reverse the dramatic decline in the bluefin population, the Plaintiff Blue Ocean Institute and several other conservation groups submitted their Petition on June 8, 2005, to the Fisheries Service. *See* Petition, attached as Exhibit A, AR D1. The June 2005 Petition emphasized that longline fishing in the Gulf of Mexico bluefin spawning area kills significant numbers of bluefin (largely as "bycatch" while the longline vessels are targeting yellowfin tuna), depletes the bluefin population, and cripples the potential of the bluefin to rebuild to a healthy level. Accordingly, the Petition requested that the Fisheries Service take immediate action to stop all longline fishing in bluefin spawning areas located in the Gulf of Mexico during spawning season. *Id.* at 2. The Petition also requested that defendants initiate a rulemaking designed to permanently prohibit all fishing activity that can catch bluefin tuna (either intentionally, or incidentally as "bycatch") in their spawning areas in the Gulf of Mexico during their spawning season. *Id.*

In response to the Petition, the Fisheries Service declined to take immediate action to prevent bycatch of spawning bluefin in the Gulf, and promised to address the problem and further consider the petition for closure in connection with its Draft Fishery Management Plan for Highly Migratory Species ("HMS FMP"). AR I23. The HMS FMP looked at a number of actions relating to the management not of only bluefin tuna, but also other so-called "highly migratory species." In an environmental impact statement ("EIS") prepared by the Fisheries Service in connection with the HMS FMP during 2005 and 2006, the Fisheries Service acknowledged that bluefin tuna are overfished and subject to continued overfishing, AR E12, at

3-43, but declined to establish a fishing closure of the bluefin spawning area in the Gulf of Mexico. This decision was based primarily upon the Fishery Service's conclusion that the proposed closure would not reduce bycatch for every potentially affected species. AR E12, at 4-66.

The Fisheries Service published the final rule implementing the HMS FMP on October 2, 2006. The rule refused to institute any closure of longline fishing in the bluefin spawning area in the Gulf of Mexico during spawning season, or otherwise to take any action to halt the collapse of the western Atlantic bluefin population. 71 Fed. Reg. 58058, 58152-58153 (Oct. 2, 2006); AR E27. The final rule and the discussion in the HMS FMP included the following reasons for the Fisheries Service decision to reject the plaintiffs' Petition for a closure:

1. If the closure resulted in a random redistribution of fishing effort, it could result in an increase in the incidental catch ("bycatch" or "discards") of bluefin, rather than a decrease. *Id*. at 58152.

2. Even if the closure resulted in a decrease in bluefin bycatch, the redistributed fishing effort could increase bycatch of other species of fish and sharks *Id*. at 58153. In this connection, the Fisheries Service "cannot place more value on one species over another species." Appendix E to the HMS FMP at E-30 (AR E 12 at E-30).

3. While not relying upon any formal "decision matrix," the Fisheries Service used the analysis of various impacts of the proposed closure on bluefin and other Highly Migratory Species to help "guide" its decision to reject the plaintiffs' Petition. AR E 17 at 6 (NMFS Memorandum For the File dated August 29, 2006).

4. New data and information needed to be gathered and analyzed before defendants could make a decision regarding the need for a closure of the type sought in the Petition.

As a result of the decision by the Fisheries Service to deny the plaintiffs' Petition, additional bluefin were killed as bycatch by longline fishers fishing in the Gulf of Mexico in 2006 and 2007. *See* Safina Decl. ¶¶ 11-12. Indeed, more than 100 bluefin reportedly were killed in the Gulf in only the two months between April and June of 2007. *Id*. ¶ 12. Absent relief from this Court, more bluefin can be expected to die in that spawning area in 2008, and in subsequent

13

years, until the Fisheries Service reduces the fishing pressure in that area during bluefin

spawning season.  These bluefin mortalities contribute to continued overfishing and harm the

capacity of the western Atlantic bluefin tuna to survive and to rebuild as a healthy and

sustainable fish population.  *See id.*  ¶¶ 11-14.

## ARGUMENT

## I.    STANDARD OF REVIEW AND STANDING

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall

be rendered if the movants establish that "there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see*

*Taylor v. Federal Deposit Ins. Corp.*, 132 F. 3d 753, 762 (D.C. Cir. 1997).  Defendants cannot

avoid entry of summary judgment merely by relying on unsupported assertions in their briefs.

*See* Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

This is an administrative record case in which no material facts are now in dispute,[21] and

the plaintiffs are entitled to judgment as a matter of law.  This memorandum establishes that the

defendants' refusal to grant plaintiffs' Petition request to close longline fishing in the Gulf of

Mexico on bluefin spawning grounds during bluefin spawning season is inconsistent on its face

with the MSA, unreasonable, arbitrary and capricious, and contrary to NEPA.  Accordingly, this

Court should enter summary judgment in favor of the plaintiffs.

The declaration of plaintiff Carl Safina, President of the plaintiff Blue Ocean Institute, is

attached to this memorandum as Exhibit F.  Dr. Safina's declaration shows that defendants'

decision to reject the Blue Ocean Institute petition to close longline fishing in the Gulf of Mexico

during the spawning season directly injures both himself and the Blue Ocean Institute in several

---

[21]   On February 23, 2007, the plaintiffs moved to complete the administrative record on grounds that it was incomplete.  Magistrate Judge Facciola denied that motion by Memorandum Opinion and Order dated September 7, 2007.

ways.  The defendants' rejection of the plaintiffs' petition has allowed additional spawning

bluefin to be killed in the Gulf of Mexico, thereby contributing to the continued depletion of the

bluefin population.  Safina Decl. ¶¶ 11-13.  Therefore, the actions of the defendants have harmed

the ability of the plaintiffs to continue to research, observe, and – in the case of Dr. Safina, fish –

for bluefin tuna.  *Id.* ¶¶ 10-15.  In short, because the defendants have injured the environmental,

recreational, aesthetic, and professional interests of the plaintiffs with respect to the western

Atlantic bluefin tuna, the plaintiffs enjoy standing to maintain this action.  *See Friends of the*

*Earth v. Laidlaw Environmental Services*, 528 U.S. 167, 180-185 (2000); *Natural Res. Defense*

*Council v. EPA*, 489 F.3d 1364, 1370-71 (D.C. Cir. 2007).

## II. THE FISHERIES SERVICE DECISION TO REJECT THE PETITION TO PROTECT THE SPAWNING POPULATION OF BLUEFIN TUNA WAS ARBITRARY AND CAPRICIOUS

Under the Administrative Procedure Act ("APA"), "[t]he reviewing court shall…hold

unlawful and set aside agency action, findings, and conclusions found to be…arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.

The MSA explicitly imports the APA standard of review.  *See* 16 U.S. C. § 1855(f)(1)(B).  To

uphold an agency's decision under the APA, a court must find that the agency "examine[d] the

relevant data and articulate[d] a satisfactory explanation for its action including a 'rational

connection between the facts found and the choices made.'"  *Motor Vehicle Mfrs. Ass'n v. State*

*Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v.*

*United States*, 371 U.S. 156, 168 (1962)).  In addition, to pass muster under the APA, an

agency's decision must be supported by record evidence.  *See Taylor v. FDIC*, 132 F.3d 753, 762

(D.C. Cir. 1997) (court "[does] not accept bare conclusory allegations as fact"); *Missouri Public*

*Service Comm. v. FERC*, 337 F.3d 1066, 1073 (D.C. Cir. 2003) (agency must fully explain

predictions or extrapolations from the record).  Mere conclusory statements in the record are not

enough to support the agency's position.  *See, e.g.*, *Bangor Hydro-Electric Co. v. FERC*, 78 F.3d

659, 664 (D.C. Cir. 1996); *Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1266 (D.C. Cir. 1994).

The APA requires the courts to examine agency actions closely: "we do not hear cases

merely to rubber stamp agency actions.  To play that role would be 'tantamount to abdicating the

judiciary's responsibility under the [APA].'"  *Natural Resources Defense Council, Inc. v. Daley*,

209 F.3d 747, 755 (D.C. Cir. 2000) (quoting *A.L. Pharma, Inc. v. Shalala,* 62 F. 3d 1484, 1491

(D.C. Cir. 1995)) (rejecting NMFS argument that court should defer to fishing quota that had less

than a 50% chance of success).  The APA's standard of review "requires the reviewing court to

engage in a substantial inquiry" and subjects the agency action to a "thorough, probing, in-depth

review."  *Citzens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971).

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on
> factors which Congress has not intended it to consider, entirely failed to consider an
> important aspect of the problem, offered an explanation for its decision that runs counter
> to the evidence before the agency, or is so implausible that it could not be ascribed to a
> difference in view or the product of agency expertise.

*Motor Vehicle Mfg. Ass'n v. State Farm Mut. Ins.*, 463 U.S. 29, 43 (1983).  Although courts

ordinarily afford some degree of deference to the agency's scientific expertise, such deference is

not unlimited.  "The [Fisheries] Service cannot rely on reminders that its scientific

determinations are entitled to deference in the absence of reasoned analysis to cogently explain

why its [decisions]" satisfy statutory requirements.  *Natural Res. Def. Council*, 209 F.3d at 755-

56 (quotations and citations omitted).  Furthermore, "[a] regulation cannot stand if it is based on

a flawed, inaccurate or misapplied study."  *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933

(5th Cir. 1998).

This Circuit has emphasized the particular importance of close record review in cases such as this, where the agency has engaged in an analysis of rather technical information. *Ethyl Corp. v. Environmental Protection Agency*, 541 F. 2d 1, 36 (D.C. Cir. 1976) (purpose of review is to "enable the court to determine whether the agency decision was rational and based on consideration of the relevant factors").

The defendants' decision to deny the plaintiffs' Petition to close longline fishing that is killing spawning bluefin in the Gulf of Mexico, and to adopt an FMP that contains no protection for spawning bluefin, is arbitrary and capricious in several respects. This decision "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, . . . [and] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfg. Ass'n*, 463 U.S. at 43. In addition, the defendants failed to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choices made.'" *Id.* (quoting *Burlington Truck Lines, Inc.*, 371 U.S. at 168).

The defendants based their decision on two arbitrary choices. First, they sharply limited their evaluation of the potential benefits of the proposed closure by ignoring key facts, including that all bluefin caught in the Gulf presumptively are western Atlantic spawners, that bluefin are subject to high levels of mortality from incidental catch and discard in the Gulf of Mexico, and that spawning bluefin are more important than non-spawning bluefin. Second, they relied upon various models on redistribution of fishing effort that do not produce meaningful results, and then failed to explain how those models compelled their decision to deny the Petition.

A.    **The Fisheries Service Ignored Key Facts About the Life History of the Bluefin and the Nature of the Bluefin Fishery in the Gulf of Mexico**

The defendants rejected the plaintiffs' Petition to close longlining in the Gulf of Mexico spawning area for bluefin without considering several vital facts about the life history of bluefin and the nature of the fishery in the Gulf. Moreover, they completely failed to explain their decisionmaking process – which gave no weight to factors unique to bluefin.

Plaintiffs filed their Petition to protect spawning bluefin tuna in a newly-documented Gulf of Mexico spawning "hot spot" in order to "reduce mortalities of reproductive adult bluefin tuna, reduce further overfishing, and promote the rebuilding of the overexploited western Atlantic bluefin tuna population." Pet. at 3-4. However, the Fisheries Service ignored the stated purpose of the Petition – to reduce bluefin overfishing and rebuild the depleted bluefin population – and only considered whether the proposed closure "would reduce the bycatch of all species considered, assuming there is some redistribution of effort." AR E12, at 4-66.

In fact, the HMS FMP simply lacks discussion of the closure's potential to reduce mortalities of reproductive adult bluefin tuna, reduce further overfishing or promote the rebuilding of the overexploited western Atlantic bluefin tuna population. Thus, the Fisheries Service completely failed to address the potential benefits of the proposed closure for the imperiled bluefin population. This failure violated the APA requirement that agencies must directly respond to the substance of the relief sought in any petition for administrative action. *See Fund for Animals v. Babbitt*, 903 F. Supp. 96, 115-116 (D.D.C 1995) ("the right to petition for rulemaking entitles the petitioning party to a response on the merits of the petition"). The defendants were required to "fully and promptly consider" the plaintiffs' petition. *WWHT, Inc. v. F.C.C.*, 656 F.2d 807, 813 (D.C. Cir. 1981). The petition asked for a longline closure in a specifically –identified area of the Gulf of Mexico for the express purpose of protecting bluefin

tuna.  The defendants' analysis simply failed to come to grips with that request.  Therefore, their response violated the APA.

Defendants' failure to focus directly on the substance of the plaintiffs' Petition manifested itself in a failure to address several crucial facts relevant to their decision: (a) bluefin protected by the proposed closure are spawning bluefin and therefore of higher importance than other bluefin; (b) bluefin protected by the closure are presumptively western Atlantic bluefin and therefore of more value to protecting that particular population than are eastern bluefin; (c) because there is a *de facto* directed fishery taking place in the Gulf of Mexico that kills bluefin, mortality of bluefin in the Gulf is higher than reported.  This failure to consider highly relevant factors rendered their decision arbitrary and capricious.  *See Citizens to Preserve Overton Park*, 401 U.S. at 416 (APA requires agencies to consider relevant factors); *Motor Vehicle Mfg. Ass'n*, 463 U.S. at 43 (agency rule is arbitrary and capricious where agency "entirely failed to consider an important aspect of the problem"); *Ethyl Corp. v. Environmental Protection Agency*, 541 F. 2d 1, 36 (D.C. Cir. 1976) (agency decision must be "rational and based on consideration of the relevant factors").

First, the Fisheries Service failed to adequately consider that the bluefin potentially affected by the proposed closure were <u>spawning</u> bluefin.  Over twenty years ago, the Fisheries Service expressed concern about the need to minimize the bycatch of bluefin tuna in the Gulf of Mexico because the tuna caught in that region "are spawning adults."  47 Fed. Reg. 17086, 17089 (Apr. 21, 1982).  The Fisheries Service explained that "minimizing their capture . . . may contribute to increasing stock size."  *Id.*  It is axiomatic that spawning adult fish are absolutely vital to the future of any fish stock.  "Clearly, if there are no spawning fish, there can be no recruits . . . ."  J.G. Shepherd, *Aide Memoire on Scientific Advice on Fisheries Management*,

19

Ministry of Agriculture, Fisheries and Food, Directorate of Fisheries Research, UK 18 (1992), Exhibit G.; *see also* Safina Decl. ¶ 10.  In this situation, "the prospect of stock collapse is real, even if it only manifests itself as increased risk of poor recruitment when spawning stock size is low."  *Id.*  Therefore, as the plaintiffs stated in comments on the rule, a full assessment of the closure required consideration of the benefits of protecting <u>spawning</u> bluefin – separate and distinct from the overall bluefin population.  Instead, the Fisheries Service merely noted that, if fishing effort from the Gulf of Mexico were displaced elsewhere resulting in an increase of bluefin discards outside of the Gulf of Mexico, "there is not necessarily a 1-to-1 equivalency between benefits to individual spawning BFT in the Gulf of Mexico and individual non-spawning BFT outside of the Gulf of Mexico."  HMS FMP 4-39.

The Fisheries Service thus acknowledged that protecting spawning bluefin tuna provides a different level of benefit than does protecting non-spawning bluefin tuna.  But this cursory mention of the role of spawning bluefin is not adequate; defendants were required to provide an estimate of the greater level of benefit that should be accorded saving spawning bluefin, as opposed to saving non-spawning bluefin.  In the event, the Fisheries Service weighted them exactly the same.  This action arbitrarily ignores basic fish population science.  *Cf. Public Citizen v. FMCSA*, 374 F.3d 1209, 1216 (D.C. Cir. 2004) (agency's failure to consider the impact of its rule is arbitrary and capricious).

Second, the Fisheries Service failed to acknowledge another unique characteristic of the bluefin encountered in the Gulf of Mexico; those bluefin are exclusively *western* Atlantic bluefin.  In contrast, scientists report encountering both eastern and western bluefin throughout other areas of the Atlantic ocean, areas that the alleged redistributed fishing effort would impact.  Accordingly, the proposed spawning area closure would have a <u>direct</u> impact on rebuilding the

western population; unlike bluefin found outside the Gulf of Mexico, presumptively every single bluefin protected inside the Gulf would be (a) a member of the western Atlantic bluefin population and (b) a spawning member of that population. Yet the defendants gave this crucial factor absolutely no consideration, and therefore no weight. This failure again ignores the most basic fish population science, as well as the known facts about the life history of the western Atlantic bluefin. In short, this action was both arbitrary and capricious. *Cf. Parravano v. Babbitt*, 837 F. Supp. 1034, 1047 (N.D. Cal. 1993) (Secretary has "duty to demonstrate, through concrete analysis, that he could rationally conclude that his approach would accomplish his legitimate objectives based on the best scientific information available.").

Moreover, this aspect of the Fisheries Service analysis overlooks the elephant in the room: that is, despite years of regulation, a *de facto* directed fishery for bluefin tuna has continued to thrive in the Gulf of Mexico. Stated succinctly, longline fishermen in the Gulf of Mexico who ostensibly are targeting fish other than bluefin are, in fact, seeking out and catching bluefin as "incidental catch" and "bycatch." As a result, there is a significant probability that fishing mortality for bluefin in the Gulf is higher than reported. And the Fisheries Service has long been aware of this situation.

The Fisheries Service has noted throughout the years that the incidental bycatch of bluefin must be closely monitored and regulated in order to comply with ICCAT's recommendation that no directed bluefin fishing be permitted in the Gulf of Mexico. *See, e.g.*, 57 Fed. Reg. 365, 369 (Jan. 6, 1992) (noting that the purpose of the proposed rule adjusting the incidental take rules "is to bring the U.S. fishery into compliance with ICCAT agreements to conserve and manage the resource by prohibiting a directed fishery in the Gulf of Mexico."). In fact, in the HMS FMP, the Fisheries Service acknowledges that bluefin are being targeted in the

Gulf of Mexico despite the prohibition.  *See* AR E12, at 4-54 ("fishermen may be targeting the [Gulf] area for the increased opportunity to catch an occasional BFT.").  This should be no surprise—the current regulations allow a longliner to retain three giant bluefin on a single trip in the Gulf, a catch that may be valued at well over $100,000.  Because the Fisheries Service failed to acknowledge the continuing problem of a directed incidental bluefin fishery in the Gulf of Mexico, the analysis of the proposed closure was woefully inadequate.  Without any real discussion of the impact of a fishery directed at spawning members of a dwindling fishery, the HMS FMP is arbitrary and capricious.  *See, e.g., Motor Vehicle Mfg. Ass'n*, 463 U.S. at 43 (arbitrary and capricious where an agency "entirely failed to consider an important aspect of the problem").

Finally, the record lacks any explanation for the defendants' decision not to assess the relative importance of mortality for particular species when making decisions on closures. Outside reviewers joined the plaintiffs in suggesting that the Fisheries Service do so, but the Service declined.  See AR D70 at [un-numbered page] 7 (outside comments suggesting the need for a decision matrix); AR D67 at 3 (outside peer review agreeing that the respective status of the affected fish populations should be taken into account in an evaluation of the effects of the proposed closure).  Instead, defendants evaluated the bluefin bycatch question inside and outside the Gulf as if bluefin were of equal value in both areas.  This is plainly a case where the defendants failed to connect the facts found (that bluefin in Gulf are presumptively western Atlantic spawners and are subject to high mortality) with the choice made (that bluefin in the Gulf should be treated as of equal value with bluefin elsewhere).  Accordingly, defendants' decision to reject the plaintiffs' Petition for a Gulf closure was arbitrary and capricious.  *Cf. Consol. Rail Corp. v. STB*, 93 F.3d 793, 799 (D.C. Cir. 1996) (court must guard against arbitrary

inferences drawn from "facts found"); *Defenders of Wildlife*, 2006 WL 2844232, *20 (D.D.C.

Sept. 29, 2006) ("The Court's only role is to determine whether there is a rational connection

between the facts found and the choices made during the rulemaking.").

### B.    The Fisheries Service Relied Arbitrarily Upon a Fatally Flawed Model and Failed to Explain How it Informed the Decision to Reject the Petition

Defendants also failed to acknowledge and examine key assumptions underlying their

"effort redistribution model."  While the Fisheries Service has discretion to choose an

appropriate model, "[t]he agency retains a duty to examine the 'key assumptions' underlying its

model."  *Columbia Falls Aluminum Co. v. E.P.A.*, 139 F.3d 914, 923 (D.C. Cir. 1988).  Several

"key assumptions" underlying the redistribution model are deeply flawed.  Moreover, through its

use of varying assumptions as to the actual behaviors of fishermen in response to the closure, the

Fisheries Service itself demonstrated that the model is essentially arbitrary – it can offer little

meaningful information, and it can be used to "justify" a completely boundless range of

management choices.

A redistribution of effort model seeks to predict how much of the fishing activity that

normally would have occurred in a newly-closed area will relocate elsewhere, and what the

impact of that redistributed effort will be on selected species.  Simple "random redistribution of

effort" models assume that fishing effort will relocate from a closed area randomly to all other

possible fishing areas.  More advanced redistribution models take account of other known factors

that affect where fishing effort may be displaced (such as proximity, previous fishing history,

and financial and market conditions), as well as factors relevant to the relative effect of the

displaced effort on affected fish populations (such as age, abundance, and breeding status).

The assumptions that form the basis for any model are key.  Here, where the defendants

tried to determine the effects of closing longline fishing in a specific area of the Gulf of Mexico,

key assumptions included: (a) the rates of bycatch, both in the area to be closed and in the areas to which effort would be redistributed; and (b) the likelihood that effort will be redistributed to any particular area outside the area to be closed. *See* AR Doc. E12, at A-2 (explaining redistribution of effort model).

The Fisheries Service made fatal errors with respect to both of these key assumptions. In fact, the record reflects serious concern with respect to the "redistribution of effort" assumptions that underlie the ultimate conclusion of the Fisheries Service to reject a closure of the type sought in the plaintiffs' Petition. *See, e.g.*, AR D70 at [un-numbered page] 6  (outside comments criticizing NMFS closure analysis and stating that "[t]he assumptions on redistribution of effort and application of corresponding CPUE [Catch Per Unit Effort] are problematic"); AR D67, at 3 (outside peer review of NMFS closure analysis noting that the NMFS data do not support its conclusion on redistribution of fishing effort and stating that "assumptions on effort redistribution need to be rigorously tested").

First, in calculating rates of bycatch for use in the population redistribution model, the Fisheries Service relied upon reported bycatch data, while acknowledging that "discards may be underreported in the HMS logbook data compared to [observed] data."  AR  E12, at 4-33.  The Fisheries Service determined that such underreporting would not impact the reliability of the model by means of a crucial hypothesis.  Specifically, it decided that "if there are no differences in underreporting for different species between different regions," then "the relative effect of each closure for each species should be comparable across alternatives."  *Id.*

In the event this hypothesis proved incorrect, defendants' reliance on logbook data would render the model largely worthless.  In response to comments on the draft HMS FMP that expressed concerns about the impact of underreporting on the reliability of the model, defendants

attempted to test that hypothesis. The Fisheries Service analyzed the ratio of catch estimated

from observed data divided by the reported catch in the HMS logbooks – <u>not for bluefin</u> – but for

undersized swordfish, sailfish, blue marlin, white marlin, and pelagic sharks from the pelagic

longline fishery operating in the US Atlantic, Caribbean and Gulf of Mexico. AR E12, at 4-33.[22]

The Fisheries Service concluded, after analyzing those ratios that "there was no difference in

underreporting between the POP [observed data] and HMS logbooks [reported data] for the

above species in the Atlantic, Caribbean, or Gulf of Mexico." *Id.*

However, even assuming *arguendo* that the data from these non-bluefin fisheries support

the conclusion that the underreporting for these particular species is consistent across

alternatives, the Fisheries Service failed to explain how that conclusion can be rationally applied

to the bluefin fishery. In fact, the bluefin fishery's unique characteristics cast significant doubt

on whether such an extrapolation would be justified. Specifically, as discussed above, directed

fishing for western Atlantic bluefin tuna is (formally) prohibited in the Gulf of Mexico, but is

permitted elsewhere in the Atlantic. Obviously, the prohibition creates considerable incentives

to not report any "accidental" catch of bluefin in the Gulf of Mexico. Accordingly, it is highly

likely that the rate of underreporting of bluefin catches in the Gulf of Mexico is higher than the

rate of underreporting elsewhere in the fishery.

Second, even if the model's data were not suspect, the random redistribution model does

not describe where the vessels are likely to go. Under this model, a longliner displaced from the

Gulf of Mexico is as likely to resume fishing off of Long Island as it is to relocate to the east

coast of Florida. Although the Fisheries Service has demonstrated that it is likely that some

effort will be displaced, and that the fleet is mobile, there is no evidence to support the

assumption that such widespread redistribution will occur in this situation. In this case, the

---

[22] *See* J. Cramer, Pelagic Longline Bycatch, 51 Col. Vol. Sci. Pp.l ICCAT 1895-1929 (2000), AR  G1.

Fisheries Service "knows that 'key assumptions'" underlying the effort redistribution model "are wrong and yet has offered no defense of its continued reliance on it." *Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 923 (D.C. Cir. 1998). Accordingly, defendants' reliance on the random redistribution of effort model was arbitrary and capricious. *See American Iron & Steel Institute v. EPA*, 115 F.3d 979 (D.C. Cir. 1997)( agency's decision "will be reversed as arbitrary and capricious if there is 'simply no rational relationship' between the model chosen and the situation to which it is applied") (quoting *Chemical Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1265 (D.C. Cir. 1994)); *Eagle-Picher Indus., Inc. v. U.S.* EPA, 759 F.2d 905, 921 (D.C. Cir. 1985).

Equally arbitrary was the defendants' treatment of the results of the redistribution model based on a somewhat more detailed set of redistribution assumptions. This scenario assumed fishermen displaced by the spawning closure would not simply be redistributed randomly, but instead would fish only in other parts of the Gulf of Mexico and "in an area in the Atlantic where many Gulf of Mexico vessels have reported fishing." *See* 71 Fed. Reg. 58152. Tellingly, under these assumptions, "there was a predicted <u>decrease in the bycatch of . . . BFT [bluefin] discards</u> . . ." *Id.* at 58152-53 (emphasis added). In fact, this scenario predicted greater than a 19% decrease in bluefin discards – 122 discards avoided each year. *See* Table A.41, AR E12, at A-61. Notwithstanding this fact, however, defendants relied on their finding that this model also showed an increase in bycatch for certain billfish and coastal sharks to justify rejecting the closure sought in the Petition. *Id.* at 58153.

The net result of these machinations is that the defendants have created a modeling approach that arrogates unto themselves complete power to choose, or reject, whatever management measure they wish to choose. Under their approach, a closure of any part of any federal ocean waters will always result in an increase in bycatch for some species somewhere

else.  In fact, as appears in the HMS FMP, the more different assumptions are employed in the

model, the more it becomes clear that reliance on the redistribution of effort model will never

yield an outcome in which *all* species will experience a decrease in bycatch.

Moreover, because the Fisheries Service has neither explained which model outcomes

underlie its decisionmaking, nor justified the assumptions used to generate any model outcomes,

the model is simply generating arbitrary results.  *See Appalachian Power Co. v. EPA*, 251 F.3d

1026, 1035 (D.C. Cir. 2001)(no excuse where agency relies upon "a methodology that generates

apparently arbitrary results, particularly where, as here, the agency has failed to justify its

choice"); *cf. American Iron and Steel Inst. v. EPA*, 115 F.3d 979, 1004 (D.C. Cir. 1997) (use of

model with "no rational relationship . . . to the situation" is arbitrary); *Public Citizen v. Fed.*

*Motor Carrier Safety Admin.*, 374 F.3d 1209, 1218-19 (D.C. Cir. 2004) (rejecting a model that

"assumes away the exact effect that the agency attempted to use it to justify").

## III.    THE FISHERIES SERVICE VIOLATED THE MSA REQUIREMENTS TO PREVENT OVERFISHING, MINIMIZE OR AVOID BYCATCH, AND RELY UPON THE BEST AVAILABLE SCIENCE

In reviewing defendants' interpretation of the MSA, courts follow the analysis

established in *Chevron, USA v. NRDC*, 467 U.S. 837 (1984).  The first question is whether

Congress has spoken directly to the precise matter at issue.  *Id*. at 842-43.  No agency deference

is afforded on the question whether the statute is ambiguous.  *Cajun Electric Power Cooperative*

*v. FERC*, 924 F.2d 1132, 1136 (D.C. Cir. 1991).  "If a court, employing the traditional tools of

statutory construction, ascertains that Congress had an intention on the precise question at issue,

that intention is the law and must be given effect."  *Chevron*, 467 U.S. at 843, n.9.

If the statute is "silent or ambiguous with respect to the specific issue," the analysis

proceeds to the second step.  *Id*. at 843-44.  There, the question is whether the agency's

interpretation is "reasonable." *Id.* at 845; *United States v. Mead Corp.*, 533 U.S. 218 (2001). Reviewing courts "must reject administrative constructions … that are inconsistent with the statutory mandate." *Securities Industry Ass'n v. Board of Governors of the Federal Reserve System*, 468 U.S. 137, 143 (1984)(citations omitted). *See also NRDC v. Daley*, 209 F.3d 747, 753-54 (D.C. Cir. 2000) (NMFS interpretation of the MSA held unreasonable under *Chevron* Step Two). Courts do not grant *Chevron* Step Two deference to agency statements that lack the force of law. *United States v. Mead Corp.*, 533 U.S. 218, 227-231 (2001).

In this case, the defendants have violated the plain language of the MSA. In violation of National Standard One, they have failed to prevent overfishing of bluefin, failed to assure optimum yield for the western Atlantic bluefin fishery, and ignored ICCAT advice to the detriment of an already-inadequate bluefin rebuilding plan. Additionally, they have rendered meaningless the requirement of National Standard Nine to avoid or minimize bycatch of the bluefin. Finally, because they have not relied upon the best scientific information available in their efforts to manage and protect bluefin, they have violated National Standard Two.

