## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BLUE OCEAN INSTITUTE and )
CARL SAFINA )     No. 06-1869 HHK JMF
    )
         Plaintiffs, )
      v. )
    )
CARLOS GUTIERREZ and NATIONAL )
MARINE FISHERIES SERVICE, )
    )
         Defendants. )
_____ )

## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Defendants hereby move for summary judgment as to all counts of Plaintiffs' Complaint for Declaratory and Injunctive Relief against Carlos M. Gutierrez, in his official capacity as Secretary of the United States Department of Commerce, and the National Marine Fisheries Service ("NMFS").

This motion is supported by "Defendants' Combined Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Cross-Motion for Summary Judgment" filed herewith.

Respectfully submitted this 19th day of December, 2007,

RONALD J. TENPAS, Assistant Attorney General
JEAN E. WILLIAMS, Section Chief
LISA LYNNE RUSSELL, Assistant Chief

/s/ Kristen Byrnes Floom
KRISTEN BYRNES FLOOM, Trial Attorney
D.C. Bar No. 469615
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife and Marine Resources Section
Ben Franklin Station
P.O. Box 7369
Washington, D.C. 20044-7369
Telephone: (202) 305-0340
Facsimile: (202) 305-0275
Email: Kristen.Floom@usdoj.gov

OF COUNSEL:
Megan Walline
NOAA Office of General Counsel
1315 East-West Highway
Silver Spring, MD 20910

Attorneys for Defendants

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BLUE OCEAN INSTITUTE and )
CARL SAFINA )　　　　　No. 06-1869 HHK JMF
　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiffs, )
　　　　　　v. )
　　　　　　　　　　　　　　　　)
CARLOS GUTIERREZ and NATIONAL )
MARINE FISHERIES SERVICE, )
　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants. )
_____ )

## DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

RONALD J. TENPAS, Assistant Attorney General
JEAN E. WILLIAMS, Section Chief
LISA LYNNE RUSSELL, Assistant Chief
KRISTEN BYRNES FLOOM, Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife and Marine Resources Section
Ben Franklin Station
P.O. Box 7369
Washington, D.C. 20044-7369
Telephone: (202) 305-0340
Facsimile: (202) 305-0275
Email: Kristen.Floom@usdoj.gov

Attorneys for Defendants

<u>TABLE OF CONTENTS</u>

<u>PAGE</u>

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    LITIGATION BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    STATUTORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    The Magnuson-Stevens Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.    The National Environmental Policy Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.    FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.    The Bluefin Tuna Fishery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      B.    Bluefin Tuna Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      C.    Plaintiffs' Petition For Rulemaking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.    STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.    DEFENDANTS COMPLIED WITH THE MAGNUSON-STEVENS ACT AND
      ADMINISTRATIVE PROCEDURE ACT IN DENYING PLAINTIFFS' PETITION. . 15

      A.    NMFS Articulated A Rational Basis For Rejecting Plaintiffs' Proposed Closure,
            And The Agency's Determination Is Entitled To Deference. . . . . . . . . . . . . . . . 15

            1.    The Final Rule explains why NMFS declined to adopt Plaintiffs' proposed
                  closure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            2.    NMFS Thoroughly Explored Plaintiffs' Proposed Closure In The EIS For
                  The Final Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      B.    NMFS Considered All Relevant Key Facts About Bluefin Biology
            and Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

     C.     NMFS Properly Applied The Redistribution Of Effort Model . . . . . . . . . . . . . 22

          1.     NMFS properly calculated expected rates of bycatch . . . . . . . . . . . . . . 23

          2.     The redistribution model reasonably approximates where vessels would be expected to move if faced with a closure . . . . . . . . . . . . . . . . . . . . . . . . . 24

II.     THE HMS FMP COMPLIES WITH NATIONAL STANDARDS ONE, TWO, AND NINE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

     A.     The Consolidated HMS FMP Contains Measures To Prevent Overfishing And Rebuild Overfished Bluefin Populations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

     B.     The Consolidated HMS FMP Is Based On The Best Scientific Information Available. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

     C.     The Consolidated HMS FMP Contains Measures To Avoid Or Minimize Bycatch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

III.    DEFENDANTS COMPLIED WITH NEPA IN PREPARING THE EIS FOR THE HMS FMP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

     A.     NMFS Adequately Analyzed The Possible Impacts Of Plaintiffs' Proposed Closure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

     B.     The EIS Sets Forth A Clear Analysis Of The Environmental Impacts Of Alternatives To Plaintiffs' Proposed Closure . . . . . . . . . . . . . . . . . . . . . . . . . . 39

     C.     The EIS Sets Forth NMFS' Analysis Of The Cumulative And Long-Term Effects Of Denying Plaintiffs' Proposed Closure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

IV.    THE COURT SHOULD DENY PLAINTIFFS' REQUEST FOR AN INJUNCTION REQUIRING NMFS TO PROMULGATE AN EMERGENCY RULE . . . . . . . . . . . . 42

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## TABLE OF AUTHORITIES

<u>CASES</u>                                                                 <u>PAGE</u>

<u>Alliance Against IFQs v. Brown</u>, 84 F.3d 343, 350 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . 5

<u>Baltimore Gas & Elec. Co. v. Natural Resources Defense Council</u>, 103 (1983) . . . . . . . . . . 13,14

<u>Bluewater Network v. EPA</u>, 372 F.3d 404, 410 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . 14

<u>C&W Fish Co. v. Fox, 931 F.2d 1556</u>, (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 4, 13, 17

<u>Carolina Envtl. Study Group v. United States</u>, 510 F.2d 796, 819 (D.C. Cir. 1975) . . . . . . . . 36

<u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971) . . . . . . . . . . . . . . 13

<u>City of Alexandria v. Slater</u>, 198 F.3d 862, 867 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 37, 38

<u>City of Grapevine v. Department of Transportation</u>, 17 F.3d 1502, 1503 (D.C. Cir. 1994) . . . . . 8

<u>City of Olmstead Falls v. FAA</u>, 292 F.3d 261, 269 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 14

<u>City of Williams v. Dombeck</u>, 151 F. Supp. 2d 9, 23 (D.D.C., 2001) . . . . . . . . . . . . . . . . . . . . . 40

<u>Coalition on Sensible Transp. v. Dole</u>, 826 F.2d 60, (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . 40, 41

<u>Common Sense Salmon Recovery v. Evans</u>, 217 F. Supp. 2d 17, (D.D.C. 2002) . . . . . . . . . . . . 9

<u>Commonwealth of Massachusetts ex rel. Div. of Marine Fisheries v. Daley</u>,
         10 F. Supp. 2d 74, 78 (D. Mass. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

<u>Commonwealth of Massachusetts ex rel. Div. of Marine Fisheries v. Daley</u>, 170 F.3d 23,
         27-28 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 32

<u>Concerned About Trident v. Rumsfeld</u>, 555 F.2d 817, 827 (D.C. Cir. 1976) . . . . . . . . . . . . 36, 42

<u>Conservation Law Found. v. Evans</u>, 209 F. Supp. 2d 1, 14 n.28 (D.D.C. 2001) . . . . 19, 20, 34, 35

<u>Conservation Law Found. v. Evans</u>, 360 F.3d 21, 27-28 (1st Cir. 2004) . . . . . . . . . . . . 17, 18, 34

<u>Florida Audubon Soc'y v. Bentsen</u>, 94 F.3d 658, 669 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . 7

<u>Florida Power & Light Co. v. Lorion</u>, 470 U.S. 729, 744 (1985) . . . . . . . . . . . . . . . . . . . . . 12, 43

<u>Grand Canyon Trust v. FAA</u>, 290 F.3d 339, 340 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 14

Hawaii Longline Ass'n v. NMFS, 281 F. Supp. 2d 1, 38 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . 43

INS v. Ventura, 537 U.S. 12, 16 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Karst Envtl. Educ. & Prot., Inc. v. EPA, 475 F.3d 1291, 1295 (D.C. Cir. 2007) . . . . . . . . . . . 14

Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 371 (1989) . . . . . . . . . . . . . . . . . . . . . 7, 13

Midwater Trawlers Coop. v. Dep't of Commerce, 393 F.3d 994, 1003 (9th Cir. 2004) . . . . . . . 31

National Ass'n of Clean Air Agencies v. EPA, 489 F.3d 1221, 1229 (D.C. Cir. 2007) . . . . . . . 13

National Audubon Soc'y v. Evans, No. Civ. A-99-1707, 2003 WL 23147552 at *1-4
        (D.D.C. July 3, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

National Coalition for Marine Conservation v. Evans, 231 F. Supp. 2d 119,
        126 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 13, 24, 27, 35

Natural Resources Defense Council ("NRDC") v. Daley, 209 F.3d 747, 749 (D.C. Cir. 2000) . . 4

North Carolina Fisheries Ass'n v. Gutierrez, – F. Supp.2d –, No. 06-1815, 2007 WL 2331048 at
        *15 (D.D.C. Aug. 17, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

NRDC v. Hodel, 865 F.2d 288, 294 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Occidental Eng'g Co. v. INS, 753 F.2d 766, 770 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 13

Ocean Conservancy v. Gutierrez, 394 F. Supp. 2d 147, 153 fn.8 (D.D.C. 2005) . . . . . . . . . . . 17

Oceana, Inc. v. Evans, 384 F. Supp. 2d 203, 219 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . 9, 30

Oceana, Inc. v. Gutierrez, 488 F.3d 1020 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Oregon Trollers Ass'n v. Gutierrez, 452 F.3d 1104, 1120 (9th Cir. 2006), cert. denied,
        127 S.Ct. 2028 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

County of Los Angeles v. Shalala, 192 F.3d 1005, 1011 (D.C. Cir. 1999) . . . . . . . . . . . . . . . 43

Palisades Gen. Hosp., Inc. v. Leavitt, 426 F.3d 400, 403 (D.C. Cir. 2005) . . . . . . . . . . . . . 43, 44

PPG Indus. v. United States, 52 F.3d 363, 365-66 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . 43

Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989) . . . . . . . . . . . . . 7, 36

Sierra Club v. Adams, 578 F.2d 389, 393 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Stuttering Found. of America v. Springer, 498 F. Supp. 2d 203, 207 (D.D.C. 2007) . . . . . . . . 13

Tongass Conservation Soc'y v. Cheney, 924 F.2d 1137, 1140 (D.C. Cir. 1991) . . . . . . . . 14, 39

Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, 435 U.S. 519,
    558 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Village of Bensenville v. FAA, 457 F.3d 52, 72 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . 37

Yakutat, Inc. v. Gutierrez, 407 F.3d 1054, 1071 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 5, 17

Young v. GSA, 99 F. Supp. 2d 59, 78 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## STATUTES

5 U.S.C. § 551 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

16 U.S.C. § 971 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

16 U.S.C. § 971d(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

16 U.S.C. § 1531 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

16 U.S.C. § 1801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

16 U.S.C. § 1801(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

16 U.S.C. § 1802(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

16 U.S.C. § 1802(33) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

16 U.S.C. § 1802(34) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 19

16 U.S.C. § 1851(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 27

16 U.S.C. § 1851(a)(1)-(10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

16 U.S.C. § 1851(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 30

16 U.S.C. § 1851(a)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 32, 33

16 U.S.C. § 1852 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

16 U.S.C. § 1852(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

16 U.S.C. § 1853(a)(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

16 U.S.C. § 1854(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

16 U.S.C. § 1854(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

16 U.S.C. § 1855(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

42 U.S.C. § 4321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 4332(2)(C)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

42 U.S.C. § 4332(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

90 Stat. 331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Pub. L. 104-208 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Pub. L. 109-479 (Jan. 12, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Pub. L. 94-265 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## STATE STATUTES

MSA Section 303(a)(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Section I.C.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 31

