# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————

BLUE OCEAN INSTITUTE, et al.,    )

        )

    Plaintiffs,       )

        )

       v.        )     No.  1:06-CV-01869-HHK JMF

        )

CARLOS M. GUTIERREZ, et al.,    )

        )

    Defendants.     )

—————————————————————)

## MEMORANDUM OF PLAINTIFFS BLUE OCEAN INSTITUTE AND CARL SAFINA IN REPLY TO DEFENDANTS' OPPOSITION TO THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO THE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

STEPHEN E. ROADY
D.C. Bar. No. 926477
JENNIFER C. CHAVEZ
D.C. Bar No. 493421
Earthjustice
1625 Massachusetts Avenue, N.W.
Washington, D.C.  20036
202-667-4500 Telephone
202-667-2356 Fax
Attorneys for the Plaintiffs

January 7, 2008

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

FACT STATEMENT..........................................................................................1

ARGUMENT.......................................................................................................4

I.    NMFS FAILED TO ARTICULATE A RATIONAL BASIS FOR
      ITS DECISION TO DENY THE PLAINTIFFS' PETITION TO
      PROTECT SPAWNING BLUEFIN ............................................................4

      A.    NMFS Failed to Consider the Potential Benefits of the Proposed
            Closure or Afford Those Benefits Any Weight in the Ultimate Decision ........4

      B.    NMFS Failed to Clearly Identify and Analyze the Advantages
            and Disadvantages of Plaintiffs' Proposed Closure ...........................................7

II.   NMFS VIOLATED THE NATIONAL STANDARDS ON OVERFISHING,
      BYCATCH, AND BEST AVAILABLE SCIENCE BY DENYING THE
      PLAINTIFFS' PETITION TO PROTECT SPAWNING BLUEFIN ......................11

      A.    NMFS Violated National Standard One by Failing to Prevent Overfishing .......12

      B.    NMFS Violated National Standard Two by Failing to Explain Its Model..........17

      C.    NMFS Violated National Standard Nine By Failing to Control Bycatch ...........18

III.  NMFS VIOLATED THE NATIONAL ENVIRONMENTAL POLICY
      ACT BY FAILING TO CLOSELY EVALUATE THE EFFECTS OF ITS
      DECISION ON THE PLAINTIFFS' PETITION TO PROTECT SPAWNING
      BLUEFIN .........................................................................................................20

IV.   THE IMMEDIATE INJUNCTIVE REMEDY SOUGHT BY THE PLAINTIFFS
      IS NECESSARY TO PREVENT IMMEDIATE IRREPARABLE INJURY ...........23

CONCLUSION ........................................................................................................25

## INTRODUCTION

The Magnuson-Stevens Act ("MSA") requires the Defendants to make adequate progress to end overfishing and rebuild the population of the western Atlantic bluefin tuna ("bluefin"). In violation of this requirement, Defendants have failed to prevent the bluefin population from declining by 80% over the past thirty years. This suit challenges the Defendants' Final Rule denying a petition filed by the Plaintiffs that seeks to help reverse that decline by protecting spawning bluefin in the Gulf of Mexico. Defendants' brief asserts that they have "acted to prevent" bluefin overfishing and to rebuild the bluefin population, but their brief completely disregards the reality of the situation – in violation of the MSA, the Defendants have not made *any* progress in halting overfishing or in rebuilding the bluefin population to a healthy level.

In an attempt to justify this failure, Defendants claim that it is lawful to allow overfishing and bycatch of bluefin to continue because granting the Plaintiffs' petition could require them also to prevent overfishing and bycatch of other overfished species. This argument turns the MSA on its head. The MSA requires Defendants to prevent overfishing of all overfished species, to minimize bycatch of those species, and to rebuild all overfished populations. Defendants' argument achieves the opposite – it allows overfishing on bluefin and other overfished species to continue, condones continued bycatch, and fails to ensure rebuilding.

## FACT STATEMENT

Defendants (the Secretary of Commerce and the National Marine Fisheries Service, hereinafter collectively "NMFS") mischaracterize several important facts about the bluefin.

**The Bluefin Tuna Fishery.** NMFS intimates that the lifespan of the bluefin and the existence of several age classes within the population "confers some degree of stock [population] stability." NMFS Br. at 8. This deceptively reassuring assertion about a "degree of stability"

says nothing about the crucial facts at the heart of this case: bluefin are overfished, and they are not resilient to overfishing.[1]   In fact, as long-lived species, bluefin are particularly dependant upon older members of the population surviving to spawn, and therefore are especially adversely affected when overfishing reduces that older population.  The administrative record shows that fishing mortality rates for bluefin age 10+ years have increased by more than 800% since 1970 (from 0.021 to 0.163).  AR H6 at 65, Table 14, Sub-table 1.  The record also reveals that the number of bluefin aged 10+ has plummeted from over 180,000 to less than 25,000 since 1970. *Id.* at Sub-table 2.  Thus, notwithstanding the bland assertion by NMFS about "stability" of the bluefin population, the essential truth is that this population is severely overfished, and that there are far fewer old spawners in the population to buffer against environmental changes.  In short, the bluefin population now is not stable.

NMFS also notes that the International Commission for the Conservation of Atlantic Tunas ("ICCAT") adopted a rebuilding program in 1998 that is "intended to rebuild" the western Atlantic bluefin population.  NMFS Br. at 9.  However, NMFS omits to mention that *no progress* is being made in rebuilding bluefin pursuant to this ICCAT program.  *See* Pl. Br. at 3-4.

**Bluefin Tuna Management.**  The NMFS rendition of its bluefin management process completely ignores the history of its repeated failures to protect bluefin.  *Compare* NMFS Br. at 9-11 *with* Pl. Br. at 7-11.  The most salient points of that history are these: (1) NMFS has acknowledged since the early 1980's that the high prices paid for bluefin encourage fishermen to target those fish, that spawning bluefin are being killed in the Gulf of Mexico as incidental catch, and that protecting spawners could contribute to increasing the bluefin population, *id.* at 8; (2) in

---

[1]   Bluefin are one of the nine "highly migratory species" ("HMS") managed by NMFS (out of a total of 23) that are currently both overfished and undergoing overfishing.  *See* the NMFS Status of Fisheries Reports (hereinafter "NMFS Reports") *available at* http://www.nmfs.noaa.gov/sfa/statusoffisheries/SOSmain.htm#roc06.

the teeth of this knowledge, NMFS dramatically increased the quota for allowable incidental

catch of bluefin in the Gulf in 1983 (by a factor of over 300%), only to acknowledge (five years

later) that this quota could have "permitted a directed fishery" for bluefin in the Gulf that was

"contrary to the intent of the regulations and the United States' obligations" to ICCAT, *id.* (citing

53 Fed. Reg. 10415, 10415 (Mar. 31, 1988)); (3) NMFS rejected a request to close the Gulf to

longline fishing during spawning season in 1992, and has continued to refuse to protect

spawning bluefin from being killed – instead, it again increased the number of bluefin allowed to

be landed as "incidental" catch in 2002, and its current regulations enable longline fishermen in

the Gulf to kill hundreds of spawners annually either as incidental catch or as bycatch.  *Id.* at 9.

Given this history, it is not credible for NMFS to assert that it has "taken aggressive

regulatory action to rebuild the stock [population] and to decrease bluefin byctach."  NMFS Br.

at 10.  Indeed, the exact opposite is true: as shown by its own public pronouncements, NMFS has

taken actions that allow the continued prosecution of a "directed incidental fishery" for spawning

bluefin in the Gulf of Mexico, and has not established a process for minimizing or avoiding

bycatch.  *See* Pl. Br. at 7-11.  Moreover, these actions have had predictable results: the

population of western Atlantic bluefin has declined steadily for the past 25 years while NMFS

has been taking its "aggressive regulatory action."

But even putting to one side the big picture, which conclusively establishes the failure of

NMFS to halt overfishing and minimize bluefin bycatch, the particular actions for which it

claims credit do not withstand scrutiny.  *See* NMFS Br. at 10.  First, the ban on directed fishing

for bluefin does nothing to address the indirect "incidental catch" problem.  Likewise, the

requirement that fishermen must land other species in order to kill bluefin as incidental catch

does nothing to actually control incidental catch, especially when the incidental catch quota is

not reduced.[2]  Finally – as indicated by the continuing population decline – size limits, retention limits, and restricted fishing days have been equally ineffectual at reducing bluefin mortality.

## ARGUMENT

I.    **NMFS FAILED TO ARTICULATE A RATIONAL BASIS FOR ITS DECISION TO DENY THE PLAINTIFFS' PETITION TO PROTECT SPAWNING BLUEFIN**

NMFS argues that it "articulated a rational basis for declining to adopt Plaintiffs' proposal based on the best available scientific information, and the agency's decision is entitled to deference."  NMFS Br. at 15.  While agencies are afforded a degree of deference in decisionmaking, such deference does not require giving agencies *carte blanche*.  This Court must not "merely rubber stamp" the NMFS action; the APA requires close examination of the action and its justification.  *See Natural Resources Defense Council, Inc. v. Daley*, 209 F.3d 747, 755 (D.C. Cir. 2000).  Here, a close examination reveals that NMFS failed to provide a rational basis for its decision not to protect spawning bluefin in the Gulf of Mexico.

### A.  **NMFS Failed to Consider the Potential Benefits of the Proposed Closure or Afford Those Benefits Any Weight in the Ultimate Decision**

According to NMFS, its decision to deny Plaintiffs' petition was based on the agency's analysis that "although bluefin discards might decrease under certain scenarios with varying levels and locations of redistribution of effort, there was a predicted increase in bycatch of other species of concern."  NMFS Br. at 16 (citing AR E.27 at 58153).  In other words, the Final Rule simply concludes that the proposed closure is not a preferred alternative because it would not reduce bycatch for all highly migratory species ("HMS") and may increase bycatch for some

---

[2] In fact, in its 1999 HMS fishery management plan ("FMP"), NMFS rejected a proposal to modify target catch limits for bluefin tuna as a means of addressing bluefin bycatch, concluding that "[a]nalyses do not indicate any correlation between catch limits and bluefin tuna discards."  1999 HMS FMP, Ex. A at 239.  The 1999 HMS FMP also tellingly notes that "in a truly incidental fishery there should be no motivation to target bluefin tuna, so regardless of the catch limits there should be no effect on target effort or catch."  *Id.* at 238.  This candid observation demonstrates Plaintiffs' point: it is clear that the bluefin landings in the Gulf of Mexico are not purely "incidental."

4

HMS. *See id.* This decision ignores that NMFS can easily control any such increased bycatch, and in so doing violates the fundamental conservation purpose of the MSA, *see infra* at 10. Moreover, this was not a rational decision based on the evidence before the agency. In particular, this analysis failed to consider the potential benefits of the proposed closure, a failure that renders the analysis arbitrary and capricious. Pl. Br. at 18-23.

Unlike 2006, in 1999 NMFS adopted a limited time area closure for the purpose of reducing bluefin bycatch. In contrast to the 2006 highly migratory species fishery management plan ("HMS FMP"), the 1999 HMS FMP explicitly discussed and considered the potential ecological benefits of that proposed closure for the bluefin. In a subsection of the 1999 FMP titled "Ecological Impacts," NMFS noted that the proposed closure "will have direct positive ecological impacts on bluefin tuna by prohibiting longline activity in a one by six degree area during the month of June where a high number of bluefin tuna discards have been reported . . . . This may have a positive impact on bluefin tuna and assist with other ongoing efforts to rebuild this fishery." Ex. A at 231-32.

In the 2006 FMP, NMFS never separately considered the potential ecological benefits of the proposed closure for the bluefin. Instead, NMFS only discussed the potential effects on discards of all species considered under the "no redistribution," "random redistribution," and "modified redistribution" scenarios. *See* E.12, at 4-38 to 4-40. This analysis is patently deficient. Unlike its approach in 1999, NMFS utterly failed to consider whether the 2006 closure sought by the Plaintiffs could have "positive ecological impacts on bluefin tuna." *Compare id. with* Ex. A at 231-32. In violation of the APA, NMFS did not provide anything in the record that sets out a reasoned explanation for this tremendous oversight, or that explains why it treated the subject of a bluefin closure differently in 2006 and 1999. *See Motor Vehicle Mfrs. Ass'n v. State*

*Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (agency rule is arbitrary and capricious where agency "entirely failed to consider an important aspect of the problem"); *Ethyl Corp. v. Environmental Protection Agency*, 541 F. 2d 1, 36 (D.C. Cir. 1976) (agency decision must be "rational and based on consideration of the relevant factors"); *Independent Petroleum Ass'n v. Babbitt,* 92 F. 3d 1248,1258 (D.C. Cir. 1996) (agency must treat similar cases similarly or provide legitimate reasons for failing to do so).

Compounding its failure to consider *any* ecological benefits for the bluefin of the proposed closure, in the Final Rule, NMFS ignored the importance of the Gulf of Mexico as the bluefin's only spawning ground. NMFS now suggests that attention to the Gulf is "myopic." NMFS Br. at 21. But NMFS has consistently acknowledged that protection for spawning bluefin in the Gulf of Mexico is vital to the recovery of the population. As NMFS stated as far back as 1982, minimizing the capture of "spawning adults" in the Gulf of Mexico "may contribute to increasing stock size." 47 Fed. Reg. 17086, 17089 (Apr. 21, 1982). NMFS has provided no evidence to undercut this basic principle of fish population science – a principle that also has been endorsed by ICCAT, which has recommended since 1982 that there be no directed fishing for spawning bluefin in the Gulf of Mexico. *See* Pl. Br. at 8.[3]

Plaintiffs' proposal simply requests that NMFS prohibit longline fishing in the Gulf of Mexico that kills spawning bluefin during their spawning season. Although there is no dispute that directed fishing for spawning bluefin in the Gulf of Mexico must be banned, NMFS

---

[3] NMFS states that "the best available data at the time NMFS prepared the FMP reflected that a closure in the Gulf of Mexico aimed at reducing mortality of larger bluefin would not necessarily offer long term benefits to the stock as a whole." NMFS Br. at 21 (citing AR H6 at 22). This statement is wrong on two points. First, NMFS has already recognized the value of reducing mortality of bluefin in the Gulf by closing the Gulf for directed bluefin fishing—a closure aimed at reducing the mortality of larger, spawning bluefin. Second, the ICCAT Report cited by NMFS is inapposite. That Report expressed concern over a different proposal that would deliberately shift fishing pressure from larger to smaller fish in the entire western Atlantic Ocean. It was that large scale shift in fishing pressure to smaller fish throughout the western Atlantic that ICCAT believed would adversely affect the bluefin population. NMFS has not shown that the limited closure sought here would, or could, lead to such a shift.

continues to turn a blind eye to the ongoing problem of longline fishing in the Gulf during

bluefin spawning season that, while not classified as "directed" at bluefin, nonetheless kills

bluefin either as incidental catch or as bycatch.  NMFS has known for 25 years that the

extremely high value of bluefin tuna creates significant incentives for fishermen to seek bluefin

tuna in the Gulf, where NMFS regulations currently allow them to land up to three fish per

outing.  *See* Pl. Br. at 8-10. A failure to consider the impacts of these landings on the future of

the bluefin, or on the outcome of the bluefin rebuilding plan, is arbitrary and capricious.  *See*

*Pub. Citizen v. FMCSA*, 374 F.3d 1209, 1222 (D.C. Cir. 2004) (criticizing agency rulemaking

analysis that focuses only on costs, not benefits); *see also Motor Vehicle Mfg. Ass'n*, 463 U.S. at

43 (arbitrary and capricious for an agency to fail to consider an important aspect of the problem).