A.    **The Fisheries Service Has Violated National Standard One By Failing to Prevent Overfishing of Western Atlantic Bluefin Tuna and By Failing to Ensure Rebuilding of the Overfished Bluefin Population**

National Standard One of the MSA (the "overfishing prohibition" standard) states that fishery management plans must contain conservation and management measures that "shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery." 16 U.S.C. § 1851(a)(1); *see also* § 1853(10) (plans must "…contain conservation and management measures to prevent overfishing or end overfishing and rebuild the fishery"). As one court explained: "[t]he ultimate goal, therefore, of any fishery management plan is to establish measures which achieve a rate or level of fishing mortality that allows the fishery to

28

produce the maximum sustainable yield on a continuing basis." *A.M.L. Int'l v. Daley*, 107 F. Supp. 2d 90, 94 and n.6 (D. Mass. 2000).  In other words, the defendants must control the amount of bluefin caught in a manner that is sufficient to ensure that the bluefin population is not reduced below a sustainable level.

For fish populations that are already reduced "below a sustainable level," as is the case with western Atlantic bluefin, the MSA requires that NMFS promulgate a rebuilding plan that will rebuild the population back to sustainable levels. 16 U.S.C. § 1854(e).  Currently, the depleted bluefin population is not sustainable and hovers at only 20% of its 1980 population. The law requires that the rebuilding time periods be "as short as possible" and "not exceed 10 years," 16 U.S.C. § 1854(e)(4), but it includes an exception where international organizations or agreements are involved, as is the case with bluefin and ICCAT.  In such situations, the rebuilding time period shall "be as short as possible" while "taking into account" recommendations from those international organizations.  16 U.S.C. § 1854(e)(4)(A)(i).  In addition, the rebuilding time period shall "not exceed 10 years, except in cases where . . . management measures under an international agreement in which the United States participates dictate otherwise."  16 U.S.C. § 1854(e)(4)(A)(ii).

1. **The Defendants Have Failed to Prevent Overfishing of Bluefin And Have Also Failed to Ensure Optimum Yield in the Bluefin Fishery**

The decision by defendants to deny the plaintiffs' June 2005 Petition – and therefore to adopt an FMP that continues to allow the killing of spawning bluefin in the Gulf of Mexico – violates National Standard One because it fails to prevent overfishing of bluefin, and in fact affirmatively allows overfishing of bluefin to continue.  In addition, that decision fails to ensure that optimum yield of bluefin is achieved.  In short, it does not ensure that the bluefin population

is being fished in a sustainable manner.  For these reasons, the defendants' decision to reject the Petition and adopt an HMS FMP that lacks any protection for spawning bluefin violates the intention of Congress as indicated in the plain language of the MSA, and is unreasonable.

There can be no question that the defendants' decision fails to prevent overfishing of bluefin, and in fact allows overfishing of bluefin to continue.  In their most recent report to Congress on the status of fisheries, the defendants classify western Atlantic bluefin as both "overfished" and as undergoing "overfishing."  *See* NOAA's National Marine Fisheries Service Report on the Status of the U.S. Fisheries for 2006, at 25 (2006).  Moreover, the population of the bluefin has been in steady decline for the past 25 years under the current management plan that allows the killing of scores – if not hundreds –  of bluefin as "bycatch" in the Gulf of Mexico during spawning season each year. Under these circumstances, the defendants' decision to reject the plaintiffs' Petition and leave the *status quo* intact is, by definition, a decision that fails to prevent overfishing.

When a fish population is fished excessively (*i.e.*, is fished at a rate that threatens the ability of the population to produce the maximum sustainable yield), that excessive fishing effort is deemed *overfishing*.  Under the stress of overfishing, a fish population suffers mortality at a rate that does not allow it to be fished sustainably – in such a circumstance, that population is considered to be *overfished*.  Continuing to kill fish whose population is already overfished delays the population's ability to rebuild to a sustainable level and could also push the population closer to population collapse, where the species could prove unable to recover to a healthy level. The fact that – far from recovering – the bluefin population has been in a steady decline for more than 20 years, demonstrates that the decision to continue with the *status quo* simply perpetuates overfishing and leaves the bluefin in an overfished state.

In addition, the defendants' decision does nothing to achieve "optimum yield" from the bluefin fishery.  The MSA defines "optimum yield" as the amount of fish that (i) constitutes maximum sustainable yield as reduced by certain factors and (ii) "in the case of an overfished fishery" provides for "rebuilding to a level consistent with producing the maximum sustainable yield."  16 U.S.C. ¶ 1802(33).  Since rejecting the plaintiffs' petition and remaining with the *status quo* is allowing the bluefin to remain in an overfished condition, the defendants' action runs afoul of the first requisite for "optimum yield" – clearly it is not a decision that allows the fishery to attain maximum sustainable yield.  Moreover, the decision allows a management regime to move forward unchanged despite the fact that it has not resulted in any perceptible rebuilding of the bluefin population.  Thus, it runs afoul of the second requirement that "optimum yield" provide for rebuilding.

In short, defendants' decision plainly violates National Standard One.  It allows overfishing to continue and perpetuates the overfished condition of bluefin.  In addition, the decision fails to ensure that optimum yield of bluefin is achieved.  Manifestly, it does not ensure that bluefin population is being fished in a sustainable manner.  The decision is therefore unlawful.  *See, e.g., Natural Res. Defense Council, Inc. v. Nat'l Marine Fisheries Serv.*, 421 F.3d 872, 881 (9th Cir. 2005).

### 2.    The Defendants Have Flouted the Recommendations of ICCAT and Violated the Rebuilding Requirements of the MSA

The defendants have violated the rebuilding provisions of the MSA by rejecting the plaintiffs' Petition and adopting an HMS FMP that allows a *de facto* directed fishery on bluefin in the Gulf of Mexico.  Far from "taking into account" the ICCAT concern over the need to protect spawning bluefin in the Gulf, this decision flouts the ICCAT preferences.

Defendants' rejection of the Plaintiffs' petition does nothing to rebuild the overfished bluefin population. The facts speak for themselves: since the "rebuilding plan" for bluefin was initiated by ICCAT in 1981, the population has been in a steady decline. Rather than rebuilding, it has continued to deconstruct. Instead of changing the *status quo*, however, the defendants' decision to reject the plaintiffs' Petition allows this population decline to continue.

Notably, ICCAT has been expressing reservations for the past few years concerning the ability of its rebuilding plan to succeed. The latest report of ICCAT scientists observes that "western bluefin tuna may be less resilient to fishing than previously thought." ICCAT 2006 SCRS Report at 57. In this report, ICCAT scientists also express significant concern that the potential for rebuilding western Atlantic bluefin is "less clear" than it has been in earlier years of the plan, and report that "current regulations may be insufficient to achieve the [rebuilding] objectives." *Id.* at 57, 58. These concerns echo those raised in 2004 by ICCAT scientists, who stated that they were uncertain as to the causes of the relatively poor recruitment for western Atlantic bluefin, but believed that it was extremely unlikely that spawning stock biomass of bluefin could recover to levels that were exhibited in the 1970s in the next 15 years without reducing catch to near zero. ICCAT 2004 SCRS Report at 51-52. Under these circumstances, even closely following the ICCAT recommendations with respect to fishing for bluefin would not guarantee that the bluefin population will rebuild.

But the defendants have in fact directly violated the rebuilding provision of the MSA by acting contrary to ICCAT's recommendations with respect to bluefin. The plain language of the statute requires the defendants to rebuild the overfished bluefin population in a time period that is "as short as possible," while taking ICCAT recommendations into account. 16 U.S.C. § 1854(e)(4)(A)(i). In fact, for more than 25 years, the defendants have countenanced the killing

of bluefin in the Gulf of Mexico in what is a *de facto* directed fishery, in contravention of ICCAT's preferred ban on such fishing.

As noted above, defendants have known for at least 25 years – since 1981 – that the high prices paid for bluefin were encouraging many fishermen to pursue them "as a target species." 46 Fed. Reg. 8012, 8013 (Jan. 26, 1981). In 1982, defendants acknowledged that the bluefin being caught in the Gulf were "spawning adults" and that "minimizing their capture, therefore, may contribute to increasing stock size." 47 Fed. Reg. 17086, 17089 (Apr. 21, 1982). In 1988, after banning directed fishing on bluefin in the Gulf, defendants recognized that their "incidental catch" management approach "may have permitted a directed fishery for Atlantic bluefin tuna in the Gulf of Mexico, contrary to the intent of the regulations and the United States obligations" to ICCAT. 53 Fed. Reg. 10415, 10415 (Mar. 31, 1988).

In short, the record establishes that the defendants have not followed the MSA requirement to take into account the recommendations of ICCAT. Instead, they have allowed a *de facto* directed fishery to kill spawning bluefin in the Gulf, and now have rejected a Petition that would have resolved that problem. This action plainly fails to take into account the long-standing ICCAT recommendation to protect spawning bluefin in the Gulf.[23]

**B.    The Fisheries Service Violated National Standard Two By Failing to Rely on the Best Scientific Information Available In Deciding Not to Protect Spawning Bluefin in the Gulf of Mexico**

National Standard Two requires that the conservation and management measures contained in the HMS FMP for ending overfishing and rebuilding the bluefin population "shall

---

[23] Given the significant reservations of ICCAT concerning the ability of the current plan to successfully rebuild the bluefin population, see ICCAT 2006 SCRS Report at 57-58, the defendants' decision to deny the plaintiffs' Petition and hold fast to the *status quo* also does not comport with the requirement that it demonstrate a "fairly high level of confidence" of rebuilding the bluefin population. *See NRDC v. Daley*, 209 F.3d 747, 754 (D.C. Cir. 2000) (quoting *Fishermen's Dock Coop., Inc. v. Brown*, 75 F.3d 164, 169-70 (4th Cir. 1996)).

be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2). *See also* 50

C.F.R. § 600.315(b)(2). "Scientific information includes, but is not limited to, information of a

biological, ecological, economic, or social nature." 50 C.F.R. § 600.315(b)(1). *See Southern Offshore*

*Fishing Ass'n v. Daley*, 995 F. Supp. 1411, 1432 (M.D. Fla. 1998) ("Under the 'best scientific

information available' standard, the Secretary must derive his determinations from the sum of pertinent

and available information.").

     This requirement to use the best scientific information available imposes a strict burden

on the defendants. Their decision "must be based on concrete analysis that permits the Secretary

to 'rationally conclude that his approach would accomplish his legitimate objectives." *The*

*Fishing Co. v. United States*, 195 F. Supp. 2d 1239, 1248 (W.D. Wa. 2002) (quoting *Parravano*

*v. Babbitt*, 837 F. Supp. 1034, 1047 (N.D. Cal. 1993). Moreover, "[c]onclusory statements

regarding the consideration of scientific data are not sufficient-the FMP must inform its audience

of the actual scientific basis supporting it." *Hadaja v. Evans*, 263 F. Supp. 2d 346, 354 (D.R.I.

2003). As outlined in the HMS FMP, the Fishery Service's decision not to implement the

proposed closure sought in the plaintiffs' Petition is based on a series of conclusory statements.

Therefore, that decision does not comport with National Standard Two.

     As discussed above, the defendants' decision not to implement any new closures was

based on the conclusion that no possible closure would reduce bycatch for all potentially affected

species. AR E12, at 4-33. In reaching this conclusion, the Fisheries Service utilized the effort

redistribution model under a variety of assumptions as to actual redistribution. But the three

scenarios described in the HMS FMP with respect to the closure proposed in the petition

(alternative B2(c)) resulted in wildly different outcomes for every species considered. The

spearfish estimates provide an illustrative example of the significant range of predicted outcomes

under the three scenarios for the estimated change in bycatch for spearfish:

1.    with no redistribution of effort = -12.0%
2.    with full redistribution of effort = + 2.0%
3.    with modified redistribution of effort = -8.3%.

*See* HMS FMP Tables 4.5 & A.40.  Similarly, although the Fisheries Service evinces concern

that the proposed closure will negatively impact loggerhead turtles, *see, e.g.*, HMS FMP 4-39,

under the "no redistribution of effort" model, loggerheads are in fact <u>benefited</u>, and under the

"modified redistribution of effort" model, there is no predicted change in bycatch for

loggerheads.

Despite the extremely disparate results reached under the different model assumptions,

the Fisheries Service never clearly explained which set of assumptions were deemed most

reliable.  Accordingly, although the varying model runs are clearly laid out in the HMS FMP,

there is no way to determine which model runs (or combinations thereof) actually informed the

Fisheries Service's opinion.  Merely stating in a conclusory fashion that no closure would reduce

all bycatch simply does not answer this very important question: it is vital, and it is legally

required, that defendants explain the true basis of their decision.  In short, under National

Standard Two, the Fisheries Service was required, if relying solely relying on this model, to

inform its audience how it reached its conclusions using the model.  It failed to do so.

This flawed decisionmaking was highlighted in the peer review process.  Messrs. Chris

Boggs and Keith Bigelow, in reviewing the analysis of the proposed closure, noted that they

"couldn't locate any objectives or decision matrix in deciding on the preferred HMS alternatives.

Most of the decisions seem to correspond to a percentage of reduction/increases for retained

species/bycatch and associated economics." AR E12, at E-24. In response, the Fisheries Service

merely noted that:

> While not a formalized decision matrix, NMFS used the analyses in time/area closure
> section, which considered all species, to evaluate the effects of the proposed time/area
> closures, including all species for a combination of closures. NFMS used the results of
> the analyses to guide the Agency in determining which management measures are
> appropriate at this time.

*Id.* at E-30. However, nowhere in the HMS FMP does the Fisheries Service further elucidate

how the "results of the analyses" were used "to guide the Agency." This explanation is the

epitome of a conclusory statement regarding the consideration of scientific data; such a statement

is not sufficient under National Standard Two. *Hadaja*, 263 F. Supp. 2d at 354.

Indeed, the Fisheries Service's position that the agency may not choose protections for

one species to the detriment of another, HMS FMP at 4-66, begs the question. If an alternative

benefits some species and may adversely affect others, then rejecting the alternative may

adversely affect the species that would benefit from that alternative. Thus, the agency may not

reject an alternative simply because its effects vary among species. Rather the agency must

analyze and compare the environmental impacts of all alternatives, including no action, on all

relevant species. Such a clear analysis has not occurred here. *See, e.g.*, *The Fishing Co. v.

United States*, 195 F. Supp. 2d 1239, 1248 (W.D. Wa. 2002).

### C.    The Fisheries Service Violated National Standard Nine By Failing to Minimize Bluefin Bycatch in the Gulf of Mexico

National Standard Nine of the MSA (the "bycatch" standard) states that fishery

management plans must contain conservation and management measures that avoid or minimize

bycatch and bycatch mortality to the extent practicable. 16 U.S.C. § 1851(a)(9). This provision

is echoed in a separate section of the MSA, which states that FMPs must include conservation

and management measures that, "to the extent practicable and in the following priority -- (A)

36

minimize bycatch; and (B) minimize the mortality of bycatch which cannot be avoided[.]"  16 U.S.C. § 1853(a)(11).  In addition, the MSA requires defendants to "establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery."  *Id.*

The bycatch provision does not exist "in a vacuum;" bycatch minimization is an integral part of the MSA's program for management of fish populations.  *See Legacy Fishing Co. v. Gutierrez*, 2007 WL 861143, *7 (D.D.C. March 20, 2007).  As one court noted:

> [The Fisheries Service] themselves recognize the threat posed by bycatch: '[B]ycatch can increase substantially the uncertainty concerning total fishing-related mortality', and thus complicates efforts to achieve the [MSA] . . .  goals to protect and rebuild threatened fish species.

*Conservation Law Found. v. Evans*, 209 F. Supp. 2d 1, 12 (D.D.C. 2001) (quoting 50 C.F.R. § 600.350(b)).

By denying the plaintiffs' Petition to prevent bycatch of spawning bluefin in the Gulf of Mexico, the Fisheries Service has failed to minimize the bycatch of bluefin tuna to the extent practicable, in violation of National Standard Nine.  *See id.* at 15 (failure to minimize bycatch and bycatch mortality violates the MSA).  Furthermore, defendants have not established a standardized bycatch reporting methodology for bluefin.

At the time they were presented with the plaintiffs' Petition, defendants were well aware that bluefin bycatch was a problem in the Gulf of Mexico.  In 1994, they noted that their "incidental catch" approach in the Gulf was "causing an increase in bluefin discard and waste." 50 Fed. Reg. 2813, 2814 (Jan. 19, 1994).  Eight years later, in 2002, they again noted that "despite efforts to alter target catch requirements . . . bycatch and discards of [bluefin] by U.S. pelagic longline vessels have continued."  67 Fed. Reg. 78404, 78406 (Dec. 24, 2002).

Plaintiffs' petition simply asked defendants to comply with the requirements of National Standard Nine with respect to a particularly important kind of bycatch – spawning bluefin.  In

refusing that request, the defendants did not engage in a meaningful analysis of practicable steps to minimize bluefin bycatch, and failed to establish the requisite bycatch reporting methodology. Instead, they offered a response that relied upon the possible bycatch effects of the closure sought by the plaintiffs on other species as an excuse to avoid the closure.

Under defendants' non-random effort redistribution scenario, the effort redistribution model predicted that bluefin bycatch would decrease by 19% -- thereby protecting 122 bluefin annually. AR E22, at 16-17. Given this result, National Standard Nine requires defendants to consider whether the closure was "practical" – for it clearly would have avoided, minimized, and reduced bluefin bycatch – not only in the closed area, but throughout all other areas that were part of this model run.

The defendants did not comply with National Standard Nine. They declined to proceed with the closure on the ground that the closure would result in an increase of bycatch for several other species. HMS FMP (AR E12) at 4-66. As we have explained elsewhere in this brief, this explanation is a classic *reductio ad absurdum* on the part of the defendants. Under their modeling scenarios, no part of the federal ocean can ever be closed, because their models will locate at least one species that is predicted to experience an increase in bycatch as a result of the closure. By ensuring that they will always be able to claim that any particular bycatch avoidance measure for one species is not "practical" (because it will adversely affect another species), defendants have robbed National Standard Nine of any meaning. Their concurrent failure to establish any standardized bycatch reporting methodology for bluefin exacerbates the problem by allowing their approach to avoid close scrutiny. All of this is unlawful. *See American Fed'n of Government Employees v. Federal Labor Relations Auth.*, 798 F. 2d 1525, 1528 (D.C. Cir. 1986) (agency interpretation should not "deprive a statutory provision of virtually all effect");

*see also Oceana, Inc. v. Evans*, 2005 WL 555416, *37-43 (D.D.C. Mar. 9, 2005); *Pac. Marine Conservation Council, Inc. v.* Evans, 200 F. Supp. 2d 1194, 1200 (N.D. Cal. 2002).

By way of excuse for its approach, the Fisheries Service stated that "National Standard 9, which requires NMFS to minimize bycatch and bycatch mortality to the extent practicable, applies to all species and fisheries." AR E22, at 16. In addition, in responding to comments from peer reviewers about the need for some sort of decision matrix to better inform its final conclusion, it claimed that it "cannot place more value on one species over another species." AR E12 at E-30, and observed that more research was needed in order to make a determine to close the Gulf. AR E12 at D-17. However, as noted above, choosing not to close the Gulf to protect spawning bluefin plainly values other species more than bluefin. Moreover, relying on future actions does not relieve the agency's duty in *this* FMP to take actions to minimize bycatch to the extent practicable. *Cf. Conservation Law Found. v. Evans*, 209 F. Supp. 2d 1, 9 (D.D.C. 2001) (rejecting argument that future agency rulemaking would remedy legal inadequacies in current regulation). In short, these excuses do not mask the fact that defendants failed to comply with National Standard Nine.

## IV.    THE FISHERIES SERVICE VIOLATED THE NATIONAL ENVIRONMENTAL POLICY ACT

The defendants violated the National Environmental Policy Act ("NEPA") in preparing the Final Environmental Impact Statement ("FEIS") for the HMS FMP that rejected the plaintiffs' Petition. The FEIS fails the most basic requirement of NEPA: to analyze clearly one of the fundamental challenges intended to be addressed by the Petition—ending the precipitous decline of the bluefin tuna population. Defendants essentially ignored a central cause of the overfishing problem—the continuing rise of a *de facto* directed bluefin fishery in the Gulf of Mexico—and failed to consider alternative management measures to solve that problem that are

required by the MSA and that could prove effective.  Accordingly, when this case is remanded to
the defendants with instructions to prepare regulations that better protect spawning bluefin in the
Gulf of Mexico, the defendants must prepare a new environmental analysis to accompany those
regulations.[24]

NEPA requires the Fisheries Service to analyze the environmental impacts of a
reasonable range of alternative measures for ending overfishing and rebuilding an overfished
stock of fish, as well as for avoiding or minimizing bycatch, when it prepares an FMP.  42
U.S.C. § 4332(2)(C); 16 U.S.C. § 1853(a)(1)(C) (providing that FMPs must be "consistent with .
. . any other applicable law").  Thus, NEPA requires defendants to analyze the environmental
impacts of the HMS FMP and consider alternatives to the Petition, including alternatives that
might mitigate the impacts of the FMP on bluefin, while developing the scientific information
and analysis necessary to analyze those impacts and alternatives.

### A.    The FEIS Failed to Analyze Adequately the Possible Impacts of the Closure Requested in the Petition

The central purpose of NEPA is to ensure that both decision-makers and the public are
well informed about the potential environmental effects of a proposed actions.  *See Robertson v.
Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (NEPA ensures that the agency will
"carefully consider detailed information concerning significant environmental impacts" and that
such information is available to the public); *accord Baltimore Gas & Electric Co. v. NRDC*, 462
U.S. 87, 97 (1983).  The regulation promulgated by defendants to govern their NEPA
compliance (National Oceanic and Atmospheric Administration Administrative Order 216-6,
hereinafter "AO 216-6") emphasizes the defendants' duty to prepare an EIS that adequately

---

[24]    Plaintiffs do not assert that an environmental analysis is required to accompany emergency regulations that
plaintiffs request be published immediately upon a ruling from this Court.

informs the public of the environmental impacts of the proposed action: "An EIS must provide a full and fair discussion of significant environmental impacts." AO216-6 § 5.04.a.1.

Notwithstanding these clear mandates, the FEIS here fails to provide a full and fair discussion of the environmental impacts of defendants' decision to deny the plaintiffs' Petition. The FEIS glosses over the problems of bluefin bycatch in the Gulf of Mexico and pays even less attention to the implications of allowing such bycatch to continue in the event the chosen management measures (allowing longline fishermen to kill spawning bluefin in the Gulf of Mexico) fail to prevent overfishing and fail to rebuild the bluefin population.

The FEIS formally identified a "No Action alternative" that "would maintain the existing time/area closures . . . and would not implement any new time/area closures." AR E12, at 4-33. However, the analysis of this alternative focuses exclusively on the "overview of the effectiveness of the existing time/area closures at reducing discards and bycatch and maintaining target catches for the entire fishery." *Id.* Notably absent from this analysis is any discussion of the concerns addressed in plaintiffs' Petition—it does not address the impact of continuing to allow high incidental catch of bluefin in the Gulf of Mexico. As a result, the FEIS fails to comply with NEPA's requirement to adequately consider the "no action" alternative.

The Council on Environmental Quality ("CEQ") has stated that the analysis of alternatives must 'include the alternative of no action.'" Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18027 (Mar. 23, 1981) (citing 40 C.F.R. § 1502.14). In a situation where "no action" is equivalent to "no change" from current management practices – such as this case – the "projected impacts of alternative management schemes" must be "compared in the EIS to those impacts projected for the existing plan." *Id.* Thus, defendants must include in the FEIS (at a minimum) a discussion

and comparative analysis of the impacts of maintaining the *status quo* with respect to the bluefin in the Gulf when contrasted with the impacts of establishing the closure sought by the plaintiffs in their Petition. Such comparison is not in the FEIS. Because the FEIS "does not provide the information necessary for decision-makers to make fully informed choices . . . the [FEIS] is therefore inadequate under NEPA." *Greenpeace v. NMFS*, 55 F. Supp. 2d 1248, 1275 (W.D. Wa. 1999).

Instead of evaluating plaintiffs' concerns about the problems presented by adopting the "No Action alternative" in a meaningful way, the defendants asserted in the most conclusory fashion that "no single closure or combination of closures would reduce the bycatch of all species considered, assuming there is some redistribution of effort." AR E12, at 4-66. This conclusion leaves unaddressed a central question presented by the Petition – whether the proposed closure significantly reduce incidental catch of western Atlantic bluefin tuna, thereby reducing overfishing of that overfished population. By failing to address this question, the FEIS does not provide the "hard look" at environmental consequences required by NEPA. *See Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976) (courts are to ensure that agencies take a "hard look" at the environmental consequences of their actions); *NRDC v. Hodel*, 865 F. 2d 288, 294 (D.C. Cir. 1988) (EIS must "contain[] sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a 'hard look' at environmental factors").

**B.    The FEIS Failed to Present a Clear Analysis of the Environmental Impacts of Alternatives to the Closure Requested in the Petition**

A basic requirement of NEPA is that an EIS present information in a clear and comprehensible fashion. *See Tongass Conservation Society v. Cheney*, 924 F.2d 1137, 1142 (D.C. Cir. 1991) (EIS text must be written in plain, readily understandable language). The CEQ guidelines also make clear that EISs "shall be concise, clear, and to the point." 40 C.F.R. §

1502.1.  Importantly, the analysis of alternatives must foster "informed decision-making and informed public participation."  *See Westlands Water District v. U.S. Department of the Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (analysis of alternatives must foster "informed decision-making and informed public participation") (quoting *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982)); *see also* 40 C.F.R. § 1502.14 (requiring that agencies must analyze alternatives in comparative form "sharply defining the issues and providing a clear basis for choice among options by the decision-maker and the public").

As described earlier in this brief, the FEIS failed to clearly and coherently discuss the exact methodologies used by the defendants in making their decision to deny the plaintiffs' Petition.  Thus, they failed to explain how they chose the alternative of the *status quo*.  They also failed to examine other alternatives for protecting spawning bluefin, such as establishing a bycatch cap.  For example, in response to concerns that there was a need for a "decision matrix" that would illuminate the process by which defendants decided not to close the bluefin spawning area in the Gulf, defendants said only that they "used the results" of their closure analyses "to guide the Agency in determining which management measures are appropriate at this time."  AR E 17 at 6.  Notably, they did not elaborate on the manner in which they relied upon their analysis for any particular guidance.   They also noted cryptically – and again without elaboration – that they "cannot place more value on one species over another species."  AR E12 at E-30. These failures to explain the bases for their decisions violate NEPA.

### C.    The FEIS Failed To Evaluate the Cumulative and Long-term Effects of Denying the Closure Requested in the Petition

Two additional failings of the FEIS are: (1) its lack of any cumulative impacts analysis of the environmental effects of the continuing failure to rebuild the western Atlantic bluefin; and (2) its refusal to examine the long-term effects of this rebuilding failure.  As we have shown, the

43

defendants have been aware for many years that the bluefin population is in a long decline.  In fact, ICCAT scientists are now expressing concern that the prospects for rebuilding bluefin under the existing rebuilding plan are "less clear" and that "current regulations may be insufficient to achieve [rebuilding] objectives.  2006 ICCAT SCRS Report at 57-58.  Under these circumstances, it is particularly important for defendants to analyze whether the closure sought by the Petition would help prevent the cumulative loss of the bluefin population at a critical time.  However, no such discussion appears in the FEIS.

This approach is plainly insufficient to comply with NEPA.  The Act expressly requires agencies to analyze "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity."  42 U.S.C. § 4332(2)(C)(iv).  As a result, defendants must make a reasonable effort to discern the long-term effects of denying the closure sought by the Petition on the productivity of the bluefin fishery.  See *Concerned About Trident* v. *Rumsfeld*, 555 F.2d 817, 829-830 (D.C. Cir. 1977) (agency must examine the future results of its actions). They cannot – at least without any environmental analysis – continue on the path set in their most recent regulations, which favor the short term interests of longline fishermen in the Gulf of Mexico over the long-term interests of all bluefin fishermen and of the bluefin population itself.  *See Potomac Alliance* v. *U.S. Nuclear Regulatory Comm'n*, 682 F.2d 1030, 1036 (D.C. Cir. 1982) (NEPA does not allow agency to be short-sighted).

In addition, the CEQ regulations make clear that agencies must evaluate the cumulative impacts of their decisions.  40 C.F.R. § 1508.27; *see Fund for Animals* v. *Clark*, 27 F.Supp. 2d 8, 12 (D.D.C. 1998) (environmental analysis required "where several separate actions may have a cumulatively significant effect on the environment").  Thus, an EIS must address both cumulative and long-term impacts of the action it examines.  By neglecting to analyze the long-

term effects – on both bluefin fishermen and bluefin – of their decision to deny the plaintiffs'

Petition, the FEIS for the HMS FMP manifestly fails this additional NEPA requirement.

## CONCLUSION

For each of the foregoing reasons, the plaintiffs respectfully request this Court to enter an

order granting summary judgment against defendants in accordance with the accompanying

motion.


DATED this 19th day of November, 2007.