FEDERAL RULES

Fed. R. Civ. Pro. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

FEDERAL REGULATIONS

40 C.F.R. Part 1502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

40 C.F.R. § 1500.2(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

40 C.F.R. § 1502.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

40 C.F.R. § 1502.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

40 C.F.R. § 1502.14(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36-38

40 C.F.R. §1508.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

50 C.F.R. Part 600 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

50 C.F.R. Part 635 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

50 C.F.R. § 600.310(f)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

50 C.F.R. § 600.315(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**INTRODUCTION**

Plaintiffs challenge a decision by the National Marine Fisheries Service ("NMFS") to deny Plaintiffs' petition to close a portion of the Gulf of Mexico to all longline fishing based on a study indicating that the area in question is a spawning area for Atlantic bluefin tuna ("bluefin").  NMFS is aware of the need to take action to conserve bluefin and prevent overfishing of the species.  To that end, NMFS has implemented measures to rebuild the stock, including banning longline fishing targeting bluefin throughout the area that Plaintiffs seek to have closed.  Plaintiffs claim that additional regulation in the form of a closed area is required to prevent unintentional bycatch of bluefin by vessels targeting other species.  Although Plaintiffs' proposed closure may appear on its face to be a useful suggestion for decreasing bluefin bycatch, NMFS determined, after thorough analyses, that Plaintiffs' proposed closure likely would make the situation worse for bluefin or other species.  Applying the best available scientific model, NMFS determined that vessels faced with such a closure would be likely to redirect their fishing elsewhere, resulting in <u>increased</u> bycatch outside of Plaintiffs' proposed closed area.  NMFS' scientific analysis revealed that, based on where fishermen were likely to move if they granted Plaintiffs' petition, there could be an increase in bycatch of bluefin or other species that NMFS is statutorily obligated to conserve.  In light of the potential negative ecological impacts on fisheries, combined with negative economic impacts on fishermen, both of which NMFS must consider when developing a fishery management plan, NMFS reasonably rejected Plaintiffs' proposal.  NMFS complied with all applicable domestic laws and international obligations and stated a rational basis to reject Plaintiffs' petition.  Thus, Defendants are entitled to summary judgment on Plaintiffs' claims.

**BACKGROUND**

## I.    LITIGATION BACKGROUND

Plaintiffs filed this action on November 1, 2006, challenging NMFS' final rule amending the Fishery Management Plan for Atlantic Tunas, Swordfish, and Sharks, 71 Fed. Reg. 58,058 (Oct. 2, 2006).  See Complaint for Declaratory and Injunctive Relief ("Complaint") (Doc. No. 1). Specifically, Plaintiffs challenge NMFS' denial of their petition for rulemaking seeking closure of a reported spawning area for bluefin tuna in the Gulf of Mexico.  Complaint at ¶ 3. Plaintiffs' Complaint alleges that Defendants failed to comply with the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act" or "MSA"), 16 U.S.C. § 1801 et seq.; the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq.; and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq., in issuing the final rule implementing the Consolidated Fishery Management Plan ("FMP") for Atlantic Highly Migratory Species ("HMS").  Plaintiffs allege that: (a) the final rule fails to comply with the MSA's requirements to prevent overfishing and promote rebuilding of bluefin tuna, Complaint at ¶ 47; (b) the final rule is not based on the best scientific information available, as required by the MSA, id. at ¶ 55; (c) the final rule fails to comply with the bycatch reporting requirements of the MSA, id. at ¶ 63; and (d) NMFS failed to adequately analyze adverse effects and consider available alternatives to its policy regarding bluefin fishery management in the Gulf of Mexico, in violation of NEPA and the APA, id. at ¶ 74.

NMFS filed its administrative record in this case on January 12, 2007.  Doc. No. 6. Plaintiffs moved to supplement the record, Doc. No. 10, and Magistrate Judge Facciola denied Plaintiffs' motion on September 4, 2007.  Doc. No. 18.

## II.    STATUTORY BACKGROUND

Atlantic HMS, which include tunas, swordfish, sharks, and billfish, live and move

throughout the entire Atlantic Ocean.  Thus, management of these species necessarily includes

both national and international components that cross broad geographic and political boundaries.

NMFS manages bluefin domestically under the dual authority of the Magnuson-Stevens Act and

the Atlantic Tunas Convention Act ("ATCA"), 16 U.S.C. §§ 971 et seq.  Bluefin are also

managed internationally by the International Commission for the Conservation of Atlantic Tunas

("ICCAT"), which consists of over 40 contracting parties including the U.S., Canada, the

European Community, Japan, and China.  A.R. E.12 at 1-3.  See also

http://www.iccat.es/main.htm.  ICCAT requires member countries to collect catch data and

recommends quotas for fish allocated to each member nation.  See id.  The U.S. implements

ICCAT recommendations through ATCA.  See id.

### A.    The Magnuson-Stevens Act

The Magnuson-Stevens Act originally was enacted in 1976, Pub. L. 94-265, 90 Stat. 331,

and has been amended several times, most recently by the Magnuson-Stevens Fishery

Conservation and Management Reauthorization Act, Pub. L. 109-479 (Jan. 12, 2007).  Congress

passed the Magnuson Act (renamed the Magnuson-Stevens Fishery Conservation and

Management Act by Pub. L. 104-208, 110 Stat. 3009-41 (Sept. 30, 1996)), inter alia, "to take

immediate action to conserve and manage the fishery resources found off the coasts of the

United States. . ." and "to promote domestic commercial and recreational fishing under sound

conservation and management principles. . . ."  16 U.S.C. § 1801(b)(1), (3).

To carry out specific management and conservation duties, the Magnuson Act created

eight independent regional Fishery Management Councils.  See Natural Resources Defense Council ("NRDC") v. Daley, 209 F.3d 747, 749 (D.C. Cir. 2000); see also Commonwealth of Massachusetts ex rel. Div. of Marine Fisheries v. Daley, 170 F.3d 23, 27-28 (1st Cir. 1999). "Each Council is granted authority over a specific geographic region and is composed of members who represent the interests of the states included in that region." C&W Fish Co. v. Fox, 931 F.2d 1556, 1557-58 (D.C. Cir. 1991), citing 16 U.S.C. § 1852.

During the 1980's, the New England, Mid-Atlantic, and Gulf of New Mexico Fishery Management Councils all were responsible for managing Atlantic HMS.  A.R. E.12 at 1-2.  On November 28, 1990, the Magnuson-Stevens Act was amended by the Fishery Conservation Amendments of 1990 to grant authority to the Secretary of Commerce ("Secretary") to directly manage HMS within the exclusive economic zone ("EEZ") of the Atlantic Ocean, Gulf of Mexico, and Caribbean Sea.  Id.  See also 16 U.S.C. § 1852(a)(3), 1854(g).  The Secretary delegated this authority to NMFS, which prepares FMPs for Atlantic HMS, including bluefin. A.R. E.12 at 1-2.

NMFS prepares and implements FMPs for Atlantic HMS in consultation with multiple affected Councils, Commissions, and the HMS Advisory Panel, which is made up of representatives of commercial and recreational fishing interests, representatives from environmental groups, marine scientists, and state and federal fisheries managers, among others. See 16 U.S.C. § 1854(g)(1).  In developing these FMPs, NMFS uses the best scientific information available regarding target and non-target species, and protected species.  See id. at § 1851(a)(2).  The FMPs are prepared through a planning process that includes extensive public comment and involvement of persons concerned with and affected by the management of these

resources.  See 16 U.S.C. § 1854(a)(1)(B).  FMPs must be consistent with ten National Standards

set forth in the Magnuson-Stevens Act.[1]/  The Secretary exercises discretion and judgment in

weighing the National Standards, and in determining how to implement them needs provide only

"'a reason for doing [so] which was consistent with the statutory standards.'"  Yakutat, Inc. v.

Gutierrez, 407 F.3d 1054, 1071 (9th Cir. 2005), quoting Alliance Against IFQs v. Brown, 84

F.3d 343, 350 (9th Cir. 1996).

Plaintiffs raise claims in this case related to National Standards One, Two, and Nine.

National Standard One requires NMFS to prevent "overfishing," defined in the MSA as "a rate

or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum

sustainable yield on a continuing basis."  16 U.S.C. § 1802(34).[2]/  In addition, NMFS must

prevent overfishing while achieving, on a continuing basis, "optimum yield."  "Optimum yield"

---

[1]/     The National Standards provide that conservation and management measures shall:

(1)     prevent overfishing while achieving, on a continuing basis, optimum yield;
(2)     be based on the best scientific information available;
(3)     to the extent practicable, manage an individual stock of fish as a unit, and
          interrelated stocks of fish as a unit or in close coordination;
(4)     not discriminate between residents of different States;
(5)     where practicable, consider efficiency in the utilization of fishery resources;
(6)     take into account variations among fisheries, fishery resources, and catches;
(7)     where practicable, minimize costs and avoid unnecessary duplication;
(8)     take into account the importance of fishery resources to fishing communities;
(9)     to the extent practicable, (a) minimize bycatch and (b) to the extent bycatch
          cannot be avoided, minimize the mortality of such bycatch; and
(10)    to the extent practicable, promote the safety of human life at sea.

16 U.S.C. § 1851(a)(1)-(10).

[2]/     "Maximum sustainable yield" ("MSY") is "the largest long-term average catch or yield
that can be taken from a stock or stock complex under prevailing ecological and environmental
conditions."  50 C.F.R. § 600.310(c)(1)(I).

is defined as the amount of fish which:

> (A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems;
> (B) is prescribed such on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor; and
> (C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery.

16 U.S.C. § 1802(33). According to NMFS' National Standard One guidelines, "[i]n determining the greatest benefit to the Nation, th[e] values that should be weighed are food production, recreational opportunities, and protection afforded to marine ecosystems." 50 C.F.R. § 600.310(f)(2). Responsibility for weighing these values rests with NMFS, as delegated by the Secretary.

National Standard Two provides that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2). "Scientific information includes, but is not limited to, information of a biological, ecological, economic, or social nature." 50 C.F.R. § 600.315(b)(1). NMFS' National Standard Two Guidelines clarify that an FMP must take into account the best scientific information available at the time the FMP is prepared. Id. at § 600.315(b)(2).[3/]

National Standard Nine provides that "[c]onservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided,

---

[3/]     In their discussion of National Standard Two, Plaintiffs cite a 2004 National Research Council report. See Memorandum of Plaintiffs Blue Ocean Institute and Carl Safine in Support of Their Motion for Summary Judgment (Nov. 19, 2007), Doc. No. 23 ("Pl. Mem.") at 5-6. This report is not part of the administrative record, and is not a reference on which NMFS relies. NMFS follows the National Standard Guidelines in the MSA implementing regulations. See 50 C.F.R. Part 600, Subpart D.

minimize the mortality of such bycatch." 16 U.S.C. § 1851(a)(9) (emphasis added). The term

"bycatch" means "fish which are harvested in a fishery, but which are not sold or kept for

personal use, and includes economic discards and regulatory discards." 16 U.S.C. § 1802(2).

See also National Coalition for Marine Conservation v. Evans, 231 F. Supp. 2d 119, 126 (D.D.C.

2002) (defining "bycatch" as "fish that fishers catch but throw back into the ocean, either

because they are not the kind of fish that people will buy. . . or because a regulation dictates that

the fish cannot be kept").