     **B.**     **NMFS Failed to Clearly Identify and Analyze the Advantages
and Disadvantages of the Plaintiffs' Proposed Closure**

Plaintiffs do not dispute that a proposed closure's potential impacts on other species

should be considered in determining whether or not to enact a closure.  However, those predicted

potential impacts to other species must be (a) based upon sound science; (b) clearly stated and

explained; and (c) balanced against the benefits of the proposed closure and the fundamental

conservation purposes of the MSA.  As discussed above, NMFS completely failed to consider

the benefits of the proposed closure for the bluefin, much less to balance those benefits against

the potential impacts to other species.  Additionally, the Final Rule's discussion of the potential

impacts of the proposed closure on other species is completely unclear.  In particular, the 2006

HMS FMP does not reveal how NMFS weighed the possible impacts of the proposed closure on

any particular species.  It is therefore impossible to accord any deference to NMFS' decision

since it lacks a clearly articulated basis.  *See Missouri Pub. Serv. Comm'n v. FERC,* 234 F.3d 36,

40 (D.C. Cir. 2000) (agency must explain on the record how it balances competing interests).

NMFS utilized various scenarios in attempting to predict the impacts of redistributing fishing effort as a result of the proposed closure. Pl. Br. at 33-36. Primarily, it posited three scenarios (1) a "no-redistribution" scenario; (2) a "full-redistribution" scenario in which all fishing effort displaced from the Gulf would be completely redistributed throughout the remaining open areas of the Atlantic Ocean; and (3) a "modified redistribution" scenario in which all fishing effort displaced from the Gulf would be completely redistributed in areas close to the Gulf. These three scenarios produced wildly different results – and provided no coherent framework for the NMFS final decision.

There are multiple problems with the NMFS approach. First, NMFS frankly admitted that its attempts to model fishing effort were mere guesswork: "[a]t this time, NMFS cannot precisely predict how individual vessels would move in response to a closure. For the purpose of this analysis, NMFS believes it is reasonable to assume that some redistribution of effort will occur even though NMFS cannot predict how much or where." AR E12 at 4-66. Further confusing matters, NMFS offered no explanation describing how its modeling results led to the decision not to adopt the proposed closure. Accordingly, the Final Rule unlawfully presents a wide range of possible outcomes without assessing which outcome is likely, or explaining why any particular outcome justifies its decision not to adopt the proposed closure.[4] *See Pub. Citizen*, 374 F.3d at 1221 (in the face of uncertainty, agency must make choices and explain why those choices are plausible).

Under any scenario that assumed either full or partial redistribution of fishing effort as a result of the closure sought by the Plaintiffs, the NMFS model showed that the closure would

---

[4] To illustrate precisely how confusing the Fisheries Service approach is, the Plaintiffs have created a table consolidating the predicted outcomes for the three scenarios included in the HMS FMP from data scattered throughout eight different tables in the HMS FMP and appendixes. *See* Ex. B. This table illustrates the wild variations in predicted bycatch results for HMS that follow from choosing one redistribution approach over another.

result in a predicted increase in bycatch (discards) of several HMS.  *See* Ex. B (3rd and 4th

columns).  Without explanation, NMFS relied upon this result to deny the Plaintiffs' petition.

AR E12 at 4-66.

In short, NMFS's use of this redistribution model has created a situation where the mere

possibility that the closure requested by the Plaintiffs could adversely affect another HMS brings

the inquiry to an end.  For example, as shown in Exhibit B, the NMFS modified redistribution of

effort model predicted that the closure sought by the Plaintiffs would reduce bluefin bycatch

discards by 19.3% but would increase discards of sailfish and sharks –  and NMFS now points to

this latter fact as a *post hoc* reason to deny the petition.  NMFS Br. at 18-19.  But neither the

record nor the Final Rule makes clear that NMFS is relying on the modified redistribution model.

*See* 71 Fed. Reg. 58058 at 58152-53 (October 2, 2006) ("[t]he actual ecological and economic

impacts of the [closure] alternative would likely be in between no redistribution of effort and the

full redistribution of effort model.").  Moreover, even if the record made clear that NMFS relied

upon the modified redistribution model, it lacks any explanation why NMFS decided that it was

appropriate to pretend to "protect" sailfish and sharks by leaving them in an overfished

condition, instead of actually protecting sailfish and sharks by limiting their bycatch in the event

the bluefin closure would increase that bycatch.  In sum, the way in which this model has been

used has rendered the decision completely arbitrary.  *See Appalachian Power Co. v. EPA*, 251

F.3d 1026, 1035 (D.C. Cir. 2001) (no excuse where agency relies upon "a methodology that

generates apparently arbitrary results, particularly where, as here, the agency has failed to justify

its choice"); *Transactive Corp. v. United States*, 91 F.3d 232 (D.C. Cir. 1996) (agency must

identify and explain the basis for its decision).[5]

---

[5] NMFS defends its use of the redistribution model by implying that it relied upon that model to implement a 1999
bluefin closure.  *Id.* at 26.  However, as discussed above, the analysis used in the 1999 HMS FMP that led to the

The *post hoc* defense of this approach now offered by NMFS – that the MSA requires it to consider all HMS and not "favor" one species over the other – ignores the fact that NMFS has the duty under the MSA to address bycatch and prevent overfishing with respect to <u>all</u> overfished HMS. *See* 12-14, *infra*. If NMFS predicts that closing the Gulf of Mexico to protect spawning bluefin might harm other overfished HMS (such as sailfish and sharks) by increasing discards from redistributed fishing effort, then the MSA requires that NMFS protect those other overfished HMS – not that it refuse to protect bluefin. In this case, for example (as Plaintiffs advised NMFS, *see* AR P12, incorporating AR P9 at 6-7), NMFS could have imposed a bycatch cap on sailfish and sharks at the same time it granted the bluefin closure. Such a cap would halt fishing on those other species once bycatch reached a certain level, thereby simultaneously minimizing bycatch and helping to protect those other HMS from overfishing. By using its refusal to limit bycatch and protect overfished sailfish and sharks as an excuse for also failing to protect overfished bluefin, NMFS turns the conservation purpose of the MSA on its head.

In sum, the NMFS decision to deny Plaintiffs' petition was arbitrary and capricious because the agency's analysis lacked any consideration of the proposed closure's demonstrable benefits for bluefin and irrationally and unlawfully concluded that the potential, indeterminate drawbacks of that closure weighed against it. NMFS argues that this outcome is justified because it must "balance multiple species' needs as well as economic interests associated with fishing,"[6] and that it therefore cannot "implement new closures that favored certain species at the

adoption of the bluefin closures differed significantly from the instant analysis, because that prior analysis actually considered the benefits of the proposed closures for the bluefin. Moreover, in 1999 NMFS did not consider the potential impact of the closure on *discard* rates of other target species, as it purported to do in connection with its 2006 analysis. Instead, the 1999 analysis examined impacts on *landings* of target species and protected species. *See* Ex. C, 1999 HMS FMP, Appendix VI, Table 2A & Table 2B. Accordingly, it is disingenuous for NMFS to argue that the same model was used in both the 1999 and 2006 HMS FMP.

[6] Contrary to NMFS's implication, the Final Rule does not conclude that the closure sought here would economically disadvantage fishermen. Instead, it states that fishermen would make money if fishing effort was fully

expense of other imperiled species in the fishery[.]"  NMFS Br. at 20. This defense ignores the reality of what NMFS actually did: it selected an alternative (the "no action" alternative) that purported to "favor certain species" (sailfish and large coastal sharks) "at the expense of other imperiled species" (bluefin).  Moreover, it did so without any explanation why it should "favor" the former species over the latter, or why it was lawful to refuse to protect *all* overfished HMS.

## II.    NMFS VIOLATED THE NATIONAL STANDARDS ON OVERFISHING, BYCATCH, AND BEST AVAILABLE SCIENCE BY DENYING THE PLAINTIFFS' PETITION TO PROTECT SPAWNING BLUEFIN

By denying the Plaintiffs' petition to protect spawning bluefin in the Gulf of Mexico, NMFS has allowed overfishing to continue, ignored its duty to minimize or avoid bycatch, and failed to take account of the best available science with respect to bluefin life history.  Thus, NMFS's denial of the petition violates National Standards One, Two, and Nine of the MSA.

NMFS endeavors to arrogate unto itself unchecked power to interpret these National Standards.  First, it observes that FMPs must be consistent with these Standards and suggests that it has some discretion to weigh them.  NMFS Br. at 5.  However, this Circuit and two others have limited that discretion by holding that the fundamental conservation command of National Standard One to prevent overfishing is paramount.  *See, e.g.*, *Natural Resources Defense Council,* 209 F. 3d at 753 (overturning NMFS failure to follow National Standard One and stating "the Service must give priority to conservation measures"); *Natural Resources Defense Council v. National Marine Fisheries Service,* 421 F. 3d 872, 879 (9th Cir. 2005) (rejecting NMFS failure to limit fishing sufficient to rebuild the overfished population and stating "[t]he

---

redistributed, and lose money if there was no redistribution of effort. AR E27, 71 Fed. Reg. at 58153.  It then states that the economic impacts of the closure would "likely be in between no redistribution of effort and the full redistribution of effort model."  *Id.* In any event, the conservation requirements of the MSA prevail over any possible short-term economic considerations.  *See, e.g.*, *Natural Resources Defense Council,* 209 F. 3d at 753 (NMFS "must give priority to conservation measures" over economic considerations); *Natural Resources Defense Council v. National Marine Fisheries Service,* 421 F. 3d 872, 879 (9th Cir. 2005) ("[t]he purpose of the [MSA] is clearly to give conservation of fisheries priority over short-term economic interests").

purpose of the [MSA] is clearly to give conservation of fisheries priority"); *Commonwealth of Massachusetts v. Daley*, 170 F. 3d 23, 27-30 (1st Cir. 1999) (overturning NMFS quotas that were not shown necessary to achieve "main conservation goal" of the MSA embodied in National Standard One).[7]

NMFS further contends that the determination on the question whether the bluefin population is in danger of collapse should be left entirely in its discretion. NMFS Br. at 9 n.4.[8] But agency discretion has limits. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971); *Motor Vehicle Mfg. Ass'n.*, 463 U.S. at 43 (1983); Pl. Br. at 15-17. NMFS's claim that this Court should afford total deference to its determination on the status of the bluefin population exceeds those limits.[9]

### A. NMFS Violated National Standard One by Failing to Prevent Overfishing

NMFS does not, and cannot, deny that it has failed to prevent overfishing of western Atlantic bluefin tuna. It has filed numerous reports in the past decade that classify bluefin as both "overfished" and undergoing "overfishing." *See, e.g.*, AR E12, at 3-43 Table 3.3; NMFS Reports, *available at* http://www.nmfs.noaa.gov/sfa/statusoffisheries/SOSmain.htm#roc06.

---

[7] NMFS also references "Guidelines" that interpret the National Standards. NMFS Br. at 6. But these Guidelines "shall not have the force and effect of law." 16 U.S.C. § 1851(b). An agency's statutory interpretation warrants deference only "when it appears that Congress delegated authority to the agency generally to make rules *carrying the force of law*, and that the agency interpretation claiming deference was promulgated in exercise of that authority." *United States v. Mead*, 533 U.S. 218, 226-27 (2001) (emphasis added). Therefore, these Guidelines are entitled to no deference in determining whether NMFS has lawfully interpreted its duties under the MSA.

[8] NMFS also suggests that the current status of the bluefin population is not relevant to its 2006 decision to deny the plaintiffs' petition, and argues for this reason that the Court should disregard the Declaration of Plaintiff Carl Safina. *Id.* As the Plaintiffs discuss in the final section of this Reply and Opposition, the Safina Declaration is relevant to the remedy sought here, and therefore is properly considered.

[9] NMFS relies on *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 223-224 (D.D.C. 2005), in an effort to bolster its "deference" claim. NMFS Br. at 9 n.4. But in that case, the question was "extremely complicated" and the evidence was "equivocal." *Oceana, Inc.*, 384 F. Supp. 2d at 223. By contrast, here the question is uncomplicated and the evidence unequivocal: (1) the bluefin population is at its lowest point in recorded history, Answer at ¶ 2; (2) spawning bluefin are being killed in the Gulf *see* AR E.12, at 4-76 Fig. 4.8; and (3) NMFS has recognized that protecting killing spawning bluefin aids in the rebuilding of the population, 47 Fed. Reg. at 17089 (Apr. 21, 1982), but has allowed the killing to continue.

Given these facts, the best NMFS can muster is the carefully-phrased assertion that it has "*acted to prevent* overfishing and ensure optimum yield" for bluefin.  NMFS Br. at 27 (emphasis added).  Of course, the plain language of National Standard One explicitly requires NMFS to do more than merely "act to prevent" overfishing; it requires NMFS to adopt conservation and management measures that "*shall prevent* overfishing while achieving, on a continuing basis, the optimum yield . . . ."  16 U.S.C. § 1851(a)(1) (emphasis added).  Moreover, the very purpose of the MSA is "to take *immediate action* to conserve and manage the fishery resources . . ."  16 U.S.C. § 1801(b)(1) (emphasis added).  Under this express language, merely "acting to prevent" overfishing – without actually preventing it for more than 25 years – is insufficient and unlawful.

As it did in defending its use of the redistribution model, NMFS defends its patent failure to comply with the plain language of National Standard One by asserting that it must be afforded "flexibility" to manage all HMS together.  NMFS Br. at 33-34.  Under this startling theory, NMFS cannot be required to prevent overfishing for bluefin if doing so would require NMFS to protect other species as well.  But this argument for "flexibility" ignores the central conservation purpose of National Standard One, which requires NMFS to prevent overfishing and rebuild all overfished fish populations – and does not allow NMFS to refuse to protect those populations.

In particular, this NMFS argument violates the explicit provisions regarding rebuilding and overfishing set out in Section 304(e) of the MSA.  That section mandates that NMFS review its HMS FMP no less than every two years to determine whether that FMP has "resulted in adequate progress toward ending overfishing and rebuilding affected fish stocks."  16 U.S.C. § 1854(e)(7).  Under this provision, NMFS was required to review its 1999 HMS FMP and to assess whether adequate progress was being made to halt overfishing and to rebuild the bluefin population and other overfished HMS populations.  The record in this case reveals that NMFS

has not, and cannot, find that such progress has been made: bluefin remain depleted, they are overfished and undergoing overfishing, and not rebuilding.  *See* Pl. Br. at 3-4.  Meanwhile, 8 other HMS, including sailfish and sharks, also remain overfished.  See NMFS Br. at 19.

Under these circumstances, Section 304(e) requires that NMFS "*immediately make revisions necessary to achieve adequate progress*" toward "*ending overfishing and rebuilding*" the bluefin population and all other HMS that are overfished and undergoing overfishing. 16 U.S.C. § 1854(e)(7) (emphasis added).  This provision imposes a continuing duty upon NMFS to review the HMS FMP every two years and to take "immediate" steps to ensure progress. Thus, NMFS was required to include in its 2006 HMS FMP those revisions necessary to achieve adequate progress in protecting the bluefin and other overfished HMS.

Accordingly, if NMFS must close more than one area to fishing in order to protect overfished HMS in addition to bluefin (such as sailfish and sharks), the MSA requires that it do so.  Once again the NMFS argument is the mirror image – the exact opposite – of what the MSA requires.  Allowing it to rely on "flexibility" to avoid its duty to prevent overfishing of bluefin by the excuse that doing so might require it also to protect other overfished HMS (through for example, imposing a bycatch cap for sailfish and sharks that might in turn require closing other areas to fishing) simply defies the purposes of the statute.  Agency "flexibility" manifestly does not extend so far.  *See Securities Industry Ass'n v. Board of Governors of the Federal Reserve System*, 468 U.S. 137, 143 (1984) (reviewing courts "must reject administrative constructions … that are inconsistent with the statutory mandate"); *Natural Resources Defense Council,* 209 F.3d at 753 (rejecting NMFS interpretation that "diverges from any realistic meaning" of the MSA); *American Fed'n of Government Employees v. FLRA*, 798 F. 2d 1525, 1528 (D.C. Cir. 1986) (no deference to interpretations that deprive statute of meaning).