Respectfully submitted,

STEPHEN E. ROADY
D.C. Bar. No. 926477
JENNIFER C. CHAVEZ
D.C. Bar No. 493421
Earthjustice
1625 Massachusetts Avenue, N.W.
Washington, D.C.  20036
202-667-4500 Telephone
202-667-2356 Fax

Attorneys for the Plaintiffs

---

## Petition for Immediate Rulemaking to Protect Spawning Atlantic Bluefin Tuna in the Gulf of Mexico

---

Submitted to Secretary of Commerce Carlos M. Gutierrez
Office of the Secretary
Room 5516
U.S. Department of Commerce
14th & Constitution Ave. NW
Washington, DC 20230

Submitted by:

Blue Ocean Institute (BOI)
Monterey Bay Aquarium Foundation (MBAF)
National Coalition for Marine Conservation (NCMC)
Natural Resources Defense Council (NRDC)
Oceana, Inc. (Oceana)

June 8, 2005

Please address correspondence to:

Stephen E. Roady                          Eric A. Bilsky
Jennifer C. Chavez                        Oceana, Inc.
Earthjustice                              2501 M Street, NW, Suite 300
1625 Massachusetts Ave. NW, Suite 702     Washington, DC  20037
Washington, DC  20036                     Phone: (202) 833-3900
Phone:  (202) 667-4500                     Fax: (202) 833-2070
Fax:  (202) 667-2356                       Attorney for Oceana
Attorneys for BOI, MBAF, NCMC, and NRDC

## I.    INTRODUCTION

The Blue Ocean Institute (BOI), Monterey Bay Aquarium (MBAF), the National

Coalition for Marine Conservation (NCMC), Natural Resources Defense Council (NRDC), and

Oceana, Inc. (Oceana) ("the Petitioners") hereby petition the Secretary of Commerce

("Secretary") to take the following two actions:

(1) to exercise his authority under 16 U.S.C. § 1855(c) to promulgate interim measures

necessary to stop pelagic longline fishing in Gulf of Mexico spawning areas during critical

bluefin tuna spawning season; and

(2) to exercise his authority under 16 U.S.C. § 1854(g) to initiate rulemaking designed

make permanent these protections for western Atlantic bluefin tuna in the Gulf of Mexico by

prohibiting pelagic longline fishing in bluefin spawning areas in the Gulf during bluefin

spawning season.

The Secretary is required under the Magnuson-Stevens Fishery Conservation and

Management Act, 16 U.S.C. § 1801 *et seq.* (the "Magnuson-Stevens Act") to prevent overfishing

and rebuild overfished populations.  If the Secretary finds that an emergency or overfishing

exists, or that interim measures are needed to reduce overfishing for any fishery, he is

authorized to promulgate emergency regulations or interim measures necessary to address the

emergency or end overfishing.  16 U.S.C. § 1855(c)(1).  Here, recently published electronic

tagging studies have identified a spawning "hot spot" for Atlantic bluefin tuna in the northern

slope waters of the Gulf of Mexico. Block, Barbara A., et al., *Electronic Tagging and Population*

*Structure of Atlantic Bluefin Tuna*, NATURE 434:1121-1127 (2005), attached as Exhibit A.   Based on

2

the new data contained in Exhibit A to this petition, the Gulf of Mexico bluefin spawning area is bounded as shown in the following illustration [1]:



The data in Exhibit A demonstrate that immediate action by the Secretary to prohibit pelagic longline fishing in the Gulf of Mexico spawning area during the months of April-June, the bluefin spawning period, should reduce mortalities of reproductive adult bluefin tuna, reduce

---

[1] Proposed boundaries of the closure are outlined in thick black line in the map, modified from Figure 2a in Block et al. 2005, attached hereto as Exhibit A, enclosing contiguous degree-square areas with more than 22 bluefin tuna occurrences, with additional modifications to reflect areas of high bluefin tuna CPUE in the longline fishery as recorded by observer and logbook data. The number of bluefin tuna observed includes information from electronic tagging, pelagic longline observers, and pelagic longline logbooks referred to in Figure 2a as "Positions in 1° x 1° area." The exact coordinates of the proposed time/area closure are between 96°W 28°N east to 92°W, north to 29°N, east to 86°W, south to 28°N, east to 85°W, south to 27°N, west to 86°W, south to 26°N, west to 89°W, south to 25°N, west to 94°W, north to 26°N, west to 96°W, and north to the starting point.

further overfishing, and promote the rebuilding of the overexploited western Atlantic bluefin tuna population.

The new data also demonstrate that this seasonal area closure should be made permanent in order to protect that population. The Magnuson-Stevens Act requires the Secretary to prepare fishery management plans and plan amendments for western Atlantic bluefin tuna that contain management measures which "promote international conservation." 16 U.S.C. § 1854(g)(1)(G)(i). The new data show that, in order to comply with this requirement to promote conservation, the Secretary must establish a permanent prohibition on pelagic longline fishing in bluefin tuna spawning areas located in the Gulf of Mexico during spawning season.

## II.    BACKGROUND

The population of western Atlantic bluefin tuna remains at an all-time low. *See* International Commission for the Conservation of Atlantic Tunas (the "Commission" or "ICCAT"), *Report of the Standing Committee on Research and Statistics* (2004) (Exhibit A at 52). The spawning stock biomass[2] (SSB) of western Atlantic bluefin tuna has decreased by 80% or more since 1970. *Id.* Despite this dramatic decline in the western stock SSB, managers have allowed the fishing mortality rate for bluefin to reach its highest level since 1970. *Id.* As a result, the western Atlantic bluefin tuna is overfished, and continues to be subject to overfishing. *Id.* at 52-53. Indeed, recognizing the dire state of the western bluefin population, the National Marine Fisheries Service ("NMFS") has prohibited directed fishing for bluefin in the Gulf of Mexico. *See* 50 C.F.R. § 285.31(a)(30). However, closure of the directed fisheries has proved insufficient to protect bluefin in the Gulf, leading NMFS to issue regulations aimed at reducing bycatch of

---

[2] SSB is an estimate of the total weight of fish in a given stock that are involved in the spawning process during the spawning season.

bluefin in directed fisheries for other species. *See, e.g.*, 57 Fed. Reg. 365 (January 6, 1992) and 69 Fed. Reg. 32,414 (May 30, 2003).

There is inadequate observer coverage of current fishing practices, and recent scientific results indicate that longline fishing, in particular, is most likely generating high numbers of dead discarded bluefin tuna. For example, a biological opinion prepared by the National Oceanic and Atmospheric Administration ("NOAA") on the Atlantic Pelagic Longline Fishery for Highly Migratory Species determined that from 1995 to 2002, a total of 10,498 bluefin tuna were caught by U.S. Atlantic pelagic longlines. *See* NOAA, *Biological Opinion – Reinitiation of Consultation on the Atlantic Pelagic Longline Fishery for Highly Migratory Species* at 2-7 (June 1, 2004). Of those caught by longlines, 8,832 fish were "discarded," meaning they were thrown back into the ocean. *Id.* According to NMFS data up to 1999, 80% of discarded bluefin tuna were dead. *See* NMFS, *Final Fishery Management Plan for Atlantic Tuna, Swordfish and Sharks* at ¶ 3.5.4.1.1 (April 1999).

A new study involving electronic monitoring of tagged bluefin identifies issues concerning both the eastern and western Atlantic bluefin tuna populations. Among other things, the study reaches two specific conclusions of particular and immediate importance to the management of the western Atlantic bluefin tuna. First, the study compiles conclusive evidence that western Atlantic bluefin tuna are subject to fishing-related mortality in the Gulf of Mexico during their spawning season. Second, the results of the study show that time/area closures would reduce the incidental catch of western Atlantic bluefin tuna by pelagic longline fisheries operating in the northern slope waters of the Gulf of Mexico, a critical habitat for bluefin tuna during the spawning season. *See* Block, *supra*, (Exhibit A at 6).

These conclusions are consistent with those expressed by NMFS, which has stated in a draft fishery management plan for Atlantic Highly Migratory Species that new time/area

5

closures of pelagic longlining fisheries or modifications to existing closures may be necessary to address bycatch of Atlantic bluefin tuna. *See* Pre-Draft of Atlantic Highly Migratory Species Fishery Management Plan at 50 (February 2005).    In this draft HMS FMP, NMFS also set forth a variety of factors that should be considered in implementing new or modified existing time/area closures, including listing of a species as overfished (as is the western Atlantic bluefin tuna), analysis of gear impacts, and location of important spawning or nursery areas. *Id.* at 51. All these factors, particularly the new information on the location of an important spawning area or "hot spot" in the Gulf of Mexico, strongly support time/area closures of longline fisheries operating in the Gulf of Mexico in western Atlantic bluefin tuna spawning waters during spawning periods.

## III.    STATUTORY AUTHORITY FOR THIS PETITION

The petitioners submit this petition to the Secretary pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §500 *et seq.*, and the Magnuson-Stevens Act. The APA mandates that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule," 5 U.S.C. § 553(e), and when such petitions are denied, the agency must give "a brief statement of the grounds for denial," *id.* § 555(e); *see National Mining Assn. v. U.S. Dept. of Interior,* 70 F. 3d 1345, 1352 (D.C.Cir. 1995); *American Horse Protection Assn., Inc. v. Lyng,* 812 F.2d 1, 5-6 (D.C. Cir. 1987). Further, "the right to petition for rulemaking entitles the petitioning party to a response on the merits of the petition." *Fund for Animals v. Babbitt,* 903 F.Supp. 96, 115-116 (D.D.C 1995). The APA requires the agency "within a reasonable time," to "proceed to conclude a matter presented to it." 5 U.S.C. § 555(b). Accordingly, the Secretary must "fully and promptly consider" the petition. *WWHT, Inc. v. F.C.C.,* 656 F.2d 807, 813 (D.C. Cir. 1981).

The Magnuson-Stevens Act requires the Secretary to manage western Atlantic bluefin tuna and other highly migratory species that migrate within the Gulf of Mexico, and authorizes the Secretary to promulgate emergency regulations or interim measures when necessary to stop overfishing. *See* 16 U.S.C. §§ 1852(a)(3) and 1855(c)(1). Today, scientific evidence shows the existence of a spawning "hot spot" for the western Atlantic bluefin tuna in the northern slope water of the Gulf of Mexico. *See* Exhibit A. As more fully set forth below, the Secretary has a duty to grant this Petition to protect spawning bluefin tuna from longline fishing pressure under the Magnuson-Stevens Act, the Atlantic Tunas Convention Act ("ATCA"), 16 U.S.C. § 971 *et seq.*, and the recommendations of ICCAT.

Under the circumstances, with the bluefin spawning season in the Gulf of Mexico estimated to span from April through June, the Secretary should respond to this request immediately. In addition, the Secretary should promptly initiate a rulemaking to make this bluefin spawning season fishery closure permanent by January 2006.

## IV.   DUTY OF THE SECRETARY TO STOP LONGLINE AND OTHER FISHING IN ATLANTIC BLUEFIN TUNA SPAWNING WATERS IN THE GULF OF MEXICO

### A.    The Magnuson-Stevens Act

The Magnuson-Stevens Act was intended, among other things, to prevent overfishing, restore presently overfished stocks, and maintain a long-term system of fishery management and conservation. 16 U.S.C. § 1801(a)-(b). Congress intended to "assure that the national fishery conservation and management program utilizes, and is based upon, the best scientific information available." *Id.* § 1801(c)(3). To that end, Congress enacted National Standard Two, which requires that conservation and management measures "shall be based upon the best scientific information available." *Id.* § 1851(a)(2). Further, national fishery conservation was intended to "[consider] the effects of fishing on immature fish and [encourage] development of

7

practical measures that minimize bycatch and avoid unnecessary waste of fish." *Id.* § 1801(c)(3).

In addition, National Standard Nine requires that conservation measures, "to the extent

practicable . . . minimize bycatch." *Id.* § 1851(a)(9).

As applied to western Atlantic bluefin tuna, the Magnuson-Stevens Act provides two

mechanisms by which the Secretary can comply with the requirements to prevent overfishing

and minimize bycatch and unnecessary waste of fish. First, the Act requires the Secretary to

prepare fishery management plans and plan amendments for bluefin tuna that comply with the

national standards and contain conservation and management measures which "promote

international conservation." 16 U.S.C. § 1854(g)(1)(G)(i). Second, the Act provides:

> If the Secretary finds that an emergency exists or that interim
> measures are needed to reduce overfishing for any fishery, he may
> promulgate emergency regulations or interim measures necessary
> to address the emergency or overfishing, without regard to
> whether a fishery management plan exists for such fishery.

*Id.* § 1855(c)(1).

The new data contained in Exhibit A show that the Secretary must take action to

promote international conservation of western Atlantic bluefin by prohibiting the use of pelagic

longline fishing gear in the Gulf of Mexico bluefin spawning area during bluefin spawning

season. The practice of longline fishing in Atlantic bluefin tuna spawning waters contributes

significant numbers of dead discards of bluefin tuna, further depletes the population, results in

unnecessary waste, and cripples the rebuilding potential of the Atlantic bluefin tuna. *See* Block,

et al., Exhibit A; *see also* Jeffrey A. Hutchings and John D. Reynolds, *Marine Fish Population*

*Collapses: Consequences for Recovery and Extinction Risk,* BioScience, April 2004, at 297-302. The

Secretary should therefore take immediate action to make a bluefin seasonal spawning closure

permanent by January 2006.

8

B.      **The Atlantic Tunas Convention Act (ATCA) and Recommendations of the Convention (ICCAT)**

Under Section 971d of ATCA, the Secretary is authorized to adopt regulations that are

necessary to carry out the purposes and objectives of the ICCAT and ATCA, 16 U.S.C. § 971d(a),

and must adopt regulations that are necessary and appropriate to carry out ICCAT

recommendations, *id.* § 971d(c)(1)(A).  In furtherance of these duties, the Secretary is

authorized to limit or prohibit the incidental catch of a regulated species, *id.* § 971d(c)(3)(E), and

to divide waters into areas and establish one or more closed seasons as to such area, *id.* §

971d(c)(3)(B) and (C).  Further, the Secretary is not limited to enumerated actions, but may

"impose such other requirements and provide for such other measures as the Secretary may

determine necessary to implement any recommendation of the Convention."  *Id.* § 971d(c)(3)(K).

Finally, regulations must be consistent with fishery management plans prepared and

implemented under the Magnuson-Stevens Act.  *Id.* § 971d(c)(1)(C).

After a 1998 stock assessment showed that the western Atlantic bluefin tuna population

is over-exploited[3], ICCAT recommended that "[t]here shall be no directed fishery on the bluefin

tuna spawning stocks in the western Atlantic in spawning areas such as the Gulf of Mexico."

*See Recommendation by ICCAT to Establish a Rebuilding Plan for Atlantic Bluefin Tuna* at ¶ 16 (June

21, 1999).  Further, ICCAT recommended that all entities "minimize dead discards [of bluefin

tuna] to the extent practicable", and "continue to take measures to prohibit any transfer of

fishing effort" between eastern and western Atlantic bluefin tuna stocks, *id.* ¶¶12 and 15.

Accordingly, NMFS regulations prohibit directed fishing for bluefin tuna in the Gulf of Mexico.

*See* 50 C.F.R. § 285.31(a)(30).  However, NMFS has acknowledged that the prohibition on

---

[3] The Commission's Standing Committee on Research and Statistics (SCRS) found that "bluefin tuna stocks in the west Atlantic are over-exploited ($B<B_{msy}$, $F>F_{msy}$; i.e. current biomass is less than biomass at MSY and current fishing mortality is higher than that of the MSY level.)"

directed fishing does not adequately control mortality associated with directed longline fisheries for other species. *See, e.g.*, 69 Fed. Reg. 32,414 (amending incidental catch regulations to reduce dead discards of bluefin tuna associated with directed longline fishing in other fisheries); 57 Fed. Reg. 365 (determining that incidental catch limit in southern fishery was not effective at reducing bluefin tuna bycatch mortality and changing the restriction for this area).

As noted above, the Secretary is required under ATCA to carry out ICCAT's recommendations, and is authorized to adopt any regulations necessary to do so. 16 U.S.C. §§ 971d(c)(1)(A), 1855(c)(1). Indeed, the current Fishery Management Plan (FMP) for Atlantic Tuna, Swordfish and Sharks states, "it is the intent of this FMP to reduce the incidental catch of bluefin tuna on gears that are not authorized to take bluefin. However, it is also the intent to reduce waste of unavoidably caught bycatch." Currently the FMP requires closure of a small area in the northwestern Atlantic (from 39 to 40E N and 68 to 74E W) to pelagic longline fishing during the month of June. *Id.* However, spawning bluefin tuna in the Gulf of Mexico are not similarly protected. Based on the foregoing, and consistent with the best scientific information available (as shown in Exhibit A), the Secretary must implement a time/area closures to protect spawning bluefin tuna in the bluefin spawning area in the Gulf of Mexico.

**V.    THE LATEST SCIENTIFIC INFORMATION SUPPORTS IMMEDIATE ACTION TO CLOSE LONGLINE AND OTHER FISHERIES THAT CAN CATCH BLUEFIN TUNA TO PROTECT SPAWNING WESTERN ATLANTIC BLUEFIN TUNA IN THE GULF OF MEXICO**

**A.    Spawning Western Atlantic Bluefin Tuna Are Subject to Fishing Pressure in Their Gulf of Mexico Spawning Areas.**

As set forth above, the Secretary has broad authority to take immediate and permanent action to protect bluefin tuna. Here, the latest scientific information (contained in Exhibit A) reveals that western Atlantic bluefin tuna are subject to fishing-related mortality in spawning waters in the Gulf of Mexico during spawning season, in contravention of ICCAT

10

recommendations for rebuilding over-exploited western Atlantic bluefin tuna stocks. *See Recommendation by ICCAT to Establish a Rebuilding Plan for Atlantic Bluefin Tuna* at ¶ 16 (stating that there shall be "no directed fishery on the bluefin tuna spawning stocks in the western Atlantic in spawning areas such as the Gulf of Mexico," and all parties "shall minimize dead discards to the extent practicable.").

Recently-published electronic tagging data, combined with United States pelagic longline observer and logbook catch data, identify a "hot spot," an area of concentrated bluefin tuna occurrence during spawning season, in the northern slope waters of the Gulf of Mexico from 1992 to 2004. *See* Block, et al., Exhibit A at 1-3. These fish enter the Gulf along the continental slope through the Straits of Florida, and move into the northern slope of the Gulf where the warm waters present favorable conditions for development of eggs and larva. *Id.* Histological examination of bluefin tuna caught by the researchers indicated that these were mature fish in pre-spawn stages, consistent with previous data indicating that spawning occurs in the Gulf of Mexico in April, May and June. *Id.*

The study by Block, et al. (see Exhibit A) demonstrates significant overlap between areas of frequent occurrence of Atlantic bluefin tuna on their western spawning ground in the Gulf of Mexico as shown in tracking data, and areas where bluefin tuna are frequently captured, as shown in U.S. pelagic longline scientific observer data and longline logbook data. *Id.* at 3, Figure 2. According to these data, the highest rates of capture of western Atlantic bluefin by tuna longline vessels occur roughly in the same areas as the spawning hot spot identified by tagging data. These data demonstrate that, contrary to ICCAT recommendations for rebuilding over-exploited western Atlantic bluefin tuna stocks, spawning bluefin tuna are presently subject to fishing pressure in their spawning areas in the Gulf of Mexico. *Id.* (Given the significant economic value of bluefin tuna, there is a suspicion that some tuna fishermen in the Gulf might

actually be targeting these fish and then keeping them as "bycatch.")  In light of these data, the Secretary must immediately and permanently protect these bluefin spawning areas.

      **B.**    **Attempting to Protect Bluefin Tuna by Continuing to Rely on Fishing Limits Rather Than Establishing a Seasonal Spawning Closure Would be Arbitrary and Capricious**

    The current prohibition on directed fishing for western Atlantic bluefin tuna in the Gulf of Mexico is inadequate to protect spawning bluefin in the Gulf, where warm weather conditions pose particular risks to individuals captured on longlines.  Researchers conducting scientific longline fishing (live capture, tag and release) found that scientifically-captured bluefin of similar size to those captured by commercial fishermen frequently died, even when the scientists used measures to avoid mortality.[4]  Exhibit A at 2-3.  Based on recent physiological data on the high rates of heat production and large metabolic demands of giant tuna, researchers concluded that "large bluefin tuna in spawning conditions might be susceptible to mortality on longlines in the [Gulf of Mexico] because of increased thermal and hypoxic stress induced by capture in warm surface waters." *Id.* at 3.  In other words, pre-spawning western Atlantic bluefin tuna are at risk of mortality even when they are released, because the stress of capture is frequently fatal. *Id.*  Under these circumstances, establishing a seasonal spawning closure is the only sure way to prevent excessive bluefin mortality in compliance with ICCAT, the Magnuson-Stevens Act, and ATCA.

**VI.**    **CONCLUSION**

    Fresh scientific research findings demonstrate that a seasonal closure to pelagic longline fishing in Gulf of Mexico bluefin tuna spawning waters would significantly reduce incidental catch of western Atlantic bluefin tuna and therefore reduce overfishing of that

---

[4] Researchers attempted to reduce mortality by reducing soak time and using circle hooks.

12

overfished population. Moreover, data on Atlantic bluefin tuna mortality under current policies have demonstrated that it would be arbitrary and capricious for the Secretary to continue to rely solely on existing regulations to limit fishing-related mortality in light of these new data. Accordingly, the Secretary must immediately institute a pelagic longline fishing seasonal spawning closure. In addition, the Secretary must initiate rulemaking designed to permanently establish this seasonal closure and complete that rulemaking not later than January 1, 2006.

Respectfully submitted,

_Stephen E. Roady_

Stephen E. Roady
Jennifer C. Chavez
Earthjustice
1625 Massachusetts Av. NW, Suite 702
Washington, DC 20036
Phone: (202) 667-4500
Fax: (202) 667-2356
Attorneys for BOI, MBA, NCMC, and NRDC

_Eric A. Bilsky_

Eric A. Bilsky
Oceana, Inc.
2501 M Street, NW, Suite 300
Washington, DC 20037
Phone: (202) 833-3900
Fax: (202) 833-2070
Attorney for Oceana

# Exhibit A

NATURE 3463—14/4/2005—MNICHOLLS—143450

## letters to nature

# Electronic tagging and population structure of Atlantic bluefin tuna

Barbara A. Block[1]*, Steven L. H. Teo[1]*, Andreas Walli[1]*, Andre Boustany[1]*, Michael J. W. Stokesbury[1,3], Charles J. Farwell[2], Kevin C. Weng[1], Heidi Dewar[1] & Thomas D. Williams[2]

[1]Tuna Research and Conservation Center, Stanford University, Hopkins Marine Station, Pacific Grove, California 93950, USA
[2]Monterey Bay Aquarium, 886 Cannery Row, Monterey, California 93940, USA
[3]Dalhousie University, Biology Department, Halifax, Nova Scotia, B3H 4J1 Canada

* These authors contributed equally to this work

Electronic tags that archive or transmit stored data to satellites have advanced the mapping of habitats used by highly migratory fish in pelagic ecosystems[1–6]. Here we report on the electronic tagging of 772 Atlantic bluefin tuna in the western Atlantic Ocean in an effort to identify population structure. Reporting electronic tags provided accurate location data[7–9] that show the extensive migrations of individual fish (n = 330). Geoposition data delineate two populations, one using spawning grounds in the Gulf of Mexico and another from the Mediterranean Sea. Transatlantic movements of western-tagged bluefin tuna reveal site fidelity to known spawning areas in the Mediterranean Sea. Bluefin tuna that occupy western spawning grounds move to central and eastern Atlantic foraging grounds. Our results are consistent with two populations of Atlantic bluefin tuna with distinct spawning areas that overlap on North Atlantic foraging grounds. Electronic tagging locations, when combined with US pelagic longline observer and logbook catch data, identify hot spots for spawning bluefin tuna in the northern slope waters of the Gulf of Mexico. Restrictions on the time and area where longlining occurs would reduce incidental catch mortalities on western spawning grounds.

Giant bluefin tuna are the largest members of the family Scombridae, attaining body sizes of more than 650 kg (refs 10, 11). They are unique among teleosts for their endothermic capacity and cardiovascular physiology[12,13]. These traits underlie their capacity to exploit environments ranging from subarctic feeding grounds to subtropical spawning areas. Top pelagic predators such as bluefin tuna are in precipitous decline globally because of overexploitation[14]. The International Commission for the Conservation of Atlantic Tunas (ICCAT) manages Atlantic bluefin tuna as distinct western and eastern stocks separated by a management boundary at the 45° W meridian[10,11]. The spawning stock biomass of western Atlantic bluefin tuna has decreased by 80% or more since 1970 (refs 10, 11). A 20-year rebuilding plan was enacted in the early 1980s in the western Atlantic[10]. The most recent assessment indicates that the western stock continues to decline[11], yet mortality throughout the North Atlantic remains high. Key questions remain on the biology of this species. Establishing the location and timing of reproduction, the mean age of maturity, spawning site fidelity, the ontogeny of movement patterns and the influence of climate

variability on movements will improve stock assessments and subsequent management[15]. Here we report the spatio-temporal distributions of Atlantic bluefin tuna determined with electronic tags, discriminate two potential spawning populations, and record spawning site fidelity to the Mediterranean Sea.

We deployed 499 implantable archival tags and 273 pop-up satellite (PAT) tags on bluefin tuna in the western Atlantic (Supplementary Information)[2,3,6]. To date, 86 archival-tagged bluefin tuna have been recaptured; 54 in the west Atlantic, 9 in the east Atlantic and 23 in the Mediterranean Sea. Twelve PAT-tagged fish were recaptured and 237 PAT tags transmitted data to Argos satellites after 2 to 251 days after tagging (Table 1). Individual tracks of 2 to 1,623 days have been obtained.

Our database comprises 13,372 positions obtained from 330 bluefin tuna that carried electronic tags from 1996 to 2004 (Fig. 1, Table 1). Geoposition data include the following: Doppler-based Argos endpoint positions calculated for PAT tags (n = 237)[7]; geolocation estimates for archival (n = 5,171) and PAT tags (n = 7,536), using light level and sea surface temperature (SST) to estimate longitude and latitude, respectively[9]; Global Positioning System deployment locations for recovered archival and reporting PAT tags (n = 330); and recapture locations from recovered archival and PAT tags (n = 98). The distribution of these positions across the North Atlantic Ocean indicates that the western and eastern management units are strongly linked with overlapping ranges.

The electronic tagging data reveal two populations of Atlantic bluefin tuna that overlap on North Atlantic Ocean foraging grounds and sort to independent spawning areas located primarily in the Gulf of Mexico (GOM) and Mediterranean Sea (Fig. 1). A bluefin tuna was assigned to the western Atlantic spawning unit if it visited a known western Atlantic ICCAT spawning area (GOM, Bahamas or Florida Straits) for more than 7 days in winter or spring[10,11,16–18] and occupied surface water temperatures of at least 24 °C, the SST reported for western spawning activity[3,18,19] (n = 36, Fig. 1a). Bluefin tuna that displayed transatlantic movements into the Mediterranean Sea and were recaptured in the spawning season (June to August[10], n = 20) or in the Straits of Gibraltar (May to August, n = 6) were classified as potential eastern spawners (Fig. 1b). Bluefin tuna that remained in the North Atlantic throughout the track duration without visiting the known ICCAT spawning areas were classified as neutral (n = 268, Fig. 1c). We compared the distributions of the 62 bluefin tuna identified as potential western or eastern spawners and calculated a spatial overlap of the positional data sets of 47% in North Atlantic waters (Fig. 1d). These mixing zones were primarily in the western and central Atlantic. Importantly, no mixing occurred in the GOM and Mediterranean spawning areas.

Electronically tagged bluefin tuna were located in the GOM (n = 29, Figs 1a and 2a) from December to July. Electronically tagged fish were also located in the Bahamas (n = 6) and northern Caribbean (n = 1; Fig. 1a). The mean curved fork length (CFL) of electronically tagged bluefin that entered the GOM from the North Atlantic was 241 ± 28 cm (about 11 years of age[20]). Location and diving data recorded on the tags[3,6] indicate that bluefin tuna enter the GOM along the continental slope through the Straits of Florida, diving to depths over 1,000 m (refs 5, 6), and move into the

| Table 1 Electronic tags deployed in the western North Atlantic, 1996–2004 | | | | | |
|---|---|---|---|---|---|
| Tag type (year) | Releases | Tagged fish recaptures | Successful pop-ups | Recovery or reporting (%) | Mean length at tagging (cm CFL) |
| Archival* (1996–1999) | 280 | 77 | n.a. | 28 | 199 ± 16 |
| Archival† (2002–2004) | 219 | 9 | n.a. | 4.1 | 199 ± 19 |
| PAT (1997–2004) | 273 | 12‡ | 237 | 89 | 211 ± 20 |

n.a., not applicable.
* Archival tag models: NMT V1.1, V1.2 and WC Mk7.
† Archival tag model: Lotek LTD2310.
‡ Six recaptures of PAT-tagged fish occurred after the PAT tag had been released and are also recorded as successful pop-up reporting events. Six bluefin tuna recaptures before PAT tag release are not listed in successful pop-up events. One tag did not transmit and the PAT tag was recovered on a beach.

Case 1:06-cv-01869-HHK    Document 23-2    Filed 11/19/2007    Page 16 of 34

NATURE 3463—14/4/2005—MNICHOLLS—143450

## letters to nature

northern slope waters of the GOM. The mean SST recorded by electronic tags on bluefin tuna in the GOM (Figs 1a and 2b), inclusive of transit and aggregation periods, was 25.5 ± 1.9 °C. Electronic tag positions of bluefin tuna in the GOM, when combined with US pelagic longline observer and fisheries logbook bycatch data, identify areas of increased bluefin tuna occurrence

('hot spots') from 1992 to 2004 (Fig. 2). A majority of bluefin tuna locations (2,537 of 3,470; 73.1%) in the GOM from the three independent data sets were over the northern slope waters between the 200-m and 3,000-m contours (85° W to 95° W).

In the GOM slope waters, scientific longlining (live capture, tag and release) was conducted from pelagic longline vessels to tag giant



**Figure 1** Positions of Atlantic bluefin tuna electronically tagged at three western Atlantic locations (arrows) during 1996–2004. Circles represent locations based on deployment positions, light-based and SST-based geolocation estimates[7–9], and PAT tag satellite endpoint positions. **a**, Fish classified as western breeders (10 archival tags, 26 PAT tags, 219 ± 27 cm CFL at release, median time at large 579 days). **b**, Fish classified as potential eastern breeders (23 archival tags, 3 PAT tags, 207 ± 17 cm CFL at release,

median time at large 926 days). **c**, Fish that did not visit a known ICCAT breeding ground (53 archival tags, 215 PAT tags, 202 ± 16 cm CFL at release, median time at large 141 days). **d**, Spatial overlap of western and eastern breeders identified in **a** and **b**. The dashed line in all panels indicates the current ICCAT management boundary (45° W meridian) and western breeding zone[10,11]. Triangles represent recapture locations of electronically tagged fish; the black triangle denotes n = 35 recaptures.