### B.    The National Environmental Policy Act

The purpose of NEPA is to focus the attention of the federal government and the public

on a proposed action so that the consequences of the action can be studied before it is

implemented, with an eye toward avoiding potential adverse environmental impacts. See Marsh

v. Oregon Natural Res. Council, 490 U.S. 360, 371 (1989); Florida Audubon Soc'y v. Bentsen,

94 F.3d 658, 669 (D.C. Cir. 1996). NEPA's mandate to federal agencies is "essentially

procedural. . . . It is to insure a fully informed and well-considered decision. . . ." Vermont

Yankee Nuclear Power Corp. v. Natural Res. Def. Council, 435 U.S. 519, 558 (1978). The

NEPA process is designed to "identify and assess the reasonable alternatives to proposed actions

that will avoid or minimize adverse effects of these actions upon the quality of the human

environment." 40 C.F.R. § 1500.2(e). "[I]t is now well settled that NEPA itself does not

mandate particular results, but simply prescribes the necessary process." Robertson v. Methow

Valley Citizens Council, 490 U.S. 332, 350 (1989) (citations omitted).

NEPA requires a comprehensive environmental impact statement ("EIS") for "major

federal actions significantly affecting the quality of the human environment." 42 U.S.C. §

4332(C); 40 C.F.R. Part 1502.  The agency must consider reasonable alternatives to the proposed

action.  40 C.F.R. § 1502.14; See also City of Grapevine v. Department of Transportation, 17

F.3d 1502, 1503 (D.C. Cir. 1994) ("[T]he EIS must include, among other things, a 'detailed

statement' describing the reasonably foreseeable environmental impact, both of the proposed

federal action and of any feasible alternative(s) to the proposed federal action, including

nonaction."), citing 42 U.S.C. § 4332(2)(C)(I), (iii).

## III.    FACTUAL BACKGROUND

### A.    The Bluefin Tuna Fishery

Bluefin tuna range from the Gulf of Mexico to Newfoundland in the west Atlantic, from

the Canary Islands to Iceland in the east Atlantic, and throughout the Mediterranean Sea.  See

FMP for Atlantic Tunas, Swordfish, and Sharks, Chapter 2, at 4, available at

http://www.nmfs.noaa.gov/sfa/finalFMP.html.  Bluefin tuna spend a large part of the year in

temperate waters and return to warmer waters in either the Gulf of Mexico or the Mediterranean

Sea to spawn.  Id.  The long life span of Bluefin tuna – 20+ years – results in a stock composed

of several age classes, which serves as a buffer against adverse environmental conditions and

confers some degree of stock stability.  Id.

Until the late 1950s there was no commercial market for bluefin tuna in the U.S.  A.R.

E.12 at 3-2.  In 1958 commercial fishing for bluefin began in Cape Cod, Massachusetts and it

expanded rapidly between Cape Cod and Cape Hatteras, North Carolina in the early 1960s.  Id.

Annual catches of juvenile bluefin tuna remained high throughout the 1960s and early 1970s,

largely as a result of takings by Japanese vessels.  Id. at 3-3.  By 1973 the U.S. and other nations

grew concerned with the decrease in bluefin tuna abundance, and the U.S. limited harvest by

imposing quotas and size limits.  Id.  In the early 1980s ICCAT recommended that catches of

western Atlantic bluefin be reduced as near to zero as possible, and that there be no directed

fishery for bluefin tuna spawning stocks in the Gulf of Mexico and other spawning areas.  Id.

Throughout the 1990s ICCAT continued to recommend measures to prevent further declines in

the western Atlantic bluefin tuna stock, and NMFS imposed quotas for permit holders in the

fishery based on historical share.  Id. at 3-4.  In 1998 ICCAT adopted a 20-year rebuilding

program intended to rebuild the western Atlantic bluefin stock to a size that will produce

Maximum Sustainable Yield ("MSY") by 2018.  Id.[4]/

    **B.    Bluefin Tuna Management**

    NMFS has by no means ignored its legal obligations with respect to bluefin.  NMFS has

---

[4]/    In describing the status of Western bluefin, Plaintiffs rely on several documents that post-date NMFS' October 2, 2006 final rule for the HMS FMP.  See Pl. Mem., Ex. C (NMFS report on status of U.S. fisheries for 2006); Ex. D (excerpt from 2006 Annual Report of U.S. to ICCAT); Ex. E (November 9, 2007 email regarding landings of Atlantic bluefin).  These post-decisional documents are plainly outside of the administrative record and should not be considered by the Court.  See, e.g., Common Sense Salmon Recovery v. Evans, 217 F. Supp. 2d 17, 20-21 (D.D.C. 2002).

    Plaintiffs have also submitted the Declaration of Carl Safina, Pl. Mem., Ex. F ("Safina Decl."), which contains the declarant's opinions related to the current status of the bluefin stock.  See Safina Decl. at ¶¶ 10, 12, 14.  The status of the bluefin stock as of the date Plaintiffs' brief was filed is irrelevant to the Court's review of whether NMFS acted reasonably in issuing the October 2, 2006 final rule.  Further, whether the bluefin stock is in danger of collapse, see Pl. Mem. at 20, is a scientific question that involves the weighing of conflicting evidence, and thus should be left to NMFS' discretion.  See Oceana, Inc. v. Evans, 384 F. Supp. 2d 203, 223-224 (D.D.C. 2005) ("Evaluation of the equivocal evidence pointed to by the parties is exactly the type of scientific debate that the Court is not meant to wade into. . . .  A conclusion based on this evidence should be left to the agency's discretion unless the record is devoid of support for the agency's position, which is not the case here.") (citations omitted).  The Court should rely on the evidence in the record with respect to bluefin biology and the status of the stock, rather than extra-record information presented by Plaintiffs.  See A.R. E.12 at 3-51 – 3-63.

long recognized the decline of the bluefin fishery and the need to protect it in accordance with the requirements of multiple laws, particularly the MSA, and has taken aggressive regulatory action to rebuild the stock and to decrease bluefin bycatch.  NMFS has banned directed fishing for bluefin by pelagic longline vessels throughout the entire Atlantic bluefin tuna fishery, including the Gulf of Mexico, and required specific amounts of other species to be landed as a condition for landing an incidental catch of bluefin.  See, e.g., 46 Fed. Reg. 8,012 (Jan. 26, 1981) (prohibiting the use of longlines in a directed bluefin fishery and changing incidental catch provisions for longline vessels).  NMFS has modified these incidental catch requirements, most recently in 2003.  See 68 Fed. Reg. 32,414 (May 30, 2003) ("Pelagic longline vessels are not allowed to target [bluefin] and thus there is no directed fishery on [bluefin].").  In addition to these and a suite of other regulatory measures to control bluefin fishing (e.g., size limits, retention limits, restricted fishing days), NMFS established a closed area in 1999 specifically to reduce bluefin discards off the Mid-Atlantic (called the Northeastern U.S. closure).  See A.R. E.12 at 3-6, 3-146, 3-162.

Since 1999, NMFS has implemented management measures for bluefin through a fishery management plan ("FMP"), which included the 1998 ICCAT Rebuilding Plan for Western Bluefin Tuna.  The first FMP for Atlantic tunas was combined with the existing FMPs for Atlantic swordfish and sharks.  See A.R. E.12 at 1-3; see also FMP for Atlantic Tunas, Swordfish, and Sharks, available at http://www.nmfs.noaa.gov/sfa/finalFMP.html ("1999 FMP").  With the publication of the 1999 FMP, Atlantic tunas, previously managed solely under the ATCA, became subject to management under both the ATCA and the Magnuson-Stevens Act.  A.R. E.12 at 3-14.  On October 2, 2006, NMFS published a final rule combining

amendments to the 1999 FMP and the FMP for Atlantic Billfish, creating one Consolidated

Highly Migratory Species Fishery Management Plan ("HMS FMP").  71 Fed. Reg. 58,058 (Oct.

2, 2006).

The HMS FMP introduced a wide range of management measures related to multiple

species, including bluefin tuna, bigeye tuna, yellowfin tuna, albacore tuna, skipjack tuna,

swordfish, sharks, white marlin, blue marlin, sailfish, and longbill spearfish.  See generally A.R.

E.12.  Management of HMS species also affects several species that are listed as endangered or

threatened under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq., including

leatherback and loggerhead turtles.  See id. at 3-199.  NMFS is required by the ESA to consider

effects on those species in regulating the pelagic longline fishery.  See id. at 3-16.

NMFS solicited extensive public input on the draft HMS FMP, holding 24 public

hearings and consultations throughout the coastal states from Maine through Texas and the

Caribbean.  See A.R. E.22 at 2.  See also A.R. D.23; D.24; D.39; D.43; D.49; D.50; D.58; E.12

at iii; id. at Appendix D; E.27 at 58,058.  The final document describes a range of alternatives

that could impact fishermen and dealers for all highly migratory species fisheries. The preferred

alternatives include those to: establish mandatory workshops for fishermen and dealers;

implement two closures, consistent with regulations implemented by the Gulf of Mexico Fishery

Management Council; establish criteria for modifying and/or establishing time/area closures;

address rebuilding and/or overfishing of northern albacore tuna, finetooth sharks, and Atlantic

billfish; modify the bluefin management process; change the fishing year for tunas, swordfish,

and billfish; authorize additional fishing gears; and clarify the regulations.  See generally A.R.

E.12 at Section 2.

### C.    Plaintiffs' Petition For Rulemaking

While NMFS was developing the FMP, Plaintiffs submitted to NMFS a petition seeking to alter the management of the bluefin tuna fishery.  Plaintiffs' Petition for Immediate Rulemaking to Protect Spawning Atlantic Bluefin Tuna in the Gulf of Mexico (June 8, 2005) ("Petition"), A.R. D1, sought closure of a portion of the Gulf of Mexico to any pelagic longline fishing during the months of April to June, bluefin spawning season.  Id. at 3.  The request was based on a study published in the magazine Nature indicating that the area was a spawning "hot spot" for bluefin.  Id.; see also id. at Exhibit A.  NMFS fully evaluated Plaintiffs' proposed closure, as set forth in detail below.  NMFS used the best available science to determine the impact of Plaintiffs' proposal on all species in the Atlantic HMS fishery by evaluating "redistribution of effort."  See infra Section I.A.  NMFS declined to adopt the proposed closure based on its analyses, which revealed that under certain redistribution scenarios there could be increases in bycatch of most species, including bluefin discards.  A.R. E. 27 at 58,153.

## IV.    STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, summary judgment may be granted when the moving party shows that there are no material facts in dispute, and the party is entitled to judgment as a matter of law.  Fed. R. Civ. Pro. 56(c).  In a case involving judicial review of a final agency action under the APA, the court's role is limited to review of the administrative record.  See 5 U.S.C. § 706 (a reviewing court "shall review the whole record or those parts of it cited by a party . . . .").  The reviewing court's task is to "decide, on the basis of the record the agency provides, whether the action passes muster under the appropriate APA standard of review."  Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985).  In the APA context,

"summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." Occidental Eng'g Co. v. INS, 753 F.2d 766, 770 (9th Cir. 1985).  See also Stuttering Found. of America v. Springer, 498 F. Supp. 2d 203, 207 (D.D.C. 2007) (summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review"), citing Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).

        NMFS' decision to deny Plaintiffs' petition is reviewed under the APA, which provides that a court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Under the arbitrary and capricious standard of the APA, the court is not empowered to substitute its judgment for the agency's.  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971); see also National Ass'n of Clean Air Agencies v. EPA, 489 F.3d 1221, 1229 (D.C. Cir. 2007).  The arbitrary and capricious standard is highly deferential and presumes that agency action is valid. Id.; see also National Coalition for Marine Conservation, 231 F. Supp. 2d at 127 ("The APA standard accords great deference to agency decisionmaking, and the Secretary's action enjoys an initial presumption of validity.").  In reviewing NMFS' actions under the Magnuson-Stevens Act, the Court's task is not to review de novo whether the action complies with the statute, but "to determine whether [NMFS'] conclusion that the standards have been satisfied is rational and supported by the record." C&W Fish Co., 931 F.2d at 1562 (citations omitted).  Where, as here, the agency's scientific and technical expertise is involved in the decision, a reviewing court must be particularly deferential to the judgment of the agency.  Baltimore Gas & Elec. Co. v. Natural

Resources Defense Council, 462 U.S. 87, 103 (1983).  See also Marsh, 490 U.S. at 375-77

(where analysis "requires a high level of technical expertise," court must defer to informed

discretion of agency); Bluewater Network v. EPA, 372 F.3d 404, 410 (D.C. Cir. 2004) (courts

must give "particular deference" to agency acting under "'unwieldy and science-driven'"

statutory scheme).