14

NMFS serves up a porridge of additional excuses for its plain violation of the express requirements of National Standard One. First, it points to the "rebuilding plan" recommended by ICCAT, and relies on *National Audubon Society v. Evans*, 2003 WL 23147552 (D.D.C. 2003) for the proposition that its adoption of that plan was not unreasonable. NMFS Br. at 27-28 and n.2. But, as the population chart for bluefin shows conclusively, *see* Pl. Br. at 4, this "rebuilding plan" has resulted in no rebuilding at all. In fact, reports filed by ICCAT itself following the decision in *National Audubon Society* raise serious questions concerning the ability of the plan to succeed. *See* Pl. Br. at 32 (citing the 2004 and 2006 ICCAT SCRS Reports). Moreover, NMFS continues to classify bluefin as both "overfished" and as undergoing "overfishing." AR E12, at 3-43, Table 3.3. And, far from taking "immediate" action to conserve the bluefin population, NMFS has dithered for 30 years while the bluefin population has collapsed. *See* Pl. Br. at 7-11. There could not be a more direct violation of National Standard One. *See, e.g.*, *Natural Resources Defense Council,* 209 F.3d at 754.[10]

Next, NMFS invokes the Atlantic Tunas Convention Act ("ATCA"), which states that NMFS may not promulgate regulations that "may have the effect of increasing or decreasing any allocation or quota of fish or fishing mortality level to the United States agreed to pursuant to a recommendation of ICCAT." NMFS Br. at 28 (*citing* 16 U.S.C. § 971d(c)(3)). However, this language does not prevent NMFS from granting the Plaintiffs' petition. In the event NMFS were to grant that petition, implementing regulations would protect bluefin only for a limited time and

---

[10]  NMFS also is violating the Administrative Procedure Act ("APA"). Under the APA, it is arbitrary and capricious for an agency to continue with a course of action once that course has been shown to be ineffective. *Cf. Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 922(D.C. Cir. 1998) (arbitrary to continue to use decision metric shown to be ineffective). Here, while the original decision by NMFS in its 1999 HMS FMP to carry out the 1998 ICCAT "rebuilding" plan was deemed reasonable in *National Audubon*, the situation had fundamentally changed by the time NMFS denied the Plaintiffs' petition in 2006. The ICCAT plan had made no progress in rebuilding the bluefin population and ICCAT itself had begun to openly question its efficacy. *See* Pl. Br. at 32. Therefore, it was arbitrary and unlawful for NMFS to continue to rely upon the ICCAT rebuilding plan when that plan had resulted in no rebuilding progress between 1998 and 2006.

space.  They would not inevitably have an effect on the "allocation or quota of fish or fishing mortality level" provided to the United States under ICCAT recommendations for bluefin. The reason is simple: longline fishing in the Gulf goes on virtually year-round (the Final Rule notes that bluefin "are caught in months other than April through June in the Gulf of Mexico" 71 Fed. Reg. at 58152), and a ban on the catching of bluefin in the Gulf during spawning season therefore cannot be assumed to transgress ICCAT recommendations or trigger the ATCA language concerning an effect on the amount of bluefin caught on an annual basis.

NMFS conceded this point in its 1992 rule that adopted certain incidental catch restrictions for bluefin.  57 Fed. Reg. 365, 368 (January 6, 1992).  In that rule, NMFS noted that, ATCA notwithstanding, "it would be possible to close specific areas to fishing in order to further the conservation and management goals of ICCAT."  *Id.*  Thus, NMFS has conceded that ATCA would not prevent it from granting the Plaintiffs' petition that seeks the closure of a specific area of the Gulf of Mexico for a limited time.

NMFS also asserts that it has not violated National Standard One because it has "implemented many measures to prevent overfishing and rebuild" the bluefin population.  NMFS Br. at 29.  But these assertions ignore the fundamental problem that the petition sought to remedy: NMFS has authorized and repeatedly enabled fishermen to kill significant numbers of spawning bluefin tuna as "incidental" (rather than directed) catch in the Gulf of Mexico and has failed to control bluefin bycatch.  *See* Pl. Br. at 7-11.  The problem of incidental catch and bycatch certainly is not resolved by the fact that "fishermen in the pelagic longline fishery are not allowed to target any bluefin."  *Id.*  Similarly, the fact that the HMS FMP "continues the prohibition on directed fishing for bluefin in the Gulf of Mexico" simply misses the point.  So

16

long as NMFS continues to allow spawning bluefin to be killed in significant numbers in the Gulf, it matters not whether those fish are killed as a result of "direct" or "indirect" catch.

NMFS argues, finally, that it is "researching" ways to reduce bycatch and "evaluating the possibility" of taking steps to "reduce discards and dissuade fishermen from keeping incidentally caught bluefin in the Gulf." NMFS Br. at 29. But the MSA – particularly Section 304(e)(7) – imposes a duty on NMFS to prevent overfishing and rebuild overfished the bluefin populations now. 16 U.S.C. § 1854(e)(7)(A) (duty to "immediately" make revisions to the HMS FMP to ensure adequate progress on halting overfishing and on rebuilding). With respect to bluefin, that duty has been in place at the very least since 1998. *See National Audubon Society*, 2003 WL 23147552 at *1. It is not lawful to delay that effort any further. *See Conservation Law Foundation v. Evans*, 209 F. Supp. 2d 1, 9 (D.D.C. 2001) (promise of future NMFS rulemaking insufficient to remedy inadequacies of existing regulation); *Nat'l Fisheries Institute v. Mosbacher,* 732 F. Supp. 210, 220 (D.D.C. 1990) (NMFS cannot delay required action by claiming uncertainty about relevant information).[11]

### B.  NMFS Violated National Standard Two by Failing to Explain Its Model

NMFS contends that it has complied with the requirement of National Standard Two, which mandates that it must rely upon the best available science, solely by defending its use of a fishing effort redistribution model that it claims represents the most likely scenario for the effects on "bycatch" of the closure sought by the Plaintiffs. NMFS Br. at 30-32. This argument entirely misses the point of the Plaintiffs' argument – the requirement to use the best available science

---

[11]  NMFS also claims that its decision to maintain existing closures while denying the Plaintiffs' petition for a new Gulf closure was reasonable because the existing closures have proven effective at reducing bycatch. NMFS Br. at 29 and n.10. This is a meritless claim. First, it ignores that existing closures have resulted in *no progress* in halting overfishing and rebuilding the bluefin population. Second, it is illogical: the assertion that closures have proven "effective" supports a decision to *grant* the petition; it hardly supports a decision to *avoid* a closure. Third, it ignores that the fish petition sought to protect via a closure are spawners that are of relatively greater importance than the non-spawning fish protected by the existing closures trumpeted by NMFS. *See* Pl. Br. at 19-20.

includes a requirement to *explain* how the model supports the ultimate decision. It is the utter

failure of NMFS to provide such an explanation that violates National Standard Two.

Plaintiffs demonstrated in their initial brief that NMFS completely failed to explain how

it used its model to conclude that granting the Plaintiffs' petition was not warranted. Pl. Br. at

34-36. The record simply does not contain any explanation how NMFS arrived at its conclusion

on the basis of the model it employed. *Id*. at 35. The NMFS response avoids this issue entirely

and focuses exclusively on defending the model, without any reference to the lack of explanation

that connects the facts found by the model to the choice it ultimately made to deny the Plaintiffs'

petition. NMFS Br. at 30-32. In the process, NMFS neglects to mention any of the cases cited

by the Plaintiffs that require an explanation as a prerequisite for compliance with National

Standard Two. *See* Pl. Br. at 34. Thus, NMFS omits any reference to *Hadaja, Inc. v. Evans,* 263

F. Supp. 2d 346, 354 (D.R.I. 2003) and other cases that find violations of National Standard Two

where NMFS fails "to inform its audience of the actual scientific basis" supporting the

decision.[12] In short, NMFS fails to rebut the showing that it violated National Standard Two.

### C.  NMFS Violated National Standard Nine By Failing to Control Bycatch

NMFS argues that it complied with National Standard Nine for two reasons: (1) it has

minimized bluefin bycatch to the extent "practicable" and: (2) it cannot adopt the closure sought

by the Plaintiffs because doing so would increase bycatch of other highly migratory species.

NMFS Br. at 33-34. Neither of these arguments withstands scrutiny.

Most of the measures NMFS recites as supporting its claim to have already reduced

bluefin bycatch to the extent "practicable" do not addresses the killing of *spawning bluefin in the*

---

[12]  In contrast, the cases relied upon by NMFS address its unrelated defense of the model and its unsubstantiated assertion that the Plaintiffs failed to show that the model was not based on the best scientific information available. NMFS Br. at 32 (*citing, e.g., Midwater Trawlers Coop. v. Dep't of Commerce*, 393 F. 3d 994 (9th Cir. 2004) and *Oregon Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1120 (9th Cir. 2006)). These cases simply do not address the failure by NMFS to explain the model.

*Gulf of Mexico* either as incidental catch or as bycatch. *See* NMFS Br. at 33. Thus, for example, the closures of two areas *in the Atlantic Ocean* do not address this problem. Nor do the use of "retention limits" and "minimum size limits" do anything to reduce or minimize bluefin bycatch – to the contrary, such limits actually encourage discards when fishermen catch bluefin that are either too small or that add to the number already caught.[13]

Moreover, NMFS rejected the one sure method for complying with National Standard Nine when it declined to adopt a "bycatch cap" system, under which the bluefin fishery and other HMS fisheries would be closed when the number of discards reached a certain amount. *See* NMFS Br. at 33-34. It now defends that decision by suggesting that it must be afforded "flexibility" to assess the effect of such a system on all HMS, and asserts that it cannot implement a bycatch cap because such a system might require it to close more than one area to fishing. *Id.* For the reasons explained above, this argument fails because it ignores the fundamental conservation requirement of National Standard One.[14] Indeed, the argument directly contravenes the central conservation purpose of the MSA by using the refusal to minimize bycatch and prevent overfishing and rebuilding of other overfished HMS as an excuse for the NMFS failure to protect the bluefin.

---

[13]    NMFS compounded its error by failing to adopt a standardized bycatch reporting methodology. It argues that it has complied with this requirement by looking at bycatch data from logbooks, observer reports, and surveys of fishermen. NMFS Br. at 34-35. However, logbooks are not effective in estimating true bycatch. *See Oceana, Inc. v. Evans*, 2005 WL 555416, *37 (D.D.C. Mar. 9, 2005) (describing logbook reporting as "notoriously inaccurate").

[14] Unlike National Standard One, which unqualifiedly orders NMFS to prevent overfishing, National Standard Nine requires that NMFS pursue conservation measures for bycatch "to the extent practicable." 16 U.S.C. § 1851(a)(9). But NMFS makes no showing that it would be impractical to impose bycatch caps on other overfished HMS (such as sailfish and sharks) in order to prevent overfishing. Accordingly, its argument fails to demonstrate compliance with either National Standard One or National Standard Nine.

III.    **NMFS VIOLATED THE NATIONAL ENVIRONMENTAL POLICY ACT BY
        FAILING TO CLOSELY EVALUATE THE EFFECTS OF ITS DECISION ON
        THE PLAINTIFFS' PETITION TO PROTECT SPAWNING BLUEFIN**

NMFS wrongly asserts that it must merely establish that it acted "in good faith" in

compiling the EIS that accompanied the 2006 HMS FMP.  NMFS Br. at 36.  But NEPA requires

that NMFS take a "hard look" at the environmental consequences of its actions.  *Kleppe v. Sierra*

*Club*, 427 U.S. 390, 410 n. 21 (1976).  This "hard look" must include "a *thorough investigation*

*into the environmental impacts* of an agency's action and a candid acknowledgment of the risks

that those impacts entail."  *National Audubon Society v. Department of the Navy*, 422 F. 3d 174,

185 (4th Cir. 2005) (emphasis added) (*citing Robertson v Methow Valley Citizens Council,* 490

U.S. 332, 350 (1989) (agencies must adequately identify and evaluate the adverse environmental

effects of the proposed action).

NMFS claims that it satisfied NEPA by adequately analyzing the impacts of the closure

proposed by the Plaintiffs, by evaluating the effects of alternatives to that closure, and by

assessing the cumulative effects of denying the Plaintiffs' petition.  NMFS Br. at 36-42.  But its

discussion does not address its failure to analyze such vital questions as the importance of

spawning bluefin to the overall population.  Moreover, it repeatedly mistakes the mere mention

of an issue with an analysis of that issue.  Finally, it ignores the NEPA requirement to provide a

cogent explanation of the impacts *on bluefin* of its final decision.

NMFS first misses the mark by claiming that it "squarely address[ed]" the issue of

bluefin bycatch in the Gulf of Mexico.  NMFS Br. at 36.  But the issue NMFS did <u>not</u> address

was the importance of the fact that the bluefin killed in the Gulf, both as incidental catch and as

bycatch, are spawning fish.  *See* Pl. Br. at 18-23, 41-42.  This failure to consider a highly

significant aspect of its action violates the basic NEPA requirement to closely analyze the

impacts of its decision to deny the Plaintiffs' petition. *See Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) (NEPA requires agencies "to *consider every significant aspect* of the environmental impact of the proposed action") (emphasis added).

NMFS further claims that it "specifically evaluated" discards of bluefin "in the Gulf of Mexico from 2001-2003." NMFS Br. at 37. But in support of this claim, it cites only a figure that sets out a list of numbers; there is no "evaluation" here. Similarly, it cites a series of tables in support of its claim to have "compared the impacts of maintaining the status quo to the impacts of implementing the closure proposed in the Plaintiffs' petition." *Id.* at 37-38. A mere compilation of tables does not constitute an analysis. *See Missouri Pub. Serv. Comm'n,* 234 F.3d at 41 ("A passing reference to relevant factors . . . is not sufficient to satisfy the Commision's obligation to carry out 'reasoned' and 'principled' decisionmaking."). Moreover, this "comparison" suffers from the same fundamental defect as its "assessment" of bluefin bycatch in the Gulf – it again ignores the fact that the bycatch and incidental catch in the Gulf is of spawning bluefin. The same flaw undermines the NMFS claim that it "examined the impact of Plaintiffs' proposed closure on incidental catch of bluefin…." NMFS Br. at 38. Because it does not account for the unique value of spawners to the population, the NMFS approach remains deficient. *See* Pl. Br. at 18-23.

NMFS relies upon two curious assertions in defense of its analysis of alternatives to the Plaintiffs' petition. First, it claims that its analysis of alternatives is sufficient because the public filed comments on that analysis. NMFS Br. at 39. But the fact that the public filed comments hardly proves that the EIS discussion of alternatives was either clear or sufficient. Second, it asserts that it "properly defined" the no action alternative, and then concludes, without more, that its "selection of the no action alternative requires no further elaboration." NMFS Br. at 39.

However, "defining" an alternative provides no indication how NMFS actually selected the alternative. Thus, this assertion simply ignores settled NEPA law, which establishes the analysis and selection of alternatives as the "linchpin" of the EIS process. *Alaska v. Andrus,* 580 F. 2d 465, 474 (D.C. Cir. 1978), *vacated in part as moot*, 439 U.S. 922 (1978); *see also Nevada v. DOE*, 457 F.3d 78, (D.C. Cir. 2006) ("At the 'heart of the environmental impact statement' is the requirement that an agency 'rigorously explore and objectively evaluate' the projected environmental impacts of all 'reasonable alternatives' to the proposed action.") (quoting 40 C.F.R. § 1502.14); *Pit River Tribe v. USFS*, 469 F.3d 768, 785 (9th Cir. 2006) (same).