NATURE | doi:10.1038/nature03463 | www.nature.com/nature

NATURE 3463—14/4/2005—MNICHOLLS—143450

## letters to nature

bluefin tuna, and frequently resulted in bluefin tuna mortalities (Supplementary Table 1). This occurred even when short sets (less than 2 h soak time) and circle hooks (200 hooks or less) were used to reduce mortality. The mean size of bluefin tuna that died during capture on the longlines ($237 \pm 17$ cm CFL, $n = 16$) was similar to the mean size of bluefin tuna captured in the GOM by commercial fishers[23]. Histological examination indicates that ovaries from mortalities in the GOM in early April (1999 and 2000) were from mature fish in pre-spawn stages. Catches sampled in mid-April or May (2000 and 2001) revealed ovaries that were well vascularized with stages that included advanced yolked oocytes, oocytes with migrating nuclei, and post-vitellogenic oocytes exhibiting atresia. These ovarian stages were indicative of ripening, final maturation and post-ovulatory oocytes[7,19,22] and are consistent with previous data indicating that spawning occurs in the GOM in April, May and June[10,18]. All histologically examined male testes ($n = 6$) contained spermatozoa. Recent physiological studies indicate that Atlantic and Pacific bluefin tunas have an upper thermal tolerance for cardiac $Ca^{2+}$ uptake that is crucial for heart function[3,23] (P. Castilho and B.A.B., unpublished data). The warm waters of the GOM are favourable for the development of the eggs and larval stages but may be physiologically stressful for giant tunas, which have high rates of heat production and large metabolic demands[10]. We

propose that large bluefin tuna in spawning conditions might be susceptible to mortality on longlines in the GOM because of increased thermal and hypoxic stress induced by capture in warm surface waters.

After leaving the western spawning areas, the highest density of positions of bluefin tuna occurred in the waters overlying the North American continental shelf, slope and Gulf Stream waters, the South and mid-Atlantic Bight, the Gulf of Maine and the Nova Scotia Shelf (Fig. 1 and Supplementary Fig. 1). Another region of retention occurred in the central North Atlantic in the vicinity of 40° W, east of the Flemish Cap (Fig. 1). In this area, putative western spawners become vulnerable to central Atlantic fisheries of the eastern management unit.

Bluefin tuna ($n = 26$) that had been electronically tagged in the western Atlantic showed transatlantic migrations to the Mediterranean Sea. These fish resided in the western Atlantic foraging grounds for 0.5 to 3 years before migrating to the Balearic Islands or the Tyrrhenian and/or Ionian seas (Figs 1b, 3 and 4, and Supplementary Fig. 2). These regions contain known spawning areas where mature females with hydrated oocytes, eggs and larvae have been collected[10,11,22]. Bluefin tuna were recaptured in the Straits of Gibraltar ($n = 5$) in May, potentially in transit to Mediterranean spawning areas, and in August ($n = 1$), when tuna that have







**Figure 2** Occurrence of Atlantic bluefin tuna on their western spawning ground in the Gulf of Mexico. **a**, Observed locations of Atlantic bluefin tuna in the GOM based on PAT tag satellite endpoint positions and geolocation estimates from electronic tags ($n = 263$ positions, 1999–2004) and catch location statistics from pelagic longlines ($n = 3,207$, US scientific observer and US logbook data). **b**, Movements of an individual Atlantic bluefin tuna (03–251) showing a migration between the foraging grounds in the North Atlantic and the breeding grounds in the GOM. Colour denotes the month of each position. The bluefin tuna was released off North Carolina on 16 January 2004 (arrow, 268 cm CFL).

The tag was detached from the fish on 27 August 2004 (green triangle). **c**, Distribution of Atlantic bluefin tuna CPUE in the GOM, based on the data from the US pelagic longline scientific observer program (1992–2004). **d**, Atlantic bluefin tuna CPUE, based on US pelagic longline logbook data (1992–2003). Only 1° × 1° areas with a total effort exceeding 50,000 and 500,000 hooks are shown in **c** and **d**, respectively. Areas exceeding this minimum effort without any bluefin tuna caught are denoted by black crosses. Solid white lines (**a**) and grey lines (**c** and **d**) indicate the US Exclusive Economic Zone.

Case 1:06-cv-01869-HHK     Document 23-2     Filed 11/19/2007     Page 18 of 34

NATURE 3463—14/4/2005—MNICHOLLS—143450

## letters to nature

spawned might be re-entering the North Atlantic. The mean size at release in the western Atlantic of bluefin tuna that were recaptured in the Mediterranean Sea ($n = 26$) was $207 \pm 17$ cm CFL (about 8.6 years of age[24]). Western-tagged fish recaptured in the Mediterranean Sea seem to be returning to natal spawning areas. This hypothesis implies that a proportion of bluefin tuna electronically tagged in the western Atlantic are of eastern stock origin and are affecting western fisheries.

Spawning site fidelity to the Mediterranean Sea was evident for fish that were tagged in the western Atlantic and provided multi-year records (3.3–4.6 years). Bluefin tuna 603 (191 cm CFL, released on 17 January 1999) showed one year of western residency, a transatlantic crossing to the east Atlantic (2000), and three consecutive years (2001–2003) of summer movements into and out of the Mediterranean Sea, near the Balearic Islands (Fig. 3). Bluefin 705 (222 cm CFL, released on 11 February 1999) also showed spawning site fidelity to the western Mediterranean Sea during 2000–2003 (Supplementary Fig. 2). Bluefin 408 (203 cm CFL, released on 3 March 1997) spent three years foraging in the western Atlantic before a transatlantic migration into the Ionian Sea in 2000 (ref. 5). To date, only one bluefin tuna that went into the GOM (bluefin 512, 207 cm CFL, released on 17 January 1999) had a sufficiently long track to show western spawning site fidelity over two consecutive years[5] (S.L.H.T. and B.A.B., unpublished data). Multi-year records, although rare, reveal the complex ontogeny of movement patterns, which must be accounted for in stock management.

For fish that did not move into a known spawning ground ($n = 268$, Fig. 1c) the tracking durations were shorter (median duration 141 days) because of premature release of PAT tags or failure of sensors on early generation archival tags. We were therefore unable to discern whether, or when, these fish proceeded to breeding areas. Many fish were less than 200 cm CFL ($n = 115$) and are, by length measurements, adolescent western fish. Some bluefin tuna with an unclassified breeding status ($n = 35$, at least 200 cm CFL) did experience SSTs of 24 °C or more in the waters of the South Atlantic or mid-Atlantic Bights and Gulf Stream. Ichthyoplankton surveys in the West Atlantic have captured bluefin tuna larvae off the Carolinas, although their presence was associated with advection from the Florida Straits and not from offshore spawning[10,25]. Examination of the ovaries of the bluefin tuna captured in the winter off North Carolina ($n = 24$, 195 cm CFL, January to April) has so far not revealed histological evidence of spawning adults in this region. However, these areas may represent extended ranges of western spawning areas[4,5] in late spring and early summer months, and require further study.

We examined the movements of electronically tagged bluefin tuna in relation to body size and season (Fig. 4). Bluefin tuna smaller than 200 cm CFL did not enter a known ICCAT spawning area (Fig. 4a–d). Most of these fish remained west of 45° W throughout the year but displayed some range expansion in spring (Fig. 4a–d). Only bluefin tuna of larger body size (at least 200 cm CFL) occupied known spawning grounds from winter to early summer (western) and spring and summer (Mediterranean, Fig. 4e–h). This asynchrony in spawning is probably due to western spawning grounds acquiring optimal temperatures for bluefin spawning earlier than eastern spawning areas. In summer and autumn, fish of larger body size in both management units move into oceanic areas of high seasonal productivity at the northern



**Figure 3** Movements over 4.5 years of one individual Atlantic bluefin tuna (603) that was tagged in the western Atlantic in 1999 and demonstrated site fidelity to a known spawning area in the Mediterranean Sea (2001–2003). Each panel shows a year of the fish's track; colour denotes month of each position. Start and end points for each year are denoted by a square and cross-hatched circle, respectively. **a**, The bluefin tuna was released off North Carolina on 17 January 1999 (arrow, 191 cm CFL) and showed a year of western residency. **b**, In 2000, the bluefin tuna showed transatlantic movement to the eastern Atlantic. **c–e**, Three consecutive years of movements from the eastern Atlantic into the Mediterranean Sea, to the vicinity of the Balearic Islands, during the breeding season: **c**, 2001; **d**, 2002; **e**, 2003. The fish was recaptured on 2 July 2003 (yellow triangle).

NATURE | doi:10.1038/nature03463 | www.nature.com/nature

4

NATURE 3463—14/4/2005—MNICHOLLS—143450

## letters to nature

extent of their range and along the continental shelves, while smaller bluefin remain primarily in areas along the North American shelf and slope waters (Fig. 4).

Archival tags, which have a large reward (US $1,000) to increase recovery rates, demonstrate that 32 of the 86 recaptured bluefin tuna (37.2%) moved from the western to the eastern Atlantic management unit. Inclusion of PAT tags with shorter mean track durations yields a transfer rate west to east of 14.5% (48 of 330 fish). The probability of making a west-to-east transatlantic migration in all electronically tagged fish depends on the time at liberty, putative stock origin, and body size (Supplementary Table 2). In the first 6 months after tagging, bluefin tuna from both putative stocks had a high probability of remaining in the western management unit (west, $0.994 > P > 0.982$; east, $0.933 > P > 0.900$; Supplementary Table 2, 95% confidence interval, 1,000 bootstrap samples). As time at liberty increases, the probability of remaining west of 45° W remains about the same for western fish but decreases rapidly for bluefin identified as eastern spawners (Supplementary Table 2). This result indicates that one component of the transatlantic migration is associated with fish of potential eastern origin moving back into the east Atlantic and Mediterranean Sea. A second component is associated with western breeding fish moving into

eastern foraging grounds where encounters occur with eastern fishers (Fig. 1a).

The transatlantic movements observed in electronic tag data sets are corroborated by conventional tagging data, which demonstrate that 10% of tag recaptures from fish tagged and released in the South Atlantic Bight (1994–2000) occur in the eastern Atlantic and Mediterranean Sea[5]. Conventional tagging in the eastern Atlantic (1911–1990) indicated that 4.5% of recaptured juvenile bluefin tuna released in the eastern Atlantic were recaptured in the western Atlantic[16]. However, in these studies, no giant bluefin tuna conventionally tagged in the eastern Atlantic was recaptured in the western Atlantic[16]. Consistent with this result is the observation that no electronically tagged fish that moved into the Mediterranean Sea during spawning season has so far returned to the western Atlantic management unit. The conventional and electronic tagging data indicate that some juvenile fish tagged in the eastern Atlantic swim to the western Atlantic, where they remain for several years (Fig. 3 and Supplementary Fig. 2) before returning to Mediterranean spawning areas. We hypothesize that once an eastern spawned bluefin tuna returns from the North Atlantic to the Mediterranean it is less likely to forage along the North American coast. Fish identified as western spawners can move to the eastern Atlantic and



**Figure 4** Seasonal distribution by size of Atlantic bluefin tuna that were tagged in the western Atlantic and measured before release. **a–d**, Less than 200 cm CFL. **a**, Winter; **b**, spring; **c**, summer; **d**, autumn. **e–h**, Greater than 200 cm CFL. **e**, Winter; **f**, spring; **g**, summer; **h**, autumn. The dashed line in each panel indicates the current ICCAT management boundary (45° W meridian). High kernel densities[23] indicate seasonal hot spots where western-tagged Atlantic bluefin tuna spent the majority of time from 1996 to 2004. Only fish that were measured were used in this analysis. A western[24] or eastern[24] growth model was applied to obtain daily length after tagging. **a**, $n = 101$, mean size at release $192 \pm 9$ cm CFL. **b**, $n = 56$, $192 \pm 6$ cm CFL. **c**, $n = 22$, $192 \pm 7$ cm CFL. **d**, $n = 13$, $187 \pm 8$ cm CFL. **e**, $n = 162$, $219 \pm 14$ cm CFL. **f**, $n = 167$, $220 \pm 13$ cm CFL. **g**, $n = 97$, $225 \pm 15$ cm CFL. **h**, $n = 49$, $227 \pm 15$ cm CFL. Pos., positions.

5

NATURE 3463—14/4/2005—MNICHOLLS—143450

# letters to nature

back, crossing the 45 °W meridian several times over the course of one or more years. The overlap areas identified in the central and eastern Atlantic seem to be foraging areas for these western spawners.

Five conclusions with management implications are apparent. First, our results support the existence of two North Atlantic bluefin tuna stocks, with discrete spawning areas primarily in the GOM and the Mediterranean Sea. Second, the two stocks overlap on North Atlantic foraging grounds as adolescents and adults, but there is no evidence for movement between the two major spawning areas in the GOM and the Mediterranean Sea. Third, fish identified as western or eastern spawners are subject to fishing pressures within their designated management unit during the spawning season. Fourth, the northern slope waters of the GOM are a critical habitat for bluefin tuna during the spawning season, and these fish could be protected with time-area closures to reduce the incidental catch of giant bluefin tuna by pelagic longline fisheries operating in the GOM. Fifth, transatlantic movements of western tagged fish have two components, one associated with tuna of eastern origin moving back to the Mediterranean spawning grounds, and another with western origin fish moving into eastern Atlantic foraging grounds.

Collaborative studies that combine electronic tagging data, otolith microchemistry[26] and genetics[27] should provide a method for validating and quantifying the extent of mixing between the putative stocks. Significant questions remain, including the relationship of the two North Atlantic bluefin tuna stocks tagged in the western Atlantic to the recently identified genetically distinct stock in the eastern Mediterranean Sea[27]. Quantifying the extent of spawning in one location relative to another, establishing whether individual adult bluefin tuna spawn every year and determining the influence of physical and biological oceanographic conditions on movements are essential to improved management strategies. If the electronic tagging results are used to develop and validate new models[28] of population mixing in the context of the dynamic North Atlantic environment, ICCAT will have a better opportunity to prevent a further decline in the Atlantic Ocean's remaining bluefin tuna.

Note added in proof: During production of the manuscript, two additional tags were recaptured in December 2004 in the central Atlantic: LTD 2310 archival tag 781 at 46.49° N, 39.97° W, and LTD 2310 tag 744 at 44.50° N, 30.28° W.                                  □

## Methods

Implantable archival tags were surgically placed in Atlantic bluefin tuna from 1996 to 2004 as described previously[2,3,6] (Table 1). Five models of archival tags (Northwest Marine Technology v1.1 and v1.2, Wildlife Computers Mk7 versions 1 and 2, and the Lotek LTD 2310) were deployed. Specifications of the tag sensors are available at the manufacturers' websites. Fishers reported 86 archival tags with corresponding conventional external tags (Table 1), but failed to return 20 electronic tags, which were included only as deployment and recovery positions. From 1997 to 2004 (Table 1), four generations of PAT tags[4,6,9] (Wildlife Computers, hardware versions 1 and 2, with modifications) were placed externally on bluefin tuna in North Carolina ($n = 213$), Massachusetts ($n = 33$) and the GOM ($n = 27$). Pressure, light intensity, ambient and internal temperature data were recorded every 60, 120 or 128 s by the implantable archival tags. All longitude estimates were derived from light-intensity data recovered from or transmitted by the electronic tags, using threshold or template techniques[2,3]. Light-level geolocation estimates were made with manufacturers' proprietary software on-board the tag (NMT and Lotek tags) or by post-processing the data (Mk2 and PAT tags, Geocontrol v3.02 and WC-GPE Suite software). The daily SSTs were obtained from the archival tag data by extracting the ambient temperatures within 1 m of the surface[3].

Pop-up satellite archival tags collected data at intervals of 60–120 s, summarized data into 2–24-h bins, and transmitted summary data to Argos satellites (PAT software versions 1.06, 1.07, 1.08 for PAT 1.0 generation tags, 2.03 and 2.04 in 2001, 2.07a in 2002, 2.08e in 2003 and 3.01d in 2004; Wildlife Computers). SSTs and thermal profiles of the water column were obtained from the profiles of depth–temperature data transmitted by the PAT tags. These data consist of the minimum and maximum temperatures at the surface, maximum depth, and six intermediate depths, over each 4-day summary interval. All electronic tag data were corrected for pressure drift and thermal inertia[3].

The SST data were combined with the corresponding light-level longitude estimates to obtain latitude estimates[3]. The daily maximum diving depths recorded by the tags were used to filter the geolocation estimates so that the maximum diving depth did not exceed the known bathymetry (inclusive of error estimates) at the geolocation estimate for the

corresponding day. The accuracy of the geolocation estimates was validated with double-tagging experiments and by comparing the last position estimated from our algorithm with the recapture or PAT-tag endpoint positions from bluefin tuna[3]. On bluefin tuna ($n = 11$; comparisons with recapture positions), archival tags have root-mean-square (r.m.s.) errors of 0.78° and 0.90° for longitude and latitude estimates, respectively. For PAT tags ($n = 49$), the r.m.s. errors in the longitude and latitude estimates were 1.30 and 1.89°, respectively[3]. After the geolocation estimates were made, we assigned each bluefin tuna to a spawning unit: western, eastern or neutral as described above.

All fish tagged on the decks of sport fishing vessels were measured (cm curved fork length, CFL). The daily lengths of fish identified as western or eastern spawners were then calculated from the western[29] or eastern[17] growth models, respectively. The western growth model was also used for fish that were not assigned to a breeding stock. All results in this study are reported as means ± s.d. When length information is provided in the text, only fish that were measured during tagging are included.

We calculated the fixed kernel density of the positions by size class (less than 200 cm CFL and 200 cm CFL or more) and season, to make nonparametric estimates of the spatial distributions of the fish[30] (Fig. 4 and Supplementary Fig. 1). The search radius was fixed at 1.25° for all kernel density calculations because this was the mean of the geolocation errors when the data from archival and PAT tags were combined. The kernel densities were calculated with the ArcGIS 9.0 Spatial Analyst (ESRI Inc.). The seasons were delineated by the equinoxes and solstices.

The spatial overlap between the western and eastern breeders (Fig. 1) was obtained by determining the area to which both western and eastern breeders were present. We divided the study area into 1.25° × 1.25° cells and identified cells that contained geopositions from both western and eastern breeders. For both populations we calculated their 95% fixed kernel spatial distributions, with smoothing parameters estimated by least-squares cross-validation[30]. This was done with ArcView 3.3 (ESRI Inc.) and the Animal Movement Extension 2.0 (P. N. Hooge and B. Eichenlaub). The percentage spatial overlap of their spatial distributions was then calculated as a proportion of their spatial distributions[30].

The Atlantic bluefin tuna catch per unit effort (CPUE) in the GOM (Fig. 2) was calculated from data collected by the US pelagic longline scientific observer program (1992–2004) and the US pelagic longline logbook program (1992–2003). Both data sets were obtained from the US National Marine Fisheries Service. The CPUE for each 1° x 1° area was calculated if the effort in each area exceeded 50,000 and 500,000 hook hours for the observer and logbook data set, respectively. The yellowfin tuna CPUE for both data sets were also calculated for comparison (Supplementary Fig. 3).

Received 6 October 2004; accepted 17 February 2005; doi:10.1038/nature03463.

1. Metcalfe, J. D. & Arnold, G. P. Tracking fish with electronic tags. Nature 12, 665–666 (1997).
2. Block, B. A., Dewar, H., Farwell, C. & Prince, E. A. new satellite technology for tracking the movements of Atlantic bluefin tuna. Proc. Natl Acad. Sci. USA 95, 9384–9389 (1998).
3. Block, B. A. et al. Archival tagging of Atlantic bluefin tuna (Thunnus thynnus thynnus). Mar. Tech. Soc. J. 32, 37–46 (1998).
4. Lutcavage, M. E., Brill, R. W., Skomal, G. B., Chase, B. C. & Howey, P. W. Results of pop-up satellite tagging on spawning size class fish in the Gulf of Maine: Do North Atlantic bluefin tuna spawn in the mid-Atlantic? Can. J. Fish. Aquat. Sci. 56, 173–177 (1999).
5. Block, B. A. et al. Migratory movements, depth preferences, and thermal biology of Atlantic bluefin tuna. Science 293, 1310–1314 (2001).
6. Stokesbury, M. J. W., Teo, S. L. H., Seitz, A., O'Dor, R. K. & Block, B. A. Movement of Atlantic bluefin tuna (Thunnus thynnus) as determined by satellite tagging experiments initiated off New England. Can. J. Fish. Aquat. Sci. 61, 1976–1987 (2004).
7. Hill, R. D. & Braun, M. J. in Electronic Tagging and Tracking in Marine Fisheries (eds Sibert, J. R. & Nielsen, J. L.) 315–330 (Kluwer, Boston, Massachusetts, 2001).
8. Ekstrom, P. A. An advance in geolocation by light. Mem. Natl Inst. Polar Res. 58, 210–226 (2004).
9. Teo, S. L. H. et al. Validation of geolocation estimates based on light level and sea surface temperature from electronic tags. Mar. Ecol. Prog. Ser. 283, 81–98 (2004).
10. National Research Council, An Assessment of Atlantic Bluefin Tuna (National Academy Press, Washington DC, 1994).
11. ICCAT. Report of the Standing Committee on Research and Statistics 2002–2003 (ICCAT, Madrid, 2003).
12. Carey, F. G. & Lawson, K. D. Temperature regulation in free-swimming bluefin tuna. Comp. Biochem. Phys. A 44, 375–392 (1973).
13. Blank, J. M. et al. In situ cardiac performance of Pacific bluefin tuna hearts in response to acute temperature change. J. Exp. Biol. 207, 881–890 (2004).
14. Myers, R. A. & Worm, B. Rapid worldwide depletion of predatory fish communities. Nature 423, 280–283 (2003).
15. Fromentin, J. The East Atlantic and Mediterranean bluefin tuna stock management: uncertainties and alternatives. Sci. Mar. 67, 51–62 (2003).
16. Rivas, L. R. A preliminary report on the spawning of the western north Atlantic bluefin tuna (Thunnus thynnus) in the Straits of Florida. Bull. Mar. Sci. Gulf Carib. 4, 302–321 (1954).
17. Baglin, R. E. Reproductive biology of western Atlantic bluefin tuna. Fish. Bull. 80, 121–134 (1982).
18. Mather, F. J., Mason, J. M. & Jones, A. C. Historical Document: Life History and Fisheries of Atlantic Bluefin Tuna (NOAA Tech. Memo. 370, NOAA, Miami, 1995).
19. Schaefer, K. M. in Tuna: Physiology, Ecology, and Evolution (eds Block, B. A. & Stevens, E. D.) 225–270 (Academic, San Diego, 2001).
20. Turner, S. C. & Restrepo, V. R. A review of the growth rate of west Atlantic bluefin tuna, Thunnus thynnus, estimated from marked and recaptured fish. ICCAT Coll. Vol. Sci. Pap. 42, 170–172 (1994).
21. Nemerson, D., Berkeley, S. & Safina, C. Spawning site fidelity in Atlantic bluefin tuna, Thunnus thynnus: The use of size–frequency analysis to test for the presence of migrant east Atlantic bluefin tuna on Gulf of Mexico spawning grounds. Fish. Bull. 98, 118–126 (2000).
22. Medina, A., Abascal, F. J., Megina, C. & García, A. Stereological assessment of the reproductive status of female Atlantic northern bluefin tuna during migration to Mediterranean spawning ground through the Strait of Gibraltar. J. Fish Biol. 60, 203–217 (2002).
23. Landeira-Fernandez, A. M., Morrisette, J. M., Blank, J. M. & Block, B. A. Temperature dependence of the Ca²⁺ ATPase (SERCA2) in the ventricles of tuna and mackerel. Am. J. Physiol. Regul. Integr. Comp.

NATURE 3463—14/4/2005—MNICHOLLS—143450

## letters to nature

*Physiol.* **286**, R398–R404 (2004).

24. Cort, J. L. Age and growth of the bluefin tuna, *Thunnus thynnus* (L.) of the northeast Atlantic. *ICCAT Coll. Vol. Sci. Pap.* **35**, 213–230 (1991).

25. McGowan, M. F. & Richards, W. J. Bluefin tuna, *Thunnus thynnus*, larvae in the Gulf Stream off the Southeastern United States: satellite and shipboard observations of their environment. *Fish. Bull.* **87**, 615–631 (1989).

26. Rooker, J. R., Secor, D. H., Zdanowicz, V. S., De Metrio, G. & Relini, L. O. Identification of Atlantic bluefin tuna (*Thunnus thynnus*) stocks from putative nurseries using otolith chemistry. *Fish. Oceanogr.* **12**, 75–84 (2003).

27. Carlsson, J. *et al.* Microsatellite and mitochondrial DNA analyses of Atlantic bluefin tuna (*Thunnus thynnus*) population structure in the Mediterranean Sea. *Mol. Ecol.* **13**, 3345–3356 (2004).

28. Apostolaki, P., Babcock, E. & McAllister, M. Further investigation of the effects of stock mixing on estimates of the size of North Atlantic bluefin tuna population using the age-area population dynamics model presented in SCRS/2002/088. *ICCAT Coll. Vol. Sci. Pap.* **56**, 1123–1133 (2004).

29. Worton, B. J. Kernel methods for estimating the utilization distribution in home-range studies. *Ecology* **70**, 164–168 (1989).

30. Atwood, T. C. & Weeks, H. P. Spatial home-range overlap and temporal interaction in eastern coyotes: the influence of pair types and fragmentation. *Can. J. Zool.* **81**, 1589–1597 (2003).

**Supplementary Information** accompanies the paper on www.nature.com/nature.

**Acknowledgements** We thank R. Rinaldo, E. Prince, A. Seitz, T. Siegel, R. Schallert, N. Tulloch,
G. Rosenwaks, S. Beemer, G. Shillinger, C. Perle, S. Vermillion, J. Bonaventura, D. Barber, M. Orbach, J. Jenkins, G. Stuve, P. Wright, D. Britt, R. Eakes, C. Perry, D. Brower, W. Whippen, R. Whorley, R. Jaesenius, G. Sharp, R. Hill, T. Lundstrom, P. Ekstrom, P. Manuel, R. Ruus and S. Loge. We are indebted to the late Richard Novak for his contributions and sacrifice on behalf of the Tag-A-Giant programme. We thank the National Marine Fisheries Service (NMFS) for providing access to the GOM scientific observer data and US pelagic longline logbook data. The Tag-A-Giant programme is supported by grants and donations from the Packard, Pew, MacArthur, Disney, Marine Ventures, Gordon and Betty Moore, and Monterey Bay Aquarium Foundations. This research was supported in part by the NOAA NMFS, the NSF and the National Fish and Wildlife Federation. We acknowledge the extensive cooperation of the commercial and recreational captains and crews of fishing vessels in North Carolina, New England, Louisiana and Texas. We thank N. Miyabe of the National Research Institute of Far Seas Fisheries, ICCAT, A. Dizatak, G. DeMetrio, M. de la Serna and the EU COFEMED programme for return of electronic tags.

**Competing interests statement** The authors declare that they have no competing financial interests.

**Correspondence** and requests for materials should be addressed to B.A.B. (bblock@stanford.edu).

## Supplementary Information

## Fishing Operations

Atlantic bluefin tuna were caught by sport fishing vessels in North Carolina and New England using rod and reel techniques and tagged in all cases on the deck of the fishing vessel[2,3,5,6]. In the Gulf of Mexico, bluefin tuna were captured using U.S. registered pelagic longline vessels that routinely fish for yellowfin tuna. Our fishing efforts in the GOM were conducted solely for the purpose of deploying PAT tags and all sets were made in the US exclusive economic zone from 86.06°W to 94.90°W in longitude and 26.67°N to 28.5°N to in latitude. Circle hooks were baited with squid or sardines and positioned at depths of 100-200 m in 1999 and 40-120 m in 2000-2002. Thermocline depths were determined with a CTD profiler (SBE19 plus SEACAT Profiler, Seabird Electronics). Bluefin were tagged at the side of the vessel using a 2 m aluminum tagging pole, and released by cutting the leader as close to the hook as possible. In some cases, the circle hook was removed prior to release. Tags were attached to the bluefin tuna with a titanium dart (59 mm x 13 mm) with an approximately 15 cm segment of 136 kg monofilament line. The dart was dipped in antiseptic and inserted into the dorsal musculature at the base of the second dorsal fin.

Six exploratory sets were made in April 1998, averaging 213 hooks per set, using 182 kg monofilament leaders and Mustad 39960 16/0 J hooks (Supplement Table 1). No bluefin were captured and we hypothesized that old leaders and possibly the hook strength were too light, because large fish, presumably bluefin tuna, had broken off. In 1999, we tested 136 and 182 kg monofilament Moi Moi leaders and Mustad 16/0 circle hooks (model 39960). In 2000, we used 182 kg monofilament leaders and Mustad 16/0 (model

39960) and Eagle Claw 20/0 circle hooks. In 2001, we used 182 kg monofilament line leaders and Mustad 16/0 circle hooks (39966DT). In 2002, we used 182 and 227 kg Moi Moi monofilament line leaders and Mustad 39966DT 16/0 circle hooks. In 1999 we increased the hook numbers and soak time simultaneously in an effort to capture bluefin tuna. We then encountered mortality on longline sets that exceeded experimental fishing permit quotas and operations ceased. The following years, we worked to optimize hook number and reduced soak times to avoid mortality and improve live release of giant bluefin (Supplement Table 1). Mortalities of bluefin tuna occurred even when sets were of short durations (2000-2002). We hypothesized that sympathetic stress upon capture in warm waters with relatively low oxygen played a role in rapid mortality. Hot lining was attempted but did not completely solve the problem. Seventeen total mortalities of bluefin tuna in the GOM were encountered from experimental longline operations 1999-2002 (one mortality was partially eaten by a pilot whale and was not histologically sampled or measured). All bluefin tuna mortalities were brought aboard the vessel for biological sampling. In sport fishing operations in North Carolina, bluefin tuna were sampled if and when mortality occurred during tagging operations (n=3), or in the commercial winter bluefin tuna fishery (n=21). Two giant bluefin tuna (one male, one female) captured in a sport fishing tournament were sampled in the Bahamas in June. Gonad samples in North Carolina and the Gulf of Mexico were preserved in 10% formalin buffered in 0.1M cacodylate at pH 7.2 to 7.4. Tissues were subsequently embedded in paraffin, sectioned (8-10 um), stained with haematoxylin and eosin, and viewed in an Olympus microscope to determine stage of reproductive development.