     NEPA claims are also reviewed under the APA's arbitrary and capricious standard.  See

Karst Envtl. Educ. & Prot., Inc. v. EPA, 475 F.3d 1291, 1295 (D.C. Cir. 2007).  In reviewing the

sufficiency of an agency's NEPA analysis, courts are deferential to the agency.  See Grand

Canyon Trust v. FAA, 290 F.3d 339, 340 (D.C. Cir. 2002); see also Tongass Conservation Soc'y

v. Cheney, 924 F.2d 1137, 1140 (D.C. Cir. 1991), quoting NRDC v. Hodel, 865 F.2d 288, 294

(D.C. Cir. 1988) (court's role is not to substitute its judgment for that of the agency, but to

"ensure that the [EIS] contains sufficient discussion of the relevant issues and opposing

viewpoints to enable the decisionmaker to take a hard look at environmental factors, and to make

a reasoned decision") (internal quotation marks omitted).  The Court's role is "'simply to ensure

that the agency has adequately considered and disclosed the environmental impact of its actions

and that its decision is not arbitrary or capricious.'"  City of Olmstead Falls v. FAA, 292 F.3d

261, 269 (D.C. Cir. 2002), quoting Baltimore Gas & Elec., 462 U.S. at 97-98.

## ARGUMENT

I.    **DEFENDANTS COMPLIED WITH THE MAGNUSON-STEVENS ACT AND ADMINISTRATIVE PROCEDURE ACT IN DENYING PLAINTIFFS' PETITION.**

    A.    **NMFS Articulated A Rational Basis For Rejecting Plaintiffs' Proposed Closure, And The Agency's Determination Is Entitled To Deference.**

NMFS fully considered the closure proposed by Plaintiffs during its development of the October 2, 2006 final rule and the HMS FMP.  The proposed closure was among the time/area alternatives that NMFS considered in the EIS for the HMS FMP, which was subject to public comment and peer review.  NMFS articulated a rational basis for declining to adopt Plaintiffs' proposal based on the best available scientific information, and the agency's decision is entitled to deference.

    1.    The Final Rule explains why NMFS declined to adopt Plaintiffs' proposed closure.

Plaintiffs' June 8, 2005 Petition requested that NMFS take immediate action to prohibit pelagic longline fishing in a reported bluefin spawning area in the Gulf of Mexico during the spawning season from April through June.  A.R. D.1 at 2-3.  The final rule for the Consolidated HMS FMP sets forth in detail why NMFS declined to implement the requested closure.  <u>See</u> A.R. E.27 at 58,152-58,153.

The agency's conclusion hinges upon "redistribution of effort" by vessels fishing with pelagic longlines in the Gulf of Mexico.  Based on the best available science, NMFS first found that, assuming all fishermen in the fleet would stop fishing in the closed area and not redirect their effort into other areas ("no redistribution of effort"), the proposed closure could reduce bycatch of bluefin by as much as 21.5 percent.  <u>Id.</u> at 58,152.  However, assuming that all vessels

that had been fishing with pelagic longlines in the closed area would redirect their fishing efforts toward other, open areas ("full redistribution of effort"), NMFS' model reflected that bluefin discards would increase by 9.8 percent, and that, as discussed in more detail below, bycatch of other fish and protected species would also increase.  Id.  NMFS then evaluated a range of scenarios in addition to the no redistribution of effort and full redistribution of effort scenarios, considering the movement of fishing effort from the proposed closed area into other areas of the Gulf of Mexico and into a particular area of the Atlantic Ocean, as explained infra at Section I.C.2.  This broader analysis revealed that, although bluefin discards might decrease under certain scenarios with varying levels and locations of redistribution of effort, there was a predicted increase in bycatch of other species of concern.  A.R. E. 27 at 58,153.

In addition to the ecological impacts, the final rule states several other bases for NMFS' decision not to adopt Plaintiffs' proposed closure.  The closure would result in significant economic impacts, affecting 75 vessels that fished in the area between 2001 and 2003 and resulting in estimated losses of approximately $1,548,082 annually.  Id.[5]  Further, NMFS determined that it would need to evaluate additional data before it could implement any new closures.  For example, because the available logbook data for the pelagic longline fishery was only current through 2004, the data did not reflect the impact of new management measures that went into effect in 2004 requiring the use of circle hooks in place of J-hooks.  Id. at 58,067.[6]

_____

[5]    This figure assumes redistribution of effort.  Without redistribution of effort, the estimated total loss is $3,136,229 annually.  Id.

[6]    A J-hook used to be a standard fishing hook in the Atlantic pelagic longline fishery, and it was designed with the barb roughly parallel to the shaft of the hook.  In a July 2004 final rule, NMFS required the whole fishery to change to circle hooks, which have barbs turned towards the shafts making a partial circle, to minimize bycatch and bycatch mortality of sea turtles.  See The

Further, because NMFS only had logbook data through 2004, it could not evaluate the effects of the 2005 hurricane season on the pelagic longline fishery in the Gulf of Mexico. <u>See</u> A.R. E.27 at 58,067. Finally, before implementing additional domestic management measures, NMFS needed to consider the results of stock assessments for bluefin and other species, which had not yet been finalized at the time NMFS published the final rule. <u>Id.</u>

The final rule sets forth a rational basis for declining to adopt Plaintiffs' proposed closure, and the agency's decision is entitled to deference. <u>See</u> <u>C&W Fish Co.</u>, 931 F.2d at 1562 (reviewing court's task is to determine whether agency's decision is "rational and supported by the record"). <u>See also</u> <u>Yakutat, Inc. v. Gutierrez</u>, 407 F.3d 1054, 1072 (9th Cir. 2005) ("When the administrative agency has provided relevant data supporting its decision, we owe deference to the agency's line-drawing."); <u>Conservation Law Found. v. Evans</u>, 360 F.3d 21, 27-28 (1st Cir. 2004) (to succeed on substantive challenge to an FMP, plaintiffs "must demonstrate that NMFS lacked a rational basis for adopting the framework"; it is not the court's role to second-guess NMFS' determinations). Here, NMFS set forth such a rational basis, based on its conclusion that Plaintiffs' proposed closure was not supported by the best available scientific data and the best available scientific model for analyzing probable redistribution of fishing effort. Therefore, the Court must defer to the agency's decision to deny Plaintiffs' petition.

---

<u>Ocean Conservancy v. Gutierrez</u>, 394 F. Supp. 2d 147, 153 fn.8 (D.D.C. 2005), aff'd sub nom. <u>Oceana, Inc. v. Gutierrez</u>, 488 F.3d 1020 (D.C. Cir. 2007) (describing hooks and upholding final rule and associated EIS and biological opinion).

2.     NMFS Thoroughly Explored Plaintiffs' Proposed Closure In The EIS For The Final Rule.

NMFS' final decision is supported by the analysis in the EIS for the HMS FMP.  NMFS

included the closure proposed in Plaintiffs' petition as an alternative (Alternative B2(c)) in the

EIS and conducted detailed analyses of the impacts of the alternative on Atlantic HMS species,

including bluefin.  See A.R. E.12 at 4-27.  To determine the impact of closing an area to all

longline fishing (in addition to bluefin fishing, which was already prohibited), NMFS analyzed

fishing effort (the number of hooks) and the number of each species observed and reported

caught inside the closed area as compared to the rest of the Atlantic, Gulf of Mexico, and

Caribbean.  Id. at 4-28.  As described in detail in the EIS, NMFS also used a "fleet-wide

redistribution of effort model," evaluating the impacts of the closure with no redistribution of

effort and with full redistribution of effort.  Id. at 4-29.  The former scenario, in which all pelagic

longline fishing would simply cease and not move elsewhere, would yield the highest possible

reduction in bycatch.  Id.  However, Plaintiffs themselves acknowledge that such a scenario is

unlikely.  See Pl. Mem. at 25 ("it is likely that some effort will be displaced").  In addition, such

a scenario would have the greatest negative impact on the fishing industry, see id., and constrain

NMFS' ability to balance multiple competing interests within that industry, as required under the

Magnuson Stevens Act.  See A.R. E.12 at 4-29.  NMFS noted that, [i]n reality, the actual result

may lie between the results obtained from these two different scenarios."  A.R. E.12 at 4-29.

NMFS also evaluated several additional redistribution of effort scenarios for alternative B2(c)

based on public comments.  Id. at 4-32.

NMFS found that "the projected number of discards may actually increase when

redistribution of fishing effort is taken into account because high levels of effort are displaced into open areas with high [catch per unit effort]." Id. at 4-28.[7]/ Furthermore, "as fishing effort is squeezed into smaller open areas, bycatch of one species may decrease, while bycatch of another species may increase." Id. at 4-30. Thus, NMFS decided not to adopt Plaintiffs' proposed closure – or any other new closures – "because with some level of displaced effort, every closure or combination of closures would have increased discards or bycatch (i.e., had a negative effect) for one or more overfished or protected species. . . ." A.R. E.17 at 6. Under the redistribution of effort model, NMFS predicted that Plaintiffs' proposed closure would result in significant increases in discards of sailfish (21.7 percent increase) and large coastal sharks (12.8 percent increase), both of which are overfished and subject to overfishing. See A.R. E.12 at 4-39. See also A.R. E.12 at 3-43 – 3-44.

The MSA requires NMFS to prevent overfishing, which is defined in terms of the HMS fishery as a whole, as opposed to individual species within the fishery. See 16 U.S.C. § 1802(34) (overfishing is "a rate . . . of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis") (emphasis added). See also A.R. E.22 at 16 (National Standard One "clearly applies to all species and all fisheries"). Similarly, NMFS' duty to minimize bycatch relates to the fishery as a whole. In selecting measures to minimize bycatch, NMFS should consider "[c]hanges in the bycatch of other species of fish and the resulting population and ecosystem effects." 50 C.F.R. § 600.350(d)(3)(i)(C). See also Conservation Law Found. v. Evans, 209 F. Supp. 2d 1, 14 n.28 (D.D.C. 2001) (MSA "requires that an FMP include measures to address the bycatch problem to the extent practicable

_____

[7]/    Catch per unit effort ("CPUE") is the number of animals caught per 1,000 hooks. Id.

for the entire FMP, not just a single species within the FMP"); A.R. E. 22 at 16 (National

Standard Nine "applies to all species and fisheries").  As summarized by one agency scientist, ".

. . NMFS must balance the impacts of management measures on all managed species.  NMFS

may not choose protection for one species to the detriment of other protected or overfished

species . . . ."  A.R. E.17 at 6.  NMFS, consistent with its Congressionally-imposed statutory

duty to balance multiple species' needs as well as economic interests associated with fishing,

reasonably declined to implement new closures that favored certain species at the expense of

other imperiled species in the fishery, and the Court should uphold the agency's decision.

### B.    NMFS Considered All Relevant Key Facts About Bluefin Biology and Status.

NMFS fully analyzed the action requested in Plaintiffs' petition: closure of a specific

area of the Gulf of Mexico for the purpose of protecting spawning bluefin during a specific time

of year.  Contra Pl. Mem. at 18-19.  By adopting the proposal as an alternative in the EIS and

undertaking the analysis described below, Defendants "directly respond[ed] to the substance of

the relief sought" and "'fully and promptly consider[ed]'" Plaintiffs' petition.  Pl. Mem. at 18.