NMFS demonstrates a similar misunderstanding of NEPA when it dismisses as "fly-specking" the Plaintiffs' request for an explanation of the agency's closure analysis and its related assertion that it cannot value one species over another.  NMFS Br. at 40.  The closure analysis is the core basis for the NMFS decision to reject the petition, and the unexplained NMFS assertion that it cannot value one species over another is a key part of that decision. Absent any explanation for those determinations, the EIS simply cannot be said to have taken a "hard look" at the effects of its decision.  *See, e.g.*, *Robertson v Methow Valley,* 490 U.S. 332, 350 (1989) (NEPA requires the agency "to consider every significant aspect of the environmental impact of the proposed action" and "to inform the public that it has indeed considered environmental concerns in its decisionmaking process"); *National Audubon Society*, 422 F. 3d at 185 (4th Cir. 2005) (agency must thoroughly investigate and candidly evaluate the impacts of its actions).

Finally, NMFS does not deny that it failed to analyze the cumulative impacts on the bluefin population of denying the Plaintiffs' petition.  *See* NMFS Br. at 41.  Instead, it claims only that it was "reasonable" to address cumulative impacts "with respect to the FMP as a whole,

rather than on a species-by-species basis." *Id.* But the "action" requested by the Plaintiffs' petition was directed solely at protecting bluefin, and the action NMFS was proposing at the time it prepared the EIS was to deny that petition. NEPA requires that an EIS evaluate "the environmental impact *of the proposed action*." 42 U.S.C. § 4332(2)(C)(i) (emphasis added); *see* 40 C.F.R. § 1502.2(g). It is, therefore, fundamental that an EIS must assess the effects of the action being proposed – rather than some other action – in order to comply with NEPA. *See Robertson,* 490 U.S. at 350 (1989) (NEPA requires the agency "to consider every significant aspect of the environmental impact *of the proposed action*") (emphasis added).

NEPA requires, therefore, that NMFS look closely at the environmental impacts of granting or denying the Plaintiffs' petition with respect to the bluefin; it does not allow NMFS to duck the responsibility to closely evaluate the cumulative impacts *on the bluefin* of denying the Plaintiffs' petition by looking instead only at all HMS. *See, e.g.*, *Kern v. U.S. Bureau of Land Management*, 284 F. 3d 1062, 1075 (9th Cir. 2002) (cumulative impact analysis "must be more than perfunctory"); *Muckleshoot Indian Tribe v. US Forest Service*, 177 F.3d 800, 810 (9th Cir. 1999) (agency must describe cumulative impacts in detail). This is precisely what NMFS did. Unlike its analysis in connection with the 1999 HMS FMP, nowhere in the 2006 EIS does NMFS analyze either the benefits or the detriments for the bluefin population of its decision on the Plaintiffs' petition. It simply does not analyze the effects of either protecting spawning bluefin, or allowing hundreds of them to die. This failure by NMFS renders meaningless the requirement of NEPA and implementing regulations to analyze the direct effects of the decision in question.

## IV.     THE IMMEDIATE INJUNCTIVE REMEDY SOUGHT BY THE PLAINTIFFS IS NECESSARY TO PREVENT IRREPARABLE INJURY

NMFS wrongly argues that the Court should deny the Plaintiffs' request for an injunction ordering NMFS to promulgate an emergency rule that prohibits longline fishing in the Gulf of

Mexico in the bluefin spawning area during spawning season, asserting that such an injunction would "exceed the Court's jurisdiction" and that it would be impractical. NMFS Br. at 42.

The Plaintiffs have demonstrated that they will be irreparably injured if the Court does not require NMFS to halt longlining before the bluefin spawning season commences this spring. Absent such injunctive relief, the Plaintiffs estimate that between 100 and 200 spawning bluefin will be killed in the Gulf of Mexico before the end of June. *See* Safina Decl. (Ex. B. to Pl. Br.) ¶¶ 9-13, 20.[15] Where irreparable environmental injury is "sufficiently likely . . . the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).

As for the question of the Court's jurisdiction to order relief, no rule of law limits the equitable power of this Court to prevent imminent irreparable injury to the Plaintiffs. *See Indiana & Michigan Electric Co. v. FPC*, 502 F.2d 336, 346 (D.C. Cir. 1974) ("[W]hile the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action."); *NAACP v. Secretary of Housing and Urban Devel.*, 817 F.2d 149, 160 (1st Cir. 1987) (court finding illegal agency action may "tailor its remedy to the occasion.").

None of the cases cited by NMFS present facts where there was a showing of imminent harm. Moreover, this Circuit and other courts have often entered orders directing agencies to promulgate regulations within a time certain in order to prevent ongoing harm. In one recent

---

[15] NMFS suggests that the Court should disregard the Safina Declaration, NMFS Br. at 9 n. 4, but this is clearly wrong. The Safina declaration is pertinent to this Court's remedy deliberations. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-312 (1982) ("the traditional function of equity has been to arrive at a 'nice adjustment and reconciliation' between the competing claims" of injury). Indeed, NMFS itself takes the view that materials outside the administrative record are appropriately considered in the context of the injunctive remedy plaintiffs seek in this case. NMFS Br. at 44-45 and n. 13. NMFS cannot have it both ways. Since the agency agrees that extra-record evidence is appropriately considered in the remedy context, it cannot credibly argue that the Court should disregard the Safina Declaration that addresses the underlying harm necessitating the remedy.

case, for example, the court ordered NMFS to revise an FMP rebuilding plan by·a date certain. *Coastal Conservation Ass'n. v. Gutierrez,* 512 F. Supp. 2d 896, 901-02 (S.D. Tex. 2007). *See also, Natural Resources Defense Council v. Reilly,* 983 F.2d 259, 261 (D.C. Cir. 1993)(ordering promulgation of regulations); *Environmental Defense Fund v. EPA*, 852 F.2d 1316, 1331 (D.C. Cir. 1988) (setting deadline for action on remand because of "EPA's history of delay and missed deadlines"); *Sierra Club v. EPA*, 719 F.2d 436, 469-70 (D.C. Cir. 1983)(setting timetable for action on remand in light of history of regulatory delays). As shown by the alarming situation facing the bluefin, this case presents a clear example of exigent circumstances that allow the use of the Court's equitable powers to fashion an immediate protective remedy.

## CONCLUSION

For these reasons, the Plaintiffs oppose the NMFS cross motion for summary judgment and respectfully request this Court to grant the Plaintiffs' summary judgment motion. Plaintiffs further request the opportunity for oral argument on their motion at the earliest opportunity.

DATED this 7th day of January, 2008.

Respectfully submitted,

STEPHEN E. ROADY
D.C. Bar. No. 926477
JENNIFER C. CHAVEZ
D.C. Bar No. 493421
Earthjustice
1625 Massachusetts Avenue, N.W.
Washington, D.C. 20036
202-667-4500 Telephone
202-667-2356 Fax

Attorneys for the Plaintiffs

25

# Final Fishery Management Plan

# For

# Atlantic Tuna,

# Swordfish,

# and Sharks

## April 1999

Including
the Revised Final Environmental Impact Statement,
the Final Regulatory Impact Review,
the Final Regulatory Flexibility Analysis,
and the Final Social Impact Assessment

Prepared by the
Highly Migratory Species Management Division,
Office of Sustainable Fisheries,
National Marine Fisheries Service
Silver Spring, Maryland

# TABLE OF CONTENTS

**VOLUME 1**

**Executive Summary**

**Chapter 1:  Introduction**

1.1    Purpose and Need
      1.1.1    The HMS Process and History
      1.1.2    Issues/Problems for Resolution
      1.1.3    Domestic Considerations
      1.1.4    International Considerations
      1.1.5    Objectives
1.2    Conservation and Management Measures
1.3    Management Units
1.4    Scientific Data and Research Needs
1.5    Development of Fishery Resources
1.6    Total Allowable Level of Foreign Fishing
1.7    Relationship to International Agreements, Applicable Laws, and Other Fishery Management Plans
      1.7.1    ICCAT and its relationship to ATCA and the Magnuson-Stevens Act
      1.7.2    The United Nations Agreement on Straddling Fish Stocks and HMS
      1.7.3    Other Fishery Management Plans
      1.7.4    Relationship of this FMP to Existing HMS Management Measures
      1.7.5    Paperwork Reduction Act
      1.7.6    Coastal Zone Management
      1.7.7    Endangered Species Act
      1.7.8    Marine Mammal Protection Act
      1.7.9    Federalism
      1.7.10    Executive Order 12866 (E.O. 12866)
1.8    What's in the HMS FMP
1.9    Relationship of the HMS FMP to the Magnuson-Stevens Act Requirements
1.10    List of Preparers
1.11    List of Agencies and Organizations Consulted

**Chapter 2:  Description of HMS Fisheries**

2.1    An Introduction to HMS Quotas, Total Allowable Catches, and Discards
2.2    Atlantic Tunas
      2.2.1    Life History and Status of the Stocks:  Atlantic Tunas
      2.2.2    International Aspects of the Atlantic Tuna Fishery
      2.2.3    Domestic Aspects of the Atlantic Tuna Fishery
      2.2.4    Social and Economic Aspects of the Domestic Atlantic Tuna Fishery
            2.2.4.1    Bluefin Tuna
            2.2.4.2    BAYS Tunas
2.3    Atlantic Swordfish
      2.3.1    Life History and Status of the Stocks
      2.3.2    International Aspects of the Atlantic Swordfish Fishery
      2.3.3    Domestic Aspects of the Atlantic Swordfish Fishery
      2.3.4    Social and Economic Aspects of the Domestic Atlantic Swordfish Fishery

2.4   Atlantic Sharks
    2.4.1   Life History and Status of the Stocks
        2.4.1.1   Status of the Stocks
        2.4.1.2   Status of the Stocks - Small Coastal Sharks
        2.4.1.3   Status of the Stocks - Pelagic Sharks
    2.4.2   International Aspects of the Atlantic Shark Fisheries
    2.4.3   Domestic Aspects of the Atlantic Shark Fisheries
    2.4.4   Social and Economic Aspects of the Domestic Atlantic Shark Fisheries
2.5   HMS Gear Types
    2.5.1   Pelagic Longlines
    2.5.2   Bottom Longlines
    2.5.3   Atlantic Pelagic Driftnets
    2.5.4   Atlantic Coastal Driftnets
    2.5.5   Southeast Shark Drift Gillnets
    2.5.6   Sink Gillnets
    2.5.7   Purse Seines
    2.5.8   Handgear (Rod and Reel, Handline and Harpoon)
2.6   Current Permitting, Reporting, Data Collection Requirements and Fisheries Monitoring
    2.6.1   Monitoring and Reporting in the Commercial Fishery
    2.6.2   Monitoring and Reporting in the Recreational Fishery
    2.6.3   Other Data Collection Programs
2.7   Existing Time/Area Closures under MMPA and Other Laws


**Chapter 3:  Rebuilding and Maintaining HMS Fisheries**

3.1   Management Under National Standard 1: The Maximum Sustainable Yield Control Rule
    3.1.1   The Maximum Fishing Mortality Threshold
    3.1.2   The Minimum Stock Size Threshold
3.2   Overfished Stocks: Managing for Recovery
    3.2.1   Biomass Target During Rebuilding
    3.2.2   Recovery Period:  The Rebuilding Trajectory
    3.2.3   Target Control Rule During Rebuilding
3.3   Healthy Stocks:  Managing for $F_{OY}$
    3.3.1   Target Control Rule for Healthy Stocks
    3.3.2   Biomass Approaching Overfished Designation: the Minimum Biomass Flag
3.4   Management Measures for Directed Fishing
    3.4.1   Quota Alternatives
        3.4.1.1   Atlantic Tunas
            3.4.1.1.1   Bluefin Tuna Quota Alternatives
            3.4.1.1.2   Bluefin Tuna Domestic Allocation
            3.4.1.1.3   Bluefin Tuna Quota Transfer Criteria
            3.4.1.1.4   Bigeye Tuna Quota Alternatives
        3.4.1.2   North Atlantic Swordfish
            3.4.1.2.1   North Atlantic Swordfish Quota Alternatives
            3.4.1.2.2   Swordfish Domestic Allocation
        3.4.1.3   Atlantic Sharks
            3.4.1.3.1   Commercial Quota Alternatives for Large Coastal Sharks
            3.4.1.3.2   Pelagic Sharks Commercial Quota Alternatives
            3.4.1.3.3   Small Coastal Sharks Commercial Quota Alternatives
            3.4.1.3.4   Fishery Operations
            3.4.1.3.5   Overharvest/Underharvest Adjustments
            3.4.1.3.6   Public Display and Scientific Quota

3.4.2    Effort Controls, Retention Limits, and Other Management  Measures
    3.4.2.1   Atlantic Tunas
        3.4.2.1.1    Bluefin Tuna Effort Controls
        3.4.2.1.2    Bluefin Tuna Recreational Retention Limits
        3.4.2.1.3    Bluefin Tuna Size Limits
        3.4.2.1.4    Yellowfin Tuna Size Limits
        3.4.2.1.5    Yellowfin Tuna Recreational Retention Limits
        3.4.2.1.6    Bigeye Tuna Size Limits
    3.4.2.2   North Atlantic - Swordfish Rebuilding
        3.4.2.2.1    Swordfish Size Limits
        3.4.2.2.2    Swordfish Retention Limits
    3.4.2.3   Atlantic Sharks
        3.4.2.3.1    Prohibited Species
        3.4.2.3.2    Shark Recreational Retention and Size Limits
        3.4.2.3.3    Recreational Landing Condition for Sharks
        3.4.2.3.4    Prohibition on Finning of Sharks
        3.4.2.3.5    Directed Large Coastal Shark Commercial Retention Limit
3.4.3    Authorized Gears
    3.4.3.1   Atlantic Tunas
3.4.4    Fishing Year
3.5    A Strategy for Bycatch Reduction in HMS Fisheries
3.5.1    Introduction
    3.5.1.1   Bycatch Reduction and The Magnuson-Stevens Act
    3.5.1.2   Bycatch Reduction and the Marine Mammal Protection Act
    3.5.1.3   Bycatch Reduction and the Endangered Species Act
3.5.2    Evaluation and Monitoring of Bycatch
    3.5.2.1   Bycatch of HMS in All Fisheries
    3.5.2.2   Finfish Bycatch in HMS Fisheries
    3.5.2.3   Marine Mammal Bycatch in HMS Fisheries
    3.5.2.4   Sea Turtle Bycatch in HMS Fisheries
    3.5.2.5   Sea Bird Bycatch in HMS Fisheries
    3.5.2.6   Summary of Bycatch Issues
3.5.3     Management Measures to Address Bycatch Problems
    3.5.4.1   Reducing HMS Bycatch and Bycatch Mortality
        3.5.4.1.1    Bluefin Tuna
        3.5.4.1.2    Swordfish Bycatch Reduction Measures
        3.4.4.1.3    Sharks
        3.5.4.1.4    Billfish
        3.5.4.1.5    General Bycatch Reduction Measures
    3.5.4.2   Reducing Protected Species Bycatch and Bycatch Mortality
3.5.4    A Strategy for Future Bycatch Reduction
3.6    Interim Milestones (During Recovery)
3.7    Uncertainty Issues
3.8    Monitoring, Permitting and Reporting
3.8.1    Introduction
3.8.2    Monitoring, Permitting and Reporting Measures
3.9    Safety of Human Life At Sea
3.9.1    Fishery Access and Weather-Related Vessel Safety
3.9.2    Procedures for Consideration of Management Adjustments
3.9.3    Other Safety Issues
3.10    Ongoing Management
3.10.1    An Introduction to FMP amendments and Frameworks
3.10.2    Stock Assessment and Fishery Evaluation Report
3.10.3    Advisory Panel and Continuing Fishery Management
3.10.4    Procedure for Adjusting the Management Measures