**Supplement Table 1.** Catch per unit effort (CPUE)* and mortality per unit effort (MPUE) during scientific longline cruises in the Gulf of Mexico from 1998 to 2002.

| Year | Total catch (fish) | Total mortality (fish) | CPUE (fish $10^{-3}$ hooks$^{-1}$ h$^{-1}$) | MPUE (fish $10^{-3}$ hooks$^{-1}$ h$^{-1}$) | Total effort (hook hours) | Number of sets | Soak time (h) | Hooks per set |
|---|---|---|---|---|---|---|---|---|
| 1998 | 0 | 0 | 0.00 | 0.00 | $9.21 \times 10^3$ | 6 | $7.3 \pm 2.9$ | $213 \pm 122$ |
| 1999 | 11 | 4 | 0.459 | 0.189 | $3.36 \times 10^4$ | 8 | $9.3 \pm 2.5$ | $457 \pm 77$ |
| 2000 | 17 | 4 | 1.15 | 0.284 | $1.32 \times 10^4$ | 36 | $1.8 \pm 1.1$ | $203 \pm 41$ |
| 2001 | 13 | 5 | 3.33 | 1.26 | $3.63 \times 10^3$ | 29 | $0.9 \pm 0.5$ | $133 \pm 13$ |
| 2002 | 13 | 4 | 1.77 | 0.542 | $7.32 \times 10^3$ | 33 | $1.5 \pm 0.4$ | $145 \pm 4$ |
| Total | 54 | 17 | 1.78 | 0.591 | $6.69 \times 10^4$ | 112 | $2.3 \pm 2.6$ | $186 \pm 91$ |

*Catches include tagged fish, mortalities, and escapes. Soak times were calculated in accordance to NMFS observer data (start of haul – end of set).

## Electronic Tags

Two types of electronic tags were used, implantable archival tags with external sensor stalks and pop-up satellite archival (PAT) tags, and both provided comparable types of data (Supplement Fig. 1). The numbers of archival and PAT tag deployments from 1996–2004 are shown in Table 1. In this study, both tag types most often provided one year or less of geolocation data. The spatial distributions from these two types of tags, with error estimates[9], produced similar results in the North Atlantic when track lengths were one year or less (Supplement Fig. 1a and b). Analysis of the position datasets indicates a 75.4% overlap of positional data collected with PAT tags (Supplement Fig. 1a, 7455 geopositions) and archival tags (Supplement Fig. 1b, 3641 geopositions). More bluefin occurred in the GOM with PAT tags than archival tags, in part due to the selected targeting of larger fish for this tag type, providing increased coverage in this region with the PAT tag (Fig. 1a; Supplement Fig. 1a and b). All geopositions recorded more than 365 days after release (Supplement Fig. 1c, n = 1595)

26

were derived from archival tag tracks. These tracks ($\geq$365 days), while lower in number demonstrate trans-Atlantic movements of individuals into the Mediterranean Sea. To date, PAT tagged fish have been recaptured in the Mediterranean Sea but only after the electronic tag has released.

## Mixing

The electronic tag data indicate there is mixing between the two stocks on the foraging grounds (Fig. 1). Estimating mixing rates from electronic tagging data in the first year remains difficult and potentially misleading due to the abrupt end of records associated with tag failure (sensor stalk failure, battery failure) or early release of PATs. Together these abbreviated tracks will bias the data to the western Atlantic (Supplement Fig. 1). The effect of time at liberty on the likelihood of a tagged fish being located in the western management unit was investigated. We estimated the probability of Atlantic bluefin tuna being located in the western management unit (Supplement Table 2) after being tagged in the western Atlantic for the 3 groups of fish identified in this study. The dataset for each group of fish (west, east or neutral) was divided into 6-month intervals and the geoposition data were bootstrapped (1000 bootstrap samples) to estimate the probability that an individual fish would be located in the western management unit during each period. During the initial 6 months post-tagging, fish (n=62) identified as western spawners and eastern spawners had a high probability of remaining in the western management unit (West: $0.994 > p > 0.982$, East: $0.933 > p > 0.900$, 95% CI, Supplement Table 2). As time at liberty increases, the probability remains approximately the same for western fish but decreases rapidly for eastern fish. Fish identified as eastern

spawners, at large for more than 720 days, have a relatively low probability of being in the western management unit (0.082 > p > 0.050), in comparison to western spawners. One individual displayed site fidelity to the GOM over two consecutive years (S.L.H. Teo and B.A. Block, unpublished data). During the initial 6 months post-tagging, tuna smaller than 200 cm CFL also had a high probability of remaining in the western Atlantic management unit (0.999> p > 0.991, 95% CI, 1000 bootstrap samples).

Our mixing rate assessments with current electronic tag data have biases associated with sample sizes, tag reporting rates, varying release and recapture rates at different locations, and track durations. As electronic tagging technology improves and more archival tags are deployed around the Atlantic Ocean, longer tracks can be expected to provide more information useful for discerning the mixing rate of the bluefin tuna populations.

**Supplement Table 2. Probability of Atlantic bluefin tuna being located in the western management unit after being tagged in the western Atlantic.[a]**

| Days at large | Probability of fish being located in the western management unit[b] | | |
|---|---|---|---|
| | Western (36) | Eastern (26) | Neutral (268) |
| 1-180 | 0.994 – 0.982 | 0.933 – 0.900 | 0.996 – 0.984 |
| 181-360 | 0.962 – 0.934 | 0.606 – 0.542 | 0.951 – 0.927 |
| 361-720 | 0.887 – 0.844 | 0.347 – 0.288 | 0.954 – 0.927 |
| >720 | 1.000 – 1.000 | 0.082 – 0.050 | 0.898 – 0.857 |

[a] Each fish was identified as a western spawner, eastern spawner or neutral fish, based on the criteria described in the text. Fish were released at 3 locations in the western Atlantic (Fig. 1, arrows).

[b] The probabilities shown are the 95% confidence intervals. The numbers of fish used to make these estimates are shown in parentheses. All geoposition data, inclusive of geolocations, release and recapture points were used.

Figure 1









Figure 2



Figure 3



Figure 4



Supplementary Figure 1







Supplementary Figure 2



Supplementary Figure 3





Exhibit B



Login   Search   Site Map   Contact Us

About Us   Programs   Media Center   Resources   Ad



Publications & Reports

**Ocean Briefings
& Citations**

Ocean Citations

Ocean Briefings

Related Writings

Aquaculture Resources

Ocean Report
Radio Show

SeaWeb Strategic Services

Bookstore

Links

**Ocean Update**

Subscribe Now

# Related Writings

## Bluefin Tuna in the West Atlantic: Negligent Managen and the Making of an Endangered Species

**by Carl Safina, PhD**

Originally published in *Conservation Biology*, 7: 229-234, 1993.

---

The bluefin tuna (Thunnus thynnus) is a creature of superlatives. Growing to 1,500 pou kilos), traveling on trans-oceanic migrations, and reputedly capable of swimming 50 mi per hour, it is one of the largest, most wide-ranging and fastest of animals. To anyone seen this saber-finned giant explode through the surface of the sea, it is among the mo magnificent. The bluefin is also one of the most valuable and most over-exploited of cr West Atlantic breeding population has plummeted 90% since 1975, from an estimated million to 22,000 animals (ICCAT 1991). The east Atlantic adult population is currently to be half what it was in 1970 (ICCAT 1992). A highly prized delicacy in Japan's most e sushi restaurants, a single bluefin can bring fishermen up to U. S. $30,000, sell at auct Tokyo for more than U. S. $60,000, then cost diners U. S. $350 per pound. Most fishin tuna is driven by the Japanese market and this international trade.

Built, like most tunas are, for speed and endurance ("tuna" is from Greek meaning "to fins retract into slots during high-speed acceleration. The bluefin tuna is "one of the mc developed of the tuna species" (Cort and Liorzou 1991). Through a highly developed c thermal exchange system known as the rete mirable or "miraculous network," bluefins body temperature of 24 to 35 degrees C, though they inhabit waters ranging as low as C (Cort and Liorzou 1991).

The bluefin tuna occurs on both sides of the Atlantic and in the Pacific. Highly migrator Atlantic bluefin range from waters off Labrador south at least to Brazil, and breed almo exclusively in the Gulf of Mexico (Mather 1974, Clay 1991). There is approximately a 3

east exchange of adult bluefin across the Atlantic Ocean (Suzuki 1991). The eastern a
populations are considered distinct for fishery management purposes (ICCAT 1989). S
bluefin tuna (Thunnus maccoyii), whose adult population has also declined continuous
now "remarkably low" (ICCAT 1992), migrate circumpolarly in the southern hemisphere
apparently breeding only off Java and northwest Australia but ranging into the south At

The body responsible for stewardship of Atlantic tunas is the International Commission
Conservation of Atlantic Tunas (ICCAT, pronounced "eye-cat," hereafter referred to as
Commission). The Commission is comprised of roughly 20 member Atlantic-rim countr
Japan, a major fisher, importer, and consumer of Atlantic tunas. Founded in the late 19
Commission assumed scientific and management authority for "tunas and tuna-like sp
practice this has included both tunas and such taxonomically distant species as marlin
(Istiophoridae) and swordfish (Xiphias gladius).

The Commission's scientific committee, composed of scientists from several countries
catch statistics and models population trends. The Commission's managers are respor
setting fishing management policy. The managers often have strong industry ties. For
this writing one of the three U. S. commissioners works full time as executive vice pres
national seafood industry advocacy and lobbying firm. Another works for the U. S. Dep
Commerce.

The Commission's charter mandates that it manage for maximum sustainable yield. Bu
several species are declining under the Commission's purview, the west Atlantic bluefi
the only one for which the Commission has ever recommended catch quotas. Yet thes
have long exceeded maximum sustainable yield. An independent panel convened in 1
U. S. National Marine Fisheries Service (NMFS) found that the west Atlantic bluefin po
"could provide substantially greater yield and spawning potential if fishing mortality wa
and that the bluefin population modeling that NMFS contributes to the Commission "us
the-art methodology and is generally of high quality" (NMFS 1991). But the Commissic
managers have repeatedly ignored their own scientists' advice. In 1981 the Commissic
Standing Committee on Research and Statistics concluded that the western Atlantic's
population was depleted and that catches "should be reduced to as near zero as feasil
Commission's managers set a 1,160 metric ton annual quota, ostensibly for "scientific
monitoring." (The Commission's U. S. advisory committee chairman remarked publicly
later, "It isn't actually a scientific quota and we never really believed it was.") In 1983, t
"scientific" quota was raised to 2,660 metric tons. Throughout the 1980s this annual "s
quota remained unchanged, though the Commission's own data showed the breeding
declining each year, as fishing mortality increased several fold (Fig. 1). In 1990, the Cc
Standing Committee on Research and Statistics noted that existing catch quotas "will c
decline of the age 8+ group [breeders] to continue" and "is expected to result in an incr
estimated fishing mortality rate and a corresponding decline in the estimated stock size
1990).

In 1991, the Commission's scientific committee reported that the west Atlantic breeding

had declined 24% in the preceding twelve months. The scientific committee also proje
decline between 1992 and 1995 under current fishing pressure, but projected a 47% in
between 1992 and 1995 if the quota was cut by 50%. By that time, Sweden had annou
would seek to list the western Atlantic bluefin on CITES Appendix 1, and Swedish obse
present at the 1991 meeting of the Commission (CITES, the Convention on Internatior
Endangered Species of Wild Flora and Fauna, is a treaty with approximately 120 party
at present. Appendix 1 includes species threatened with extinction which are affected l
international trade). Apparently feeling some pressure, the Commission's managers cu
ten percent that year. No recovery target or recovery schedule for bluefin tuna, or any
species, has ever been adopted by the Commission. The Commission is not in a stron
to regulate or manage much of the international bluefin tuna fishing. Countries that are
Commission members make significant catches. Japan Fisheries Agency officials have
catches by non-ICCAT countries may exceed 80% of the Commission's members' cat
Atlantic. And "an increasing number of boats have been reported flying flags of conver
ICCAT non-member countries so as to target bluefin tuna in the Gulf of Mexico and the
Mediterranean Sea [the only known spawning areas], and thereby fish without any
restrictions" (Miyake 1992).

These problems have drawn the attention of conservation organizations. Based on the
Commission's management record and on its 1990 statistical report, and in an attempt
the Commission accountable for its actions, the National Audubon Society in the spring
proposed to the U. S. Fish and Wildlife Service that the western Atlantic population be
CITES Appendix I. Such a listing would have suspended export to Japan of bluefin tur
listed population. The U. S., under heavy pressure from tuna exporters, decided not to
listing. Consequently, Audubon sought the World Wildlife Fund's assistance in furtherir
discussions Audubon had initiated with Sweden, whose once-productive bluefin fishery
vanished in the last 2 decades. In October 1991, Sweden announced its proposal that
western Atlantic population be listed in CITES Appendix 1 and the eastern Atlantic pop
Appendix 2 (the latter listing would mandate monitoring of international trade).

A month after Sweden's announcement, the Commission held its annual meeting in Ma
U. S. position at that meeting was to pursue a 50% reduction in catch quota for the we
Atlantic population. This position, the first catch reduction for bluefin tuna proposed by
Commission country in nearly a decade, had been hard-won by conservation advocate
against bitter industry lobbying. This lobbying had escalated to the White House when
exporters hired a lobbying firm partnered by a former White House political director and
man who would become chairman of the Republican National Committee during the Pi
campaign. Conservationists countered with their own White House contacts and preva
the policy to seek a 50% catch quota reduction, based on the U. S. National Marine Fis
Service's scientists' population projections, emerged.

At the 1991 Commission meeting, the three member countries fishing for bluefin in the
Atlantic were encouraged to decide fishing and quota policies among themselves. How
of the three U. S. Commissioners told members of the U.S. delegation that they did no

such a catch reduction was necessary or politically realistic (the third commissioner lat
that he had been excluded by the chief U. S. commissioner from attending a closed se
Canadian and Japanese delegates). Initial Japanese opposition to the U. S. position fo
allocations shifted to support of a 50% phased reduction over four years. Japan's desir
a CITES listing and Canada's strong resistance to reduced quotas resulted in continue
negotiations throughout the meeting.

By the Commission's adjournment, a conditional four-year phased 25% reduction was
Over the four-year period this phased scheme would reduce the allowed catch by 17.5
compared to the current allocation scheme. By year four, the quota would be reduced
However, it was agreed that this phase-in will be automatically abandoned after the 19
scientific reports of the Commission, unless these reports "indicate otherwise." No qua
targets for population recovery were set. Japan had also offered a trade resolution whi
have banned trade in bluefin tuna from non-ICCAT countries, but this resolution was re
the European Community because it would have affected some of their non-ICCAT me
CITES' 100-plus member nations and a host of non-governmental organizations and o
convened in March 1992 in Kyoto. Japanese seafood representatives picketed the cor
Listing West Atlantic bluefin as proposed would have suspended only one percent of J
tuna species imports, and roughly 15-20% of its bluefin tuna imports (up to 85% of Jap
imports come from the east Atlantic, Pacific, and Indian Oceans-- including southern b
this international trade would not have been interrupted by the proposed listings). But J
delegates said repeatedly to members of the conservation community, 'This is the sam
thing you did to us on whales, sea turtles, and driftnets, and we will not let this happen
tuna. If you succeed here, you will go on to the next species and the next until you des
food culture.'

Japan, with Canadian and U. S. assistance, worked feverishly to force Sweden to with
proposal prior to a vote. One Swedish delegate said, 'The Japanese and Canadians ar
the worst kind of pressure. We will have to do as instructed.' Fierce conflict over the blu
proposal was evident in the constant flow of position papers and rebuttals distributed tl
the CITES meeting by the Japan Fisheries Association, the Japan Tuna Federation an
American consultants, the Japanese government's Fisheries Agency, the World Conse
Union (IUCN), and a wide variety of international conservation groups. The paper deba
the conference lobby was reflected in the attentions of reporters from around the world
fight over elephant ivory received more attention.

A peculiar bluefin tuna "briefing book" appeared, containing a 6-page statement by "Th
Federation of Japan Tuna Fisheries Cooperatives, in agreement with the International
Commission for the Conservation of Atlantic Tunas, the Inter-American Tropical Tuna
Commission, the National Fisheries Institute of the United States [the seafood industry
firm employing one of the U. S.' tuna Commissioners], the U. S. East Coast Tuna Assc
[bluefin exporters], the International Coalition of Fisheries Associations..." This did little
impressions that the Commission for the Conservation of Atlantic Tunas has conflicts o

When the bluefin proposal was formally taken up on the floor of the CITES conference
advocated the need for a 50% quota reduction, adding that they would withdraw the pr
the Commission's countries agreed to pursue quota reductions. The U. S., Canada, Me
Japan eagerly agreed, and Sweden withdrew their proposal.

Although floor statements were permitted on all other proposals that were withdrawn b
proponents during the 2-week conference, an attempt at floor debate by the World Cor
Union (IUCN) was not permitted on the bluefin issue. Eyewitnesses to closed meetings
occurred over the bluefin proposal reported that, apparently to squelch debate, Canada
Japan had insisted that no floor statements be permitted from anyone besides the fishi
countries, and Sweden, under severe duress, acquiesced. Sweden's delegation head s
press conference after formally withdrawing its proposal, "We had come expecting to d
biological merits of our tuna proposal, but it soon became evident that other concerns
decide the issue." TRAFFIC USA (Trade Record Analysis of Flora and Fauna in Comm
subsidiary of World Wildlife Fund) later reported "official discussion over the merits [of
proposal] never even took place, due to backroom politicking... In a well-orchestrated p
designed to foreclose any open debate... Sweden, under extreme pressure... withdrew
proposal before any views could be heard." (Hemley 1992). An African delegate later v
was sickened by the manipulations on the Bluefin Tuna."

A special Commission meeting was convened in May 1992 in Tokyo in accordance wit
promises made by the fishing countries to the CITES assembly prior to Sweden's withd
proposal. Although Japan seemed ready to ban imports of tuna from non-ICCAT count
pending consensus by Commission members that it do so, France and the European C
(which includes several non-ICCAT countries) again blocked any attempted trade cont
Although Japan supported in principle the U. S. proposal for halving catch quotas, Jap
delegates emphasized that non-ICCAT countries must be dealt with first. By adjournme
Commission appeared more incapable than ever of addressing conservation needs, ev
had identified itself.

The Commission's mismanagement is perhaps best highlighted by the U. S. National M
Fisheries Service's recent analysis showing that if the Commission had simply not rais
catch quota from 1,160 to 2,660 metric tons in 1983, the adult population would by nov
been approximately 3.4 times what it is, and would have been steadily increasing, rath
declining (Powers 1992). When the catch level of 2,660 metric tons for Atlantic bluefin
put in place in 1983, 2,660 mt was roughly 15% of the breeding adult biomass. By 199
was approximately 50% of the breeding biomass. Under the system whereby a fixed to
(rather than a percentage) quota is taken from an ever-diminishing adult population, pr
the remaining fish increases even if the number of animals taken remains constant. NM
"the objective of stemming the decline in adult population size will not be achieved und
management program now in effect. In order to stem further decline in the adult spawn
it is necessary to reduce the allowable take 50% or more" (NMFS 1992; The U. S. can
unilaterally reduce its catch quota because, through a fishing-industry sponsored 1990
amendment to the United States' Atlantic Tunas Convention Act, the U. S. has legally p

itself from setting a domestic catch quota that is less than the quota provided to the U.
Commission; this appears to be the only law that suspends U. S. discretion over mana
its own natural resources). The American Fisheries Society's (AFS) 1991 resolution on
Atlantic bluefin tuna concluded that "all directed harvests should be immediately prohib
1992 AFS stated that "The present management regime (A) will not allow the stock to
poses an unacceptable risk of there not being enough adult fish to spawn new generat
tuna, and (C) is counter to the long-term interest of both fishery producers and consum
Although the threat to the biological integrity of the stock is of most concern, the econo
incurred to date are staggering and cannot be recovered" (AFS 1992).

Despite this increasing international scrutiny from conservation groups and fishery scie
Commission has attempted to remain insulated. At its 1992 meeting in Madrid, the Cor
refused observer status to the World Wildlife Fund. The Commission's secretariat also
distribute to its delegates a modestly worded joint statement by World Wildlife Fund, A
and the Center for Marine Conservation, which requested rebuilding targets and timeta
reductions that reflect the Commission's scientists' population projections, and a certific
origin system for bluefin (and similar measures for swordfish, whose population trends
been a source of serious concern).

Despite the Commission's attempts to remain behind closed doors, scrutiny of the Con
conservation organizations and fishery scientists seems likely to increase. Audubon, W
Wildlife Fund and the Center for Marine Conservation have formed "ICCAT Watch" to t
publicize the Commission's activities. And just prior to the Commission's 1992 meeting
American Fisheries Society's president warned the U. S.' delegation head that "Failure
implement strong conservation measures would be a serious mistake which could caus
concerned countries to find solutions through... CITES and the Endangered Species
Act" (Fetterolf 1992).

The Commission may be changing its approach. At its November 1992 meeting the Co
adopted some modest but potentially constructive measures. The Commission recomm
beginning 1 September 1993, all frozen bluefin imported into any of the Commission's
countries be accompanied by an "ICCAT statistical document." The original proposal b
Canada, and Japan was for a "certificate of origin," but after three days of intense negc
the European Community, France, Portugal, and Spain, the countries agreed to replac
term "certificate of origin" with "bluefin statistical document," allowing use of a Commis
accepted document or its equivalent, instead of a certificate that would have required v
by a government official. The countries also agreed to delete any language about whet
unaccompanied by appropriate documents would be denied entry into any member co
Commission. Each country may determine the disposition of undocumented bluefin de
its interpretation of obligations under the General Agreements on Tariffs and Trade (G,
to implementation of this program for imports of fresh bluefins (the high-value animals
sashimi), several practical problems regarding handling by customs officials must be re
Despite its dilutions and potential implementation problems, this arrangement could he
distinguish non-ICCAT international trade from that of member nations. This could give

far the major importer, the discretion to prohibit imports of bluefin tuna from non-ICCA
depending on its interpretation of trade obligations. The Commission also directed its s
committee to provide and evaluate "various management measures that could be impl
the east and west bluefin tuna stocks and provide scientifically based target options fo
rebuilding of the stocks in a reasonable period of time." The scientific committee will co
new assessment of the West Atlantic bluefin population in 1993.

These movements give rise to the hope that the Commission's long quiescence may b
Real progress will not have been made, however, until Japan prohibits non-ICCAT imp
quotas are halved, and recovery plans are implemented to rebuild the breeding popula
early-1970s level within a decade (a recovery rate equivalent to the depletion rate that
Commission allowed). If the Commission's conservation and rebuilding measures rema
inadequate after its 1993 meeting, a CITES Appendix 1 listing for west Atlantic bluefins
necessary. It also seems that a CITES Appendix 2 listing, which would require uniform
of all international bluefin trade, might offer the most efficient and cost-effective way of
accomplishing the monitoring of non-ICCAT countries' catches, something the Commis
has identified as necessary. Catches of other fishes under the Commission's purview h
in excess of maximum sustainable levels, including blue marlin (Makaira nigricans), wh
(Tetrapturus albidus), swordfish, east Atlantic bluefin tuna, east Atlantic yellowfin tuna
albacares), albacore tuna (Thunnus alalunga), and bigeye tuna (Thunnus obesus) (ICC
Currently nothing prevents systematic repetition of the West Atlantic bluefin scenario f
species, several of which have already declined significantly. Until the Commission be
serious about complying with its charter mandate to manage for sustainable yield, the
ICCAT will appear to represent International Commission to Catch All the Tuna. If susp
international trade in west Atlantic bluefin tuna eventually occurs, whether through CIT
another legal mechanism, or through commercial extinction, it might seem the result of
Commission's long history of failing to heed its charter and its scientists.

### References

AFS 1991. American Fisheries Society Resolution for the Conservation of West Atlantic Bluefin Tuna. A
Fisheries Society.

AFS 1992. American Fisheries Society Position Statement on Bluefin Tuna, April 24, 1992.

Clay, D. 1991. Atlantic bluefin tuna (Thynnus thynnus thynnus (L.)): a review. pp 91-179, In: In: R. B. De
H. Bayliff (eds.) World meeting on stock assessment of bluefin tunas: strengths and weaknesses. Inter-
Tropical Tuna Commission Special Report No. 7. 357 pp.

Cort, J. L. and B. Liorzou. 1991. Migration - eastern Atlantic and Mediterranean. pp 130-132, In: R. B. D
H. Bayliff (eds.) World meeting on stock assessment of bluefin tunas: strengths and weaknesses. Inter-
Tropical Tuna Commission Special Report No. 7. 357 pp.

Fetterolf, C. M., Jr. 1992. Letter to Carmen Blondin, U. S. Commissioner to ICCAT. October 19.

Hemley, G. 1992. CITES 1992: Endangered Treaty? TRAFFIC USA 11:1-3

ICCAT. 1989. Report of the Standing Committee on Research and Statistics. International Commission
Conservation of Atlantic Tunas.

ICCAT 1990. Report of the Standing Committee on Research and Statistics. International Commission f
Conservation of Atlantic Tunas.

ICCAT. 1991. Report of the Standing Committee on Research and Statistics. International Commission
Conservation of Atlantic Tunas.

ICCAT. 1992. Report of the Standing Committee on Research and Statistics. International Commission
Conservation of Atlantic Tunas.

Mather, F. 1974. The bluefin tuna situation. Sixteenth annual international game fish research conferenc
Woods Hole Oceanographic Institution contribution 3304.

Miyake, P. M. 1992. Tuna catches by ICCAT non-member countries. International Commission for the C
of Atlantic Tunas. NMFS. 1992. Draft Environmental Assessment for the U. S. Western Atlantic Bluefin
National Marine Fisheries Service. 31 pp.

NMFS. 1991. Meeting Report. Ad-hoc bluefin tuna review group, Southeast Fisheries Center, Miami, Se
1991.

NMFS. 1992. Regulatory Impact Review for the Atlantic Bluefin Tuna Regulations for 1992. National Ma
Service. 56 pp.

Powers, J. E. 1992. Bluefin tuna stock trajectories under alternative catch histories. Memo to Dr. Williarr
Director, National Marine Fisheries Service. 9 January.

Suzuki, Z. 1991. Migration- Western Atlantic. pp 129-130, In: R. B. Deriso and W. H. Bayliff (eds.) Worlc
stock assessment of bluefin tunas: strengths and weaknesses. Inter-American Tropical Tuna Commissic
Report No. 7. 357 pp.



# A Message from the NOAA Assistant Administrator for Fisheries

NOAA's National Marine Fisheries Service
Report on the Status of the U.S. Fisheries for 2006

I am pleased to present the 2006 report on the status of U.S. marine fish stocks. NOAA's National Marine Fisheries Service (NMFS) is dedicated to sustainable management of our Nation's living marine resources. Ending overfishing and rebuilding stocks to maximum sustainable yields is a top priority for this Administration, NMFS, the eight regional Fishery Management Councils, and our constituents. Long-term sustainable management of the Nation's marine fisheries helps create a robust fishing industry, ample recreational fishing opportunities, and vibrant fishing communities.

This report updates the 2005 status of stocks report and includes determinations for stocks assessed in 2006. The results from 2006 are mixed – some stocks have improved while others have declined. Based on new assessments, we need to end overfishing and rebuild several additional stocks. The number of stocks subject to overfishing has increased from 45 in 2005 to 48 in 2006, and the number of overfished stocks has increased from 43 to 47. Although the numbers have increased, the majority of our stocks are not subject to overfishing and are not overfished.

As 2007 proceeds, we continue to implement the new Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006 (MSRA). In the MSRA, Congress called for strong action to end overfishing and has provided new management tools and requirements to meet this goal. Provisions such as annual catch limits and limited access privilege programs are important tools for more effective fisheries management. Measures that end overfishing must be in place by 2010 for all stocks experiencing overfishing.

In closing, I want to reiterate that the majority of our domestic assessed fish stocks are either not overfished (75 percent) or not subject to overfishing (80 percent). Each year, we undertake new assessments to increase the knowledge of our stocks. Stock assessments are vital for providing the scientific basis for sound management and decision making. Still, the status of many of our stocks is unknown. The dedicated and hardworking staffs of NMFS and the Councils will work to meet the challenge of increasing the number of assessments, rebuilding all stocks, and maintaining them at highly productive levels.

We appreciate the support of Congress, stakeholders, and constituencies, and look forward to continued collaboration as we implement the MSRA and continue to improve the status of U.S. fisheries.

*William T. Hogarth*

William T. Hogarth, Ph.D.

2

# Table of Contents

*Executive Summary* _____ **5**

*Introduction* _____ **6**

*Using the Best Available Data* _____ **7**

*Summary of Stock Status Determination Changes* _____ **8**

    Overview of overfishing status of stocks _____ 8

    Changes in overfishing status _____ 8

    Overview of overfished status _____ 9

    Changes in overfished status _____ 9

    Approaching an overfished condition _____ 10

*Tracking Changes* _____ **11**

*Historical Perspectives* _____ **11**

*Changes in Biomass Levels* _____ **14**

*Management Actions to Address Overfishing and Overfished
Determinations* _____ **16**

*Status Determinations by Region* _____ **19**

    Northeast Region _____ 19

    Southeast Region _____ 20

    Southwest Region _____ 21

    Northwest Region _____ 22

    Pacific Islands Region _____ 23

    Alaska Region _____ 24

    Atlantic Highly Migratory Species _____ 25

# Executive Summary

The Magnuson-Stevens Fishery Conservation and Management Act requires that NOAA's National Marine Fisheries Service (NMFS) report annually to Congress and the Councils on the status of fisheries (Sec. 304(e)(1)). This report fulfills that requirement.

The information in this report was generated by the NMFS regional offices and science centers based on the most recent stock assessments. Status determinations are generally made during a formal review of a scientific stock assessment using the best available scientific information and status determination criteria specified in a fishery management plan.