In the EIS, NMFS examined bluefin biology and the status of the stock extensively, A.R. E.12 at

3-51 – 3-63, including differences between western and eastern Atlantic bluefin.  See, e.g., id. at

3-52 (noting that western bluefin generally spawn later in life and reach a larger maximum size

than eastern bluefin).

Contrary to Plaintiffs' assertions, NMFS considered all relevant key facts with regard to

bluefin when it conducted its analyses.  NMFS was aware of the importance of the Gulf of

Mexico as a spawning area for bluefin, and acknowledged that discards within the Gulf of

Mexico were more likely to be spawning bluefin than discards outside of the Gulf.  See A.R.

E.12 at 4-39 ("Therefore, there is not necessarily a 1- to 1- equivalency between benefits to

individual spawning [bluefin] in the Gulf of Mexico and individual non-spawning [bluefin]

outside of the Gulf of Mexico.").  However, based on its analyses, NMFS had concerns

regarding potential impacts on bluefin outside the Gulf of Mexico, specifically the relative value

of protecting spawning bluefin in the Gulf of Mexico at the expense of increased discards of

non-spawning bluefin outside of the Gulf.  A.R. E.27 at 58,067 (NMFS was trying to assess how

"protecting spawning [bluefin will] help rebuild the stock if it results in increased discards of

non-spawning adults, juveniles, and sub-adult [bluefin] along the eastern seaboard.").  As noted

earlier, fishery management actions are subject to ten National Standards under the Magnuson-

Stevens Act, and National Standard Three requires that, "to the extent practicable, an individual

stock of fish shall be managed as a unit throughout its range. . . ."  16 U.S.C. § 1851(a)(1).

Recognizing this obligation, the EIS not only considered closure alternatives in the Gulf of

Mexico but also other closure alternatives throughout the fishery.  See A.R. E.12 at 4-40 and

A.R. E.27 at 58,069 (discussing potential benefits of Northeast and Gulf of Mexico closures); see

also A.R. E.12 at 11-3 ("The preferred alternatives in this FMP are consistent with [National

Standard Three]").

      While NMFS took into consideration a range of closure alternatives throughout the

fishery, Plaintiffs focus on western bluefin in the Gulf area to the exclusion of all other western

bluefin elsewhere.  See Pl. Mem. at 21- 22.  This myopic attention to the Gulf is scientifically

unjustified.  In fact, the best available data at the time NMFS prepared the FMP reflected that a

closure in the Gulf of Mexico aimed at reducing mortality of larger bluefin would not necessarily

offer long term benefits to the stock as a whole.  See Report of the 2006 Atlantic Bluefin Tuna

Stock Assessment Session ("SCRS Report") (draft), A.R. H.6., at 22. According to the ICCAT

Standing Committee on Research and Statistics ("SCRS"), such a closure would lead to an

"inevitable increase in fishing mortality on smaller fish (age 7 and below)" which would "impact

the spawning biomass negatively." Id. Further, Plaintiffs' narrow view fails to take into

consideration impacts on western bluefin throughout its range – a consideration that Plaintiffs

themselves, in another context, have asserted is critical. See A.R. I.4 at 4 (stressing importance

of protecting bluefin located in waters off North Carolina). Plaintiffs simply cannot have it both

ways.

Although NMFS determined that no new closures were appropriate at that time, it

committed when it released the FMP, as a critical component of the FMP's future success, to

continue to pursue alternatives to reduce bluefin bycatch in the Gulf of Mexico to benefit

spawning western bluefin. See id. For example, NMFS stated that it would evaluate possible

incentives to prevent fishermen from keeping incidentally caught spawning bluefin in the Gulf.

Id. NMFS also stated its intent to investigate sea surface temperatures and how they affect

distribution of bluefin in the Gulf, to enable the agency to "tailor management measures over

space and time to maximize ecological benefits while minimizing economic impacts, to the

extent practicable." Id.

     **C.    NMFS Properly Applied The Redistribution Of Effort Model.**

NMFS reasonably relied on the best available scientific model, the "redistribution of

effort" model, to predict the behavior of fishermen faced with the proposed time/area closures.

NMFS acknowledged that predicting fishermen's behavior is difficult, and that the agency

cannot predict with certainty how individual vessels would move in response to a closure. A.R.

E.12 at 4-66.  However, because NMFS' analysis of the effect of current closures on the HMS

fishery suggested that there was a shift in effort in the Gulf of Mexico since the existing closures

were put in place, the agency had to assume that some redistribution of effort would occur in

response to any new time/area closures.  See id.  To predict the likely redistribution of effort,

NMFS reasonably relied on a model that it had successfully used in past rulemakings.  See id. at

4-30.

> 1.    NMFS properly calculated expected rates of bycatch.

NMFS evaluated data from logbooks kept by the pelagic longline fleet between 2001 and

2004 to estimate how many bluefin and other species would be discarded under various closure

alternatives, including that proposed by Plaintiffs.  A.R. E.12 at 4-26.[8]/  NMFS noted the

possibility that discards may be underreported in logbook data, but decided to rely on logbook

data based on the assumption that any underreporting would be comparable from region to

region, and thus would not affect the overall comparative analysis of closure alternatives.  A.R.

E.12 at 4-33.  See also A.R. E.27 at 58,070 ("NMFS did not develop mortality estimates from the

[logbook] data.  Rather, NMFS evaluated percent change in total discards as the measure of the

effectiveness of potential time/area closures.").  Plaintiffs offer no factual support for their

speculation that the rate of underreporting of bluefin catches in the Gulf of Mexico is higher than

that elsewhere in the fishery.  See Pl. Mem. at 25.

NMFS' use of pelagic logbook data in considering time/area closures has been upheld

---

[8]/    In analyzing bycatch without redistribution of effort, NMFS also used data from
observers ("POP" data).  A.R. E.12 at 4-32.  NMFS did not use observer data to estimate bycatch
in scenarios assuming redistribution of effort, because observer data is collected from only a
portion of the fleet.  Id. at 4-33.

over similar objections that under-reporting causes logbooks to be unreliable.  See National

Coalition for Marine Conservation, 231 F. Supp. 2d at 129-130 ("logbooks are the best available

scientific information because, unlike observer records, logbooks reflect data from the universe

of pelagic fishers and not merely a sampling of them").  The court noted that, "[e]ven if the

logbooks underreport a certain amount of catch and bycatch, plaintiffs have not pointed to any

other information either available or appropriate for NMFS to consider during the rulemaking

process."  Id. at 130.  Plaintiffs in this case also fail to point to any other information that NMFS

should have relied on.  In the absence of better available information, NMFS' reliance on

logbook data was reasonable.

> 2.   The redistribution model reasonably approximates where vessels would be expected to move if faced with a closure.

Plaintiffs do not dispute the underlying assumption that fishing effort would be displaced

if NMFS implemented Plaintiffs' proposed closure.  See Pl. Mem. at 25 ("it is likely that some

effort will be displaced").  However, Plaintiffs criticize the "random" effort redistribution model,

arguing that the model fails to accurately describe where the vessels are likely to go.  See id.

NMFS addressed this concern during the rulemaking and NEPA process by undertaking a more

detailed analysis that predicts where vessels are likely to move based on the past fishing habits of

fishermen, and the agency relied on that analysis in concluding that Plaintiffs' proposed closure

was not appropriate.  See A.R. E.27 at 58,152-53.

NMFS' initial analysis employed a "random" effort redistribution scenario, assuming that

the observed effort in a potential closed area would be redistributed to all remaining open areas.

A.R. E.12 at 4-28.  Under this scenario, NMFS did not attempt to predict with any specificity

where vessels would move when they relocated outside of the closed area, and some commenters

on the draft EIS criticized the approach for failure to "accurately reflect the reality of the fleet." Id. at 4-29. In response, NMFS examined several additional scenarios where it assumed that fishermen would move to particular areas based on their past fishing habits. See A.R. E.12 at 4-31 – 4-32, A-3 – A-4. NMFS divided the Atlantic, Caribbean and Gulf of Mexico into six distinct areas, with one area (Area 2) split along the west and east coasts of Florida (Areas 2A and 2B, respectively). A.R. E.12 at A-52. NMFS plotted vessels according to where they fished in those six different areas in relation to their reported homeport, as reflected in Figure A.6 in the HMS FMP. Id. at A-53. This allowed NMFS to examine the distance that different vessels could move and predict where they might fish if faced with a large closure in the Gulf of Mexico, based on their past fishing habits.

For example, NMFS' analysis reflected that most of the fishing effort (measured by number of hooks) that moved out of the Gulf of Mexico went to an area of the Atlantic Ocean designated as "Area 6." Id. at 4-31. See also id. at A-54 (reflecting that 82 percent of the effort that moved out of the Gulf of Mexico had been observed fishing in "Area 6" in the past). NMFS then evaluated several scenarios of the redistribution of effort model for alternatives B2(a) and B2(c), where some movement is expected into Area 6. Id. at 4-32. See also id. at A-3 – A-4. Based on past observed fishing locations of pelagic longline vessels, NMFS made reasonable assumptions as to where fishing vessels would go if faced with a closure in the Gulf of Mexico or along the Atlantic seaboard.

Plaintiffs attack the detailed analysis based on unsupported conjecture that NMFS will never implement closures because "reliance on the redistribution of effort model will never yield an outcome in which all species will experience a decrease in bycatch." See Pl. Mem. at 26-27.

Plaintiffs' argument is meritless. In this case, NMFS determined that no new closures were appropriate because "there were indications that the closures could actually result in an increase in bycatch to the detriment of some species with the consideration of redistributed effort." A.R. E.27 at 58,066. However, NMFS has implemented closures in the HMS fishery in the past. See A.R. E.12 at 4-69 (Figure 4.1). Thus, NMFS has demonstrated that it can balance the interests of all species in the fishery and implement closures when appropriate.

Finally, contrary to Plaintiffs' assertions, see Pl. Mem. at 27, NMFS clearly set forth its analyses and the basis for its management decisions. See A.R. E.12 at 4-65 – 4-67. With respect to Plaintiffs' proposal, NMFS opted not to adopt closure B2(c) because

> even with the additional scenarios of redistributed effort for B2(c), there is a predicted increase for [large coastal sharks] discards (12.8 percent or 2,545 over 3 ½ years), blue marlin discards (0.7 percent or 20 over 3 ½ years), sailfish discards (21.7 percent or 281 over 3 ½ years), and spearfish discards (2 percent or 10 over 3 ½ years) (Table A.41). Given either the overfished stock status or unknown stock status of these species, NMFS does not prefer to implement a new closure, such as B2(c), at this time.

Id. at 4-66. See also A.R. E.27 at 58,153 ("Due to the potential negative ecological impacts, negative economic impacts, and the increase in bycatch and discards based on the different redistribution of effort scenarios, NMFS is not selecting this alternative at this time."). NMFS also explained its assumptions regarding how fishing effort would be redistributed into open areas. See A.R. E.12 at 4-65. For instance, in some scenarios NMFS assumed that all fishing effort would shift from the closed area into open areas of the Gulf of Mexico as fishermen moved their businesses or sold their permits to other fishermen near open areas, while other scenarios assumed that fishermen would not relocate. Id. NMFS evaluated certain scenarios for redistribution of fishing effort for closure B2(a) since it was the smallest closure in the Gulf of

Mexico, and other scenarios for closure B2(c), Plaintiffs' proposal, based on public comments.
Id. at 4-32. NMFS thoroughly investigated alternative closures using different assumptions of
redistribution of fishing effort to accomplish the difficult task of predicting fishermen's
behavior, and the Court should uphold its decision.