3.10.5  Shark Operations Team

**Chapter 4: Limited Access**

4.1  Background
4.2  Purpose and Need for Action
4.3  Limitations on Access
4.4  Limitations on Number of Permitted Vessels
4.5  Initial Permit Issuance
    4.5.1  Permit Eligibility Period - Historic
    4.5.2  Landings Eligibility Period
    4.5.3  Permit Eligibility Period - Recent
    4.5.4  Directed Landings Thresholds
    4.5.5  Incidental Landings Threshold
    4.5.6  Swordfish Handgear
    4.5.7  BAYS Tuna Fishery
    4.5.8  Appeals
        4.5.8.1  Process
        4.5.8.2  Hardship
    4.5.9  Exemptions
4.6  Harvest Limits
    4.6.1  Limits for Swordfish Directed Permit Holders During Directed Fishery Closures
    4.6.2  Limits for Incidental Limited Access Permit Holders
4.7  Transferability of Permits
    4.7.1  Transferability Restrictions
    4.7.2  Upgrading Restrictions
    4.7.3  Ownership Restrictions
4.8  Environmental Consequences
    4.8.1  Number of Permit Categories
    4.8.2  Limits the Number of Vessels Permitted
    4.8.3  Eligibility to Participate in the Directed and Incidental Fisheries
    4.8.4  Appeals Process
    4.8.5  Transferability Restrictions
    4.8.6  Upgrading Restrictions
    4.8.7  Ownership Restrictions
    4.8.8  Harvest Limits
    4.8.9  Impacts on Marine Mammal and Endangered Species
    4.8.10  Mitigating Measures
    4.8.11  Unavoidable Adverse Impacts
    4.8.12  Irreversible and Irretrievable Commitment of Resources

**VOLUME II**

**Chapter 5:  HMS Habitat Provisions**

5.1  Introduction
5.2  Regulatory Requirements
    5.2.1  Description and Identification of EFH
    5.2.2  Fishing Activities That May Adversely Affect EFH
    5.2.3  Non-Fishing Activities That May Adversely Affect EFH and Respective Conservation Measures
    5.2.4  Cumulative Impacts Analysis
    5.2.5  Habitat Areas of Particular Concern
    5.2.6  Research and Information Needs

### 3.5.3     Management Measures to Address Bycatch Problems

#### 3.5.4.1   Reducing HMS Bycatch and Bycatch Mortality

##### 3.5.4.1.1   Bluefin Tuna

It is the intent of this FMP to reduce the incidental catch of bluefin tuna on gears that are not authorized to take bluefin.  However, it is also the intent to reduce waste of unavoidably caught bycatch.  See Section 3.5.2.1 for a description of bluefin tuna bycatch.  Recently, NMFS has begun to collect and analyze discard data from other gear types.  However, it is important to recognize that when comparing past estimates of dead discards reported to ICCAT to future estimates for detecting trends, the past estimates have, for the most part, only included dead discards from pelagic longlines.  Therefore, it would be inappropriate to conclude that dead discards have not changed if the total estimate of dead discards were to remain at the same level, when the new estimate may include additional gear types.  Refer to Table 3.48 for a summary of reported dead discards, quotas and landings of bluefin tuna for 1992 through 1997, as reported to ICCAT in the 1997 and 1998 National Reports of the United States to ICCAT.

During the 1980 winter/spring longline fishery for bluefin tuna in the Gulf of Mexico, a number of U.S. longline vessels fishing for swordfish began to land increasing quantities of giant bluefin tuna.  NMFS was concerned that without immediate action there could be substantial investment in fishing gear and processing facilities by the U.S. industry in developing a directed longline fishery for bluefin tuna in the Gulf of Mexico, a known spawning area for bluefin tuna.  There was also concern that under the regulations at the time, longline catches could severely and negatively impact the other fisheries in the Gulf of Mexico and mid-Atlantic areas.  As a result of these concerns, NMFS published a final rule dated January 26, 1981 (46 FR 8012), which prohibited the use of longlines in a directed bluefin tuna fishery, prohibited a targeted bluefin tuna fishery in the Gulf of Mexico, implemented an incidental catch limit of bluefin tuna, and established two management areas north and south of 36° N where different catch limits would apply.  South of 36° N, longline fishermen were restricted to two fish per vessel per trip, whereas north of 36° N, they were restricted to two percent by weight of all other fish on board at the end of the fishing trip.

In 1982, ICCAT recommended a ban on directed fishing for bluefin tuna in the Gulf of Mexico to protect the spawning stock.  This action primarily impacted Japanese longline fishermen in the area, as U.S. longline gear had already been prohibited from targeting bluefin tuna in the Gulf of Mexico.  However, concern remained over the adequacy of the incidental catch limits, particularly regarding the efficiency of the restriction at reducing bycatch and discards of bluefin tuna.  NMFS' examination of available longline fishery data regarding discarded bluefin tuna in the

Gulf of Mexico revealed that more than 80 percent of those bluefin tuna released were dead.

On January 6, 1992 (57 FR 365), NMFS determined that the incidental catch limit in the south was not effective at reducing bluefin tuna bycatch and changed the restriction for this area. Until that time, the bycatch restriction of up to two bluefin tuna per trip, without any requirement that the bluefin tuna be landed in conjunction with other species, and the short distance from shore to the fishing grounds, made it feasible for vessels to direct their fishing on bluefin tuna, despite the retention limit. As this activity ran counter to the intent to prohibit directed fishing of bluefin tuna by longline gear the final regulations required longline vessels operating in the southern area (south of 36° N) to land, offload and sell at least 2,500 pounds of other species as a condition for landing a maximum of one bluefin tuna. After this action, NMFS received several comments indicating that the new bycatch restriction in the southern area caused an increase in bluefin tuna discards and waste. NMFS conducted scoping meetings on this issue and examined several options that included: 1) requiring special gear; 2) requiring a minimum number of days between a vessel's landings; and 3) review the minimum target catch requirements. Recommendations also included prohibiting bluefin tuna catches in the Gulf of Mexico or, conversely, working through ICCAT to rescind the prohibition and allow limited directed fishing.

On January 19, 1994 (59 FR 2814) NMFS proposed to amend the minimum landing requirements that changed by time of year. At that time NMFS maintained that it was possible to conduct directed fishing on species other than bluefin tuna, with only a limited amount of bluefin tuna catch. However, NMFS also stated in this *Federal Register* notice that "if evidence indicates this is not true, NMFS may consider more stringent measures, such as area or season closures or gear restrictions, in future rulemaking." On April 14, 1994 (59 FR 17723) NMFS published a final rule that changed the directed fishery minimum weight requirement on landing one bluefin tuna, for the southern area only, from at least 2,500 pounds to 1,500 pounds during the months from January to April, and to 3,500 pounds from May through December. Catch restrictions remained the same for the northern area.

At the same time as NMFS modified the landings requirements, NMFS also modified the geographic separation between the northern and southern management areas by adjusting the dividing boundary south to 34° N (59 FR 17723, April 14, 1994). This was primarily because the previous location at 36° N was located in a particularly dynamic oceanographic area where vessels fishing on one side of the line may find themselves transported by currents to the other side. This division line adjustment prompted comments regarding division of quota and specification of landings requirements affecting the northern and southern subcategories of the incidental longline category.

*Chapter 3 - Strategy for Bycatch Reduction - 228*

In addition, NMFS received numerous written comments that the landings requirements applicable in the northern area cannot be met by vessels in the shark longline fisheries operating off of North Carolina in the winter months, due to the retention limits in effect under the shark fishery management plan. Participants in this winter shark fishery have noted that the bluefin tuna and shark regulations, taken together, force discarding of bluefin tuna, e.g., the 4,000-mt dw LCS retention limit allows retention of only 80 lb ww of bluefin tuna. These fishermen requested an allowance to land and market fish that would otherwise be discarded dead, thus increasing boat revenues without contributing to additional bluefin tuna mortality. Also, despite these ongoing efforts to reduce discards by changing target catch requirements and geographic areas, U.S. bluefin tuna dead discards increased in 1995 to a total of approximately 142 mt (U.S. National Report to ICCAT, 1997).

In response to these comments, and the relatively high number of discards reported to ICCAT, NMFS undertook a review of the bluefin tuna incidental catch regulations, including division of the quotas, position of the dividing line between the northern and southern  subcategories, and landing criteria applicable to each management area. Observer data from longline trips taken from 1991 to 1994 indicated that two or fewer bluefin tuna were hooked on 91 percent of all observed trips. NMFS also analyzed landings information to determine trends in landings by time and area. NMFS published the results of its review in an Advanced Notice of Proposed Rulemaking (ANPR), published on September 17, 1996, (61 FR 48876).

The ANPR requested public comments on possible changes to the regulations to reduce incidental mortality of bluefin tuna while allowing for commercial use of unavoidable bycatch. Various proposals were presented and several public comments were received during the comment period on the ANPR. Many of the proposals called for various changes to the catch limits and/or moving the dividing line between management areas while other comments raised concern over providing an incentive for a directed fishery and advocated use of time/area closures to address the problem of discards.

In response to the 1996 ICCAT recommendation that called for the United States to adopt measures designed to reduce discards of bluefin tuna during 1997 and 1998, and since publication of the ANPR and receipt of comments, NMFS examined different options for reducing dead discards. NMFS considered a variety of options, including changing the current target weight requirement, limiting the number of days per trip, and implementing time/area closures. Logbook and dealer weighout slips from 1991 through 1995 were collected, and initial results indicated significant differences between the number of bluefin tuna caught and discarded per trip by season and region.

Analyses of bluefin tuna discard data continued through 1998, the preliminary results of which were presented to the HMS and Billfish APs in March and July

1998.  The 1998 ICCAT Recommendation on west Atlantic bluefin tuna requires that all Contracting Parties, including the United States, minimize dead discards of bluefin tuna to the extent practicable.  The Recommendation also established a 79-mt allowance for dead discards for the west Atlantic, of which the United States was allocated 68 mt.  If a country has dead discards in excess of their allowance, they must be counted against that country's landing quota for the following year.  If there are fewer dead discards, then half of the underharvest may be added to the following year's quota while the other half is conserved.  For any of the following alternatives, if NMFS determines that the United States' annual dead discard allowance has been exceeded, NMFS would subtract the amount in excess of the allowance from the total amount of bluefin tuna that can be landed.  If NMFS determines that the annual dead discard allowance has not been reached, NMFS may add one half of the remainder to the total amount of bluefin tuna that can be landed.

Other measures adopted by NMFS in the FMP (e.g., prohibiting driftnets for Atlantic tunas other than bluefin, limited access for sharks and swordfish, and reduced quotas for sharks and swordfish) may contribute to reducing dead discards of bluefin tuna.  In addition, the recent final rule issued by NMFS prohibiting the use of driftnets for swordfish may contribute to the reduction of bluefin tuna discards.

**Final Action:    Closure of area to pelagic longline fishing in June**

This action implements a prohibition of the use of pelagic longlines in the Northwestern Atlantic from 39 to 40° N and 68 to 74° W during June (See Figure 3.5.1).  NMFS chose this alternative after the completion of analyses on nine different time area closure options on logbook data ranging from 1992 through 1997 (see Appendix 6).  This is different from the preferred alterative published in the bluefin tuna Addendum, which called for the closed area to be from 37 to 41° N and 70 to 74° W.  Comments from the longline industry stated that there was little interaction with bluefin tuna in the southern half of the proposed area.  After re-examination of the logbook data, a discrepancy was found with the original analysis, and new analyses show that an equivalent reduction in discards can be achieved by closing a smaller area that is consistent with requests from the longline industry.

**Figure 3.8**    Time/Area closure to reduce discards of bluefin tuna in the pelagic longline fishery.



The challenge of time/area closures is to determine times and areas that will effectively meet the goal of minimizing bluefin tuna dead discards while having the least impact on the directed fisheries over a long period of time. It may be necessary, based on physical oceanographic data, to change the timing and location of the closure from year to year or from month to month. However, it would be difficult to accurately identify areas and times and implement closures that change from year to year. Therefore, a wide range of options was considered. Temporal closure alternatives extended from a monthly closure to a year-round closure. Spatial alternatives extended from two by two degree squares to an eight by four degree rectangle. Analyses of logbook data indicate that: 1) at certain times of the year, high levels of discards (dead and alive) can be expected in particular areas; 2) only a few sets catch large numbers of bluefin tuna; and, 3) the location and timing of these discards vary over time and space. This fluctuation in time and space may be due to the variability of the natural environment, particularly the location of the northern edge of the Gulf Stream. A more detailed description of the analyses performed, the results, and a discussion of the rationale for adopting this alternative can be found in Appendix 6.

*Ecological Impacts*

The action will have direct positive ecological impacts on bluefin tuna by prohibiting longline activity in a one by six degree area during the month of June where a high number of bluefin tuna discards have been reported. This time/area closure is predicted to reduce total U.S. discards of bluefin tuna by longline vessels

by approximately 55 percent within the entire area and thus reduce fishing mortality of bluefin tuna (Appendix 6)[3]. This may have a positive impact on bluefin tuna and assist with other ongoing efforts to rebuild this fishery. The analysis of this time/area combination includes an accounting of the indirect effects of displaced effort to areas outside the closed area in June. Results show that the increased effort in adjacent areas is predicted to cause a slight increase in the rate of bluefin tuna discards in these new areas, although overall it is predicted that discards will significantly decrease. The impact on target fisheries such as swordfish, tunas other than bluefin, and sharks is difficult to ascertain. Appendix 6 provides an analysis of estimated catch rates of other species if vessels displace to areas adjacent to the study area. These analyses predict that landings of tuna (other than bluefin) might decrease on the order of two percent, whereas landings of other target species might actually increase. Since the swordfish and shark fisheries are managed under a quota, it can be assumed that the fishery would continue until the quota is reached, albeit in different areas. Thus it is possible that there would be no net change in the overall impact to swordfish or shark stocks. It is possible, however, that movement of the vessels away from the time/area closures may mean that different size classes of swordfish or sharks are caught. Swordfish is classified as overfished, and a minimum size of 29 inches CK (or 33 pounds dressed weight) is in place to protect small fish. Large coastal sharks are also classified as overfished. This FMP implements a minimum size of 4.5 feet fork length on ridgeback sharks. There are no commercial minimum sizes established for other shark species. There are no quotas on the other tunas, although there is a minimum size on yellowfin and bigeye tuna of 27 inches CFL.

The closure of certain areas and times to reduce discards of bluefin tuna may have an impact on species such as marine mammals, turtles, and seabirds that are distributed throughout the study area. Observer and logbook data indicate pelagic longline interactions with these protected species, particularly sea turtles. Closure of the proposed areas to the longline fleet could have a positive impact on these species by removing the potential for interaction with longline gear. However, as it is possible that longline fishing activities will be displaced to other areas, any benefits accrued in the closed area may be offset by increased interactions in the new areas fished. The displacement model predicts that if vessels are displaced from the one by six degree area in June, then landings of turtles could either increase by eight percent or decrease by six percent relative to the status quo depending on the year in question (Appendix 6). These results are variable because of the low interaction rate of this gear with turtles. Given the low level of interactions between this gear type and these protected species, the final action is not expected to have any significant impact on sea turtle stocks. The interaction between pelagic longline gear and marine mammals is significantly less than that for sea turtles (Johnson *et al.*, 1999).