Stocks discussed in this report are characterized under two categories: (1) subject to overfishing and (2) overfished. A stock that is subject to overfishing has a fishing mortality (harvest) rate above the level that provides for the maximum sustainable yield. A stock that is overfished has a biomass level below a biological threshold specified in its fishery management plan.

NMFS reviewed 530 individual stocks and stock complexes in 2006. Two hundred forty-two stocks or stock complexes have known overfishing determinations: 194 (80 percent) are not subject to overfishing and 48 (20 percent) are subject to overfishing. These percentages represent a slight change from last year's report, in which 81 percent were not subject to overfishing and 19 percent were subject to overfishing. One hundred eighty-seven stocks have known overfished determinations: 140 (75 percent) are not overfished and 47 (25 percent) are overfished. The percentages are unchanged relative to 2005. The specifics are outlined below.

The number of stocks subject to overfishing increased to 48 in 2006 from 45 in 2005. Three stocks were removed from the list and six were added. Specifically: Two stocks are no longer subject to overfishing—*Atlantic sea scallops* and *Gulf of Mexico vermilion snapper*. The status of the *Large Coastal Shark complex* is now unknown based on a 2006 stock assessment. Four stocks have become subject to overfishing—*winter skate, Gulf of Mexico gag, petrale sole,* and *yellowfin tuna (Eastern Pacific)*. Finally, two stocks of previously unknown status were found to be subject to overfishing—*Gulf of Mexico gray triggerfish* and *dusky shark*.

The number of overfished stocks has increased to 47 in 2006 from 43[1] in 2005. Two stocks were removed and six were added to the list. Specifically: The status of the *Large Coastal Shark complex* is now unknown based on a 2006 stock assessment. One stock is no longer overfished—*Gulf of Mexico vermilion snapper.* Four stocks have become overfished—*monkfish—north, monkfish—south, South Atlantic pink shrimp,* and *sandbar shark.* Finally, two stocks of previously unknown status were found to be overfished—*porbeagle shark* and *dusky shark.*

Management action associated with 4 stocks—*Bluefish (except Gulf of Mexico), Gulf of Mexico vermilion snapper, South Atlantic tilefish,* and *South Atlantic gag*[2]—has resulted in rebuilding to levels of at least 80 percent of their maximum sustainable levels. Continued, sustainable management should allow these stocks to achieve optimal levels.

Since 2001, 13 stocks or complexes were removed from the overfishing list (one of which resorted to an unknown status) and 19 stocks or complexes have been added to the list, with 8 of these stocks previously of unknown status or not reported in 2001.

Since 2001, 27 stocks or complexes were removed from the overfished list (14 of which resorted to an unknown status) and 17 stocks or complexes have been added to the list, with 3 of these stocks previously of unknown status or not reported in 2001.

---

[1] For comparison purposes, the number of overfished stocks reported in 2005 (54) is reduced by 11 due to a re-evaluation of some previous overfished determinations. This change is explained in Appendix 1.

[2] Result is preliminary because the assessment is currently being reviewed.

# Introduction

This report describes the state of our Nation's marine fisheries and the effectiveness of fisheries management under the Magnuson-Stevens Fishery Conservation and Management Act, Public Law 94-294 (MSA), as amended in 1996 by the Sustainable Fisheries Act (SFA) and again in 2007 by the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006 (MSRA). The SFA emphasized the need to end overfishing, rebuild overfished stocks, and establish management plans designed to ensure biologically and economically sustainable fisheries; the MSRA set a firm deadline of 2010 for measures to be in place that end overfishing in the United States. A stock that is subject to overfishing has a fishing mortality (harvest) rate above the level that provides for the maximum sustainable yield. A stock that is overfished has a biomass level below its prescribed biological threshold.

> ## Definitions
>
> *Overfishing* – Harvest rate is above a prescribed fishing mortality threshold.
>
> *Overfished* - Stock size is below a prescribed biomass threshold.
>
> *Approaching Overfished Condition* - Based on trends in harvesting effort, fishery resource size, and other appropriate factors, it is estimated that the fishery will become overfished within 2 years.
>
> $B_{MSY}$ – The weight (biomass) of a group of fish necessary to produce MSY on a continuing basis.
>
> $F_{MSY}$ – A fishing mortality rate that, if applied constantly, would result in the maximum sustainable yield.
>
> *MSY* - Maximum Sustainable Yield - The largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological and environmental conditions.

We continue to make progress in our scientific knowledge of marine fisheries and in our ability to use that knowledge to manage for the sustained use of these resources. This report fulfills the congressional requirement for an annual report on the status of fisheries within each Council's geographic area of authority and to identify fisheries that are overfished or approaching a condition of being overfished.

This report lists the managed marine fish stocks in the U.S. Exclusive Economic Zone,[3] including stocks that straddle international boundaries and highly migratory stocks. In response to the congressional requirement, the report categorizes stocks according to their status. The report answers four questions which help determine the effectiveness of management measures in meeting the provisions of the MSA:

1. *What stocks are subject to overfishing?*
2. *What stocks are overfished?*
3. *What stocks are approaching an overfished condition?*
4. *How do this year's determinations compare to previous years?*

---

[3] The U.S. Exclusive Economic Zone extends from 3 to 200 miles offshore and covers more than 2 million square miles.

Finally, this report discusses management action taken by the relevant Councils to address new overfishing and overfished determinations. In 2006, several stocks were added to the list of stocks subject to overfishing and stocks overfished (Table 1). NMFS, through its regional offices, is working closely with the relevant Councils to address these determinations and reverse downward trends.

## Using the Best Available Data

To categorize marine fish stocks for this report, NMFS reviewed each stock relative to the status determination criteria (SDC) contained in the relevant fishery management plan (FMP).[4] Sometimes the SDC do not apply to an individual stock, but to a group of similar species harvested together or sharing a similar life history. These groups are referred to as stock complexes, units, or assemblages. Such groupings may be particularly useful when data are sparse or lacking, because they provide a level of protection for all related stocks and allow for data collection on them. In some cases, the status of a stock complex is determined using the SDC for one stock in the complex. In other cases, the SDC apply to the complex as a whole. Stock complexes are used in the Southeast, Pacific Islands, and Alaska Regions, as well as by the NMFS Atlantic Highly Migratory Species (HMS) division. This report includes the FMPs' stock complexes, rather than listing species individually.

Based on a review of the best scientific information available for each stock or stock complex, relative to its SDC, NMFS determined the overfishing and overfished condition, including whether the stock is approaching an overfished condition. NMFS used many resources to make these determinations, including final, peer-reviewed documents such as Stock Assessment Review Committee reports and recommendations of each Council's Scientific and Statistical Committee. For species not included in a federal FMP (i.e., species managed by international agreement), the stock status determination was made in accordance with the relevant FMP or agreement. More information on stock complexes and the methodology used to include them in this report can be found in Appendix 1 on the NMFS website.

A 2006 evaluation of overfished SDC found spawning potential ratio (SPR) was used to measure the overfished status for 21 stocks. SPR is inadequate for making overfished determinations and, as a result, the overfished status of these stocks was changed to unknown. Eleven of these stocks had been previously declared overfished. This change is fully described in Appendix 1.

---

[4] In order to use the best available data, some stocks use SDC specified in the most recent scientific assessment, rather than those contained in the FMPs. Alaska SDC are generally specified in the annual Stock Assessment and Fishery Evaluation (SAFE) Report, rather than in the FMP itself.

## Summary of Stock Status Determination Changes

This year's report is based on assessments completed as of December 31, 2006. Results from fishery stock assessments in progress on that date will be summarized in next year's report.  Results are updated quarterly and the most resent may be found at:
*http://www.nmfs.noaa.gov/sfa/statusoffisheries/SOSmain.htm*

### Overview of overfishing status of stocks
• 242 stocks or stock complexes are known with respect to their overfishing status. Of these:
  o 194 (80 percent) stocks or stock complexes are not subject to overfishing.
  o 48 (20 percent) stocks or stock complexes are subject to overfishing (i.e., have a fishing mortality rate that exceeds the overfishing threshold).
• 288 stocks or stock complexes have overfishing thresholds not defined or applicable, or are unknown with respect to their overfishing status.

### Changes in overfishing status
The following stocks had a change in overfishing status during 2006; stocks with previously unknown or undefined status are noted.
• In the Northeast Region –
  o *Atlantic Sea Scallop* is not subject to overfishing.
  o *Silver Hake–Southern Georges Bank/Middle Atlantic* is not subject to overfishing (was previously unknown).
  o *Winter Skate* is subject to overfishing.
• In the Southeast Region –
  o *Gulf of Mexico Vermilion Snapper* is not subject to overfishing.
  o *Gulf of Mexico Gray Triggerfish* is subject to overfishing (was previously listed as unknown).
  o *Gulf of Mexico Gag* is subject to overfishing.
• In the Southwest Region –
  o *Yellowfin Tuna–Eastern Pacific* is subject to overfishing.
• In the Northwest Region –
  o *Cabezon–South* is not subject to overfishing (was previously listed as unknown).
  o *Blackgill Rockfish* is not subject to overfishing (was previously listed as unknown).
  o *Petrale Sole* is subject to overfishing.
• In the Highly Migratory Species Division –
  o *Porbeagle shark* is not subject to overfishing (was previously listed as unknown).
  o *Dusky Shark* is subject to overfishing (was previously listed as unknown).
  o *Blacktip Shark* was previously assessed as a single stock and was not subject to overfishing. It is now assessed as two stocks; a *Gulf of Mexico* stock that is not subject to overfishing and an *Atlantic* stock whose overfishing status is unknown.

8

    o   The *Large Coastal Shark Complex* is unknown, based on results of the 2006 stock assessment (was previously subject to overfishing).
- There are no changes to the other regions.

## Overview of overfished status
- 187 stocks or stock complexes are known with respect to their overfished status. Of these:
  - 140 (75 percent) stocks or stock complexes are not overfished. This number includes 4 stocks that are not currently overfished, but are approaching an overfished condition.
  - 47 (25 percent) stocks or stock complexes are overfished.
- 343 stocks or stock complexes have overfished thresholds not defined or applicable, or are unknown with respect to their overfished status.

## Changes in overfished status
The following stocks had a change in overfished status in 2006; stocks with previously unknown or undefined status are noted.
- In the Northeast Region –
  - *Monkfish–North* is overfished.
  - *Monkfish–South* is overfished.
- In the Southeast Region –
  - *Gulf of Mexico Vermilion Snapper* is not overfished.
  - *South Atlantic Gag* is not overfished (was previously listed as unknown[5]).
  - *South Atlantic Pink Shrimp* is overfished.
  - Eleven stocks were removed from the overfished list due to an evaluation of the adequacy of their SDC to measure the overfished status of those stocks (see Appendix 1). Those stocks have been relisted as unknown and are: *SA Red Snapper, SA Red Grouper, SA Black Grouper, SA Speckled Hind, SA Warsaw Grouper, SA Red Drum, SA Nassau Grouper, SA Goliath Grouper,* and *GM Goliath Grouper* (now listed as a single SA/GM stock), *GM Nassau Grouper,* and *GM Red Drum.*
- In the Northwest and Alaska Regions –
  - *Pacific Halibut* is not overfished (was previously listed as undefined).
- In the Alaska Region –
  - *Walleye Pollock–Aleutian Islands* is not overfished (was previously listed as unknown).
- In the Highly Migratory Species Division –
  - *Sandbar Shark* is overfished.
  - *Porbeagle Shark* is overfished (was previously listed as unknown).
  - *Dusky Shark* is overfished (was previously listed as unknown).
  - The *Large Coastal Shark Complex* is unknown, based on results of the 2006 stock assessment (was previously overfished).

---

[5] This stock is one of 21 stocks listed in 2005 using SPR for the overfished determination. The 2006 re-evaluation revised this stock's overfished listing from *no* to *unknown*. The stock was also assessed in 2006, and the result of that assessment indicate that the stock is *not overfished*, a change from the revised unknown determination.

- *Blacktip Shark* was previously assessed as a single stock and was not overfished. It is now assessed as two stocks; a *Gulf of Mexico* stock that is not overfished and an *Atlantic* stock whose overfished status is unknown.
- There are no changes to the other regions.

## Approaching an overfished condition

The basis for determining whether a stock is approaching an overfished condition is an examination of the current stock biomass and trends in fishing effort. Unless the status of the stock is known, a determination about whether the stock will become overfished within 2 years cannot be made with any certainty. Therefore, the definition for the biomass threshold in the FMP, along with trends in fishing effort, should be the determining criteria in evaluating whether a stock is approaching an overfished condition. For Pacific salmon stocks, the determining criteria are based on maximum sustainable yield/maximum spawner potential objectives for natural stocks or stock complexes.

- In the Southeast Region –
  - *Caribbean Snapper Unit 1* is approaching an overfished condition.
  - *Caribbean Parrotfishes* is approaching an overfished condition.
- In the Northwest Region –
  - *Klamath River Fall (Klamath and Trinity Rivers) Chinook salmon* is approaching an overfished condition.
- In the Pacific Islands Region –
  - *The Bottomfish Multispecies Complex–Hawaiian Archipelago* is not approaching an overfished condition (was previously listed as unknown).

# Tracking Changes

The status of all 530 stocks and stock complexes[6] is summarized in Table 2. A tabular summary of the changes in status determinations from 2005 to 2006 is shown in Table 1. These changes are further illustrated in Tables 11 and 12.

Table 1. Number of stocks or stock complexes that have changed status compared to their listing in 2005. To read this table, note the number of stocks with a status change from 2005 (shown in blue) and see the determination in 2006 (shown in tan). For example, 2 stocks listed in 2005 as subject to overfishing are listed in 2006 as not subject to overfishing – *Atlantic sea scallop* and *Gulf of Mexico vermilion snapper*.

| Status in 2006 | Status in 2005 | | |
|---|---|---|---|
| | Overfishing | Not Overfishing | Unknown/Undefined |
| Overfishing | - | 4[a] | 2[b] |
| Not overfishing | 2[c] | - | 4[d] |
| Unknown/Undefined | 1[e] | 1[f] | - |
| | | | |
| Status in 2006 | Status in 2005 | | |
| | Overfished | Not Overfished | Unknown/Undefined |
| Overfished | - | 4[g] | 2[h] |
| Not overfished | 1[i] | - | 3[j] |
| Unknown/Undefined | 12[k] | 13[l] | - |

a. *Winter skate, Gulf of Mexico gag, Eastern Pacific yellowfin tuna, and petrale sole.*
b. *Gulf of Mexico gray triggerfish and dusky shark.*
c. *Atlantic sea scallop and Gulf of Mexico vermilion snapper.*
d. *Southern Georges Bank/Middle Atlantic silver hake, cabezon-south, blackgill rockfish, and porbeagle shark.*
e. *Large coastal shark complex.*
f. *Blacktip shark–Atlantic.*
g. *Monkfish–north, monkfish–south, South Atlantic pink shrimp, sandbar shark.*
h. *Porbeagle shark and dusky shark.*
i. *Gulf of Mexico Vermilion Snapper.*
j. *South Atlantic gag, Pacific halibut, and Aleutian Islands walleye pollock.*
k. *Large coastal shark and evaluation stocks: SA red snapper, SA red grouper, SA black grouper, SA speckled hind, SA warsaw grouper, SA red drum, SA Nassau grouper, SA goliath grouper and GM goliath grouper (now listed as a single SA/GM stock), GM Nassau grouper, and GM red drum.*
l. *Blacktip shark–Atlantic and evaluation stocks: SA gag, SA scamp, SA white grunt, SA gray triggerfish, SA wreckfish, SA mutton snapper, SA gray (mangrove) snapper, SA yellowedge grouper, SA lane snapper, SA/GM little tunny, GM gag, and GM stone crab.*

# Historical Perspectives

In 2005, NMFS completed 196 assessments. Determinations of overfishing status were made for 139 stocks or stock complexes while the status of 57 was unknown or undefined, or such determinations were not applicable. Of those that resulted in known determinations:
- o  18 (13 percent) were subject to overfishing, and
- o  121 (87 percent) were not subject to overfishing.

Determinations of overfished status were made for 122 stocks or stock complexes while the status of 74 was unknown or undefined, or such determinations were not applicable. Of those that resulted in known determinations:
- o  28 (23 percent) were overfished, and
- o  94 (77 percent) were not overfished.

---

[6] The 900+ fish stocks identified in management plans are now managed as 530 stocks and stock complexes, of which 230 are tracked with the Fish Stock Sustainability Index and other performance measures.

In 2006, NMFS completed 108 assessments. Determinations of overfishing status were made for 102 stocks or stock complexes while the status of 6 was unknown or undefined, or such determinations are not applicable. Of those that resulted in known determinations:

- o  19 (19 percent) were subject to overfishing, and
- o  83 (81 percent) were not subject to overfishing.

Determinations of overfished status were made for 86 stocks or stock complexes while the status of 22 was unknown or undefined, or such determinations are not applicable. Of those that resulted in known determinations:

- o  19 (22 percent) stocks or stock complexes were overfished, and
- o  67 (78 percent) were not overfished.

NMFS then combined the numbers of stocks assessed in either 2005 or 2006, counting stocks that were assessed in both years only once and using the most recent determination.  In the 2 years combined, NMFS reviewed 226 discrete stocks or stock complexes.  Determinations of overfished status were made for 169 stocks or stock complexes while the status of 57 was unknown or undefined, or such determinations are not applicable. Of those that resulted in known determinations:

- o  33 (20 percent) stocks or stock complexes subject to overfishing, and
- o  136 (80 percent) were not subject to overfishing.

Determinations of overfished status were made for 112 stocks or stock complexes while the status of 114 was unknown or undefined, or such determinations are not applicable.

Of those that resulted in known determinations:

- o  24 (21 percent) stocks or stock complexes were overfished, and
- o  88 (79 percent) were not overfished.

Finally, NMFS reviewed the overfishing listings in 2001 and compared the status of those stocks listed as subject to overfishing in 2006. In 2001, 62 stocks (representing 42 stocks and stock complexes) were listed as subject to overfishing.

| Between 2001 and 2006.. | Stocks *removed* since 2001 | Stocks *added* since 2001 |
|---|---|---|
| ..Twelve (12) stocks were removed from the list and are no longer subject to overfishing in 2006. | *Gulf of Maine (GOM) haddock*<br>*American plaice*<br>*Atlantic sea scallop*<br>*spiny dogfish*<br>*black sea bass*<br>*golden tilefish*<br>*red porgy*<br>*yellowtail snapper*<br>*vermillion snapper*<br>*red drum*<br>*blacktip shark*<br>*swordfish* | |
| ..One (1) stock complex was removed as unknown based on a new assessment. | *Large coastal shark complex* | |
| ..Twelve (12) stocks or complexes have been added to the list by 2006, after being previously listed as not subject to overfishing. | | *Georges Bank (GB) cod*<br>*Cape Cod/GOM yellowtail flounder*<br>*SNE/MA winter flounder*<br>*GB yellowtail flounder*<br>*GB winter flounder*<br>*greater amberjack*<br>*gray triggerfish*<br>*Grouper Unit 1*<br>*petrale sole* |

| | | |
|---|---|---|
| | | *Eastern Pacific yellowfin tuna*<br>*Central Western Pacific yellowfin tuna*[7]<br>*finetooth shark* |
| ..Six (6) stocks or stock complexes have been added to the list by 2006, after being previously listed as unknown or undefined. | | *winter skate*<br>*Grouper Unit 4*<br>*Parrotfishes*<br>*Snapper Unit 1*<br>*Pacific bigeye tuna*[8]<br>*dusky shark* |
| ..One (1) stock complex was newly added to the report as subject to overfishing. | | *Bottomfish multi-species complex – HI Archipelago*[9] |

In summary, since 2001 -
13 stocks or complexes removed from the overfishing list.
19 stocks or complexes added to the list.

Similarly, NMFS reviewed the overfished listings in 2001 and compared the status of those stocks listed as overfished in 2006. In 2001, 80 stocks (representing 57 stocks and stock complexes) were listed as overfished.

| Between 2001 and 2006.. | Stocks *removed* since 2001 | Stocks *added* since 2001 |
|---|---|---|
| ..Thirteen (13) stocks were removed from the list and are no longer overfished in 2006. | *redfish*<br>*silver hake – So. Georges Bank/Mid-Atl.*<br>*golden tilefish (MA)*<br>*black sea bass (MAFMC)*<br>*gag*<br>*Red grouper (SAFMC)*<br>*golden tilefish (SA)*<br>*yellowtail snapper*<br>*king mackerel – Gulf group*<br>*lingcod*<br>*widow rockfish*<br>*Bering Sea Tanner crab*<br>*swordfish* | |
| ..Fourteen (14) stock complex was removed as unknown based on a new assessment. | *Red grouper (GMFMC)*[*]<br>*Spiny dogfish*[**]<br>*Red snapper (SAFMC)*[***]<br>*Speckled hind (SAFMC)*[***]<br>*Warsaw grouper (SAFMC)*[***]<br>*Black grouper (SAFMC)*[***]<br>*Goliath grouper (SAFMC/ GMFMC)*[***]<br>*Nassau grouper (SAFMC)*[***]<br>*Red drum (SAFMC)*[***]<br>*Vermilion snapper (SAFMC)*[***]<br>*Nassau grouper (GMFMC)*[***]<br>*Red drum (GMFMC)*[***]<br>*large coastal shark complex*<br>*blacktip shark* | |
| ..Fourteen (14) stocks or complexes have been added to the list by 2006, after being previously listed as not subject to overfishing. | | *Gulf of ME cod*<br>*GB cod*<br>*Gulf of ME haddock*<br>*GB haddock*<br>*American plaice*<br>*CC/GOM YTF*<br>*GB YTF*<br>*SNE/MA windowpane flounder*<br>*SNE/MA winter flounder*<br>*Monkfish – North*<br>*Butterfish*<br>*Pink shrimp*<br>*Yelloweye rockfish*<br>*Pribilof Islands blue king crab* |
| ..Three (3) stocks or stock complexes | | *Thorny skate* |

---

[7] The two yellowfin tuna stocks were undefined in 2001 and was not overfishing in 2003, the first year a determination could be made.
[8] This stock was undefined in 2001 and was listed as subject to overfishing in 2003, the first year in which a determination was made.
[9] This complex was added as a result of a new FMP.

| | | |
|---|---|---|
| have been added to the list by 2006, after being previously listed as unknown or undefined. | | *Grouper Unit 4 (Yellowfin grouper)* *Porbeagle shark* |

\* Stocks are now rebuilding.
\*\* Removed because there is no approved rebuilding target.
\*\*\* Stocks removed as part of re-evaluation of SDC (See Appendix 1).

In summary, since 2001 -
27 stocks or complexes removed from the overfished list.
17 stocks or complexes added to the list.


## Changes in Biomass Levels

The Fish Stocks Sustainability Index (FSSI) is a performance measure for the sustainability of 230 U.S. fish stocks selected for their importance to commercial and recreational fisheries. The FSSI establishes a threshold of 80 percent of the biomass that supports the maximum sustainable yield as an indicator of sustainability for non-rebuilding stocks. Stocks with biomass above that level are considered to be within the range of natural fluctuation around the $B_{MSY}$ level, which is defined as a long-term average. The following stocks have biomass levels determined, in 2006, to have increased above the 80 percent criterion.

- In the Northeast Region –
  The biomass of:
    o *Bluefish (except Gulf of Mexico)* is at 95 percent of maximum sustainable yield.
- In the Southeast Region –
  The biomass of:
    o *Gulf of Mexico Vermilion Snapper* is at 152 percent of maximum sustainable yield.
    o *South Atlantic Tilefish* is now at 95 percent of maximum sustainable yield.
    o *South Atlantic Gag* is at 117 percent of maximum sustainable yield.
- In the Southwest Region –
    o The biomass of *Yellowfin Tuna–Eastern Pacific* is now at 99 percent of maximum sustainable yield.

There are no changes for the other regions.

Table 2. Description of FSSI and non-FSSI Stocks by Council, 2006.

| Jurisdiction* | Stock Group | Number of Stocks | Overfishing | | | | | Overfished | | | | | Approaching Overfished Condition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Yes | No | Not Known | Not Defined | N/A | Yes | No | Not Known | Not Defined | N/A | |
| NEFMC | FSSI | 34 | 9 | 21 | 2 | 2 | 0 | 14 | 19 | 1 | 0 | 0 | 0 |
| | NonFSSI | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| | Total | 35 | 9 | 22 | 2 | 2 | 0 | 15 | 19 | 1 | 0 | 0 | 0 |
| MAFMC | FSSI | 11 | 2 | 9 | 0 | 0 | 0 | 2 | 8 | 1 | 0 | 0 | 0 |
| | NonFSSI | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total | 11 | 2 | 9 | 0 | 0 | 0 | 2 | 8 | 1 | 0 | 0 | 0 |
| NEFMC/ MAFMC | FSSI | 3 | 2 | 1 | 0 | 0 | 0 | 2 | 0 | 0 | 1 | 0 | 0 |
| | NonFSSI | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total | 3 | 2 | 1 | 0 | 0 | 0 | 2 | 0 | 0 | 1 | 0 | 0 |
| SAFMC | FSSI | 21 | 10 | 10 | 1 | 0 | 0 | 4 | 6 | 11 | 0 | 0 | 0 |
| | NonFSSI | 65 | 1 | 11 | 51 | 2 | 0 | 0 | 1 | 62 | 2 | 0 | 0 |
| | Total | 86 | 11 | 21 | 52 | 2 | 0 | 4 | 7 | 73 | 2 | 0 | 0 |
| GMFMC | FSSI | 17 | 5 | 8 | 4 | 0 | 0 | 2 | 5 | 0 | 10 | 0 | 0 |
| | NonFSSI | 37 | 0 | 5 | 30 | 2 | 0 | 0 | 0 | 1 | 36 | 0 | 0 |
| | Total | 54 | 5 | 13 | 34 | 2 | 0 | 2 | 5 | 1 | 46 | 0 | 0 |
| SAFMC/ GMFMC | FSSI | 10 | 0 | 9 | 1 | 0 | 0 | 0 | 7 | 3 | 0 | 0 | 0 |
| | NonFSSI | 2 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 |
| | Total | 12 | 0 | 9 | 2 | 1 | 0 | 0 | 7 | 4 | 1 | 0 | 0 |
| CFMC | FSSI | 8 | 4 | 1 | 3 | 0 | 0 | 4 | 0 | 3 | 0 | 0 | 1 |
| | NonFSSI | 14 | 1 | 0 | 13 | 0 | 0 | 0 | 0 | 13 | 0 | 0 | 1 |
| | Total | 22 | 5 | 1 | 16 | 0 | 0 | 4 | 0 | 16 | 0 | 0 | 2 |
| PFMC | FSSI | 48 | 2 | 28 | 17 | 1 | 0 | 6 | 26 | 13 | 3 | 0 | 0 |
| | NonFSSI | 119 | 0 | 15 | 51 | 0 | 53 | 0 | 13 | 52 | 0 | 53 | 1 |
| | Total | 167 | 2 | 43 | 68 | 1 | 53 | 6 | 39 | 65 | 3 | 53 | 1 |
| WPFMC | FSSI | 16 | 2 | 4 | 10 | 0 | 0 | 1 | 6 | 9 | 0 | 0 | 0 |
| | NonFSSI | 20 | 0 | 3 | 15 | 2 | 0 | 0 | 1 | 17 | 2 | 0 | 0 |
| | Total | 36 | 2 | 7 | 25 | 2 | 0 | 1 | 7 | 26 | 2 | 0 | 0 |
| PFMC/ WPFMC | FSSI | 6 | 1 | 2 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 |
| | NonFSSI | 4 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 |
| | Total | 10 | 1 | 2 | 7 | 0 | 0 | 0 | 3 | 7 | 0 | 0 | 0 |
| NPFMC | FSSI | 35 | 0 | 32 | 3 | 0 | 0 | 2 | 27 | 0 | 6 | 0 | 0 |
| | NonFSSI | 34 | 0 | 25 | 8 | 1 | 0 | 0 | 6 | 0 | 28 | 0 | 0 |
| | Total | 69 | 0 | 57 | 11 | 1 | 0 | 2 | 33 | 0 | 34 | 0 | 0 |
| PFMC/ NPFMC | FSSI | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | NonFSSI | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| | Total | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| HMS | FSSI | 21 | 9 | 8 | 4 | 0 | 0 | 9 | 7 | 4 | 0 | 0 | 1 |
| | NonFSSI | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 |
| | Total | 24 | 9 | 8 | 7 | 0 | 0 | 9 | 7 | 7 | 0 | 0 | 1 |
| TOTAL | FSSI | 230 | 46 | 133 | 48 | 3 | 0 | 46 | 114 | 48 | 20 | 0 | 2 |
| | NonFSSI | 300 | 2 | 61 | 176 | 8 | 53 | 1 | 22 | 153 | 69 | 53 | 2 |
| | Total | 530 | 48 | 194 | 224 | 11 | 53 | 47 | 136 | 201 | 89 | 53 | 4 |

* NEFMC = New England Fishery Management Council; MAFMC = Mid-Atlantic Fishery Management Council; SAFMC = South Atlantic Fishery Management Council; GMFMC = Gulf of Mexico Fishery Management Council; CFMC = Caribbean Fishery Management Council; PFMC = Pacific Fishery Management Council; WPFMC = Western Pacific Fishery Management Council; NPFMC = North Pacific Fishery Management Council; HMS = Atlantic Highly Migratory Species.

## Management Actions to Address Overfishing and Overfished Determinations

In 2006, several stocks were added to the list of stocks subject to overfishing and stocks overfished (see Table 1). NMFS, through its regional offices, is working closely with the relevant Councils to address these determinations and reverse downward trends. Below is a summary of new management actions planned or begun to address overfishing and overfished determinations.

Northeast Region
- NMFS notified the NEFMC on October 17, 2006, that *winter skate* was subject to overfishing. No action has been taken to date.
- *Monkfish north* and *monkfish south* are both managed under plans implemented due to a 1997 overfished determination. In 2001 the rebuilding northern stock came off the overfished list, and in 2003 the southern stock followed. In 2006, however, survey indices indicate that both stocks have both fallen below their overfished thresholds. NMFS is proposing interim rebuilding measures for the 2007 monkfish fishery, pending results of a new stock assessment that will be conducted in the summer of 2007.