## II.    THE HMS FMP COMPLIES WITH NATIONAL STANDARDS ONE, TWO, AND NINE.

### A.    The Consolidated HMS FMP Contains Measures To Prevent Overfishing And Rebuild Overfished Bluefin Populations.

National Standard One requires NMFS to prevent overfishing while achieving the
optimum yield from each fishery. 16 U.S.C. § 1851(a)(1). "The statutory 'optimum yield'
definition recognizes that optimum yield is a standard that should be achieved over the long-run,
not necessarily a standard that must be achieved with precision each year." National Coalition
for Marine Conservation, 231 F. Supp. 2d at 135, citing 50 C.F.R. § 600.310(f)(1)(ii). NMFS
has acted to prevent overfishing and ensure optimum yield with respect to bluefin.

The United States cannot unilaterally prevent or end overfishing or rebuild Atlantic
bluefin. Because of their highly migratory nature, bluefin and other HMS need international
conservation and management. See A.R. E.12 at 3-1. Thus, the United States participates as a
member of ICCAT, an international fishery management body which gathers scientific
information on tuna and tuna-like fishes and, on the basis of scientific evidence, develops
binding measures to maintain fish populations at levels which permit MSY. See
http://www.iccat.es/Documents/Commission/BasicTexts.pdf (describing scientific and
management objectives in Articles IV and VIII of the Convention). In 1998, based on advice
from its scientific body, ICCAT adopted a western Atlantic bluefin tuna rebuilding plan that

seeks to achieve MSY within 20 years.  NMFS adopted that international plan in an HMS FMP.

See National Audubon Soc'y v. Evans, No. Civ. A-99-1707, 2003 WL 23147552 at *1-4 (D.D.C.

July 3, 2003) (describing domestic and international bluefin tuna management).  Since 1998,

ICCAT has amended the rebuilding plan twice, and NMFS implemented regulatory changes

accordingly in 2003 and 2005.  See 68 Fed. Reg. 41103 (July 10, 2003) and 68 Fed. Reg. 56783

(October 2, 2003) (implementing 2002 ICCAT-adopted amendments to total allowable catch

(TAC) level for rebuilding plan); see also 70 Fed. Reg. 14630 (March 23, 2005) and 70 Fed.

Reg. 33033 (June 7, 2005) (maintaining 2002 TAC level and implementing 2004 ICCAT-

adopted amendments to plan).  As noted above, NMFS implements ICCAT recommendations

under the authority of ATCA, which provides that no regulation promulgated under that Act

"may have the effect of increasing or decreasing any allocation or quota of fish or fishing

mortality level to the United States agreed to pursuant to a recommendation of [ICCAT.]" 16

U.S.C. § 971d(c)(3).

    NMFS has a rebuilding plan in place for the species, and has adopted all of the ICCAT

recommendations for bluefin management.  A.R. E.27 at 58,069.  In the instant action, NMFS

conducted detailed analyses of a range of bluefin alternatives, and selected final alternatives for

bluefin tuna management that were consistent with "the ICCAT [bluefin] rebuilding plan, which

considers the uncertainty associated with [bluefin] stock assessment analyses and reviews the

efficacy of additional management options to reduce [bluefin] bycatch in the Gulf of Mexico."

A.R. E.27 at 58,141.[9]/

---

[9]/    In National Audubon Soc'y, 2003 WL 23147552, plaintiffs claimed that the HMS FMP –
which adopted the 1998 ICCAT rebuilding plan – violated National Standard One.  Id. at *5.
The court disagreed and held that the Secretary "did not act unreasonably in concluding that [the

In addition to setting quotas consistent with the ICCAT rebuilding plan and with obligations under the Magnuson-Stevens Act and ATCA, NMFS has implemented many measures to prevent overfishing and rebuild the stock.  For example, fishermen in the pelagic longline fishery are not allowed to target any bluefin, regardless of its size.  Id. at 58,070.  The HMS FMP continues the prohibition on directed fishing for bluefin in the Gulf of Mexico.  Id. at 58,141.  NMFS also declined to allow the use of speargun gear for bluefin based on concerns about the status of the stock.  Id. at 58,110.  Finally, NMFS is researching how changes in fishing practices may reduce bycatch, and is evaluating the possibility of offering incentives to fishermen to reduce discards and dissuade fishermen from keeping incidentally caught bluefin in the Gulf.  A.R. E.17 at 3.  See also A.R. E.27 at 58,069.  With respect to time/area closures, NMFS reasonably decided to maintain the existing closures based on analyses reflecting that the closures already in place "have been effective at reducing bycatch of protected species and non-target HMS", including bluefin.  A.R. E.12 at 4-34 (noting that the overall number of reported discards of bluefin has declined by more than 30 percent).[10]/  As in National Audubon Society,

---

TAC], adopted according to ICCAT's recommendations, affords an optimum yield that is 'consistent with producing the maximum sustainable yield in [the bluefin] fishery.'"  Id.

[10]/     As summarized in the final rule:

> NMFS analyzed the reported landings and bycatch in the pelagic longline fishery from 1997-99 versus 2001-03 to measure the effectiveness of the time/area closures implemented in 2000-01.  The analyses showed that the existing closures have been effective at reducing bycatch of protected species and non-target HMS and have provided positive ecological benefits.  For example, the overall number of reported discards of swordfish, bluefin and bigeye tunas, pelagic sharks, blue and white marlin, sailfish, and spearfish have all declined by more than 30 percent.  The reported discards of blue and white marlin declined by about 50 percent and sailfish discards declined by almost 75 percent.  The reported number of sea turtles caught and released declined by almost 28 percent.

Plaintiffs in this case fail to show how NMFS' actions violate National Standard One. NMFS'

decision is consistent with the ICCAT-adopted rebuilding plan and with the Magnuson-Stevens

Act, ATCA, and other legal obligations.

**B.    The Consolidated HMS FMP Is Based On The Best Scientific Information Available.**

National Standard Two requires NMFS to base conservation and management measures

on "the best scientific information available." 16 U.S.C. § 1851(a)(2). The standard is a

"practical" one, "requiring only that fishery regulations be diligently researched and based on

sound science," and NMFS need not "rely upon perfect or entirely consistent data." The Ocean

Conservancy, 394 F. Supp. 2d at 157. "Time and time again courts have upheld agency action

based on the 'best available' science, recognizing that some degree of speculation and

uncertainty is inherent in agency decisionmaking. . . ." Oceana, 384 F. Supp. 2d at 219.

The redistribution of effort model used by NMFS represents the best scientific

information available for predicting the effect of a closure. See A.R. E.12 at 4-30 (noting that

model was successfully used in past rulemakings and is based on "the best science currently

available for the Atlantic HMS [pelagic longline] fishery"); see also A.R. E.17 ("Given the

current technology and resources available, NMFS considers this the best scientific approach to

modeling the distribution of effort and resulting change in bycatch."). NMFS' analysis of the

potential closed areas was subject to scrutiny by outside scientists and the public. The analysis

---

A.R. E.27 at 58,143. See also A.R. N.8 at 3 (existing time/area closures, "as NMFS attests, have
been effective in reducing bycatch mortality of a wide range of HMS by more than 30 percent
and, in the case of overfished blue and white marlin, by 50 percent and 75 percent
respectively.").

was peer-reviewed by scientists from both within and outside the agency who were not involved

in drafting the HMS FMP.  See A.R. E.12 at 4-31.  See also A.R. D.74 at 4 ("Overall the

analytical approach seems sound."); A.R. D.70 at 6 (noting that draft assumed all effort would be

uniformly distributed into remaining areas, and suggesting that NMFS examine additional

redistribution scenarios); A.R. D.67 at 3 (". . . as stated in the draft FMP, reality likely lies

between no effort redistribution and complete redistribution.").  In response to extensive

comments received from the peer reviewers and the public, NMFS undertook additional analyses

of where vessels in the pelagic longline fleet fished in relation to their homeports between 2001

and 2004.  A.R. E.12 at 4-31.  See also supra Section I.C.2.

        Although there are other models that attempt to predict where fishermen may move in

response to closures, each of those models has shortcomings.  For example, there are

econometric models that predict where fishermen may move to maximize revenues when faced

with a closure.  See A.R. E.12 at 4-30.  However, these models either are not designed to be used

for the HMS pelagic longline fishery or, in the case of the Strand model, are based on outdated

data.  Id.  Further, the Strand model is based on data from fishermen using J-hooks, whereas

current regulations require the pelagic longline fleet to use circle hooks.  Id.  NMFS is aware of

the need to update its models as new information becomes available and has indicated that it will

explore revising the Strand model once the agency has complete data on the effects of circle

hooks on bycatch.  See id.  This additional data, combined with recent stock assessments for

bluefin and other species, will provide a basis for NMFS to reconsider modifying existing

closures.  See A.R. E.27 at 58,153.

        In the absence of an ideal model, NMFS must base its decisions on the best available

information regarding redistribution of effort.  See Midwater Trawlers Coop. v. Dep't of Commerce, 393 F.3d 994, 1003 (9th Cir. 2004) ("Indeed, by specifying that decisions be based on the best scientific information available, the Magnuson-Stevens Act recognizes that such information may not be exact or totally complete.").  The phrase "best scientific information available" is not defined, and "case law . . . seems to imply that it does not mandate any affirmative obligation on the agency's part," and that the agency may act based on incomplete information.  Commonwealth of Massachusetts ex rel. Div. of Marine Fisheries v. Daley, 10 F. Supp. 2d 74, 78 (D. Mass. 1998), aff'd 170 F.3d 23 (1st Cir. 1999).  This is true "even where concerns have been raised about the accuracy of the methods or models employed."  North Carolina Fisheries Ass'n v. Gutierrez, – F. Supp.2d –, No. 06-1815, 2007 WL 2331048 at *15 (D.D.C. Aug. 17, 2007).  In this case, NMFS based its decision on the best available model to predict fishermen's behavior in the face of uncertainty.

In order to successfully challenge NMFS' rational decision, Plaintiffs must introduce evidence of contrary science, and may not rely on bare allegations that the agency's decision conflicts with undefined better available scientific information.  See Oregon Trollers Ass'n v. Gutierrez, 452 F.3d 1104, 1120 (9th Cir. 2006), cert. denied, 127 S.Ct. 2028 (2007).  Plaintiffs do not attempt to identify an alternate model that NMFS should have used.  By failing to offer any alternative information, Plaintiffs have failed to support their claim that the Secretary failed to use the best scientific information available.  See Commonwealth of Massachusetts, 170 F.3d at 30 ("If no one proposed anything better, then what is available is the best.").  Thus, the Court should uphold NMFS' use of the redistribution of effort model and reject Plaintiffs' claim that the HMS FMP violates National Standard Two.

**C.     The Consolidated HMS FMP Contains Measures To Avoid Or Minimize Bycatch.**

Under National Standard Nine, NMFS must adopt conservation and management measures that minimize bycatch or, if bycatch cannot be avoided, minimize the mortality of such bycatch. 16 U.S.C. § 1851(a)(9). The plain language of the statute makes clear that NMFS is not required to reduce bluefin bycatch to zero. Rather, NMFS must minimize bycatch "to the extent practicable." Id. NMFS has implemented a number of management measures to reduce bluefin bycatch. For example, NMFS has implemented closures during the month of June in two areas in the Atlantic Ocean (Mid-Atlantic Bight and Northeastern Coastal) that have resulted in a significant decrease in bluefin discards. A.R. E.27 at 58,143. In the Gulf of Mexico, NMFS has prohibited the use of live bait by the pelagic longline fishery. Id. Additionally, NMFS' regulations include the following measures to reduce bluefin bycatch: (a) daily retention limits for commercial and recreational anglers; (b) minimum size limits for retention of bluefin by commercial and recreational anglers; (c) open and closed seasons for commercial and recreational anglers; (d) the ability to set restricted fishing days for recreational anglers; and (e) target catch requirements for retention of incidentally caught bluefin, with a maximum number of three bluefin per vessel per trip. See generally 50 C.F.R. Part 635, Subpart C.