---

[3] In 1997, the pelagic longline fleet discarded a total of 37.1 mt ww dead bluefin tuna in the Atlantic and Gulf of Mexico, 30.7 mt ww of which were discarded dead in the northwest Atlantic. If the anticipated 55 percent reduction in bluefin tuna discards in the northwest Atlantic is applied to the 1997 figures, NMFS estimates that the total amount bluefin tuna dead discards for the pelagic longline fleet in 1997 would have been 20 mt ww.

Thus, this final action is not expected to have any significant impact on marine mammal stocks.

Once implemented, NMFS will evaluate the efficacy of this closure in reducing bluefin tuna dead discards, given the distribution of bluefin tuna and the expected redistribution of fishing effort. NMFS will monitor impacts to the users of pelagic longline gear to determine what, if any, future action or modifications to the proposed time/area closure may be necessary. Such actions could be accomplished by regulatory amendment under the framework procedures of the HMS FMP.

*Social and Economic Impacts*

Although this time/area closure is expected to reduce the number of bluefin tuna discards in the longline fishery, it is not expected to have a significant impact on landings of target species such as sharks, swordfish, and other tunas. The predicted negative impact for this action is greater, however, than that predicted for the previously preferred four by four degree time/area closure. This is due to the fact that the selected closed area is one in which more concentrated longline fishing effort takes place. If fishermen decide to displace effort to other areas, fishing costs for fuel, bait, and ice may increase. In addition, travel time may increase. However, NMFS does not expect this possible increase in fishing costs for the short period of time of the closure to have a significant impact on small entities, especially since commenters asked for this smaller area. This time/area closure may also have an impact on entities such as seafood processors and tackle shops in that area. However, fishing effort will be displaced to other locations, NMFS does not believe that this action, given its short time-span, will adversely impact these communities.

There are potential concerns regarding the safety of human life at sea associated with a time/area closure in the north Atlantic during June. NMFS received comments that the initially proposed four by four degree closed area would force vessels to fish in, and travel through,  a dangerous area of the Gulf Stream. This was a particular concern for some of the smaller vessels which would have to travel a larger area even though the fuel capacity of their vessels would not increase. The modification of the closed area to the selected one by six degree area should mitigate some of these concerns especially since the selected one by six degree area does not include the dangerous area referred to in these comments.

Time/area closures can also be costly, difficult to administer, and difficult to enforce. Use of a vessel monitoring system (VMS) can reduce the substantial enforcement costs of a time/area closure. With the use of a well-designed VMS program, enforcement can be made more efficient without sacrificing effectiveness. Use of VMS can increase compliance with the closure and increase net revenues to fishermen by enabling the agency to monitor the real-time locations and, in some

cases, fishing patterns of many vessels at any time, thereby allowing otherwise prohibited activities. This FMP requires VMS on all pelagic longline vessels.

The design of the closed area has been chosen, in part, to assist with enforcement. Enforcement resources, in terms of overflights and at-sea patrols, would be necessary to ensure that longline fishing is not taking place in the closed area and time. Deployment of these assets could be combined with current operations and thus not incur any additional costs. This FMP requires VMS for all pelagic longline vessels, which should reduce any additional burden and mitigate enforcement operational costs. This would also allow longline vessels to transit the closed area. Other than the enforcement costs of monitoring the closed areas, there are not expected to be additional administrative costs from this option.

*Conclusion*

This final action will allow NMFS to minimize bluefin tuna dead discards while also minimizing the economic and social impacts on fishermen.

**Rejected Options for Reducing Bluefin Tuna Bycatch Mortality**

**Rejected Option:** No action (status quo)

U.S. reports to ICCAT show an increase in dead discards in the longline fishery between the years of 1995 and 1997. These dead discards were decreased from 141.6 mt in 1995 to 37.1 mt in 1997. Quota reductions for the fisheries in which bluefin tuna are bycatch (i.e., the swordfish quota was reduced by 30 percent from 1992-1998, and the large coastal shark quota by 50 percent in 1997), have affected overall longline discards of bluefin tuna particularly during closures of these fisheries. Thus, the status quo resulted in the incidental category landing fewer bluefin tuna than have been allowed in recent years. Subsequently, the remaining quota has been transferred from the Incidental category to other categories.

*Ecological Impacts*

Under this alternative, NMFS would not take any further action, beyond that proposed in the draft HMS FMP, to implement the ICCAT recommendation to minimize dead discards of bluefin tuna to the extent practicable. Thus, no additional ecological impacts would be expected from this alternative. Although recent NMFS actions impacting the longline fishery have had the additional effect of reducing bluefin tuna discards, no additional actions would be taken to reduce bluefin tuna discards. The reduction in quotas for other species targeted by pelagic longline vessels adopted in this FMP (swordfish and sharks), along with the limited access

system implemented for swordfish and sharks, however, may have the added effect of reducing dead discards of bluefin tuna.

Under status quo, fishing patterns would not be expected to change beyond what it would under the other preferred alternatives in the draft HMS FMP which affect the pelagic longline fishery,  and thus interactions with marine mammals and protected species would not be expected to change as a direct result of this alternative.  Currently, the longline fishery is classified as a Category I fishery under the MMPA.  Longline gear incidentally catches turtles as well as some seabirds and interacts with certain marine mammal species.

*Social and Economic Impacts*

Currently the USCG conducts routine overflights of the study area as part of enforcement and safety patrols.  NMFS Enforcement officers conduct enforcement operations throughout the study area.  NMFS Port Agents monitor dealer reports in the Northeast region and vessel trip reports are sent directly to NMFS in the Southeast Region for sharks and swordfish.  Fishing activity is not expected to change beyond what it would under the other final actions in the FMP that affect the pelagic longline fishery.  As such, no additional economic impacts would be expected as a direct result of this alternative.

*Conclusion*

Under this alternative, no additional action would be taken by NMFS to minimize bluefin tuna bycatch, beyond the other preferred alternatives in the draft HMS FMP which affect the pelagic longline fishery.  This alternative may not directly result in further bycatch reductions beyond those already achieved, but dead discards of bluefin tuna may decline due to other measures in the FMP or due to voluntary measures taken by the pelagic longline fleet.

**Rejected Option:**  Change catch limits

Under this alternative, target catch requirements to land a bluefin tuna would be modified in an effort to reduce discards in the longline fishery.  The catch limit could be made more restrictive to further reduce any incentive to target bluefin tuna and avoid areas and times of high bluefin tuna concentration.

Analyses of databases show no relationship between target catch and the number of bluefin tuna discarded. This is expected if the fishery is truly incidental.  Figures 3.7 and 3.8 indicate this lack of relationship between target catch and the number of bluefin tuna caught.  These figures are included at the request of many commenters.  Without any firm relationship between target catch and discard rate there is no basis

for modifying target catch regulations.  However, since data have been processed on a trip basis since 1996 only, future database analyses may provide guidance for a change in the target catch regulations.  NMFS will continue to work with the HMS AP to consider such analyses in the future.

**Figure 3.9**    Figure showing the relationship between the number of bluefin tuna caught versus the number of target fish caught per trip in 1996.  Each triangle or square indicates a trip in 1996 on which bluefin tuna were caught.



**Figure 3.10**    This is an enlarged view of the lower left hand corner of Figure 3.9.  Each triangle or square indicates a trip in 1996 on which a bluefin was caught.



**Figure 3.11**   Figure showing the relationship between the number of bluefin tuna caught versus the number of target fish caught per trip in 1997.  Each triangle or square indicates a trip in 1997on which a bluefin tuna was caught.



**Figure 3.12**   This is an enlarged view of the lower left hand corner of Figure 3.11.  Each triangle or square indicates a trip in 1997 on which a bluefin tuna was caught.



*Ecological Impacts*

The current regulations could be changed to increase the amount of target catch required before a bluefin tuna could be retained. This may provide further incentive to avoid bluefin tuna, but could potentially increase discards due to the greater catch requirements of target species. Conversely, the regulations could decrease the amount of target catch required, which would make it easier to retain bluefin tuna caught. This could reduce discards but could also provide an incentive to fish in areas where bluefin tuna were more likely to be caught. Neither increasing the catch requirements nor decreasing the catch requirements would address the problem of the few sets that occasionally catch large numbers of bluefin tuna. Analyses show that there is little to no relationship between the target catch amounts and the numbers of discards (Figures 3.7 to 3.10), lending support to the characterization that the bluefin tuna caught are only incidental to target fishing operations. Thus, changing the target catch requirements alone in this incidental fishery would not directly address the problem of bluefin tuna discards.

If incidental catch limits were increased, then fishermen would need to increase the catch of other target fish stocks to land any bluefin tuna they may catch. This could potentially negatively impact target stocks. If catch limits were decreased, the converse would be true and target stocks maybe positively impacted. If however, a target fishery is quota limited, then target fisheries would continue until the quota is attained, regardless of the incidental catch limit. Finally, in a truly incidental fishery there should be no motivation to target bluefin tuna, so regardless of the catch limits there should be no effect on target effort or catch.

Changing the catch limits would probably have no impact on protected species interactions except to the extent that changes in target catch limit requirements affect vessel behavior. If target catch requirements are set at appropriate levels, fishing effort on target species would continue at a comparable level to the status quo. Only the amount of bluefin tuna that vessels may retain would change.

*Social and Economic Impacts*

Increasing or decreasing the target catch limits could have a range of social and economic impacts. If the catch limits were increased, fishermen could land an additional amount of target fish along with bluefin tuna. This would have immediate benefits for each trip. However, if the target fishery is limited by a quota, this additional amount landed per trip could reduce the season. In the long term, this could have a greater negative impact on the fishermen as income over the entire year would not be constant.

If the catch limits were decreased, fishermen would not need to catch as many target fish to land a bluefin tuna. This would also have immediate benefits for each

trip.  The fishermen could have fewer days at sea, buy less bait, ice, and fuel, and have more trips each year.  However, if reducing the catch limits creates a target fishery on bluefin tuna, this option could be devastating in the long term if fishermen begin to rely on an overfished species.

The regulations governing catch limits are already divided by geographic area and further subdivided by season.  Additional changes to the regulations may provide an extra level of complexity to the catch limit regulations that could burden enforcement and require additional education to fishermen.  Monitoring of the incidental catches may also be more burdensome due to the need for finer scale quota monitoring.

*Conclusion*

Analyses do not indicate any correlation between catch limits and bluefin tuna discards.  Thus, this alternative does not meet the goals of the FMP and is rejected.

**Rejected Option:**  Canadian time/area closure regime

At the HMS AP meeting held in March 1998, NMFS was advised to consider the regime used by Canada for the time/area closure in the Canadian swordfish longline fishery to eliminate bluefin tuna bycatch.  Below is a brief description of the regulatory background and procedure implemented by Canada as outlined in the Canadian Swordfish Management Plan and via personal communication with Chris Allen, Canadian Department of Fisheries and Oceans (DFO), March 1998.

In July 1994, at-sea boardings of swordfish longline vessels indicated high levels of bluefin tuna bycatch, particularly along Brown's and Georges Banks.  Since high mortalities of bluefin tuna discards were observed by Officers of Canada's DFO,  the DFO closed the swordfish longline fishery west of a line drawn due south of 65°30' W from Baccaro Point (southwest of Nova Scotia) to the eastern edge of the Northwest Atlantic Fisheries Organization Convention Area.  DFO conducted a series of observer-monitored test fisheries throughout the summer fishery until early fall.  Once the bluefin tuna bycatch ceased to be a problem, the area was reopened to swordfish longline fishing.

Based on this experience, the industry proposed a Conservation Harvesting Plan, which included an annual closure for swordfish longline fishermen west of 65°30' W until August 1, with a provision to conduct test fisheries with observers aboard during the closure period.  Because of the selective nature of the swordfish harpoon fishery, this closure did not apply to these vessels.  In addition, industry and DFO jointly created a "Contingency Protocol" with the objective of establishing conservation criteria, action options and test fishery elements.  This protocol has

been incorporated into the Canadian Swordfish Management Plan since 1995.  In 1997, two vessels conducted test fisheries under the Protocol and, as a result of their catches, the area remained closed until August 10.  After August 10, the area west of 65°30' W was reopened, but all vessels had to carry an observer, at their own expense, in order to closely monitor all haul-backs.

In 1995 and 1996 the opening of the Canadian swordfish fishery was delayed until August 1 west of 65°30' W to avoid the problem of bluefin tuna bycatch.  The Canadian Atlantic Fishery Regulations stipulate a zero tolerance of bluefin tuna bycatch.  Closure will occur should this be exceeded based on observations from either at-sea inspections by Fisheries and Oceans Canada (DFO) or by at-sea observers.  DFO consults with large pelagic participants to determine whether the fishery should continue at a reduced level of activity with a high level of observer coverage, or whether to close the fishery area for a specific time period and implement a comprehensive test fishery, or close the fishery for a specific time period and conduct no test fishery.  The participants in the fishery determine which vessels may participate in the test fishery and vessel operators are responsible for all observer costs for the duration of the test fishery.

*Ecological Impacts*

The Canadian model for time/area closures may also help reduce discards of bluefin tuna and have a positive impact on the stocks.  The intent would be similar to the final action described above.  A time/area closure would be implemented when large numbers of bluefin tuna are believed to be on the fishing grounds.  In contrast to the final action, determination of the appropriate time/area closure would be done by vessels testing the closed area to ascertain when the bluefin tuna have left the area so that traditional target longline fishing can resume.

The Canadian time/area closure model could also be used to monitor the abundance and distribution of marine mammals or other protected species in a certain test area so that fishing effort would only be allowed when the area is clear of these species.  This alternative could potentially reduce interaction rates with protected species although it is not used in this fashion.

*Social and Economic Impacts*

Canada requires observer coverage at the expense of the longline fishermen involved.  If implemented for the United States, this alternative would present an additional economic burden to the fishery as well as an additional administrative burden for the government because of openings/closings based on test results.  The Canadian model also assumes that once the test boats have determined that bluefin tuna have migrated out of the test area, the fish will remain out of the area long enough for normal fishing operations to take place.  Whereas this may be a good

assumption for bluefin tuna migrations in the northern Canadian waters, it may not be applicable in the waters of the U.S. continental shelf where migration patterns are less predictable. Finally the Canadian system may be more appropriate for a fishery in which industry routinely pays for observer vessels, and for fleets of relatively modest size. For the U.S. pelagic longline fleet, guaranteed ten percent observer coverage would cost up to $2.5 million per year.

In addition, this alternative would not allow fishermen to plan their fishing season. Under this alternative, fishermen would not know when the fishery may open or close. As such, plans for buying bait, fuel, ice, and other equipment would impact not only fishermen, but also the communities which rely on these sales. Also, unlike the final action, this alternative would not allow fishermen to displace effort as easily.

In addition to the costs of monitoring the area to determine when is an appropriate time for opening, enforcement would be necessary to oversee the fishery while in progress. On-going monitoring of catches and quota would continue as normal.

*Conclusion*

This alternative is unduly harsh to fishermen and the communities which rely on fishing. In addition, this alternative would create a large administrative burden. As such, even though this alternative may decrease bluefin tuna discards and bycatch, it is rejected.

**Rejected Option:** Closure of all longline fisheries once any HMS quota is reached

Under this alternative, NMFS would prohibit pelagic and bottom longlines for all species, for the remainder of the season, regardless of where and when fishing occurs, once any single quota for any HMS species is attained (quotas are in place for directed longline fishing of sharks and swordfish, and an incidental (now called longline) quota for bluefin tuna). For example, the quota of incidentally caught bluefin tuna would remain as established each year for longlines with no catch limits or seasonal restrictions. Once the bluefin tuna quota for longlines was attained, pelagic longlines would be prohibited in all areas. The same would be true if the shark or swordfish quota was met first: longlines would be prohibited for that quota season.