Southeast Region
- NMFS notified the GMFMC on October 11, 2006, that *gag* and *gray triggerfish* were subject to overfishing. Amendment 30 to the Reef Fish FMP is currently under development. This amendment examines a range of alternatives to end overfishing for these stocks. The Council expects to submit the amendment for review during the summer of 2007.
- *Pink shrimp* was listed as overfished on November 3, 2006. The SAFMC Shrimp Review Advisory Panel met in February 2007 to review the cause of the decline in status of the pink shrimp stock and recommend any appropriate Council action. Pink shrimp are an annual crop. The Panel concluded the apparent decline in pink shrimp abundance does not appear to be due to overfishing and recommended no management actions at this time. The Panel feels that the pink shrimp stocks in some areas along the Southeast coast are depleted due to factors other than fishing, such as environmental and climatic factors.

Southwest Region
- The PFMC was notified on October 25, 2006, that *yellowfin tuna–Eastern Pacific* was subject to overfishing. The U.S. harvest for yellowfin tuna in the Eastern Pacific is less than one-half percent of the stockwide catch.[10] The PFMC has proposed to work with NMFS, the Department of State, and the U.S. delegations to Pacific tuna Regional Fishery Management Organizations to develop recommendations to end overfishing. To be consistent with the Inter-American Tropical Tuna Commission (IATTC) resolution C-04-09 (June 2004), NMFS prohibited fishing for tuna with purse seine gear in the Eastern Tropical Pacific Ocean for a 6-week period

---

[10] Pacific Fishery Management Council. 2006. Status of the U.S. West Coast Fisheries for Highly Migratory Species through 2005: Stock Assessment and Fishery Evaluation. Portland, OR. 128 pp.

(November 20 to December 31) in 2004, 2005, and 2006. For 2007, NMFS published a proposed rule to implement Resolution C-06-02 (June 2006). The comment period for this proposed rule closed March 28, 2007. At this time, NMFS is addressing comments to this proposed rule. The final rule will include a closure of the tuna purse seine fishery for a 6-week period in 2007.

Northwest Region

- NMFS notified the PFMC on February 14, 2007 that *petrale sole* was subject to overfishing. The overfishing status determination is based on catch exceeding the 2005 acceptable biological catch level by 0.14 percent. Preliminary information suggests that overfishing did not continue in 2006. Management measures such as reduced trip limits and improved data tracking have been implemented for 2007–2008.

Highly Migratory Species

- The HMS division published a notice in the *Federal Register* on November 7, 2006 (71 FR 65086), indicating that *porbeagle shark* and *sandbar shark* are overfished, and that *dusky shark* is overfished and subject to overfishing. NMFS is examining management alternatives for an amendment to the HMFS FMP to end overfishing and rebuild these overfished stocks.

These management actions, as with all management actions, require time to implement, and still more time to show an impact in the fishery. Regardless, management actions can have a real and positive impact on a stock, even if it is not reflected in a change in its listed status. For instance, darkblotched rockfish, a slow-growing stock from the Pacific Northwest, has been under a rebuilding plan since 2002. As the catch (as proxy for fishing mortality) has decreased (see Figure 1), the biomass has increased significantly (See Figure 2). While this stock remains listed as overfished because stock size is still below the overfished threshold, important progress has been made.

Figure 1. Changes in Darkblotched Rockfish total fishing mortality (in mt) Relative to Acceptable Biological Catch (ABC), 1997–2005.



Figure 2.  Changes in darkblotched rockfish stock status, 1997–2005.  Stock status for darkblotched rockfish is based on spawning output in terms of eggs. From: "Status of the Darkblotched Rockfish (*Sebastes crameri*) Resource in 2005" by Dr. Jean Beyer Rogers (SAFE, 2006).



## Status Determinations by Region

### Northeast Region

Thirteen FMPs containing 49 stocks or complexes are managed by NMFS and the New England and Mid-Atlantic Fishery Management Councils: Atlantic Sea Scallop; Northeast Multispecies; Northeast Skate; Atlantic Herring; Red Crab; Monkfish; Spiny Dogfish; Summer Flounder, Scup and Black Sea Bass; Atlantic Bluefish; Atlantic Surfclam and Ocean Quahog; Atlantic Mackerel, Squid, and Butterfish; Tilefish; and Atlantic Salmon. Within these FMPs, 13 stocks are subject to overfishing, 19 stocks[11] are overfished, and no stocks are approaching an overfished condition. See Table 3.

Table 3. Northeast Region stocks that are subject to overfishing, are overfished, or are approaching an overfished condition.

| Council | FMP | Overfishing | Overfished | Approaching |
|---|---|---|---|---|
| NEFMC | Atlantic salmon | - | *Atlantic salmon* | - |
| | Northeast Multispecies | *cod - Gulf of Maine* *cod - Georges Bank* - - *yellowtail flounder – Georges Bank* *yellowtail flounder - Southern New England (SNE)/Mid-Atlantic (MA)* *yellowtail flounder - Cape Cod/Gulf of Maine* *white hake* - *winter flounder – SNE/MA* *winter flounder – Georges Bank* - - | *cod - Gulf of Maine* *cod - Georges Bank* *haddock - Gulf of Maine* *haddock - Georges Bank* *American plaice* *yellowtail flounder – Georges Bank* *yellowtail flounder - Southern New England SNE/MA* *yellowtail flounder - Cape Cod/Gulf of Maine* *white hake* *windowpane flounder – SNE/MA* *winter flounder – SNE/MA* - - *ocean pout* *Atlantic halibut* | - |
| | Northeast Skate | - *winter skate* | *thorny skate* - | - |
| NEFMC/ MAFMC | Monkfish | *monkfish - North* *monkfish – South* | *monkfish - North* *monkfish – South* | - |
| MAFMC | Summer Flounder, Scup and Black Sea Bass | *summer flounder* *scup* | - *scup* | - |
| | Atlantic Mackerel, Squid, and Butterfish | | *butterfish* | - |

---

[11] There is currently no definition in the Spiny Dogfish FMP to make a determination of biomass target. Based on the current NMFS-recommended biomass threshold, however, the biomass estimates indicate this stock is overfished.

## Southeast Region

Eighteen FMPs[12] containing 175 stocks or complexes are managed by NMFS and the South Atlantic, Caribbean, and Gulf of Mexico Fishery Management Councils: South Atlantic Golden Crab; South Atlantic Shrimp; South Atlantic Snapper Grouper; Atlantic Coast Red Drum; Coral, Coral Reefs, and Live/Hard Bottom Habitats of the South Atlantic Region; Pelagic Sargassum Habitat of the South Atlantic Region; Dolphin Wahoo; Coastal Migratory Pelagics of the Gulf of Mexico and South Atlantic; Gulf of Mexico/South Atlantic Spiny Lobster; Gulf of Mexico Stone Crab; Gulf of Mexico Shrimp; Reef Fish Resources of the Gulf of Mexico; Gulf of Mexico Red Drum; Coral and Coral Reefs of the Gulf of Mexico; Reef Fish Fishery of Puerto Rico and the U.S. Virgin Islands; Spiny Lobster Fishery of Puerto Rico and the U.S. Virgin Islands; Queen Conch Resources of Puerto Rico and the U.S. Virgin Islands; and Corals and Reef Associated Invertebrates of Puerto Rico and the U.S. Virgin Islands. Within these FMPs, 21 stocks are subject to overfishing, 10 stocks are overfished, and 2 stocks are approaching an overfished condition. See Table 4.

Table 4. Southeast Region stocks that are subject to overfishing, are overfished, or are approaching an overfished condition

| Council | FMP | Overfishing | Overfished | Approaching |
|---|---|---|---|---|
| SAFMC | South Atlantic Snapper Grouper | vermilion snapper<br>red snapper<br>snowy grouper<br>red grouper<br>black sea bass<br>gag<br>speckled hind<br>warsaw grouper<br>tilefish<br>black grouper<br>-<br>- | -<br>-<br>snowy grouper<br>-<br>black sea bass<br>-<br>-<br>-<br>-<br>-<br>-<br>red porgy | None |
| | South Atlantic Shrimp | - | pink shrimp | None |
| | Atlantic Coast Red Drum | red drum | - | None |
| GMFMC | Reef Fish Resources of the Gulf of Mexico | red snapper<br>red grouper<br>greater amberjack<br>-<br>-<br>gag<br>gray triggerfish | red snapper<br>-<br>greater amberjack<br>-<br>-<br>-<br>- | None |
| | Gulf of Mexico Red Drum | - | - | None |
| CFMC | Reef Fish Fishery of Puerto Rico and the USVI | Grouper Unit 1<br>-<br>Grouper Unit 4<br>Snapper Unit 1<br>Parrotfishes | Grouper Unit 1<br>Grouper Unit 2<br>Grouper Unit 4<br>-<br>- | -<br>-<br>-<br>Snapper Unit 1<br>Parrotfishes |
| | Queen Conch Resources of Puerto Rico and the USVI | queen conch | queen conch | - |

---

[12] Last year's report listed a Calico Scallop FMP as under development; however, no plans exist to implement an FMP in the EEZ for this species.

## Southwest Region

Two FMPs containing 19 stocks or complexes[13] are managed by NMFS and the Pacific Fishery Management Council: Coastal Pelagic Species and the new West Coast Highly Migratory Species. Within these FMPs, 2 stocks are subject to overfishing, no stocks are overfished, and no stocks are approaching an overfished condition. See Table 5.

Table 5. Southwest Region stocks that are subject to overfishing, are overfished, or are approaching an overfished condition.

| FMP | Overfishing | Overfished | Approaching |
|---|---|---|---|
| West Coast Highly Migratory Species | yellowfin tuna - Eastern Pacific<br>bigeye tuna - Pacific[*] | -<br>- | None |

[*] This stock also appears in Table 7 as a stock subject to overfishing in the Pacific Islands Region's *Pelagic Fisheries of the Western Pacific Region FMP*. Each of the 10 stocks shared between these two FMPs is listed only once in the support tables as a single stock managed under both FMPs. The Southwest and the Pacific Islands Regions, along with the Pacific and Western Pacific Fishery Management Councils, are working together to end overfishing in this stock.

---

[13] Total includes 10 pelagic species shared with the Pacific Islands Region.

## Northwest Region

Two FMPs containing 158 stocks or complexes are managed by NMFS and the Pacific Fishery Management Council: West Coast Salmon and Pacific Coast Groundfish. In addition, Pacific halibut is managed jointly with the Alaska Region and the International Pacific Halibut Commission. Within these FMPs, 1 stock is subject to overfishing, 6 stocks are overfished, and 1 stock is approaching an overfished condition. See Table 6.

Table 6. Northwest Region stocks that are subject to overfishing, are overfished, or are approaching an overfished condition.

| FMP | Overfishing | Overfished | Approaching |
|-----|-------------|------------|-------------|
| Pacific Coast Groundfish | -<br>-<br>-<br>-<br>-<br>-<br>Petrale sole | bocaccio<br>canary rockfish<br>darkblotched rockfish<br>cowcod<br>yelloweye rockfish<br>Pacific ocean perch<br>- | None |
| West Coast Salmon | - | - | Klamath River fall (Klamath and Trinity Rivers) Chinook salmon |

## Pacific Islands Region

Five FMPs containing 45 stocks or complexes[14] are managed by NMFS and the Western Pacific Fishery Management Council: Pelagic Fisheries of the Western Pacific Region; Crustaceans Fisheries of the Western Pacific Region; Precious Coral Fisheries of the Western Pacific Region; Bottomfish and Seamount Groundfish Fisheries of the Western Pacific Region; and Coral Reef Ecosystems of the Western Pacific Region. Within these FMPs, 3 stock or stock complexes are subject to overfishing, 1 stock or stock complex is overfished, and no stock or stock complexes are approaching an overfished condition. See Table 7.

Table 7. Pacific Islands Region stocks that are subject to overfishing, are overfished, or are approaching an overfished condition.

| FMP | Overfishing | Overfished | Approaching |
|---|---|---|---|
| Pelagic Fisheries of the Western Pacific Region | bigeye tuna - Pacific [*]<br><br>yellowfin tuna – central Western Pacific | - <br><br> - | None |
| Bottomfish and Seamount Groundfish Fisheries of the Western Pacific Region | Bottom Multispecies complex – Hawaiian archipelago | Seamount Groundfish complex – Hancock Seamount[**] <br><br> - | None |

[*] This stock also appears in Table 5 as a stock subject to overfishing in the Southwest Region's *West Coast Highly Migratory Species FMP*. Each of the 10 stocks shared between these two FMPs is listed only once in the support tables as a single stock managed under both FMPs. The Southwest and the Pacific Islands Regions, along with the Pacific and Western Pacific Fishery Management Councils, are working together to end overfishing in this stock.
[**] *Pelagic armorhead* is assessed as the indicator species of a 3-species groundfish complex that includes *raftfish* and *alfonsin*.

---

[14] Total includes 10 pelagic species shared with the Southwest region.

## Alaska Region

Five FMPs containing 69 stocks or complexes are managed by NMFS and the North Pacific Fishery Management Council: GOA Groundfish; BSAI Groundfish; Bering Sea and Aleutian Islands King and Tanner Crab; Alaska Weathervane Scallops; and Alaska High Seas Salmon. In addition, Pacific halibut is managed jointly with the Northwest Region and the International Pacific Halibut Commission. Within these FMPs, no stocks or stock complexes are subject to overfishing, 2 stocks or stock complexes are overfished, and no stocks or stock complexes are approaching an overfished condition. See Table 8.

Table 8. Alaska Region stocks that are subject to overfishing, are overfished, or are approaching an overfished condition.

| FMP | Overfishing | Overfished | Approaching |
|---|---|---|---|
| BSAI King and Tanner Crab | -<br>- | blue king crab - Pribilof Islands<br>blue king crab – Saint Matthew Island | None |

## Atlantic Highly Migratory Species

One FMP[15] containing 23 stocks or complexes are managed by NMFS. Within this FMP, 9 stocks or stock complexes are subject to overfishing, 9 stocks or stock complexes are overfished, and one stock is approaching an overfished condition. See Table 9.

Table 9. Atlantic Highly Migratory stocks that are subject to overfishing, are overfished, or are approaching an overfished condition.

| FMP | Overfishing | Overfished | Approaching |
|---|---|---|---|
| Atlantic Highly Migratory Species | blue marlin - Atlantic<br>white marlin - Atlantic<br>sailfish - West Atlantic<br>bigeye tuna - Atlantic<br>albacore - North Atlantic<br>bluefin tuna - West Atlantic<br>-<br>finetooth shark<br>dusky shark<br>sandbar shark* | blue marlin - Atlantic<br>white marlin - Atlantic<br>sailfish - West Atlantic<br>bigeye tuna - Atlantic<br>albacore - North Atlantic<br>bluefin tuna - West Atlantic<br>porbeagle shark<br>-<br>dusky shark<br>sandbar shark* | yellowfin tuna - Atlantic |

* This stock is part of the Large Coastal Shark complex, but is assessed separately.

---

[15] A final rule, implemented on October 2, 2006 (67 FR 58057), amended the Atlantic Billfish FMP and the Atlantic Tunas, Swordfish, and Sharks FMP by consolidating them into a single Highly Migratory Species FMP.

Table 11. Comparing stocks or stock complexes with "subject to overfishing" determinations in 2005 and 2006. Stocks in BOLD were added to the list in 2006. Stocks in *ITALICS* under "2005" were removed from the list in 2006.

| COUNCIL | 2005 | 2006 | COUNCIL | 2005 | 2006 |
|---|---|---|---|---|---|
| NEFMC | cod - Gulf of Maine<br>cod - Georges Bank<br>yellowtail flounder - SNE/ Mid-Atlantic<br>yellowtail flounder - Cape Cod/Gulf of Maine<br>white hake<br>winter flounder - SNE/ Mid-Atlantic<br>*ATLANTIC SEA SCALLOP*<br>yellowtail flounder – Georges Bank<br>winter flounder – Georges Bank | cod - Gulf of Maine<br>cod - Georges Bank<br>yellowtail flounder - SNE/ Mid-Atlantic<br>yellowtail flounder - Cape Cod/Gulf of Maine<br>white hake<br>winter flounder - SNE/ Mid-Atlantic<br><br>yellowtail flounder – Georges Bank<br>winter flounder – Georges Bank<br>WINTER SKATE | CFMC | Queen conch<br>Grouper Unit 1<br>Grouper Unit 4<br>parrotfishes<br>Snapper Unit 1 | Queen conch<br>Grouper Unit 1<br>Grouper Unit 4<br>parrotfishes<br>Snapper Unit 1 |
| NEFMC/MAFMC | monkfish - North<br>monkfish – South | monkfish - North<br>monkfish – South | PFMC | None | YELLOWFIN TUNA – EASTERN PACIFIC<br>PETRALE SOLE |
| MAFMC | scup<br><br>summer flounder | scup<br><br>summer flounder | WPFMC | bottomfish multi-species complex – Hawaiian archipelago<br>yellowfin tuna – Central Western Pacific | bottomfish multi-species complex – Hawaiian archipelago<br>yellowfin tuna – Central Western Pacific |
| SAFMC | vermilion snapper<br>red snapper<br>snowy grouper<br>tilefish<br>red grouper<br>black sea bass<br>gag<br>speckled hind<br>warsaw grouper<br>black grouper<br>red drum | vermilion snapper<br>red snapper<br>snowy grouper<br>tilefish<br>red grouper<br>black sea bass<br>gag<br>speckled hind<br>warsaw grouper<br>black grouper<br>red drum | PFMC/ WPFMC | bigeye tuna – Pacific | bigeye tuna – Pacific |
| SAFMC/GMFMC | None | None | NPFMC | None | None |
| GMFMC | red snapper<br>red grouper<br>*VERMILION SNAPPER*<br>greater amberjack | red snapper<br>red grouper<br><br>greater amberjack<br>GRAY TRIGGERFISH<br>GAG | HMS | blue marlin - Atlantic<br>white marlin - Atlantic<br>sailfish - West Atlantic<br>bigeye tuna - Atlantic<br>albacore - North Atlantic<br>bluefin tuna - West Atlantic<br>sandbar shark<br>finetooth shark<br>*LARGE COASTAL SHARK COMPLEX\** | blue marlin - Atlantic<br>white marlin - Atlantic<br>sailfish - West Atlantic<br>bigeye tuna - Atlantic<br>albacore - North Atlantic<br>bluefin tuna - West Atlantic<br>sandbar shark<br>finetooth shark<br><br>DUSKY SHARK |

NEFMC = New England Fishery Management Council; MAFMC = Mid-Atlantic Fishery Management Council; SAFMC = South Atlantic Fishery Management Council; GMFMC = Gulf of Mexico Fishery Management Council; CFMC = Caribbean Fishery Management Council; PFMC = Pacific Fishery Management Council; WPFMC = Western Pacific Fishery Management Council; NPFMC = North Pacific Fishery Management Council; HMS = Atlantic Highly Migratory Species.
* Based on the results of the 2006 stock assessment, this stock complex status is unknown.

Table 12. Comparing stocks or stock complexes with "overfished" determinations in 2005 and 2006. Stocks in **BOLD** were added to the list in 2005. Stocks in *ITALICS* under "2005" were removed from the list in 2006.

| Council | 2005 | 2006 | Council | 2005 | 2006 |
|---|---|---|---|---|---|
| NEFMC | cod - Gulf of Maine<br>cod - Georges Bank<br>haddock - Gulf of Maine<br>haddock - Georges Bank<br>American plaice<br>yellowtail flounder – SNE/<br>Mid-Atlantic<br>yellowtail flounder – Cape<br>Cod/Gulf of Maine<br>yellowtail flounder –<br>Georges Bank<br>white hake<br>windowpane Flounder –<br>SNE/ Mid-Atlantic<br>winter Flounder – SNE/<br>Mid-Atlantic<br>ocean pout<br>Atlantic halibut<br>thorny skate<br>Atlantic salmon | cod - Gulf of Maine<br>cod - Georges Bank<br>haddock - Gulf of Maine<br>haddock - Georges Bank<br>American plaice<br>yellowtail flounder – SNE/<br>Mid-Atlantic<br>yellowtail flounder – Cape<br>Cod/Gulf of Maine<br>yellowtail flounder –<br>Georges Bank<br>white hake<br>windowpane Flounder –<br>SNE/ Mid-Atlantic<br>winter Flounder – SNE/<br>Mid-Atlantic<br>ocean pout<br>Atlantic halibut<br>thorny skate<br>Atlantic salmon | CFMC | queen conch<br>Grouper Unit 1<br>Grouper Unit 2<br>Grouper Unit 4 | queen conch<br>Grouper Unit 1<br>Grouper Unit 2<br>Grouper Unit 4 |
| NEFMC/ MAFMC | None | **MONKFISH – NORTH**<br>**MONKFISH – SOUTH** | PFMC | bocaccio<br>canary rockfish<br>darkblotched rockfish<br>cowcod<br>yelloweye rockfish<br>Pacific ocean perch | bocaccio<br>canary rockfish<br>darkblotched rockfish<br>cowcod<br>yelloweye rockfish<br>Pacific ocean perch |
| MAFMC | butterfish<br>scup | butterfish<br>scup | WPFMC | Seamount Groundfish<br>complex - Hancock<br>Seamounts | Seamount Groundfish<br>complex - Hancock<br>Seamounts |
| SAFMC | *RED SNAPPER\**<br>snowy grouper<br>*RED GROUPER\**<br>black sea bass<br>*SPECKLED HIND\**<br>*WARSAW GROUPER\**<br>*BLACK GROUPER\**<br>red porgy<br>*GOLIATH GROUPER\**<br>*NASSAU GROUPER\**<br>*RED DRUM\** | snowy grouper<br><br>black sea bass<br><br><br><br>red porgy<br><br><br><br>**PINK SHRIMP\*\*** | PFMC/ WPFMC | None | None |
| SAFMC/ GMFMC | None | None | NPFMC | blue king crab - Pribilof<br>Islands<br>blue king crab - Saint<br>Matthew Island | blue king crab - Pribilof<br>Islands<br>blue king crab - Saint<br>Matthew Island |
| GMFMC | red snapper<br>greater amberjack<br>*VERMILION SNAPPER*<br>*NASSAU GROUPER\**<br>*GOLIATH GROUPER\**<br>*RED DRUM\** | red snapper<br>greater amberjack | HMS | blue marlin (Atlantic)<br>white marlin (Atlantic)<br>sailfish (West Atlantic)<br>bigeye tuna (Atlantic)<br>albacore (North Atlantic)<br>bluefin tuna (West Atlantic)<br><br><br><br>*LARGE COASTAL SHARK*<br>*COMPLEX\*\*\** | blue marlin (Atlantic)<br>white marlin (Atlantic)<br>sailfish (West Atlantic)<br>bigeye tuna (Atlantic)<br>albacore (North Atlantic)<br>bluefin tuna (West Atlantic)<br>**SANDBAR SHARK**<br>**PORBEAGLE SHARK**<br>**DUSKY SHARK** |

NEFMC = New England Fishery Management Council; MAFMC = Mid-Atlantic Fishery Management Council; SAFMC = South Atlantic Fishery Management Council; GMFMC = Gulf of Mexico Fishery Management Council; CFMC = Caribbean Fishery Management Council; PFMC = Pacific Fishery Management Council; WPFMC = Western Pacific Fishery Management Council; NPFMC = North Pacific Fishery Management Council; HMS = Atlantic Highly Migratory Species
\* The SDC used to determine overfished status is not appropriate. Consequently, this stock status is unknown.
\*\* Pink shrimp are an annual crop. A panel concluded the apparent decline in pink shrimp abundance appears to be due to environmental factors, rather than overfishing.
\*\*\* Based on the results of the 2006 stock assessment, this stock complex status is unknown.

28

ANN/2007/###

**Annual Report of the United States**
*U.S. Department of Commerce, NOAA Fisheries*

## 1. NATIONAL FISHERIES INFORMATION

Total (preliminary) reported U.S. catch of tuna and tuna-like fishes (including swordfish, but excluding other billfishes) in 2006 was 18,081 MT, a decrease of about 6 % from 19,261 MT in 2005. Estimated swordfish catch (including estimated dead discards) decreased 339 MT to 2,048 MT, and provisional landings from the U.S. fishery for yellowfin increased in 2006 to 7,075 MT from 5,568 MT in 2005. U.S. vessels fishing in the northwest Atlantic landed in 2006 an estimated 468 MT of bluefin, a decrease of 245 MT compared to 2005. Provisional skipjack landings increased by 30.1 MT to 60.8 MT from 2005 to 2006, estimated bigeye landings increased by 503 MT compared to 2005 to an estimated 987 MT in 2006, and estimated albacore landings decreased from 2005 to 2006 by 91 MT to 397 MT.

## 2. STATISTICS AND RESEARCH

### 2.1 Fisheries Statistics

#### 2.1.1 Tropical Tuna Fishery Statistics

*Yellowfin Tuna.* Yellowfin is the principal species of tropical tuna landed by U.S. fisheries in the western North Atlantic. Total estimated landings increased to 7,075 MT in 2006, from the 2005 landings estimate of 5,568 MT (Appendix Table 2.1-YFT). The 2006 estimate is considered provisional and may change owing to incorporation of late reports of commercial catches as they become available and to possible revisions in estimates of rod & reel catches made by recreational anglers. A high proportion of the estimated landings were due to rod & reel catches of recreational anglers in the NW Atlantic (4,649 MT). Estimates of U.S. recreational harvests for tuna and tuna-like species continue to be reviewed and this may result in the need to report additional revisions to the available estimates in the future. Nominal catch rate information from logbook reports (longline catch per 1,000 hooks) for yellowfin by general fishing areas is shown in Appendix Figure 2.1-YFT.

*Skipjack Tuna.* Skipjack tuna also are caught by U.S. vessels in the western North Atlantic. Total reported skipjack landings (preliminary) increased by 30.1 MT to 60.7 MT from 2005 to 2006 (Appendix Table 2.1-SKJ). Estimates of recreational harvests of skipjack continue to be reviewed and could be revised again in the future. Appendix Figure 2.1-SKJ presents nominal catch rate information (longline catch per 1,000 hooks) based on fishing logbook reports.

*Bigeye Tuna.* The other large tropical tuna reported in catches by U.S. vessels in the western North Atlantic is bigeye tuna. Total reported catches and landings (preliminary) for 2006 increased by 503 MT from 484 MT in 2005 to 987 MT (Appendix Table 2.1-BET). Note that like yellowfin, the estimates of rod & reel catch are considered provisional and may be revised based on results of a future review of recreational harvest estimates. Appendix Figure 2.1-BET presents nominal catch rate information (longline catch per 1,000 hooks) based on fishing logbook reports.

#### 2.1.2 Temperate Tuna Fishery Statistics

*Bluefin Tuna.* The U.S. bluefin fishery continues to be regulated by quotas, seasons, gear restrictions, limits on catches per trip, and size limits. To varying degrees, these regulations are designed to restrict total U.S. landings and to conform to ICCAT recommendations. U.S. 2006 provisional estimated landings and discards from the northwest Atlantic (including the Gulf of Mexico) were 468 MT and 91 MT, respectively. Those estimated landings and discards represent a decrease of 289 MT from the 2005 estimates, and are 507 MT less than the 2004 estimates. The 2006 landings by gear were: 4 MT by purse seine, 30 MT by harpoon, less than 1 MT by handline, and 149 MT by longline (including discards) of which 51 MT were from the Gulf of Mexico.

**To:** MARGO SCHULZE-HAUGEN, CHIEF, F/SF1                    November 9 2007
**From:** BRAD MCHALE, F/SF1
**Subject:** LANDINGS OF LARGE MEDIUM AND GIANT ATLATNIC BLUEFIN TUNA

---

# NOAA FISHERIES
## National Marine Fisheries Service
### Atlantic Bluefin Tuna Landing Data

| Category | Sub Category | Current Year: 2007 | | | | Previous Year: 2006 | | |
|---|---|---|---|---|---|---|---|---|
| | | Count of Fish | Average Weight | Gross Weight | Final Initial Quotas | Count of Fish | Average Weight | Gross Weight |
| General | - | 411 | 450.9 | 84.1 | 643.6 | 431 | 547.4 | 107.0 |
| | Handline | 1 | 678.0 | 0.3 | | 2 | 340.5 | .3 |
| | Harpoon | 61 | 378.1 | 10.5 | | 32 | 557.1 | 8.1 |
| | Rod and Reel | 349 | 463.0 | 73.3 | | 397 | 547.7 | 98.6 |
| Harpoon | - | 74 | 359.5 | 12.1 | 53.3 | 85 | 575.1 | 22.2 |
| Longline | - | 122 | 435.7 | 24.1 | | 112 | 483.4 | 24.6 |
| | North | 98 | 417.8 | 18.6 | 105.0 | 102 | 477.5 | 22.1 |
| | South | 24 | 508.6 | 5.5 | 120.0 | 10 | 543.6 | 2.5 |
| Trap | - | | | | 1.4 | | | |
| Purse Seine | - | 109 | 565.3 | 28.0 | 254.1 | 29 | 273.2 | 3.6 |
| | Giant | 104 | 578.6 | 27.3 | | 11 | 359.7 | 1.8 |
| | Large Medium | 5 | 288.0 | 0.7 | | 18 | 220.4 | 1.8 |
| Angling | - | 1 | 454.0 | 0.2 | | 3 | 281.7 | .4 |
| | North | 1 | 454.0 | 0.2 | 2.1 | 3 | 281.7 | .4 |
| | South | | | | 4.1 | | | |
| Reserve | - | | | | 207.6 | | | |
| **Total:** | | **717** | **456.3** | **148.5** | **1391.2** | **660** | **526.9** | **157.8** |

**NOTE**
This report **SHOULD NOT** be considered useful for real time catch monitoring purposes. It only includes landings reported to NMFS to date.

**Average Weight:** based on individual weights in pounds.

**Gross Weight:** Metric Tons

**Angling:** Records large, medium and giant size class (trophy).  Does not include school, large school or small medium size class tuna harvested.