Plaintiffs allege that NMFS was required to consider establishing a "bycatch cap" for bluefin. See Pl. Mem. at 43. In response to public comments advocating a bycatch cap system, NMFS explained that, while caps had been used successfully in some contexts, they may not be appropriate in every fishing sector "due to logistical constraints such as placing observers on every recreational and commercial vessel, limited resources, and other management measures that are already in place for the fishery such as mandatory circle hook use for the [pelagic

longline] fishery." A.R. E.27 at 58,144. NMFS decided not to impose pre-determined bycatch

reduction goals in the HMS fishery because they "do[] not consider the impact on the remaining

portion of the catch." A.R. E.12 at 4-47 – 4-48. Pre-set reduction goals for bycatch compromise

the agency's ability to consider multiple species, which conflicts with NMFS' obligations under

National Standard One (to prevent overfishing) and National Standard Nine (to minimize

bycatch) with respect to all species and fisheries, not just individual species such as bluefin. See

id. at 4-48. NMFS explained the need for flexibility in managing the multispecies HMS fishery:

> By not choosing a specific threshold or establishing a decision matrix, NMFS
> retains the flexibility to balance the needs of all the species encountered and the
> fishery as a whole. . . . Absent this flexibility, NMFS might potentially have to
> implement more restrictive measures to protect one species causing potential
> cascade effects (e.g., closing one area may increase the bycatch of another species
> which could result in closing another area, etc.).

Id. NMFS' decision that bycatch caps are inappropriate is consistent with Congress' intent to

allow for the exercise of agency discretion in adopting measures to minimize bycatch. See

Conservation Law Found. v. Evans, 360 F.3d 21, 28 (1st Cir. 2004) (use of the term

"practicable" reflects Congress' intent "to allow for the application of agency expertise and

discretion in determining how best to manage fishery resources").

The alternate basis for Plaintiffs' claim under National Standard Nine – that NMFS has

failed to establish a standardized bycatch reporting methodology for bluefin – is similarly

flawed. See Pl. Mem. at 38. In accordance with MSA Section 303(a)(11), NMFS has

"establish[ed] a standardized reporting methodology to assess the amount and type of bycatch

occurring in the fishery. . . ." 16 U.S.C. § 1853(a)(11). The standardized reporting

methodology, set forth in Section 3 of the EIS, applies to all Atlantic HMS fisheries, including

bluefin. See A.R. E.12 at 3-266 – 3-270. NMFS' decision to adopt a methodology that applies

to the HMS fishery as a whole, rather than to bluefin individually, is consistent with NMFS'

obligation to minimize bycatch for all species in the fishery.  See Conservation Law Found. v.

Evans, 209 F. Supp. 2d 1, 14 n.28 (D.D.C. 2001).

NMFS gathers data on bycatch in the Atlantic HMS fishery through logbooks, at-sea

observers, and surveys of fishermen.  A.R. E.12 at 3-269.  For the Atlantic pelagic longline

fishery, NMFS requires fishermen to self-report bycatch in logbooks.  Id. at 3-270.  There is also

an observer program pursuant to which contractors employed by the agency travel onboard

vessels to document bycatch.  Id.  At its inception in 1992, the program had a target coverage

level of five percent of the U.S. fleet in the North Atlantic.  Id.  This target level was upheld in

National Coalition for Marine Conservation, 231 F. Supp. 2d at 139-140.  NMFS raised the

target level to eight percent to comply with a 2004 biological opinion, and observer coverage in

2004 ranged from 6.2-9.0 percent per quarter.  A.R. E.12 at 3-270.  See also The Ocean

Conservancy, 394 F.Supp.2d at 159 (upholding eight percent coverage and standardized bycatch

reporting methodology in fishery).  These measures satisfy NMFS' obligation to establish a

standardized bycatch reporting methodology.

## III.    DEFENDANTS COMPLIED WITH NEPA IN PREPARING THE EIS FOR THE HMS FMP.

NMFS prepared a lengthy, detailed EIS for the HMS FMP.  See generally A.R. E.12.

The EIS describes the affected environment (id. at 3-1 – 3-308), the alternatives and their

environmental consequences (id. at 4-1 – 4-322), and economic impacts (id. at 6-1 – 6-26).

Dissatisfied with the outcome of the NEPA process, Plaintiffs ask this Court to order NMFS to

prepare a new environmental analysis in connection with the new regulations they seek.  See Pl.

Mem. at 40.  As documented in the administrative record, NMFS considered a reasonable range

of alternatives, including the closure proposed by Plaintiffs, and fully analyzed the potential

environmental impacts.  NMFS "'carefully consider[ed] detailed information concerning

significant environmental impacts'", and made such information available to the public.  See id.,

quoting Robertson, 490 U.S. at 349.  NMFS followed the necessary process to ensure a fully-

informed decision, in keeping with the purpose of NEPA.  See Robertson, 490 U.S. at 351.

In reviewing the EIS, "'the court's task is to determine whether the EIS was compiled

with objective good faith and whether the resulting statement would permit a decisionmaker to

fully consider and balance the environmental factors.'"  Concerned About Trident v. Rumsfeld,

555 F.2d 817, 827 (D.C. Cir. 1976), quoting Carolina Envtl. Study Group v. United States, 510

F.2d 796, 819 (D.C. Cir. 1975).  Plaintiffs have pointed to no facts indicating that NMFS failed

to act in good faith.  Further, as discussed infra, Plaintiffs' objections to the substance of the EIS

are baseless.  Thus, this Court should reject Plaintiffs' NEPA claim and award summary

judgment to Defendants.

### A.    NMFS Adequately Analyzed The Possible Impacts Of Plaintiffs' Proposed Closure.

Far from "gloss[ing] over" the issue of bluefin bycatch in the Gulf of Mexico, see Pl.

Mem. at 41, the EIS squarely addresses this issue.  NMFS examined bluefin discards in the Gulf

of Mexico as reported in logbooks and by observers.  See A.R. E.12 at 4-76, 4-77, 4-81.  NMFS

analyzed expected bluefin bycatch in discussing each of the alternative time/area closures.  See

A.R. E.12 at 4-37 (Closure B2(a)); id. at 4-38 (Closure B2(b)); id. at 4-39 (Closure B2(c)); id. at

4-40 (Closure B2(d)); id. at 4-41 (Closure B2(e)).  See also id. at 4-91 - 4-92 (Table 4.11); id. at

4-93 (Table 4.12); id. at 4-94 (Table 4.13); id. at 4-105 (Table 4.24).

As required by NEPA regulations, NMFS considered the "no action" alternative with

respect to time/area closures.  See 40 C.F.R. § 1502.14(d).  The no action alternative establishes

a benchmark for comparison of impacts.  NMFS properly defined this alternative as maintaining

existing time/area closures, without adding new closures.  See A.R. E.12 at 4-25 (alternative B1).

Judgments regarding development of the baseline against which alternatives are assessed are the

type of "expert analytical judgments" to which courts typically defer.  Village of Bensenville v.

FAA, 457 F.3d 52, 72 (D.C. Cir. 2006).  In evaluating NMFS' consideration of alternative

closures, the Court should grant "considerable deference to the agency's expertise and policy-

making role."  City of Alexandria v. Slater, 198 F.3d 862, 867 (D.C. Cir. 1999) (citation

omitted).

      NMFS analyzed the effects of maintaining the status quo.  See A.R. E.12 at 4-33 – 4-35

(considering "effectiveness of the existing time and area closures at reducing discards and

bycatch and in maintaining target catches for the entire fishery").  NMFS specifically evaluated

bluefin tuna discards in the Gulf of Mexico from 2001-2003.  Id. at 4-81 (Figure 4.13).  The

analysis showed that the existing closures "have been effective at reducing bycatch of protected

species and non-target HMS", and NMFS concluded that "the No Action alternative would

continue to have a positive ecological impact by maintaining a low overall bycatch of non-target

and protected species."  Id. at 4-34.

      NMFS compared the impacts of maintaining the status quo to the impacts of

implementing the closure proposed in Plaintiffs' petition, alternative B2(c).  See A.R. E.12 at 4-

82 (Table 4.4, percent change in discards of bluefin and other species without redistribution of

effort); id. at 4-83 (Table 4.5, percent change in discards of bluefin and other species with and

without redistribution of effort); id. at 4-94 (Table 4.13, percent change in incidental catch and

discards of bluefin and other species without redistribution of effort); id. at 4-96 (Table 4.15, percent change in kept and discarded catch of bluefin and other species with and without redistribution of effort); id. at A-14 (Table A.5, increase in number of bluefin kept/discarded with redistribution of effort); id. at A-15 (Table A.6, percent reduction or increase in number of bluefin kept/discarded with redistribution of effort); id. at A-43 (Table A.31, percent change of bycatch for bluefin and other species without redistribution of effort); id. at A-61 (Table A.41, cumulative number of bluefin kept and discarded in Gulf of Mexico and Area 6 under alternative B2(c)).

Plaintiffs claim that NMFS failed to address "a central question presented by the Petition – whether the proposed closure significantly reduce [sic] incidental catch of western Atlantic bluefin tuna, thereby reducing overfishing of that overfished population." Pl. Mem. at 42. NMFS thoroughly examined the impact of Plaintiffs' proposed closure on incidental catch of bluefin under several different redistribution scenarios. See A.R. E.12 at 4-38 – 4-39. NMFS concluded that the closure could significantly reduce bluefin discards under some redistribution scenarios. See id. at 4-39. However, that does not end NMFS' inquiry. As explained above, NMFS' obligations under National Standard 1 (to prevent overfishing) and National Standard 9 (to minimize bycatch) apply to all species and fisheries. See supra Section I.A.2. Thus, NMFS properly considered the predicted increase in bycatch of other species in rejecting Plaintiffs' proposal, particularly in light of the economic impacts associated with the closure. See A.R. E.12 at 4-39 – 4-40.

**B.    The EIS Sets Forth A Clear Analysis Of The Environmental Impacts Of Alternatives To Plaintiffs' Proposed Closure.**

The EIS for the HMS FMP is "concise, clear, and to the point", as required by the NEPA regulations.  See 40 C.F.R. § 1502.1.  The information in the EIS is disclosed in terms intelligible to the general public.  See Tongass Conservation Soc'y v. Cheney, 924 F.2d at 1142.  It is clear from the volume of public comments received and the diversity of the individual and organizational commenters that the EIS is intelligible to the general public and provides a meaningful opportunity for comment.  See generally A.R. Section N ("Public Comments on the Pre-Draft to the HMS FMP"), Section O ("Public Comments on the Draft HMS FMP and Proposed Rule"), Section P ("Public Comments on the Final EIS").  With respect to existing and proposed time/area closures, the analysis is "extensive and comprehensive."  A.R. D.67 at 3.  Members of the public had a full opportunity to comment on proposed time/area closures, including Plaintiffs' proposal.  See A.R. E.22 at 2 (NMFS held 24 public hearings and extended the comment period due to the 2005 hurricanes in the Gulf of Mexico).  See also A.R. E.3 at 1 (NMFS received many comments on time/area closures); A.R. N.11 at 16 (opposing any new closures); A.R. O.57 at 2 (supporting Plaintiffs' proposed closure); A.R. O.83 at 2 (supporting modified version of Plaintiffs' proposal).