This measure could be difficult to implement and enforce due to different seasonal openings and closures of the various affected fisheries. Also, because longline discards are estimated as reported (using reported numbers multiplied by observed weights), this alternative might increase the incentive to under-report discards, thus

necessitating increased observer coverage.  If all bluefin tuna caught were landed, bluefin tuna discards would be reduced to zero as all bluefin tuna could be retained until the quota was met.  This regime could potentially have a benefit of reducing incidental mortality of billfish, undersized swordfish, and sharks due to early closure of the entire longline fishery for all species.  However, if the bluefin tuna quota, or any other quota, were met rapidly at the beginning of the directed fishery for any species (including swordfish, sharks or tuna other than bluefin tuna), there could be significant economic disruption for all of the fisheries.  Also, this alternative would not utilize the entire quota of those fisheries that were not met first, which would be counter to the intent of ATCA and the Magnuson-Stevens Act to provide U.S. fishermen an opportunity to harvest the full quota.

*Ecological Impacts*

   Closing the entire longline fishery once a quota has been reached in any HMS longline fishery may have a positive impact on bluefin tuna.  All bluefin tuna caught could be landed until the quota was reached, unless a quota for another fishery was reached first.  Thus, potentially there would be no dead discards of bluefin tuna and potentially the allocated quota may not even be caught if the quota of another fishery (i.e., sharks or swordfish) was caught first.  However, if bluefin tuna that would normally have been released alive are now retained, some of the positive impacts would be diminished.

   Closing all longline fisheries once any individual fishery quota is reached could have an impact on target stocks depending on which fishery closed first.  Once the longline fishery is closed after reaching a certain quota then all other target species would be relieved from any additional fishing pressure - until the opening of the next quota period.  Target stocks may be positively impacted if fishing mortality was reduced as a result of a closed longline fishery.  However, this alternative could cause a large race-for-the fish in which fishermen try to land as many fish as possible of all species before the fishery closes.  This could increase bycatch and discards of many species. Closing all longline activities once any quota is reached could reduce interactions with protected species, but the magnitude of that potential effect is uncertain.

*Social and Economic Impacts*

   This alternative would have a significant negative impact on fishermen.  While the fishery for some species currently remains open for most of the season (i.e., swordfish) other fisheries close after only a few weeks (i.e., large coastal sharks).  Thus, this alternative would close all fisheries, preventing fishermen from switching fisheries once a quota is reached.  The possible decrease in income, and the unsteady nature of the fishery not only may force fishermen out of business, but also may affect the communities which rely on those fisheries.

This option could require additional enforcement and monitoring costs to ensure that discards are properly reported and deducted from the quota. Currently, discards are self-reported on vessel trip reports. If some limited government-funded (versus fishery-funded) observer coverage were to be implemented to independently verify discard amounts, then administrative costs would increase. Other administrative issues include whether the discards are deducted from the longline or total quotas. There may be some additional burden on administrators to quickly and accurately compile discard numbers from the previous year to ensure the correct amount is deducted in time. In addition, if this alternative increases the race-for-the-fish, safety at sea could decrease as fishermen may be more intent on bringing in large amounts of fish quickly than in paying attention to the safety of the vessel and crew.

*Conclusion*

This alternative could have large negative ecological and economical impacts. In addition, it may decrease safety-at-sea. Thus, this alternative is rejected.

**Table 3.48**   Total U.S. quotas and landings; longline category landings, quotas, and dead discards of bluefin tuna, in metric tons whole weight, 1992 - 1997.

|   |   | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|------|------|------|------|------|------|
| A | **Total U.S. Quota[1]** | 1,272.0 | 1,331.0 | 1,235.0 | 1,335.0 | 1,306.0 | 1,344.0 |
| B | **Total U.S. Landings[2]** | 1,084.5 | 1,238.1 | 1,162.9 | 1,309.7 | 1,284.1 | 1,333.6 |
| C | **Longline Quota[1]** | 132.0 | 83.0 | 109.0 | 123.0 | 109.0 | 109.0 |
| D | **Longline Landings[2]** | 135.6 | 88.5 | 101.6 | 72.6 | 67.9 | 49.8 |
| E | **Longline Dead Discards[2]** | 43.9 | 30.0 | 75.3 | 141.6 | 73.5 | 37.1 |

[1]From *Federal Register* notices setting quota allocations, 1992 through 1997. Longline Quotas are initial quotas; in some years the longline quota was reduced or increased due to transfers from or to other categories.
[2]From 1997 and 1998 U.S. National Reports to ICCAT.

### 3.5.4.1.2    Swordfish Bycatch Reduction Measures

NMFS establishes measures in this FMP that are likely to reduce bycatch of swordfish in HMS fisheries. In some cases, bycatch reduction measures may be developed in the future through the FMP framework. Those near-term and long-term measures that may directly or indirectly minimize bycatch include: bycatch limits, limited entry, gear modifications, minimum size, retention limits, time/area closures, and a process for accounting for dead discards of swordfish. In this section, NMFS considers time/area closures as a complement to the current swordfish minimum size requirement as a way to reduce bycatch of undersized swordfish and to foster rebuilding of this overfished stock. NMFS has also considered gear modifications and educational workshops and materials.

Exhibit B

Table 1: Summary of Estimated Change in Discards For Varying Redistribution Assumptions[1]

| Species | Change in Discards Without Redistribution | Change in Discards Without Redistribution *with 2004 data | Change in Discards With Modified Redistribution *with 2004 data | Change in Discards With Total Redistribution |
|---|---|---|---|---|
| *Bluefin Tuna* | -21.5% | -29.6%   -35.8%[2] | -19.3% | +9.8% |
| Yellowfin Tuna | -27.0% | -28.6% | -9.1% | -18.3% |
| Bigeye Tuna | -0.2% | -0.6% | +0.6% | +1.7% |
| BAYS | -18.7% | -16.4% | -5.2% | -11.8% |
| Swordfish | -9.9% | -20.6% | +5.0% | +6.0% |
| White Marlin | -10.3% | -15.9% | -2.6% | +7.0% |
| Blue Marlin | -10.0% | -14.6%   -14.0%[3] | +0.7% | +2.0% |
| Sailfish | -12.1% | -19.2% | +21.7% | +4.4% |
| Spearfish | -8.3% | -12.0% | +2.0% | +13.2% |
| Leatherback Sea Turtles | -11.1% | -14.7% | -1.3% | -2.6% |
| Loggerhead Sea Turtles | -3.9% | -2.9% | 0.0% | +23.5% |
| Other Sea Turtles | -18.2% | -15.4% | -15.4% | -18.2% |
| Pelagic Shark | -0.8% | -3.8% | -1.4% | +17.1% |
| Large Coastal Shark | -3.7% | -8.4% | +12.8% | +25.9% |

Key

| Table A.2 |
|---|
| Table A.31 |

[1] The following data are compiled from Tables included in the 2006 HMS FMP, AR E12. Unless indicated otherwise, the percentages were calculated using data from the 2001-2003 HMS logbooks.

[2] The HMS FMP Appendix lists two different figures for the percent change of bycatch for the proposed closure without redistribution based on the 2001-2004 data. Table A.31, HMS FMP at A-43, indicates -35.8% and Table A.41, HMS FMP at A-61, indicates -29.6%.

[3] The HMS FMP Appendix lists two different figures for the percent change of bycatch for the proposed closure without redistribution based on the 2001-2004 data. Table A.31, HMS FMP at A-43, indicates -14.6% and Table A.41, HMS FMP at A-61, indicates -14.%.

| Table. 4.16 |
|---|
| Table A.4 |
| Table A.40 |
| Table A.6 |
| Table A.41 |
| Table A.7 |

# Appendix VI
## ANALYSES OF OPTIONS CONSIDERED FOR THE BLUEFIN TUNA TIME/AREA CLOSURE

**Material and Methods**

The following is a brief description of the methods used to analyze the pelagic longline logbook database, maintained by NMFS' Southeast Fisheries Science Center, to determine which time/areas would most effectively minimize discards of bluefin tuna while minimally impacting target fishing practices.

A.   The Data

Data were separated into three time frames in order to examine historic and current fishing conditions.  The first and second time frames consisted of sets from 1997 and 1996, respectively.  These years are the most current data available at this time.  The third time frame consisted of the combination of sets from 1992 through 1995.  This time frame represents the historic fishery and includes data from both before the target catch requirements were implemented and after.  Discard data were analyzed as **total** discards which includes all discards both dead and alive.  Throughout this discussion and in following sections, references to discards means **total** bluefin tuna discards (i.e., alive and dead) unless otherwise noted.[1]

All data indicated a proportionally large number of bluefin tuna, in relation to the number of bluefin tuna discarded in other areas, were reported discarded between 37 and 41° N and  66 and 74° W  (Figure 1).  This area was divided into eight blocks, each consisting of two degree by two degree square areas (numbered zero through seven) and was defined as the study area for purposes of this analysis (see Figure 2).  The surrounding areas to the south and east (from 30° N and 60° W ) were divided into areas labeled "8" and "9" (see Figure 2).  Areas 8 and 9 were used for determining impacts when displacement of vessels was considered from time/area closures.  Either the entire area (Blocks 0 to 9) or just the study area (Blocks 0 to 7) is specifically mentioned throughout the analyses.

For all time frames, three different time periods (year-round, quarterly, and monthly) and three different block sizes (the study area consisting of blocks 0 through 7, two by eight degree blocks, and eight two by two degree blocks) were considered.  Based on comments received during the comment period, NMFS re-analyzed some of the blocks for the month of June and analyzed a block similar to the one suggested by commenters.  This analysis found a discrepancy in the original analysis that was fixed for the final analyses.  Thus, ten different options were examined.  For each option, the number of hooks set, bluefin tuna discarded (dead or alive), bluefin tuna landed, other tuna (yellowfin, bigeye, etc.), swordfish, large

---

[1] Total bluefin tuna discards were analyzed to ensure NMFS conducted a broad, comprehensive analysis of the data set.  Specific analyses could be done at latter stages to examine dead versus alive discards if necessary.  Regardless of whether NMFS examines just dead discards or all discards, the relative, qualitative assessment of where and when discards occur should remain the same.

coastal sharks landed, billfish caught, other fish (dolphin, oilfish, etc.), and turtles caught in each area (zero to nine) were calculated. The catch of each species per 10,000 hooks (CPUE) was also calculated. The data for areas 0 to 7 were sorted by the number of bluefin tuna discarded per 10,000 hooks (DPUE). For areas 8 and 9 the average CPUE for each species and the DPUE were calculated.

B.    The Models

    Data were analyzed and results presented using two models: a No-Displacement Model and a Displacement Model. In the No-Displacement Model, effort and landings for particular times/areas were simply subtracted from the database. This assumes that if a time/area is closed then all fishery effort and landings from that time/area would no longer occur and fishermen would stay at port and not fish or displace to other areas. Under this model there is no offsetting increase in catch and discards due to displaced effort. Thus, all impacts to the stocks would be measured as decreases in landings and reductions in discards. Although this is an unrealistic assumption, it does provide a "worst-case" scenario in terms of economic impacts to target fisheries and a "best-case" scenario in terms of reductions in discards. This model provides a basic overall understanding of the magnitude of the catch in the different areas for different time periods as well as a baseline for assessments of the status quo. This model was not examined for the new blocks suggested during the comment period.

    The Displacement Model calculated the estimated reduction in numbers of target fish caught and bluefin tuna discarded for the different time/area closures as follows: the area and time combination with the highest DPUE was closed first. Effort (i.e., hooks) from that area and time were assumed to move into areas 8 and 9. In reality, fishermen would probably switch effort to areas with the next highest CPUE. However, it is difficult to predict which species CPUE fishermen would try to maximize and how much effort would go to which area in order to maximize the CPUE of that species. The number of additional fish caught in areas 8 and 9 due to the closure of the high DPUE area, was estimated using the average CPUE for each species in areas 8 and 9 and the number of hooks from the closed block. Although it is unknown whether vessels would actually displace to, and fish in, areas 8 and 9, (i.e., if closer areas are open), the average CPUE values from areas 8 and 9 provide a reasonable estimate of possible CPUE values regardless of where the displaced vessels actually conduct fishing operations. The values for displaced catches were added to the number of fish actually caught in areas 8, 9, and any remaining open blocks, in order to estimate the number of fish caught for that time/area closure. The percent reduction was calculated. This was repeated for each time/area combination in order of decreasing DPUE. Once an area and time combination was closed, the model assumed it remained closed. This method still allows calculation of each individual option by subtracting the percent reduction of one time/area combination from the next one.

    Unlike the No-Displacement Model, it is possible under the Displacement Model to actually predict an increase in landings and/or discards of certain species. This could occur when areas 8 and 9 have higher CPUE for that particular species that the closed area(s).

*Results*

Table 2 provides a summary of the impacts of each time/area closure option in terms of estimated changes in landings of target species and discards of bluefin tuna. Table 2(a) summarizes the impacts of assuming displacement to areas 8 and 9. Table 2(b) summarizes the impacts with no displacement.

**Final Action:    June closure; south half of blocks 0, 1, and 2 (one by six degree block; 39 to 40° N and 68 to 74° W)**

*Displacement Model*: Closing the south half of blocks 0, 1, and 2, a one by six degree block, during June only, is predicted to reduce the number of bluefin tuna discarded by approximately 55 percent.[2] The change (increase and decrease) in landings for other target species, including other tuna, is predicted to be less than six percent. The model predicts that turtle catches could decrease by nine percent or increase by six percent under this action. This prediction is variable due to the small numbers of turtles reported in the data.

*Conclusion*: Of all the options examined, this option seems to minimize the impact on fishermen and producers while maximizing the percent reduction of bluefin tuna discarded and not significantly altering bycatch of turtles. In addition, comments received during the comment period urged NMFS to move the proposed southern boundary to 39° N for safety reasons and due to the lack of bluefin tuna discards in that area. Based on these reasons, this option was selected.

**Rejected Options for time/area closure**

**Rejected Option:** Year-round closure; all eight two by two degree blocks

*Displacement Model*: This option would close the study area (blocks 0 to 7) year round, and thus would have the greatest impact in terms of reductions of target species landings and discards. This option predicts a decrease in the number of bluefin tuna discarded by over 85 percent, as well as a decrease in the number of bluefin tuna landed by approximately 24 to 46 percent. There is a chance the number of bluefin tuna landed could increase. This model also predicts that the number of large coastal sharks, swordfish, and other fish landed could substantially increase if effort was switched out of the study area and displaced to areas 8 and 9.

*No-Displacement Model*: The predicted number of bluefin tuna discards would drop by over 90 percent. Thus, under the assumption of no-displacement, bluefin tuna discards are only reduced an additional five percent when compared to the displacement model. Impacts to target fisheries may be particularly pronounced in the tuna fishery (over 40 percent in 1996 and 100 percent in 1997), including the landings of incidentally caught bluefin tuna (over 65 percent in 1996 and earlier and 98 percent in 1997).

---

[2] In 1997, the pelagic longline fleet discarded a total of 37.1 mt ww dead bluefin tuna in the Atlantic and Gulf of Mexico, 30.7 mt ww of which were discarded dead in the northwest Atlantic. If the anticipated 55 percent reduction in bluefin tuna discards in the northwest Atlantic is applied to the 1997 figures, NMFS estimates that the total amount bluefin tuna dead discards for the pelagic longline fleet in 1997 would have been 20 mt ww.