**Longline North:** Includes quota and landings for the NED set-aside.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                            )
**BLUE OCEAN INSTITUTE, et al.,**           )
                                            )
          **Plaintiffs,**                   )
                                            )
          **v.**                            )          No.  **1:06-CV-01869-HHK**
                                            )
**CARLOS M. GUTIERREZ, et al.,**            )
                                            )
          **Defendants.**                   )
_____)


**DECLARATION OF CARL SAFINA**

I, Carl Safina, declare as follows:

1.  I am an author and scientist, and currently serve as President of the Blue Ocean Institute.  Along with the Institute, I am a plaintiff in this case.  I received a Ph.D. in Ecology from Rutgers University in 1987.  I have studied, fished for, written about, and sought protection for western Atlantic bluefin tuna ("bluefin") for more than 40 years.

2.  During the late 1960s, the 1970s, 1980s, 1990s, and occasionally after 2000, I fished recreationally for bluefin in the Atlantic Ocean off Long Island and elsewhere on many occasions.  Up until roughly the mid-1990s, I was able to catch bluefin often, as were other recreational fishers in those waters.  Fishing for bluefin during these years was a significant business at several ports on Long Island, including the port of Montauk.  Many fishers targeted bluefin on both charter and party boats and commercial boats with much success.

3.  Beginning at some point in the later 1990s, it became more challenging to fish for bluefin in the waters off Long Island, for the reason that fewer bluefin could be found.  As a

result of this decline in bluefin populations, that part of the fishing industry based in Long Island

that relied upon charter and party boat fishing for bluefin began to disappear.

4.   For the past six years, it has become increasingly rare to locate any bluefin in the

waters off Long Island.  As of this year, virtually every fishing operation located in Long Island

and at other ports with which I am familiar that formerly relied upon bluefin to support its

charter and party boat business in autumn no longer devotes any time to fishing for bluefin in

these waters; there simply are too few bluefin to be found.

5.   During the 1990s I served as a member of the Mid-Atlantic Fishery Management

Council and attended numerous government meetings convened to address the regulation of the

bluefin, including meetings held both in the United States and abroad in connection with the

deliberations of the International Commission for the Conservation of Atlantic Tunas

("ICCAT").  I was for a time on the U.S. delegation to this International Commission.

6.   Also during the 1990s I worked to secure a listing of the bluefin under the

international treaty known as the Convention on International Trade in Endangered Species

("CITES").    This effort ultimately was unsuccessful.

7.   I communicate regularly with the National Marine Fisheries Service (the "Fisheries

Service" or "NMFS" or "defendants") concerning the need to protect the bluefin.  I have met

with NMFS officials on many occasions and urged them to take actions to protect bluefin

populations, including closing longline fishing in the Gulf of Mexico to protect spawning

bluefin.

8.   I am the author of *Song for the Blue Ocean*, a book published in 1998 that devotes

itself in part to describing the depleted condition of the bluefin and the need to take action to

conserve the bluefin population. I am also an author of the following works dealing extensively with the management and status of bluefin tuna:

Klinger, D. and C. Safina. In press. Collapse of Bluefin Tuna in the Western Atlantic. Conservation Biology.

Nemerson, D., S. Berkeley and C. Safina. 2000. Determining Spawning Site Fidelity in Atlantic Bluefin Tuna *Thunnus thynnus*: The use of size-frequency analysis to test for the presence of migrant east Atlantic bluefin tuna on Gulf of Mexico spawning grounds. Fisheries Bulletin 98:118-126.

Safina, C. 1993. Bluefin Tuna in the West Atlantic: Negligent Management, and the Making of an Endangered Species. Conservation Biology 7:229-234.

9. As a result of my work and research, I am conversant with the best available science on the life history and population status of the western Atlantic bluefin tuna, including the article published in the journal *Nature* in early 2005 that showed that bluefin spawn in the Gulf of Mexico and then forage along the east coast of the United States, including areas off North Carolina and Long Island. This article and other publications, including some of my own research, establishes that spawning bluefin are being killed as “bycatch” by the longline fleet that fishes in the Gulf of Mexico, and that the defendants’ failure to protect those spawning bluefin is contributing to the decline in the bluefin population throughout its range, including off the east coast of the United States where I have observed, researched, and fished recreationally for bluefin.

10. It is well-established in the scientific literature that spawning fish are essential to ensure a viable fish population. Without sufficient spawners, a fish population cannot reproduce itself. It is particularly critical to protect spawning fish when the population in question is depleted; otherwise the risk of population collapse increases significantly. In the case of bluefin, whose population is at its lowest recorded level in history, the need to protect spawners is particularly urgent in order to avoid a continued population decline and possible collapse.

11.   Defendants are not taking adequate steps to protect spawning bluefin in the Gulf of Mexico.  A recent submission filed with ICCAT by the defendants reportedly establishes that 51 metric tons of bluefin were killed in the Gulf of Mexico in 2006 by the longline fishing fleet. This amounts to approximately 200 bluefin.  The killing of this amount of spawning bluefin significantly and adversely affects its population, contributes to its continued depletion, and prevents it from rebuilding to a sustainable level.

12.   The killing of bluefin in the Gulf of Mexico continues unabated.  Between April 15 and June 15 of 2007, defendants placed observers on virtually every longline fishing vessel in the Gulf of Mexico.  The data generated by those observers reportedly revealed that more than 100 bluefin were killed by the longline fleet during that two month period.  As was the case in 2006, the killing of this amount of spawning bluefin significantly and adversely affects its population, contributes to its continued depletion, and prevents it from rebuilding to a sustainable level.

13.   Unless this Court orders the defendants to grant the Petition filed in June 2005 by the Blue Ocean Institute, it is reasonable to expect that another 100 – 200 spawning bluefin will be killed in the Gulf of Mexico by the longline fishing fleet during the spring of 2008.  This amount of mortality of spawning bluefin would further deplete the already critically-reduced bluefin population.

14.   Under the population model most commonly used by ICCAT and the defendants to predict the future status of the bluefin, this additional killing of spawning bluefin in the Gulf in 2008 would push the bluefin population closer to commercial extinction.  In light of the historically low level of the bluefin population, this additional mortality of spawning bluefin in 2008 would run a significant risk of pushing the bluefin population past the point of collapse.

15.  I intend to continue to work on protecting the bluefin population, and to observe and write about the bluefin.  I also intend to fish recreationally for bluefin in the future in the event the Fisheries Service takes actions that allow the population of bluefin to rebuild to a more sustainable level.  These actions would include halting longline fishing in the Gulf of Mexico on the bluefin spawning grounds during bluefin spawning season, as was requested by the Blue Ocean Institute in its June, 2005 Petition to the Fisheries Service.

16.  My personal and professional interests in protecting western Atlantic bluefin are directly and adversely affected by the failure of the Fisheries Service to prevent overfishing of the western Atlantic bluefin tuna and its failure to avoid or minimize bluefin bycatch.  By allowing continued overfishing and bycatch of bluefin, and in particular by refusing to grant the Petition filed in June 2005 by the Blue Ocean Institute that requested a closure of longline fishing that catches spawning bluefin in the Gulf of Mexico during their spawning season, the Fisheries Service is reducing the already depleted population of that fish to even more dangerously low levels.  This rejection of the Petition by defendants is contributing to the possible collapse of that fish population that has recently been shown to harbor unique genetic diversity.

17.  I am concerned that the Fisheries Service's actions and failures to act as described in the Complaint in this case are resulting in lowered bluefin populations in the Gulf of Mexico and along the east coast of the United States.  As a result, my continuing interests in observing, studying, and fishing for western Atlantic bluefin tuna have been adversely affected by the failures of the Fisheries Service to prevent overfishing and to minimize bycatch of bluefin.

18.  Among other things, the Fisheries Service's failure to halt overfishing of bluefin and to protect spawning bluefin in the Gulf of Mexico from being killed has caused bluefin to be

effectively unavailable for recreational fishing of the type in which I engage.  Moreover, unless

the relief sought in the Complaint and this motion for summary judgment is granted, my personal

and professional interests in studying, fishing for, and writing about bluefin will continue to be

adversely affected and irreparably injured by the Fisheries Service's unlawful failure to perform

its non-discretionary duties to protect bluefin under the Magnuson-Stevens Act, the National

Environmental Policy Act, and the Administrative Procedure Act.

19.  The Blue Ocean Institute (the Institute) is a non-profit conservation organization

headquartered in East Norwich, New York dedicated to developing conservation solutions for

ocean resources.  To further this goal, the Blue Ocean Institute promotes public awareness,

education, and citizen involvement in the conservation of marine wildlife and resources and

supports related programs.

20.  The Institute conducts research and writes about western Atlantic bluefin tuna.  The

interests of the Institute in protecting western Atlantic bluefin tuna, and in observing, writing

about, and educating the public concerning western Atlantic bluefin tuna, have been adversely

affected and injured by the failures of the Fisheries Service to prevent overfishing and to

minimize bycatch of that fish.  These failures include the failure by the Fisheries Service to grant

the Petition filed in June 2005 by the Institute seeking a closure of longline fishing in the Gulf of

Mexico spawning grounds for the bluefin during their spawning season.  Unless this Court orders

defendants to grant that Petition, the interests of the Institute in bluefin will continue to be

adversely affected by the killing of spawning bluefin in the Gulf of Mexico.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 17th day of November, 2007.


_____
CARL SAFINA
President, Blue Ocean Institute

MINISTRY OF AGRICULTURE, FISHERIES AND FOOD
DIRECTORATE OF FISHERIES RESEARCH

LABORATORY LEAFLET
Number 70

# Aide memoire on scientific advice on fisheries management

J. G. Shepherd

LOWESTOFT
1992

Case 1:06-cv-01869-HHK    Document 23-8    Filed 11/19/2007    Page 2 of 18

The author: J. G. Shepherd, MA PhD, is Deputy Director of Fisheries Research, with responsibility for Fish Stock Management, and is based at the Fisheries Laboratory at Lowestoft.

Lab. Leafl., MAFF Direct. Fish. Res., Lowestoft, (70): 18pp

© Crown copyright 1992

*Requests for reproduction of material contained within this leaflet should be addressed to MAFF*

# CONTENTS                                                    Page

*Abstract* ................................................................................................ 5

1. **Introduction** ................................................................................ 7

2. **The effect of fishing on stock size** .......................................... 7

3. **The effects of changes of fishing effort** ................................. 9

4. **The effect of fishing effort on catches** ................................. 10

5. **Practical and economic considerations** ................................ 12

6. **Technical measures: minimum mesh sizes, closed areas and seasons** ................ 12

7. **Variable recruitment of young fish** ....................................... 15

8. **The implications for management** .......................................... 17

9. **Further reading** ......................................................................... 18

# Aide memoire on scientific advice on fisheries management

### J G Shepherd

Ministry of Agriculture, Fisheries and Food

Directorate of Fisheries Research

Pakefield Road

Lowestoft

Suffolk NR33 0HT

UK

*Abstract*

In this "aide memoire" the basic facts of fish population dynamics are described in a concise and accessible form.

The effects of various fishery management measures, such as controls on fishing effort and minimum mesh size, on the fish stocks concerned are explained. Conservation measures often lead to short-term losses of catch before they lead to long-term gains, and the reasons for this are discussed.

# 1.  INTRODUCTION

Scientific advice on the management of fish stocks is often given in a highly condensed and quite technical form, as in the reports of the ICES Advisory Committee on Fishery Management (ACFM). To understand this advice properly requires an understanding of the basics of fish population dynamics, and the effects of various management measures, such as controls on fishing effort and mesh size. The purpose of this short note is to set out those basic facts in a concise and accessible form. It is intended to complement other publications in the same series which give more information on important aspects of fisheries managment, ie,

- assessing the state of fish stocks (J G Pope, 1982)
- control of mesh size (A C Burd, 1986)
- the basis of management and regulations (D J Garrod, 1987)
- stability and the objectives of management (J G Shepherd, 1990)

Full details of these publications are given in Section 9 "Further Reading".

The topics considered are firstly the effect of fishing on the size and structure of a fish stock, and the way in which the stock responds to a change in the level of fishing effort. Next, the implications of this for catches are considered, with the problem of balancing short-term losses and long-term gains. The effects of adjusting the nature of fishing (rather than just the amount of fishing) through technical measures are considered, followed by the complications caused by variations of recruitment to the stock, and the implications for management.

This account deals only with single-species aspects of the matter. In reality there are also multi-species aspects, caused by the capture of several species together in mixed fisheries, and by the biological interactions between species, especially predation. These do not generally change the nature of the mechanisms described here, but they do of course make the processes more complicated, and may change the magnitude of the effects (eg, the size of the losses and gains involved).

The discussion here also concentrates on the basis for scientific advice that fishing effort, and the catches it produces, needs to be limited, but does not deal with the ways in which this may be done, or the details of the calculations required (Pope, 1982 considers these aspects).

At present, the basic method of management under the Common Fisheries Policy of the European Community involves setting Total Allowable Catches (TACs) and agreeing national quotas. These then have to be managed in some way, which usually involves direct or indirect limitations on fishing effort. There are of course differences in practice between limitation of catches and limitation of effort, but both serve to moderate the level of exploitation, and here the focus is on the way in which the level (and nature) of the exploitation affects the fish stocks. The discussion is therefore phrased in terms of changes of fishing effort, although in practice this may be achieved indirectly by restricting catches.

# 2.  THE EFFECT OF FISHING ON STOCK SIZE

Catching fish increases their death rate above that due to natural causes, and greater fishing effort leads to a higher mortality rate due to fishing. Thus, as illustrated in Figure 1, it eventually leads to fewer fish of any yearclass[1] surviving to each age. This means that not only are there fewer fish, but in

particular there are fewer old, and therefore large and mature fish, in the surviving stock. The numbers, the average age and the average size of the fish are all reduced by fishing.

The size of a stock is best expressed as its biomass - the sum of the weights of all the fish of that stock in the sea. Clearly, since greater fishing effort means that there are fewer fish left in the sea, and that they are smaller, there is therefore a smaller biomass. As illustrated in Figure 2, the effect of fishing on stock biomass can be quite dramatic. A fishing effort which leads to a fishing mortality rate which is equal to the natural mortality rate is enough to reduce the stock to half of its natural size, because this doubles the total mortality rate. This would in fact be a low level of fishing: the fishing effort in the North Sea and many other places is so high that the rate of fishing mortality is three, four or five times that of natural mortality, and the stock sizes have consequently been much reduced by fishing. The reduction to around 20% of the unexploited stock size indicated for heavy fishing in Figure 2 is not unrealistic.



*Figure 1. The effects of fishing on the survival of fish*



*Figure 2. The effect of fishing on stock size*

# 3.    THE EFFECTS OF CHANGES OF FISHING EFFORT

Figure 2 shows how fishing affects stock size if the level of fishing is kept the same for long enough for the stock to come to equilibrium. This equilibrium (or steady state) is never reached in practice, because of variations of yearclass strength, but this does not affect the underlying processes, and is discussed further later on. If the fishing effort[2] is changed, it takes some time for the full effect to work through the whole stock - about twice the average lifetime of a fish (a few years, in practice). This is illustrated in Figure 3, which shows how the stock size responds to an increase and then a decrease in fishing effort. The benefit of any reduction of fishing effort (and in fact any other conservation measures) takes a few years to appear. Regrettably, it is just not possible to slide smoothly and quickly up and down the curve shown in Figure 2. In practice what happens is shown by the arrowed lines on Figure 4 - one only gets to the smooth curve eventually. Note also that (Figure 3) the detrimental effect of an increase of fishing effort does not show up immediately, either. There is a "honeymoon" period while the stock is being fished down to the new lower level where the full effect has worked through.



**Figure 3.    *The response of a fish stock to changes of fishing effort***



**Figure 4.    *The same thing drawn in a different way***

---

[2] *Fishing effort is in fact quite difficult to define and measure precisely. Scientific advice is therefore often presented in terms of the fishing mortality rate, which for dispersed, bottom-living fish is usually proportional to fishing effort for any given method of fishing. For the purposes of this note the distinction is not important, and they may be regarded as essentially synonymous. See Pope (1982) for a full explanation*

# 4.   THE EFFECT OF FISHING EFFORT ON CATCHES

The discussion above deals with the effect of fishing on the stock. The effect on the catch is rather different, and more complicated. In the short-term, the harder you fish, the more you catch. In any given year, if fishing effort were low, then the catches would increase roughly in proportion to any immediate increase of fishing effort. As shown in Figure 5, however, at higher levels of effort, one gets a diminishing return. If one fished very hard indeed, the greatest possible catch would be the whole of the stock that was there at the beginning of the year - thus the curve in Figure 5 levels off quite quickly at moderate to high levels of fishing.

In the longer term, things get a bit more complicated: obviously fishing hard in one year reduces the stock, so that in the next year there will be fewer fish to catch. One has to take account of this longer-term effect on the stock size (already shown in Figure 2). When this is done, one finds that the longer-term effect of fishing (shown in Figure 6) is quite different from the short-term effect. In fact, there is



*Figure 5.   The short-term effect of fishing effort on catches*



*Figure 6.   The long-term effect of fishing effort on catches*

usually a maximum catch which is obtained at quite a low level of fishing effort. At higher levels of fishing effort one gets into a region of reduced catches (negative returns, not just diminished returns). This occurs because a fish stock is a limited renewable resource, with its own natural rate of growth and replenishment. Such resources need especially prudent management.

Now, Figure 6 is (like Figure 2) a steady-state picture - it shows what happens if things are kept the same for long enough. What actually happens to catches after sharp changes of fishing effort is shown in Figure 7. At first the response to an increase of effort is an increase of catch like that of Figure 5 (the short-term picture). However, in the long-run the stock declines, and the result becomes like that of Figure 6 - it is the long-term picture that wins out in the end. Conversely, if one then decreases effort, there is at first a loss of catch, according to the short-term picture, but thereafter the stock recovers, leading to a long-term gain.[3]

Figure 8 shows how these changes look over a period of time.



**Figure 7.  Short and long-term effects of fishing effort on catch**



**Figure 8.  The same thing drawn in a different way**

[3] *This assumes that the stock is over-exploited, as shown in Figure 7, with effort beyond the maximum of the curve. If it is not, there will be no long-term gain of catch, only of biomass*

## 5.  PRACTICAL  AND  ECONOMIC  CONSIDERATIONS

Figures 7 and 8 thus sum up the basic problem of fisheries management. In the long-term, it is a good thing to keep fishing effort low. Unfortunately, if the effort is already too high (as it usually is), getting it back down is a painful business. The fishing industry needs to accept a short-term loss of catch (and therefore earnings, since prices are not usually very elastic), if it is to reap the benefits a few years later. Finding an acceptable level of short-term loss which is justified by the future gains is a difficult trade-off to make. It must be remembered that the long-term gains are for ever, whilst the loss is only borne once. Even if one discounts future gains rather heavily, as a rough rule of thumb one might say that if the size of the short-term loss is less than three times the long-term gain, then the investment (short-term loss) is probably worthwhile. In fact, economic considerations suggest that a lower discount rate would be appropriate so that it would be worth accepting substantially larger short-term losses relative to long-term gains, but this would require the industry to take a very long-term view.

The economic effects of the short-term loss arising from a reduction of effort may also be less than they first seem. This is because going fishing costs money, so that a reduction of effort is accompanied by a reduction of costs, although probably not by the same amount. The reduction of costs will go some way to offset the loss of earnings, and thus the loss of profit is less than that of catch and earnings. Any increase of prices due to lower landings will also help. In fact, the individual fisherman's catch-rate (strictly, catch per unit of effort) and therefore his earnings per unit of effort (and costs) is for most stocks roughly proportional to the stock size. As can be seen in Figure 3, the reduction in effort is followed by an immediate growth of biomass: there is no short-term loss of stock size or catch-rates, even though there is a loss of catch. Whether or not individual fishermen suffer serious losses of profit therefore depends as much on how the reduction of aggregate effort and catches is shared out, as on anything else.

A final important point is that it is necessary to keep fishing effort down even after the stock has recovered. It is clear from Figures 3 and 8, that if the effort is allowed to rise again, the stock will be driven back to its previous depressed state. The short-term gain of catch would be followed by long-term losses of both catch and biomass (and therefore profitability). This means that the reductions of fishing effort recommended by the scientists (and economists) are intended to be permanent. The stock and the catches will increase again, but the amount of fishing effort needed, and the number of boats needed to exert it, will not.

## 6.  TECHNICAL  MEASURES:  MINIMUM  MESH  SIZES,<br>CLOSED  AREAS  AND  SEASONS

So far, we have not considered the composition of the catch - the proportion of large and small fish which it contains. Most fishing gears, apart from purse seines and the small mesh nets used for midwater trawling or industrial fishing, are more-or-less selective. They allow most small fish to escape, whilst retaining most of the large ones (see Figure 9). This is useful, because it turns out that catching small juvenile fish before they reach sexual maturity is very damaging to the spawning stock size - much more damaging than fishing on the mature and spawning stock itself.

The reason for this is that any fishing mortality on juveniles kills the fish before they ever have a chance to spawn. It is therefore not only very effective, but operates again and again each year until first



may still be discarded because of market size and price factors in practice

*Figure 9.  Mesh selection and discards*

spawning, so the effect is compounded. The same mortality operating after the fish have matured is less effective, because each year the fish have the opportunity to spawn, as well as the risk of death, and that opportunity is repeated year after year: the processes of reproduction and death act in parallel rather than one after the other. It is easy to see that if exploitation were delayed until after the majority of the fish had had the opportunity to spawn at least once, it would be very difficult to reduce the spawning stock to a very low level, however hard one fished. By contrast, even a moderate fishing mortality operating on juveniles over three or four years can easily reduce the spawning stock to just a few percent of its unexploited size.

Ideally, if one wished to maintain a large spawning stock, it would be best to catch only large fish which have already matured. In practice this is impossible, firstly because as shown in Figure 9, the selectivity of fishing gear is not perfect, and secondly because different species of fish which may be caught to-gether in a mixed fishery have different sizes at maturity. Thus it is impossible to avoid catching some immature fish of large species (such as cod) without losing altogether the catch of smaller species (such as whiting). Nevertheless, the impact on the spawning stocks of catching a given amount of fish can be reduced to some extent by trying to ensure that the catch is composed mainly of larger fish. Minimum mesh regulations are used for this purpose.

The effects of an increase of minimum mesh size are in many respects similar to those of a reduction of fishing effort, since both reduce the effective level of exploitation of the stock. Just as shown in Figures 3 and 8, there are long-term gains of stock size, and often of catches too, offset by a short-term loss of catch. These are however caused not by moving up and down the curves as in Figures 4 and 7, but by moving (usually at constant effort) on to different curves, as shown in Figures 10 and 11. These make it clear that technical measures affect the efficiency of fishing: they lead to different levels of catch (and biomass) for the same level of fishing effort. The benefits arise because the short-term losses consist of many small fish, which escape to grow and to contribute to the spawning stock and the catch in later years.

From a fisheries management point of view, however, control of minimum mesh size is a rather limited instrument. It is possible to assist the stocks of fish which are naturally of a small size, but those species which are big will not benefit as much. Sometimes, therefore, this may be the right tool for the job, but at other times it may not be appropriate. In the same way, closed areas and seasons may be used to modify the composition of the catch, both by size and by species mix, since fish of different ages (and therefore different sizes), and fish of various species, all tend to be preferentially located in different places at different times of year. The separation is, however, very far from perfect, and as with mesh size control, there is a limit to what can be achieved by these means. These technical measures are therefore best regarded as allowing fine tuning of the basic conservation programme based on control of fishing effort through TACs, quotas and direct controls, not as a sufficient alternative to it. There is a limit to how far they can be used to compensate for the effects of excessive fishing effort.



*Figure 10.  Effect of an increase of mesh size on stock size*



*Figure 11.  Effect of an increase of mesh size on catches*

From an economic point of view, these technical measures have a further drawback compared to limitation of effort. This is that they act by reducing the efficiency of the fishing activity, by allowing small fish to escape, or by forcing fishermen to avoid the densest concentrations of fish. They reduce catches <u>without</u> any associated significant reduction of costs, and therefore result in reduced profitability at least in the short-term.

For these reasons, coupled with the fact that it is still possible to drive stocks down to a low level by excessive fishing effort even using fairly selective gear, it is generally considered that technical measures are an important but not a sufficient basis on their own for fish stock management. They are therefore used as an addition to other direct conservation measures which control the overall level of exploitation.

## 7.  VARIABLE RECRUITMENT OF YOUNG FISH

The processes described above are complicated in practice by the natural variability in the numbers of young fish which survive their first year of life, and are able to join the stock as new recruits each year. This recruitment, or yearclass strength, may vary enormously from year to year, as shown in Figure 12, and is not very clearly related to the size of the spawning stock. The variation of yearclass strength is the other main factor, in addition to fishing, controlling the abundance of fish stocks. The reasons for it are not known, despite many years of research, and it is clearly not controlled by any single factor operating every year. Most likely it depends on the conjunction of several key environmental conditions at certain times of the year, but because the processes of growth and death are taking place over large areas of sea, the causes are difficult to study.

The variations in stock size so caused may be large, and are superimposed on those due to changes of fishing effort, etc, as described above. All of the diagrams used so far are drawn assuming constant recruitment, and in practice there would also be a lot of confusing changes due to varying recruitment.



*Figure 12.  Recruitment of North Sea sole*



**Figure 13.  Stock and recruitment of North Sea herring**

It is for this reason that the scientific advice sometimes proposes an increase in a Total Allowable Catch (TAC) at the same time as it calls for a reduction of fishing effort. This happens when a strong yearclass is just about to recruit it to the fishery. In this case there will be an increase of the expected catch at any level of fishing due to the increased stock size, and this may outweigh the reduction which would normally result from a reduction of
effort. Varying recruitment is also the main reason for changes of recommended TACs from one year to the next. The TACs are usually just tracking the recruitment-driven changes of stock size - one cannot buck the trends imposed by uncontrollable changes of recruitment for very long at all.

These increases of TACs due to fluctuations of recruitment should <u>not</u> be taken as a signal for investment: no more fishing boats or fishing effort are required, since the increase is only due to the expected increase in the catch-rate of the boats already operating. Conversely, decreases of TAC due solely to poor recruitment do not mean that boats will have to fish less, only that they will catch less because there are fewer fish in the sea. Any changes of TAC due to changes of fishing mortality however <u>do</u> imply a need to adjust effort and capacity to follow suit.

Apart from these short-term fluctuations, the main problem concerning recruitment is the extent to which it depends on stock size. Clearly, if there are no spawning fish, there can be no recruits, but the relationship between spawning stock and subsequent recruitment is hardly ever clear, because of all the short-term fluctuations. One of the clearest examples is that for North Sea herring (see Figure 13). Nevertheless, if recruitment does decline when spawning stock size is reduced too far, this opens up the possibility of catastrophic stock collapse at high fishing mortality levels, rather than just progressive depletion; this is illustrated in Figure 14. It is believed that this is what happened to the North Sea herring in the mid-1970s, and there are several other examples of stocks collapsing after very heavy fishing, including North Sea mackerel and the haddock on Georges Bank off North America.

Fisheries scientists have great difficulty in advising when a stock collapse is likely, however, and suggested minimum stock levels and maximum exploitation rates involve a large measure of professional



**Figure 14.** *The long-term effect of reduced recruitment at low stock size*

judgement. Nevertheless, the prospect of stock collapse is real, even if it only manifests itself as increased risk of poor recruitment when spawning stock size is low. Suggested minimum stock levels can in any case only be taken as a guide, because it is in practice virtually impossible to try to manage to maintain a fixed minimum stock size. A fishery managed in this way would suffer from severe fluctuations of TACs as strong and weak yearclasses enter the fishery, and would often be closed completely whenever recruitment was poor. For this reason the scientific advice is usually framed in terms of increases or decreases of fishing effort (or fishing mortality) as this allows more continuity of effort and supplies to the market, and avoids a precipitate response to short-term fluctuations.

## 8.   THE IMPLICATIONS FOR MANAGEMENT

Reducing the size of a fish stock is easy: given the levels of effort which can be deployed by modern fleets, depletion to a small fraction of the initial size in a few years is quite possible. Engineering a recovery is, however, much more difficult. There is essentially little that a manager can do, except to reduce fishing effort to a low level and wait. Given reasonable recruitment, this will permit the rebuilding of the spawning stock over a period of several years, this being the time needed for the young fish to reach maturity. This increased stock should then provide the basis for improved recruitment in the future. It is, however, not suggested that stock sizes should be increased for their own sake.

When the objectives of fisheries management are considered, it appears that, although there is some conflict among them, most imply that fishing mortality rates should be kept low, and stocks high (see Shepherd, 1990). Unfortunately, the economic forces acting upon fishermen have had, and still have, a tendency to drive effort up to a level where the mortality rate is too high. Reducing effort and mortality rates through management measures has proved to be difficult, largely because of the need to bear a short-term loss in order to make a long-term gain, as explained in this paper. This is a result of the basic dynamics of fish stocks, and there seems to be no way around it.

Hopefully, this publication will help all those concerned to understand why the scientific advice on fisheries management so often calls for a reduction of fishing effort, why this is usually associated with a reduction of catches, why this reduction of catches should be temporary, whilst the reduction of effort is likely to be permanent, why the benefits of such changes usually take a few years to appear, and why control of mesh sizes is not a simple alternative to control of effort. If it does this, it may assist in the task of finding an acceptable way of making the changes that are needed.

## 9.  FURTHER READING

Pope J G (1982). Background to scientific advice on fisheries management. Lab. Leafl., MAFF Direct. Fish. Res., Lowestoft, *(54)*: 1-26.

Burd A C (1986). Why increase mesh sizes? Lab. Leafl., MAFF Direct. Fish. Res., Lowestoft, *(58)*: 1-29.

Garrod D J (1986). The scientific essentials of fisheries management and regulations. Lab. Leafl., MAFF Direct. Fish. Res., Lowestoft, *(60)*: 1-14.

Shepherd J G (1990). Stability and the objectives of fisheries management: the scientific background. Lab. Leafl., MAFF Direct. Fish. Res., Lowestoft, *(64)*: 1-16.