Plaintiffs take issue with the level of detail in the EIS.  See Pl. Mem. at 43.  For example, Plaintiffs allege that NMFS failed to explain how they chose the alternative of status quo.  See id.  As Plaintiffs acknowledge, in this case "'no action' is equivalent to 'no change' from current management practices."  Pl. Mem. at 41.  NMFS properly defined this alternative as maintaining existing time/area closures, without adding new closures.  See A.R. E.12 at 4-25.  NMFS' selection of the no action alternative requires no further elaboration.

Plaintiffs further allege that NMFS failed to examine other alternatives for protecting spawning bluefin, such as a bycatch cap. <u>See</u> Pl. Mem. at 43. NMFS examined the possibility of imposing a bycatch cap, and decided that a pre-determined bycatch reduction goal would be inappropriate. <u>See</u> A.R. E.12 at 4-47 – 4-48; <u>see also supra</u> Section II.C.

Finally, Plaintiffs fault NMFS for failing to elaborate on certain statements in the analysis. <u>See</u> Pl. Mem. at 43 (claiming that NMFS failed to explain how it relied upon its closure analysis and did not elaborate on its statement that it cannot value one species over another). This is exactly the type of "fly-specking" in which courts routinely refuse to engage. <u>City of Williams v. Dombeck</u>, 151 F. Supp. 2d 9, 23 (D.D.C., 2001) <u>citing</u> <u>Sierra Club v. Adams</u>, 578 F.2d 389, 393 (D.C. Cir. 1978) ("'full, fair, bona fide compliance with NEPA, does not authorize the courts to 'fly speck' the EIS, nor substitute their judgment for that of the agency'"); <u>Coalition on Sensible Transp. v. Dole</u>, 826 F.2d 60, 66 (D.C. Cir. 1987) (while it "is of course always possible to explore a subject more deeply and to discuss it more thoroughly . . . line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts"). NMFS' discussion of these issues is "concise, clear, and to the point"; no more is required under NEPA.

**C.     The EIS Sets Forth NMFS' Analysis Of The Cumulative And Long-Term Effects Of Denying Plaintiffs' Proposed Closure.**

In accordance with NEPA's implementing regulations, 40 C.F.R. §1508.7, NMFS properly considered the impacts on the environment resulting from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions ("cumulative impacts"). To satisfy NEPA's cumulative impacts requirement, an agency must have "reasonably identified and discussed various impacts." <u>Young v. GSA</u>, 99 F. Supp. 2d 59, 78

(D.D.C. 2000), aff'd, 11 Fed. Appx. 3 (D.C. Cir. 2000).  The scope and extent of the duty to

discuss cumulative impacts "requires the weighing of a number of relevant factors, including the

extent of the interrelationship among proposed actions and practical considerations of

feasibility."  Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976).  The nature of the obligation to

address cumulative impacts depends upon the nature and character of the federal action at issue.

Accordingly, determination of the scope and structure of a cumulative effects analysis "is a task

assigned to the special competency of the appropriate agencies."  Kleppe, 427 U.S. at 413-14;

see also Coalition on Sensible Transp., 826 F.2d at 66-67 & 71 (upholding agency's cumulative

impacts analysis because it sufficiently alerted public "to any arguable cumulative impacts").

 Plaintiffs would prefer that NMFS discuss cumulative impacts in the specific context of

rebuilding the western Atlantic bluefin population.  See Pl. Mem. at 43.  This approach would

not be feasible in an EIS covering an action of this magnitude.  Instead, NMFS reasonably

discussed cumulative impacts with respect to the FMP as a whole, rather than on a species-by-

species basis.  See A.R. E.12 at 4-297 – 4-322 (Section 4.8).  NMFS' analysis of the impacts of

alternatives considered is summarized in Table 4.75.  Id. at 4-308 – 4-322.

 With respect to time/area closures, the EIS discusses the effects of NMFS' past actions:

the existing time/area closures.  See id. at 4-298 ("In general, the cumulative impact of

implementing a number of time/area closures since 1999, in addition to other measures to reduce

bycatch and bycatch mortality, has been positive ecologically, but negative socially and

economically, particularly for the pelagic longline industry").  See also id. at 4-34 – 4-35.

NMFS also considered the expected effects of modifying existing closures.  See id. at 4-42 – 4-

46.  The EIS also discusses the anticipated effects of the present action: new time/area closures,

including Plaintiffs' proposal.  See id. at 4-35 – 4-42.  In addition to ecological impacts, the EIS

explores social and economic impacts.  See id. at 4-304 – 305 ("The current preferred

alternatives in this action are not expected to have large economic or social impacts. . . .").  See

also id. at 4-50 – 4-62 (discussing social and economic impacts of alternative closures).  Finally,

NMFS considered reasonably foreseeable future actions.  See id. at 4-299 ("NMFS is

considering alternatives to reduce bycatch in the Gulf of Mexico, especially for [bluefin]",

possibly including an experimental fishery in the Gulf of Mexico to test ways to reduce bycatch

of spawning bluefin); see also id. at 1-17.  This satisfies NMFS' obligation to "make a

reasonable effort to discern what the effects" of its actions will be.  See Concerned About

Trident, 555 F.2d at 830.

## IV.    THE COURT SHOULD DENY PLAINTIFFS' REQUEST FOR AN INJUNCTION REQUIRING NMFS TO PROMULGATE AN EMERGENCY RULE.

Even if the Court awards summary judgment in Plaintiffs' favor on some or all of their

claims, the Court should deny Plaintiffs' request for an injunction requiring NMFS to

promulgate an emergency rule.  Plaintiffs ask the Court to order NMFS to "promulgate an

emergency rule closing longline fishing in the Gulf of Mexico in the manner requested by

plaintiffs" in their petition.  Doc. No. 22-2 ([Proposed] Order) at 1.[11]/  Plaintiffs' requested relief

should be denied for two reasons.  First, such an injunction would exceed the Court's jurisdiction

in this APA case.  Second, practical considerations weigh against granting the injunctive relief

---

[11]/    The MSA provides that the Secretary "may promulgate emergency regulations" based on a finding that "an emergency exists or that interim measures are needed to reduce overfishing for any fishery . . . ."  16 U.S.C. § 1855(c)(1).

sought by Plaintiffs.[12]/

Plaintiffs' requested relief is inappropriate in this case, where the Court is reviewing agency action under the arbitrary and capricious standard of the APA. Where the administrative record does not support an agency action, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." See Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985); see also INS v. Ventura, 537 U.S. 12, 16 (2002) ("Generally speaking, a court . . . should remand a case to an agency for decision of a matter that statutes place primarily in agency hands."); PPG Indus. v. United States, 52 F.3d 363, 365-66 (D.C. Cir. 1995) ("when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards"). If the administrative record does not support NMFS' decision, the Court should remand to NMFS for reconsideration of its denial of Plaintiffs' petition.

Even if the Court properly could order NMFS to undertake an emergency rulemaking, it could not adopt Plaintiffs' suggestion to dictate to the agency the substance of an emergency rule. In remanding to the agency, the court may not order specific relief. See County of Los Angeles v. Shalala, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (when reviewing court determines that agency made an error of law, it must remand to agency and may not retain jurisdiction to devise

---

[12]/     Plaintiffs also seek an order requiring Defendants to "initiate a rulemaking process to establish new long-term management measures for the longline fishery in the Gulf of Mexico that will protect spawning western Atlantic bluefin tuna. . . ." Id. Because Plaintiffs do not ask the Court to require NMFS to adopt particular measures, Defendants do not argue that such relief would exceed the Court's jurisdiction. However, the requested relief should be denied because Plaintiffs' claims should be dismissed for the reasons set forth above.

specific remedy for agency to follow) (quoting PPG Indus., 52 F.3d at 365-66); see also

Palisades Gen. Hosp., Inc. v. Leavitt, 426 F.3d 400, 403 (D.C. Cir. 2005) (district court

reviewing final agency action has "no jurisdiction to order specific relief"); Hawaii Longline

Ass'n v. NMFS, 281 F. Supp. 2d 1, 38 (D.D.C. 2003) (where court vacates decision and remands

to agency, "it is up to the agency to decide how to proceed next – not for the Court to decide or

monitor").  Where a district court determines that an agency decision is arbitrary and capricious,

the court has jurisdiction only to vacate the agency's decision and remand to the agency for

further action consistent with the court's opinion, and may not dictate how the agency is to

exercise its discretion on remand.  See, e.g., Palisades Gen. Hosp., 426 F.3d at 403 (although

district court had jurisdiction to vacate decision by Secretary of the Department of Health and

Human Services as arbitrary and capricious, it lacked jurisdiction to order Secretary to grant

geographic reclassification for hospital for purposes of determining applicable wage index for

Medicare reimbursement).

     The Court should also reject Plaintiffs' requested remedy for practical reasons.  Plaintiffs

suggest that NMFS should be required to promulgate an emergency rule in two weeks based on a

petition dated June 8, 2005.  See A.R. D.1.  It would be unreasonable for NMFS to promulgate a

rule based on data that is over two years old, and not consider new information that is available

to the agency.  For example, Plaintiffs' petition was based primarily on an April 14, 2005 study

identifying a "spawning 'hot spot'" for bluefin tuna in the Gulf of Mexico.  See id. at 2; id. at

Exhibit A.  Plaintiffs' petition argued that the area identified in the 2005 study should be

immediately closed to pelagic longline fishing during bluefin spawning season.  Id. at 3-4.

Several of the authors of the 2005 study have released an updated study, dated June 21, 2007,

that significantly changes the location of the bluefin spawning "hot spot."[13]/ NMFS would have to consider this and any other available new information on bluefin status before promulgating a rule that would close a portion of the Gulf to all pelagic longline fishing.

## CONCLUSION

For the foregoing reasons, NMFS' decision to deny Plaintiffs' petition to close a portion of the Gulf of Mexico to all longline fishing should be upheld. Plaintiffs' motion for summary judgment should be denied because Plaintiffs have failed to show that NMFS lacked a rational basis for its decision. Because NMFS' decision is supported by the administrative record and in accordance with applicable law, Defendants' cross-motion for summary judgment should be granted and Plaintiffs' Complaint should be dismissed in its entirety.

---

[13]/     While not part of the administrative record, Defendants believe that it would be appropriate for the Court to consider this study for the limited issue of remedy and will provide a copy to the Court upon request.

Respectfully submitted this 19th day of December, 2007,

RONALD J. TENPAS, Assistant Attorney General
JEAN E. WILLIAMS, Section Chief
LISA LYNNE RUSSELL, Assistant Chief

/s/ Kristen Byrnes Floom
KRISTEN BYRNES FLOOM, Trial Attorney
DC Bar No. 469615
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife and Marine Resources Section
Ben Franklin Station
P.O. Box 7369
Washington, D.C. 20044-7369
Telephone: (202) 305-0340
Facsimile: (202) 305-0275
Email: Kristen.Floom@usdoj.gov

OF COUNSEL:
Megan Walline
NOAA Office of General Counsel
1315 East-West Highway
Silver Spring, MD 20910

Attorneys for Defendants

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BLUE OCEAN INSTITUTE and )
CARL SAFINA )          No. 06-1869 HHK JMF
 )
            Plaintiffs, )
            v. )          **[PROPOSED] ORDER**
 )
CARLOS GUTIERREZ and NATIONAL )
MARINE FISHERIES SERVICE, )
 )
            Defendants. )
_____ )

      This Court, having considered Defendants' Cross-Motion for Summary Judgment, and

any opposition thereto, hereby GRANTS the motion and ORDERS that all counts of Plaintiffs'

Complaint for Declaratory and Injunctive Relief are dismissed with prejudice.

      The Court further ORDERS that all parties shall bear their own costs and fees.

Dated: _____          _____
                                     Hon. Henry H. Kennedy, Jr.
                                     United States District Judge