*Conclusion*:  Overall, due to the large temporal and spatial nature of this option, and the relatively high impact of this option in terms of landings foregone, this option was not selected.

**Rejected Option:**  Year-round closure; two by eight degree blocks

*Displacement Model*: Under this alternative the two by eight block on the northern end of the study area (blocks 0, 1, 2, and 3 in Figure 2) has the greatest reduction in bluefin tuna discards in all time frames examined.  This two by eight degree block contains the most activity in terms of landings and discards and achieves similar levels of reductions in discards and landings as closing the entire area, as considered in Option 1.  In particular, this option predicts a decrease in the number of bluefin tuna discarded of over 76 percent, a decrease in the number of bluefin tuna landed by over 40 percent, an increase in the number of large coastal sharks landed, and, in one of the time frames (1996), a possible increase in turtle bycatch.

*No-Displacement Model*:  This model predicts the decrease in the number of bluefin tuna discarded to be over 85 percent together with significant decreases in landings of other tuna, swordfish, and sharks as well catches of billfish and turtles.

*Conclusion*:  The possible positive ecological benefits obtained with this option, were not large enough, as compared to the other options, to account for the large negative economic impacts on fishermen and fishing communities who rely on these fisheries.  For these reasons, this option was not chosen.

**Rejected Option:**  Year-round closure; two by two degree blocks

*Displacement Model*:  A year round closure of a two by two degree block would not consistently encompass areas of high discards.  For example, area 2 contained the bulk of bluefin tuna discards in 1996 and 1997 but from 1992 to 1995 the model did not predict a large reduction in bluefin tuna discards in any one particular time and area combination.  It would be difficult to determine from year to year which two by two degree area would be optimal to close without an observer program similar to the Canadian program.  In addition, closing a combination of different two by two degree blocks over different times would be complex for the industry and difficult to administer.

*No-Displacement Model*:  As in the displacement model, reductions in discards of bluefin tuna and landings of BAYS tuna are predicted to be relatively high in different two by two blocks over different years.  However, only low reductions in the landings of target species (less than 10 percent) are predicted.

*Conclusion*:  This option was not chosen for two reasons:  1) a year-long closure may be considered overly harsh especially as bluefin tuna are not likely to stay in so small an area for an entire year; and 2) the model was unable to predict a closure for the same block for all three time frames.

**Rejected Option:**  Quarterly closure; all eight two by two blocks

*Displacement Model*:  Closing the entire study area for only the three months of April through June is predicted to reduce the number of bluefin tuna discarded by over 55 percent.  However, closing this entire area may have a significant impact on fishermen who may need to spend time traveling to other areas and producers who may rely on fishing activities in that area.  In addition, the model predicts a ten-percent or greater increase in large coastal shark landings.  Although this increase in landings may offset the increase in cost of fishing, but it may also cause the large coastal sharks fishery to close earlier thus increasing the race for the fish (decreased safety at sea) and increasing large coastal sharks bycatch.

*No-Displacement Model*:  This model estimates reductions in bluefin tuna discards and bluefin tuna landings of approximately 58 and 21 percent, respectively.  Landings of other target species are relatively low (less than ten percent).

*Conclusion*:  This closure may be overly harsh for some fishermen and producers.  This closure may also have a negative impact on the rebuilding of large coastal sharks, safety at sea, and bycatch.  For these reasons, this option was not chosen.

**Rejected Option:**  Quarterly closure; two by eight degree blocks

*Displacement Model*:  Closing the northern half of the study area for the second quarter  is predicted to decrease bluefin tuna discards by over 55 percent.  Although the number of bluefin tuna landed may be reduced by 30 percent, the number of other species is not predicted to change (increase or decrease) beyond ten percent.

*No-Displacement Model*:  As with the displacement model, this model predicts bluefin tuna discards will be reduced by less than 73 percent while bluefin tuna landings will be reduced by less than 32 percent.  Landings of target species is predicted to be less than eight percent.

*Conclusion*:  This option accomplishes the goal of minimizing bluefin tuna discards without having a large impact on other target fisheries.  However, due to possible high impact of this three month closure on fishermen and producers in the surrounding areas, in contrast to other possible options, this option was not chosen.

**Rejected Option:**  Quarterly closure; two by two degree blocks

*Displacement Model*:  As with the option that would close two by two degree blocks year round, this model was not able to predict a closure for the same two by two degree block in all three time frames.

*No-Displacement Model*:  As with the option that would close two by two degree blocks year round, the model was not able to predict a closure for the same two by two degree block in all three time frames.

*Conclusion*:  Even though this option also appears to accomplish the goal of minimizing discards, the fact that the two by two degree block may switch from year to year, does not make the option as viable as others.  In addition, a three month long closure may be unduly harsh on fishermen and fishing communities.

**Rejected Option:**   Monthly closure; all eight two by two degree blocks

*Displacement Model*:  Closing the entire area for the month of June only, may reduce the number of bluefin tuna discarded by approximately 60 percent.  The impact on other species may be less than ten percent.

*No-Displacement Model*:  June is consistently the month with highest discards over the entire study area.  During this month tuna landings and discards are relatively high, although catches of other species are less than five percent.

*Conclusion*:  This option was not chosen due to the relatively high impact (compared to the option below) on surrounding producers and fishermen.

**Rejected Option:**   Monthly closure; two by eight degree block

*Displacement Model*:  Closing the northern half of the study area, a two by eight degree block, during June only, is predicted to reduce the number of bluefin tuna discarded by approximately 60 percent.  The change (increase and decrease) in landings for other target species, including other tunas, is predicted to be less than ten percent.

*No-Displacement Model*:  Landings and discards of bluefin tuna are relatively high in the north portion of the study area.  In addition, reductions of target species are less than five percent.

*Conclusion*:  This option was not chosen because the final action is nearly equivalent in terms of reducing the number of bluefin tuna discarded, has less of an impact on target catch, and addresses fishermen's concerns about the size of the area.  Based on these reasons, this option was selected as preferred.

**Rejected Option:**   Monthly closure; two by two degree blocks

*Displacement Model*:  Similar to other options comparing two by two degree blocks, the optimal areas for closure under this option are not the same for both time frames.  From year to year a different two by two degree block would have to be closed in different months to achieve a uniform percent reduction of bluefin tuna discarded.  This would be confusing to

implement and enforce and may not be effective if the migration pattern of bluefin tuna changes due to environmental factors.

*No-Displacement Model*:  Closing different two by two degree squares for different years in June is estimated to reduce bluefin tuna discards up to almost 60 percent and reduce landings of target species by seven percent or less.

*Conclusion*:  As with the other options that compared two by two degree blocks, the model was not able to predict a closure for the same area consistently for all three time frames.  For this reason, this option was not chosen.

**Table 1**  Times and areas analyzed by NMFS for possible closure

| Times | Areas |
|---|---|
| Yearly | 2 by 2 degree blocks (8 total) |
| Quarterly | 2 by 8 degree blocks (2 total) |
| Monthly | 4 by 8 degree block (1 total) |

**Table 2A**  Displacement Model Summary Table

Percent reductions estimated if only one block is closed at a time for each alternative assuming fishers switch effort from closed area to areas 8 and 9.

Negative percentages indicate possible increase.

Times and areas shown below are combination for each option which predicts the greatest reduction of bluefin tuna discarded.

For two by eight degree blocks:  Area 1 = Areas 0, 1, 2, and 3 of the two by two degree blocks
Area 2 = Areas 4, 5, 6, and 7 of the two by two degree blocks

| Alternative | Year(s) | Time | Area | BFT discards | BFT landed | TUNA landed | SWO landed | LCS landed | BILL caught | Fish landed | Turtles landed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Monthly; southern half of blocks 0, 1, and 2 | 1997 | Year | All | 54% | 18% | 0% | -1% | -3% | -2% | 0% | 9% |
| | 1996 | Year | All | 56% | 24% | 2% | -5% | -6% | -3% | -2% | -6% |
| Year-round; blocks 0-7 | 1997 | Year | All | 81% | -69% | 66% | 27% | -215% | 20% | -197% | -105% |
| | 1996 | Year | All | 85% | 46% | 8% | -42% | -32% | 3% | -41% | -14% |
| | 1992-1995 | Year | All | 88% | 24% | 24% | -45% | -98% | -20% | -63% | 50% |
| Year-round; 2x8 block | 1997 | Year | 1 | 76% | 43% | 37% | -31% | -77% | 7% | -68% | 57% |
| | 1996 | Year | 1 | 83% | 43% | 2% | -26% | -16% | -7% | -26% | -6% |
| | 1992-1995 | Year | 1 | 83% | 22% | 17% | -34% | -75% | -20% | -49% | 47% |
| Year-round; 2x2 block | 1997 | Year | 2 | 55% | 18% | 18% | -15% | -34% | 0 | -27% | 19% |
| | 1996 | Year | 2 | 76% | 36% | 3% | -12% | -15% | -2% | -9% | -6% |
| | 1992-1995 | Year | 3 | 39% | 6% | 1% | -1% | -14% | 0% | -8% | 10% |
| Quarterly; blocks 0-7 | 1997 | 2nd | All | 56% | 24% | 2% | -4% | -11% | -3% | -5% | 10% |
| | 1996 | 2nd | All | 74% | 34% | 3% | -8% | -10% | -2% | -6% | -9% |
| | 1992-1995 | 2nd | All | 72% | 16% | -1% | -5% | -14% | -4% | -5% | 10% |
| Quarterly; 2x8 block | 1997 | 2nd | 1 | 55% | 20% | 1% | -3% | -7% | -3% | -3% | 9% |
| | 1996 | 2nd | 1 | 72% | 29% | 2% | -7% | -8% | -4% | -4% | -7% |
| | 1992-1995 | 2nd | 1 | 68% | 13% | -1% | -3% | -10% | -4% | -5% | 8% |
| Quarterly; 2x2 block | 1997 | 2nd | 2 | 52% | 15% | 1% | -2% | -5% | -2% | -2% | 9% |
| | 1996 | 2nd | 2 | 67% | 28% | 2% | -6% | -8% | -3% | -4% | -7% |
| | 1992-1995 | 2nd | 3 | 25% | 4% | 0% | -1% | -3% | -1% | -1% | 4% |
| Monthly; blocks 0-7 | 1997 | June | All | 54% | 19% | 1% | -2% | -8% | -2% | -3% | 9% |
| | 1996 | June | All | 64% | 31% | 2% | -8% | -9% | -2% | -5% | -8% |
| | 1992-1995 | June | All | 66% | 13% | 0% | -4% | -10% | -3% | -4% | 9% |
| Monthly; 2x8 block | 1997 | June | 1 | 53% | 18% | 1% | -2% | -6% | -2% | -3% | 9% |
| | 1996 | June | 1 | 61% | 27% | 2% | -6% | -8% | -3% | -4% | -7% |
| | 1992-1995 | June | 1 | 63% | 11% | 0% | -3% | -8% | -4% | -4% | 8% |
| Monthly; 2x2 block | 1997 | June | 2 | 51% | 14% | 1% | -1% | -5% | -2% | -2% | 10% |
| | 1996 | June | 2 | 58% | 26% | 2% | -6% | -7% | -3% | -3% | -6% |
| | 1992-1995 | June | 3 | 22% | 4% | 0% | 0% | -3% | 1% | -1% | 4% |

*Appendix VI - Options for BFT Closure - 8*

**Table 2B**   No-Displacement Model Summary Table

Percent reductions estimated if only one block is closed at a time for each alternative assuming fishers do not switch effort

Times and areas shown below are combination for each option which predicts the greatest reduction of bluefin tuna discarded.

For two by eight degree blocks:       Area 1 = Areas 0, 1, 2, and 3 of the two by two degree blocks
                                      Area 2 = Areas 4, 5, 6, and 7 of the two by two degree blocks

| Alternative | Year(s) | Time | Area | BFT discards | BFT landed | TUNA landed | SWO landed | LCS landed | BILL caught | Fish landed | Turtles landed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Year-round; blocks 0-7 | 1997 | Year | All | 100% | 98% | 100% | 99% | 97% | 99% | 97% | 98% |
| | 1996 | Year | All | 91% | 67% | 43% | 12% | 18% | 40% | 13% | 29% |
| | 1992-1995 | Year | All | 94% | 65% | 65% | 34% | 10% | 45% | 26% | 77% |
| Year-round; 2x8 block | 1997 | Year | 1 | 85% | 64% | 56% | 31% | 9% | 46% | 12% | 75% |
| | 1996 | Year | 1 | 87% | 56% | 25% | 9% | 17% | 17% | 9% | 23% |
| | 1992-1995 | Year | 1 | 88% | 55% | 49% | 28% | 8% | 31% | 19% | 68% |
| Year-round; 2x2 block | 1997 | Year | 2 | 58% | 26% | 26% | 10% | 1% | 16% | 5% | 26% |
| | 1996 | Year | 2 | 78% | 42% | 13% | 4% | 0% | 9% | 7% | 6% |
| | 1992-1995 | Year | 3 | 39% | 12% | 7% | 9% | 0% | 9% | 4% | 14% |
| Quarterly; blocks 0-7 | 1997 | 2nd | All | 58% | 27% | 4% | 4% | 0% | 2% | 5% | 12% |
| | 1996 | 2nd | All | 76% | 38% | 10% | 2% | 0% | 5% | 6% | 0% |
| | 1992-1995 | 2nd | All | 73% | 21% | 4% | 5% | 0% | 4% | 6% | 14% |
| Quarterly; 2x8 block | 1997 | 2nd | 1 | 56% | 22% | 3% | 3% | 0% | 1% | 3% | 11% |
| | 1996 | 2nd | 1 | 73% | 32% | 8% | 2% | 0% | 2% | 4% | 0% |
| | 1992-1995 | 2nd | 1 | 69% | 17% | 3% | 4% | 0% | 2% | 3% | 10% |
| Quarterly; 2x2 block | 1997 | 2nd | 2 | 52% | 17% | 2% | 2% | 0% | 0% | 2% | 11% |
| | 1996 | 2nd | 2 | 68% | 31% | 8% | 2% | 0% | 2% | 4% | 0% |
| | 1992-1995 | 2nd | 3 | 26% | 6% | 1% | 2% | 0% | 1% | 2% | 5% |
| Monthly; blocks 0-7 | 1997 | June | All | 54% | 21% | 3% | 3% | 0% | 2% | 4% | 11% |
| | 1996 | June | All | 65% | 35% | 9% | 2% | 0% | 5% | 5% | 0% |
| | 1992-1995 | June | All | 67% | 17% | 3% | 4% | 0% | 3% | 4% | 11% |
| Monthly; 2x8 block | 1997 | June | 1 | 53% | 19% | 3% | 2% | 0% | 1% | 3% | 11% |
| | 1996 | June | 1 | 62% | 30% | 7% | 2% | 0% | 2% | 4% | 0% |
| | 1992-1995 | June | 1 | 64% | 14% | 3% | 3% | 0% | 2% | 3% | 10% |
| Monthly; 2x2 block | 1997 | June | 2 | 51% | 15% | 2% | 2% | 0% | 0% | 2% | 11% |
| | 1996 | June | 2 | 59% | 29% | 7% | 2% | 0% | 2% | 4% | 0% |
| | 1992-1995 | June | 3 | 22% | 5% | 1% | 2% | 0% | 1% | 2% | 5% |

**Figure 1**
A) Number of bluefin tuna discarded in 1992 through 1995



B) The number of bluefin tuna discarded in 1996



**Figure 1 (continued)**
C) The number of bluefin tuna discarded in 1997



**Figure 2**    The Study area blocks.  The final action closes the southern half of blocks 0, 1, and 2 (i.e., 39 to 40° N and 68 to 74° W) for the month of June.

