## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BLUE OCEAN INSTITUTE and  )
CARL SAFINA       )   No. 06-1869 HHK JMF
            )
    Plaintiffs,   )
   v.       )
            )
CARLOS GUTIERREZ and NATIONAL )
MARINE FISHERIES SERVICE,  )
            )
    Defendants.  )
_____ )

## DEFENDANTS' REPLY IN SUPPORT OF
## CROSS-MOTION FOR SUMMARY JUDGMENT

RONALD J. TENPAS, Assistant Attorney General
JEAN E. WILLIAMS, Section Chief
LISA LYNNE RUSSELL, Assistant Chief
KRISTEN BYRNES FLOOM, Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife and Marine Resources Section
Ben Franklin Station
P.O. Box 7369
Washington, D.C. 20044-7369
Telephone: (202) 305-0340
Facsimile: (202) 305-0275
Email: Kristen.Floom@usdoj.gov

Attorneys for Defendants

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.    NMFS ARTICULATED A RATIONAL BASIS FOR DENYING PLAINTIFFS'
      PETITION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    NMFS Considered the Potential Benefits of the Proposed Closure. . . . . . . . . . . 5

      B.    NMFS Clearly Analyzed the Impacts of Plaintiffs' Proposed Closure . . . . . . . . 9

II.   NMFS' DECISION COMPLIED WITH THE MSA NATIONAL STANDARDS ON
      OVERFISHING, BEST AVAILABLE SCIENCE, AND BY CATCH. . . . . . . . . . . . . 13

      A.    NMFS Complied With National Standard One By Including Measures in the
            HMS FMP To Prevent Overfishing and Rebuild Overfished Populations . . . . . 13

      B.    NMFS Complied With National Standard Two by Using the Best Scientific
            Model Available and Explaining How the Model Supports Its Decision . . . . . . 15

      C.    NMFS Complied With National Standard Nine by Including Measures in the
            HMS FMP to Avoid or Minimize Bycatch . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

III.  NMFS EVALUATED THE EFFECTS OF ITS DECISION IN ACCORDANCE WITH
      THE NATIONAL ENVIRONMENTAL POLICY
      ACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      A.    NMFS Considered The Impacts of Plaintiffs' Proposed Closure on Bluefin . . . 18

      B.    NMFS Adequately Discussed Alternatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      C.    NMFS Adequately Discussed Cumulative Impacts . . . . . . . . . . . . . . . . . . . . . . . 21

IV.   THE COURT SHOULD DENY THE IMMEDIATE INJUNCTIVE REMEDY SOUGHT
      BY PLAINTIFFS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      A.    The Injunction That Plaintiffs Seek Would Exceed the Court's Jurisdiction . . . 22

      B.    The Injunction Sought By Plaintiffs Would Not Address the Alleged Harm . . . 24

## TABLE OF AUTHORITIES

CASES                                                                                    PAGE

Am. Rivers v. FERC, 201 F.3d 1186, 1201 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

Aviation Consumer Action Project v. Washburn, 535 F.2d 101, 108 (D.C. Cir. 1976) . . . . . . . 24

City of Alexandria v. Slater, 198 F.3d 862, 869-70 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . 20, 21

City of Grapevine v. U.S. DOT, 17 F.3d 1502, 1503 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . 18

Coastal Conservation Ass'n v. Gutierrez, 512 F. Supp. 2d 896 (S.D. Tex 2007) . . . . . . . . . . . 23

Envtl. Def. Fund v. EPA, 852 F.2d 1316, 1318 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . 23

Fishing Co. v. United States, 195 F. Supp. 2d 1239, 1248 (W.D. Wash. 2002) . . . . . . . . . . 16, 17

Ford Motor Co. v. NLRB, 305 U.S. 364, 373 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Hadaja, Inc. v. Evans, 263 F. Supp. 2d 346 (D.R.I. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Hammond v. Norton, 370 F. Supp. 2d 226, 245 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 21

Indiana & Michigan Elec. Co. v. FPC, 502 F.2d 336, 346 (D.C. Cir. 1974) . . . . . . . . . . . . . . . 22

Kleppe v. Sierra Club, 427 U.S. 390, 413 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

McBride v. Merrell Dow & Pharm., 800 F.2d 1208, 1210-11 (D.C. Cir. 1986) . . . . . . . . . . . . . 14

Midwater Trawlers Coop. v. Mosbacher, 727 F. Supp. 12, 15 (D.D.C. 1989) . . . . . . . . . . . . . . 14

National Standards. See Alliance Against IFQs v. Brown, 84 F.3d 343, 350 (9th Cir.1996) . . . 12

Natural Res. Def. Council ("NRDC") v. Daley, 209 F.3d 747, 753 (D.C. Cir. 2000) . . . . 8,11, 12

Nat'l Audubon Soc'y v. Evans,  2003 WL 23147552, at *1-4 (D.D.C. July 3, 2003) . . . . . . . . . 2

Nat'l Coal. for Marine Conservation v. Evans, 231 F. Supp. 2d 119, 141 (D.D.C. 2002) . . 12, 18

Nebraska HHS v. HHS, 435 F.3d 326, 330 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

North Carolina Fisheries v. Gutierrez, 518 F. Supp. 2d 62, 80 (D.D.C. 2007) . . . . . . . . . . . . . 13

<u>NRDC v. Morton</u>, 458 F.2d 827, 835 (D.C. Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

<u>NRDC v. Reilly</u>, 983 F.2d 259, 273 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

<u>Ocean Conservancy v. Gutierrez</u>, 394 F. Supp. 2d 147, 157 (D.D.C. 2005) . . . . . . . . . . 15, 17, 21

<u>Oceana, Inc. v. Evans</u>, 2005 WL 555416, at *37 (D.D.C. Mar. 9, 2005) . . . . . . . . . . . . . . . . . 18

<u>Parravano v. Babbitt</u>, 837 F. Supp. 1034, 1041 (N.D. Cal. 1993) . . . . . . . . . . . . . . . . . . . . . . . . 17

<u>Sierra Club v. EPA</u>, 719 F.2d 436, 439 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

<u>Sierra Club v. U.S. DOT</u>, 753 F.2d 120, 139 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

<u>So. Utah Wilderness Alliance v. Norton</u>, 326 F. Supp. 2d 102 (D.D.C. 2004) . . . . . . . . . . . . . 21

<u>Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council</u>,
    435 U.S. 519, 558 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

<u>STATUTES</u>

5 U.S.C. § 551 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

16 U.S.C. § 971 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

16 U.S.C. § 971d(c)(1)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

16 U.S.C. § 1801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

16 U.S.C. § 1851(a)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12

16 U.S.C. § 1851(a)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

16 U.S.C. § 1854(e)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

16 U.S.C. § 1855(f)(1)-(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

42 U.S.C. § 4321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

FEDERAL REGULATIONS

40 C.F.R. § 1502.14(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

50 C.F.R. § 635.23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

50 C.F.R. § 635.71 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**INTRODUCTION**

In challenging the National Marine Fisheries Service's ("NMFS") decision to deny their petition to close a portion of the Gulf of Mexico to all longline fishing, Plaintiffs advocate their closure as a panacea for ending overfishing of the western Atlantic bluefin tuna ("bluefin") population.  Plaintiffs' narrow view is unjustified for several reasons.  First, it ignores the negative impacts that the closure would have on other species that NMFS is statutorily obligated to conserve.  Second, it conflicts with the best available science at the time of the decision, which indicated that Plaintiffs' proposed closure would not have rebuilt western bluefin tuna.  In fact, subsequent scientific developments call into question whether the area that Plaintiffs seek to close is actually a "spawning hot spot" for bluefin in the Gulf of Mexico.  Third, it implies that a closure in the Gulf of Mexico is the only tool to rebuild the bluefin stock, and disregards other measures that NMFS has implemented to end overfishing and rebuild the stock under the rebuilding plan that the U.S. agrees to implement through its participation in the International Commission for the Conservation of Atlantic Tunas ("ICCAT").  It would be impossible for the U.S. to unilaterally end overfishing of western Atlantic bluefin in light of the nature of the fishery, which crosses many geographic and political boundaries.  Thus, NMFS actively participates through ICCAT in international efforts to address the decline of the eastern and western bluefin stocks.

Defendants fully considered the impacts of Plaintiffs' proposed closure, including possible benefits to bluefin, and provided a rational basis for denying Plaintiffs' petition.  Plaintiffs have failed to show that NMFS' decision to reject their proposal violates the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act" or

("MSA"), 16 U.S.C. § 1801 et seq.; the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq.; or the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq. Thus, Defendants are entitled to summary judgment on Plaintiffs' claims.

## STATEMENT OF FACTS

Plaintiffs' description of NMFS' actions with respect to bluefin fails to give sufficient weight to the international nature of the fishery. Because eastern and western Atlantic Bluefin migrate long distances, see FMP for Atlantic Tunas, Swordfish, and Sharks ("1999 HMS FMP") at 2-4,[1] they are managed internationally by ICCAT. See also Defendants' Combined Opposition to Plaintiffs' Motion for Summary Judgment and Memorandum in Support of Cross-Motion for Summary Judgment, Doc. No. 24 ("Def. Mem."), at 27-28. In enacting the Atlantic Tunas Convention Act ("ATCA"), 16 U.S.C. §§ 971 et seq., Congress authorized the Secretary of State to participate in ICCAT. See Nat'l Audubon Soc'y v. Evans, No. Civ. A-99-1707, 2003 WL 23147552, at *1-4 (D.D.C. July 3, 2003). See also 46 Fed. Reg. 8,012 (Jan. 26, 1981). The U.S. is a member of ICCAT pursuant to a treaty, and ICCAT recommendations are binding on the U.S. See ICCAT, Basic Texts, Article VIII (2007).[2] As an ICCAT member, the U.S. is obligated to collaborate with other ICCAT members with respect to management measures for bluefin. See id. at Article IX. Under ICCAT's provisions, NMFS may not take an action that "may have the effect of increasing or decreasing any allocation or quota of fish or fishing mortality level to the United States agreed to pursuant to a recommendation of [ICCAT]." See

---

[1]    Available at http://www.nmfs.noaa.gov/sfa/finalFMP.html. Excerpt attached as Exhibit A to Memorandum of Plaintiffs Blue Ocean Institute and Carl Safina in Reply to Defendants' Opposition to the Plaintiffs' Motion for Summary Judgment and in Opposition to the Defendants' Cross-Motion for Summary Judgment, Doc. No. 26 ("Pl. Reply").

[2]    Available at http://www.iccat.es/Documents/Commission/BasicTexts.pdf.

16 U.S.C. § 971d(c)(3).  While NMFS is legally bound to implement ICCAT measures, NMFS

has authority to promulgate regulations as may be necessary and appropriate to achieve the

ICCAT recommendations.  See 16 U.S.C. § 971d(c)(1)(a).

Since 1981, NMFS has prohibited all directed fishing for bluefin in the Gulf of Mexico,

whether by pelagic longline gear or any other gear type.  See 50 C.F.R. § 635.23.  Thus, any

bluefin catch in the Gulf of Mexico is purely incidental to other legally authorized fishing.

Contra Memorandum of Plaintiffs Blue Ocean Institute and Carl Safina in Reply to Defendants'

Opposition to the Plaintiffs' Motion for Summary Judgment and in Opposition to the

Defendants' Cross-Motion for Summary Judgment, Doc. No. 26 ("Pl. Reply") at 4, n.2.  To close

the directed fishery, NMFS published a final rule prohibiting directed fishing for bluefin with

longlines, implementing incidental catch limits, and establishing two management areas that

each had different catch limits.  See 46 Fed. Reg. 8,012 (Jan. 26, 1981).  In 1992 NMFS

acknowledged that the incidental catch limits were not working as planned.  See 57 Fed. Reg.

365 (Jan. 6, 1992).  In response, NMFS changed the incidental catch limits, increasing the target

catch requirement for landing one bluefin during the months of May through December.  See 59

Fed. Reg. 17,723 (April 14, 1994).  In 2002, NMFS changed the incidental catch limits

throughout the HMS fishery to mirror those in the Gulf of Mexico, in an effort to ensure

consistent  requirements throughout the fishery.  See 67 Fed. Reg. 78,404 (Dec. 24, 2002).

The bluefin target catch requirements were intended to prevent fishermen from

deliberately fishing for bluefin and from discarding dead bluefin in order to comply with NMFS

regulations (i.e., regulatory discards), while permitting harvest of bluefin that is consistent with

ICCAT recommendations.  See id.  However, as Plaintiffs correctly note, Pl. Reply at 4, n.2,

NMFS has concluded that there is no relationship between target catch limits and bluefin discards. See 1999 FMP at 3-239. Thus, the only way to reduce incidental catch is to reduce the total allowable catch ("TAC"), which is exactly what NMFS has done in response to the latest bluefin stock assessment.[3]/  When the ICCAT rebuilding plan for western Atlantic bluefin was adopted in 1998, the overall TAC of western Atlantic bluefin for all participating nations was set at 2,500 metric tons (mt), with 1,387 mt allocated to the U.S. See 1999 FMP at 2-9. The 2006 bluefin stock assessment concluded that maintaining the current TAC, while implementing some closures to reduce mortality of spawning bluefin, would not improve the condition of the stock because it would increase the fishing mortality of non-spawning fish, resulting in a long-term reduction of spawning biomass. See Report of the 2006 Atlantic Bluefin Tuna Stock Assessment Session at 22.[4]/  Thus, ICCAT recommended a reduction in the TAC for western Atlantic bluefin to 2,100 mt, a level expected to result in increased spawning stock biomass. See Report of the Standing Committee on Research and Statistics (October 2007), at 59.[5]/  NMFS adopted the ICCAT recommended U.S. TAC of 1,190.12 mt, see 72 Fed. Reg. 33,401 (June 18, 2007), which will reduce overall bluefin mortality.[6]/

---

[3]/     The TAC is the total level of harvest that a stock can support, generally computed on an annual basis. See 1999 FMP at 2-2.

[4]/      Available at http://www.iccat.es/Documents/SCRS/DetRep/DET_bft.pdf (draft version at A.R. H.6).

[5]/     Available at http://www.iccat.int/Documents/SCRS/SCRS_2007_ENG.pdf.

[6]/     NMFS' current regulations allocate only 8.1% of the U.S. quota to the incidental pelagic longline fishery. See 72 Fed. Reg. at 33,407. Most of the U.S. bluefin quota is allocated to the General Category (47.1%), see id., and General category fishing is prohibited in the Gulf of Mexico. See 50 C.F.R. § 635.71. Thus, the fishery that Plaintiffs are most concerned about – pelagic longline fishing in the Gulf of Mexico – comprises a small portion of the overall quota.

Plaintiffs' argument that no progress has been made toward rebuilding under the ICCAT plan, <u>see</u> Pl. Reply at 2, disregards the fact that the plan is for long-term rebuilding of the stock. The goal is to rebuild, with a fifty percent probability, by 2018.  <u>See</u> A.R. E.12 at 3-58.  NMFS has implemented many measures to ensure that the stock will be rebuilt.  <u>See</u> Def. Mem. at 28-29.  Plaintiffs argue that the bluefin stock is unstable, comparing bluefin adult stock sizes in 1970 to present-day levels.  <u>Compare</u> Pl. Reply at 2 <u>with</u> Def. Mem. at 8 (stating that, because bluefin stock is composed of a large number of age classes, it is more stable than a short-lived species).  If one directly compares the stock size in 1970 to that in 2006, the stock appears unstable.  However, if the adult spawning biomasses are examined on an annual basis since 1970, the bluefin spawning stock biomass has not changed more than ten percent from year to year.  <u>See</u> Exhibit 1 (NMFS spreadsheet and graph based on data from most recent ICCAT bluefin stock assessment).

**ARGUMENT**

I.    **NMFS ARTICULATED A RATIONAL BASIS FOR DENYING PLAINTIFFS' PETITION.**

A.    **NMFS Considered the Potential Benefits of the Proposed Closure.**

NMFS balanced the positive and negative benefits of the closure, and clearly set forth its analysis in the EIS, <u>see</u> A.R. E.12 at 4-38 – 4-40, and final rule.  <u>See</u> A.R. E.27 at 58,152-58,153.  <u>See also</u> Def. Mem. at 15-19.  NMFS concluded that it should not adopt Plaintiffs' proposed closure because under the most detailed redistribution analysis, the closure would likely have increased bycatch of other species, <u>see</u> A.R. E.27 at 58,153, and resulted in significant economic impacts, <u>see</u> <u>id.</u>  NMFS also noted that it was still assessing the effects of a significant gear change implemented in 2004 to protect certain species (a mandatory shift from J-hooks to circle

hooks), which could impact future bycatch rates for HMS.  See id. (noting that NMFS would reconsider modifications to existing time/area closures after further data on circle hooks and stock assessments for bluefin and other HMS became available).

        1.     NMFS' analysis of Plaintiffs' proposed closure is consistent with the 1999 FMP.

Plaintiffs rely on NMFS' discussion of a Northeast Atlantic closure in the 1999 FMP to challenge NMFS' analysis of their proposed closure in the Consolidated Highly Migratory Species Fishery Management Plan ("Consolidated HMS FMP"), 71 Fed. Reg. 58,058 (Oct. 2, 2006).  See Pl. Reply at 5; see also Pl. Reply, Exhibit A at 231-32.  Contrary to Plaintiffs' assertion, the 1999 FMP employed the same redistribution of effort model as the Consolidated HMS FMP.  See Pl Reply at 9-10, n. 5.  In both cases, NMFS considered a "no displacement of effort" scenario and a "displacement of effort scenario."  See 1999 FMP at 3-232; A.R. E.12 at 4-28 – 4-29.  The same methodology was used for both FMPs: NMFS considered catch per unit effort ("CPUE") in the proposed closed areas and assumed that fishing effort would move into the remaining open areas around the closures.  See 1999 FMP, Appendix VI at 2; A.R. E.12 at 4-28 – 4-29.  In both the 1999 and Consolidated FMPs, NMFS expressly considered impacts not only on bluefin, but also on other species in the HMS fishery, such as swordfish, sharks, and sea turtles.  See 1999 FMP at 3-232; A.R. E.12 at 4-38 – 4-39.  However, in the 1999 FMP NMFS evaluated landings for multiple species, but bluefin was the only species for which discards were evaluated.  See 1999 FMP, Appendix VI at 8-9.  NMFS was focusing in the 1999 FMP on effectively minimizing bluefin discards.  See id. at 1.  By contrast, in the Consolidated FMP NMFS considered discards of multiple species.  See e.g., A.R. E.12 at 4-83 (Table 4.5).

The 1999 FMP focuses on the positive impacts of the Northeast Atlantic closure because,

due to the unique characteristics of the closure, the expected effects were predominantly positive. Unlike Plaintiffs' proposed closure, the Northeast Atlantic closure was small in size and short in duration. The Northeast Atlantic closure is limited to a 21,600 nm$^2$ area, whereas Plaintiffs' proposed closure in the Gulf of Mexico is 101,670 nm$^2$. See 64 Fed. Reg. 29,090, 29,118 (May 28, 1999); A.R. E.12 at 4-38. Further, the Northeast Atlantic closure is only for the month of June, whereas Plaintiffs' proposed closure would extend from April through June. See 1999 FMP at 3-231; A.R. E.12 at 4-38. NMFS predicted no anticipated increases in bluefin discards as a result of the Northeast Atlantic closure. See 1999 FMP, Appendix VI at 8-9 (negative percentages indicate possible increases). With respect to swordfish and sharks, NMFS concluded that the closure "might actually increase" landings of these species, but because the fisheries are managed under a quota "it is possible that there would be no net change in the overall impact to swordfish or shark stocks." Id. at 3-232. NMFS further found that the Northeast Atlantic closure was not expected to have any significant impact on sea turtle stocks "[g]iven the low level of interactions between [pelagic longline gear] and these protected species." Id.

By contrast, in the 2006 Consolidated FMP NMFS found that the overall impacts of Plaintiffs' proposed closure in the Gulf of Mexico would be predominantly negative. See Def. Mem. at 18-19. NMFS considered the impact of the proposed closure solely on bluefin, finding that it could reduce discards of bluefin by 19.3 percent. See A.R. E.12 at 4-39. However, this reduction would come at the expense of other imperiled species, which would likely suffer increased bycatch. See id. In addition, the closure would have significant economic impacts on the pelagic longline fleet. See A.R. E.27 at 58,153. Thus, NMFS focused on positive impacts to

a greater extent in the 1999 FMP than in the Consolidated FMP because there simply were more positive impacts resulting from the Northeast Atlantic closure than from Plaintiffs' proposed closure.

Plaintiffs argue that NMFS can "easily" control any increased bycatch resulting from their proposed closure by simply closing additional areas to protect the affected species.  See Pl. Reply at 5.  Following Plaintiffs' argument to its logical conclusion, NMFS would be required to implement a continuing series of closures that could eventually result in the shutdown of a number of fisheries.  Although the conservation objectives of the MSA have priority over other objectives, NMFS is required under National Standard Eight to minimize adverse economic impacts on fishing communities.  See 16 U.S.C. §§ 1851(a)(8).  See also Natural Res. Def. Council ("NRDC") v. Daley, 209 F.3d 747, 753 (D.C. Cir. 2000).  NMFS reasonably decided to limit increased bycatch in the first instance by declining to adopt Plaintiffs' proposed closure, rather than relying on an unwieldy series of closures that could have severe negative economic impacts.

> 2.    NMFS considered the significance of the Gulf of Mexico to spawning bluefin.

In their reply, Plaintiffs again assert that NMFS should have treated spawning bluefin in the Gulf of Mexico differently than bluefin in other areas.  See Pl. Reply at 6.  See also Def. Mem. at 20-22.  Yet Plaintiffs fail to point to any record evidence showing that NMFS had a basis to conclude that it was a priority to protect spawning bluefin in the Gulf of Mexico, as opposed to other year-size classes, such as spawning-size fish in the Atlantic Ocean.  NMFS did not disregard the significance of the Gulf of Mexico to spawning bluefin and acknowledged that there were spawning size bluefin in the Gulf and elsewhere.  See A.R. E.12 at 4-39, 4-40, 4-67,

and 4-299.  However, NMFS had no basis to conclude that implementing the closure sought by

Plaintiffs would end overfishing of the species.

 Plaintiffs rely on a statement NMFS made in 1982 for the proposition that minimizing

capture of spawning bluefin in the Gulf of Mexico may help increase the size of the stock.  See

Pl. Reply at 6, citing 47 Fed. Reg. 17,086, 17,089 (Apr. 21, 1982).  However, more recent

evidence available to NMFS in 2006 indicated that Plaintiffs' proposed closure could actually

harm the stock by increasing the fishing pressure on smaller fish.  See Def. Mem. at 21-22, citing

A.R. H.6 at 22 (Draft ICCAT Secretariat Report of the 2006 Atlantic Bluefin Tuna Stock

Assessment).  Plaintiffs attempt to distinguish these data by arguing that the report relates to a

different proposed closure.  See Pl. Reply at 6, n.3.  The report expressly considered a closure

that would eliminate fishing mortality on larger fish, which would shift fishing pressure to

smaller fish in the northwestern Atlantic Ocean.  See A.R. H.6 at 22.  NMFS determined that

Plaintiffs' closure would have had the same result.  In the Consolidated FMP, NMFS concluded

that, although bluefin "discards in other areas outside of the Gulf of Mexico are most likely

discards of non-spawning [bluefin] . . . increasing the number of discards of [bluefin] in areas

outside the Gulf of Mexico could still be detrimental to the stock."  A.R. E.12 at 4-39.  Thus,

although the report did not consider the exact closure proposed by Plaintiffs, the results of the

study are relevant to NMFS' consideration of Plaintiffs' proposed closure.

 **B.    NMFS Clearly Analyzed the Impacts of Plaintiffs' Proposed Closure.**

 NMFS expressly considered the impacts of Plaintiffs' proposed closure on bluefin and

other species.  The Consolidated HMS FMP sets forth the expected increase in annual discards

that would result from Plaintiffs' proposed closure in the Gulf of Mexico, in terms of the

percentage and number of species.  See A.R. E.12 at 4-38 – 4-40, 4-66.  NMFS considered

impacts on multiple species, including bluefin, as set forth in Tables 4-13, 4-16, A-40 and A-41.

See A.R. E.12 at 4-94, 4-97, A-60, A-61.  NMFS analyzed and considered these impacts in the

final rule.  See A.R. E.27 58152 – 58153.  With respect to bluefin, NMFS explained the varying

predicted effects associated with each redistribution of effort scenario: (a) with no redistribution

of effort, bluefin discards could be reduced up to 21.5 percent; (b) with full redistribution of

effort, bluefin discards could increase by 9.8 percent; and (c) under the detailed redistribution

analysis, bluefin discards could decrease by 19.3 percent.  See A.R. E.12 at 4-39.

     Although Plaintiffs imply that they have not challenged the redistribution of effort model

on the basis that it does not constitute the best available science, Pl. Reply at 17-18, they criticize

the model as "mere guesswork," id. at 8.  Defendants explained in their opening brief why the

redistribution analysis used by NMFS represents the best available scientific model for

predicting where fishermen are likely to move if faced with a closure.  See Def. Mem. at 30-32.

The 1999 FMP, about which Plaintiffs speak glowingly, see Pl. Reply at 5, contains a disclaimer

similar to that which Plaintiffs criticize in the Consolidated NMFS: NMFS assumed that some

redistribution would occur, although it could not predict exactly how much or where.  See A.R.

E.12 at 4-66; see also 1999 FMP, Appendix VI, at 2 ("[I]t is difficult to predict which species

CPUE fishermen would try to maximize and how much effort would go to which area in order to

maximize the CPUE of that species.").  In the Consolidated FMP, NMFS refined its

redistribution analysis to better predict where fishing might be displaced in the face of a large

closure in the Gulf of Mexico, based on past fishing effort.  See A.R. E.12 at 4-31 – 4-32.

     NMFS clearly explained how the results of the redistribution analysis led to the decision

not to adopt Plaintiffs' proposed closure.  In the Consolidated HMS FMP, NMFS explained that "even with the additional scenarios of redistributed effort for B2(c) (Plaintiffs' proposed closure), there is a predicted increase for [large coastal shark] discards. . . blue marlin discards. . . sailfish discards. . . and spearfish discards. . . . Given either the overfished stock status or unknown stock status of these species, NMFS does not prefer to implement a new closure, such as B2(c), at this time."  A.R. E.12 at 66-67.  See also Def. Mem. at 18-19.  There is nothing "wild" about the results of NMFS' redistribution analyses.  See Pl. Reply at 8, n. 4.  In fact, the table compiled by Plaintiffs demonstrates a pattern with respect to bluefin.  See Pl. Reply, Exhibit B.  With no redistribution of effort, the largest decrease in discards is predicted (a decrease of 21.5 to 29.6 percent) because the overall decrease in fishing effort will lead to fewer discards.  See A.R. E.12 at 4-29.[7]/  Under the full redistribution of effort model, the largest increase in discards is predicted (an increase of 9.8 percent) because effort is displaced to other areas where bluefin are caught.  See id.  Finally, under the modified redistribution of effort model there is a predicted decrease in discards, although not as significant as under the no redistribution model (a decrease of 19.3 percent), because the refined analysis assumes that fishing effort will be redirected to specific areas where there is less bluefin bycatch.  See id. at 4-32.  With respect to other species, the overall trend is clear: implementing Plaintiffs' proposed closure would result in increased bycatch of certain species under either scenario where some degree of redistribution of effort is assumed.[8]/

---

[7]/    Table A.31 lists 21.5 to 35.8 percent.  A.R. E.12 at A-43.  The 35.8 percent figure is a typographical error.  The correct value is 29.6 percent, as reflected in Table A.41.  Id. at A-61.

[8]/    Plaintiffs state that the EIS lists two different figures for percent change of blue marlin bycatch without redistribution.  See Pl. Reply Ex. B at 1, n. 3.  However, Table A.41 does not include blue marlin.  See A.R. E.12 at A-61.  The correct figure for blue marlin is 14.6 percent,

In addition to ecological impacts, NMFS also considered the social and economic impacts of each alternative as required by the MSA.  See A.R. E.12 at 4-50 – 4-62.  Based on the outcome of the redistribution analysis, NMFS predicted that the proposed closure could have negative social and economic impacts.  See A.R. E.27 at 58,153.  See also A.R. E.12 at 4-55 – 4-56.  The MSA requires NMFS to consider economic impacts on fishing communities when weighing management measures.  See 16 U.S.C. § 1851(a)(8).  Although the MSA's conservation goals are paramount, see Pl Reply at 10-11, n. 6, NMFS is charged with balancing the requirements of all ten National Standards. See Alliance Against IFQs v. Brown, 84 F.3d 343, 350 (9th Cir. 1996) ("Congress required the Secretary to exercise discretion and judgment in balancing among the conflicting national standards in Section 1851."); Nat'l Coal. for Marine Conservation v. Evans, 231 F. Supp. 2d 119, 141 (D.D.C. 2002) (NMFS must balance competing requirements of National Standards).

Nothing in the MSA obligates NMFS to adopt every proposed measure that could possibly benefit an individual species.  Rather, NMFS is required to prevent overfishing of HMS species as a whole.  See Def. Mem. at 19-20.  NMFS reasonably decided not to adopt Plaintiffs' proposed closure where the agency's analyses showed that the closure would have unacceptable negative impacts on one or more overfished or protected species.  See A.R. E.27 at 58,153.  This decision is consistent with NMFS' duty to prevent overfishing and advance the conservation goals of the MSA.  See NRDC, 209 F.3d at 753.[9]/  NMFS did not "favor certain species" at the

as reflected in Table A.31.  See id. at A-43.

[9]/    Plaintiffs' contention that this is a "post hoc" justification for denying their petition is puzzling.  See Pl. Reply at 10.  The record clearly reflects NMFS' view that it is required to consider impacts on all species.  See, e.g.,; A.R. E.12 at 4-48 ("[w]hile the Magnuson-Stevens Act provides NMFS with the authority to manage all species, NMFS must balance the impacts of

expense of others, or "refuse to protect" bluefin or other overfished HMS.  See Pl. Reply at 11.

Rather, it balanced the predicted impacts on all HMS, and determined that closing the area as

requested by Plaintiffs would not meet overall management needs for the HMS fishery.  This

decision is reasonable and supported by the administrative record, and is entitled to deference.

See North Carolina Fisheries v. Gutierrez, 518 F. Supp. 2d 62, 80 (D.D.C. 2007) ("Fisheries

regulation requires highly technical and scientific determinations that are within the agency's

expertise," and courts should generally defer to NMFS' expertise).

## II.    NMFS' DECISION COMPLIED WITH THE MSA NATIONAL STANDARDS ON OVERFISHING, BEST AVAILABLE SCIENCE, AND BYCATCH.

### A.    NMFS Complied With National Standard One By Including Measures in the HMS FMP To Prevent Overfishing and Rebuild Overfished Populations.

Plaintiffs portray NMFS as idly standing by while bluefin populations plummet.  This is

simply not the case.  As explained in Defendants' opening brief, Def. Mem. at 27-28, NMFS has

undertaken actions nationally to protect bluefin consistent with its MSA obligations and actively

participates in international efforts to conserve Atlantic bluefin.  Further, NMFS has

implemented measures in the HMS FMP to prevent overfishing and rebuild the stock.  Id. at 29.

NMFS has complied with its obligations under Section 304(e) of the MSA.  NMFS

reviewed the measures in the 1999 FMP to assess whether adequate progress was being made

toward ending overfishing of bluefin and other species and rebuilding the affected stocks.  See

A.R. E.12 at 1-3 – 1-7.  See also 16 U.S.C. § 1854(e)(7) (NMFS must review FMPs every two

years to ensure that they have "resulted in adequate progress toward ending overfishing and

---

management measures on all managed species. . . ."); A.R. E.22 at 16 (same); A.R. E.17 at 6
("NMFS may not choose protection for one species to the detriment of other protected or
overfished species.").

rebuilding affected fish stocks"). With respect to bluefin, NMFS in 2006 concluded that management "has become increasingly complicated, and may no longer accurately reflect the needs of the fishery and the goals of the 1999 FMP." A.R. E.12 at 1-6. NMFS described in detail the effect of current regulations on the bluefin stock. See id. at 3-57 – 3-59. The bluefin fishery is subject to "quotas, gear restrictions, limits on catches per trip, and size limits" to achieve compliance with ICCAT recommendations. Id. at 3-59. In the 2006 Consolidated HMS FMP, NMFS adopted additional measures to prevent overfishing and achieve adequate progress toward rebuilding bluefin, in accordance with Section 304(e). See Def. Mem. at 29.

Plaintiffs criticize NMFS for "continu[ing] to rely upon the ICCAT rebuilding plan when that plan had resulted in no rebuilding progress between 1998 and 2006." Pl. Reply at 15, n. 10. Plaintiffs' Complaint does not raise claims challenging the ICCAT rebuilding plan, or NMFS' reliance thereon.[10]/ Further, Plaintiffs' argument that their proposed closure is the best way to end overfishing and rebuild the bluefin stock is not supported by current scientific evidence. See Def. Mem. at 21-22. Rather, NMFS' analysis of the most recent scientific data indicates that the best way to end overfishing is by reducing the TAC, which NMFS has done. See supra at 3-4.

---

[10]/   Although the sole basis for Plaintiffs' Complaint is denial of their petition, Plaintiffs appear to challenge other NMFS actions, such as adherence to the ICCAT rebuilding plan. Plaintiffs have not raised any claims in this action related to the rebuilding plan. Nor could they challenge in this lawsuit adoption of the rebuilding plan or other past actions taken by NMFS. See 16 U.S.C. § 1855(f)(1)-(2) (regulations and actions implementing FMPs are subject to judicial review "if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register"). See also Midwater Trawlers Coop. v. Mosbacher, 727 F. Supp. 12, 15 (D.D.C. 1989).

Further, the Court should disregard Plaintiffs' argument that NMFS' reliance on the rebuilding plan violates the APA, see Pl. Reply at 15, n.10, because Plaintiffs may not raise this argument for the first time in their reply. See McBride v. Merrell Dow & Pharm., 800 F.2d 1208, 1210-11 (D.C. Cir. 1986).

Under the MSA, ending overfishing is a process that legally may take place over time, and immediate results are not required.  See Def. Mem. at 27.  In 2006, NMFS was only eight years into implementation of a twenty-year rebuilding plan, which is designed to rebuild the fishery by 2018.  See A.R. E.12 at 3-58.  Plaintiffs' displeasure with the pace of rebuilding is not a basis for requiring NMFS to adopt a closure that might not accomplish its intended purpose and would likely have negative impacts on other species.

**B.    NMFS Complied With National Standard Two by Using the Best Scientific Model Available and Explaining How the Model Supports Its Decision.**

NMFS complied with National Standard Two by basing its decision on the best scientific information available.  See Def. Mem. at 30-32.  See also The Ocean Conservancy v. Gutierrez, 394 F. Supp. 2d 147, 157 (D.D.C. 2005) ("The 'best information' standard is a practical standard requiring only that fishery regulations be diligently researched and based on sound science.").  The Court should be particularly deferential to NMFS' decisionmaking in this case, which involves technical issues that implicate agency expertise.  See id., citing Sierra Club v. U.S. DOT, 753 F.2d 120, 139 (D.C. Cir. 1985).

Plaintiffs argue that NMFS failed to "explain how the model supports the ultimate decision."  Pl. Reply at 18 (emphasis in original).  This explanation is clearly set forth in the Consolidated HMS FMP and the final rule.  The final rule reflects that NMFS relied on the detailed redistribution of effort analysis in determining that Plaintiffs' proposed closure was not appropriate.  See A.R. E.27 at 58,153 (with respect to Plaintiffs' petition, NMFS "also evaluated the movement of fishing effort to other open areas in the Gulf of Mexico and to a specific area in the Atlantic Ocean.  Due to the potential negative ecological impacts, and the increase in bycatch and discards based on the different redistribution of effort scenarios, NMFS is not selecting this

alternative at this time"). <u>See</u> <u>also</u> Def. Mem. at 24.  NMFS clearly explained its reasoning in the FMP:

> For instance, even with the additional scenarios of redistributed effort for B2(c) [Plaintiffs' proposed closure], there is a predicted increase for LCS discards (12.8 percent or 2,545 over 3 ½ years), blue marlin discards (0.7 percent or 20 over 3 ½ years), sailfish discards (21.7 percent or 281 over 3 ½ years), and spearfish discards (2 percent or 10 over 3 ½ years) (Table A.41). Given either the overfished stock status or unknown stock status of these species, NMFS does not prefer to implement a new closure, such as B2(c), at this time.

A.R. E.12 at 4-66 – 4-67.  <u>See</u> <u>also</u> Def. Mem. at 26.  NMFS' Record of Decision reiterates the

scientific basis for denying Plaintiffs' petition.  <u>See</u> A.R. E.22 at 16-17.<u>11</u>/

This case bears no similarity to <u>Hadaja, Inc. v. Evans</u>, 263 F. Supp. 2d 346 (D.R.I. 2003),

cited by Plaintiffs.  <u>See</u> Pl. Reply at 18.  There the court found that there was no scientific

evidence in the record supporting the challenged permit scheme and that the agency's action was

based solely on a "political compromise."  <u>Hadaja</u>, 263 F. Supp. 2d at 354.  <u>See</u> <u>also</u> <u>The Fishing</u>

<u>Co. v. United States</u>, 195 F. Supp. 2d 1239, 1248 (W.D. Wash. 2002) (NMFS may not "create a

---

<u>11</u>/     The decision record explains:

> NMFS also performed a second scenario of the redistribution of effort analysis where effort was redistributed to open areas of the Gulf of Mexico and into a portion of the Atlantic Ocean beyond the U.S. [exclusive economic zone] where Gulf of Mexico vessels have reported fishing.  The results of this analysis indicated a potential reduction in bycatch for white marlin, leatherback and other sea turtles, and pelagic shark discards, bluefin discards, yellowfin discards, and BAYS tuna discards, with the largest being for [bluefin] (19.3 percent decrease over 3.5 years or ~ 122 discards per year).  However, the analysis also predicted an increase in bycatch of blue marlin, sailfish, spearfish and large coastal sharks.  The largest expected increase would be for LCS of 12.8 percent or 2,454 LCS over 3.5 years.  Additionally, given the results of the latest LCS stock assessment, released July 24, 2006 (71 FR 41774), which indicate the status of the LCS complex is unknown and sandbar sharks, one of the primary species, is overfished, NMFS does not want to take actions at this time that might increase LCS mortality.  Thus, NMFS is not selecting this alternative at this time.

<u>Id.</u>

rule out of whole cloth or one based on mere political compromise," but must base regulations

on "concrete analysis").  As explained supra, in this case the record clearly reflects that NMFS'

decision was based on concrete redistribution of effort analyses, and the "FMP[] inform[s] its

audience of the actual scientific basis supporting" the decision to deny Plaintiffs' petition.

Hadaja, 263 F. Supp. 2d at 354.  Based on the outcome of the redistribution analyses, NMFS had

a sufficient basis to rationally conclude that its decision would "'accomplish [its] legitimate

objectives'" of avoiding increased bycatch of species that NMFS is statutorily obligated to

conserve.  See The Fishing Co., 195 F. Supp. 2d at 1248, quoting Parravano v. Babbitt, 837 F.

Supp. 1034, 1041 (N.D. Cal. 1993).

> ### C.    NMFS Complied With National Standard Nine by Including Measures in the HMS FMP to Avoid or Minimize Bycatch.

NMFS has fully complied with its obligation to implement conservation and management

measures that minimize bycatch to the extent practicable.  See 16 U.S.C. § 1851(a)(9) (emphasis

added).  Plaintiffs cannot dispute that NMFS has adopted measures aimed at reducing bluefin

bycatch.  See Def. Mem. at 33.  Plaintiffs dismiss these measures because they allegedly do not

address bycatch of spawning bluefin in the Gulf of Mexico.  See Pl. Mem. at 18-19.  NMFS is

not required to "adopt the most protective measure available with regards to minimizing

bycatch" for any particular species.  See The Ocean Conservancy, 394 F. Supp. 2d at 158.

National Standard Nine cannot be viewed in a vacuum, but must be applied in a manner

consistent with the other nine National Standards.  See id.  This includes National Standard One,

which requires NMFS to prevent overfishing for all species in the fishery.  See Def. Mem. at 19.

Thus, NMFS reasonably declined to implement Plaintiffs' proposed closure to reduce bluefin

bycatch where the closure likely would increase bycatch of other species, including other

overfished species.

NMFS also complied with the MSA requirement to adopt a standardized reporting methodology to assess the amount of bycatch in the HMS fishery.  See Def. Mem. at 34-35. NMFS uses a variety of methods to gather data on bycatch in the Atlantic HMS fishery, including logbooks, at-sea observers, and surveys of fishermen.  Id. at 35.  In their reply, Plaintiffs attack only one of these methods, logbooks, as inaccurate.  See Pl. Reply at 19, n. 13. Plaintiffs rely on Oceana, Inc. v. Evans, No. 04-0811, 2005 WL 555416, at *37 (D.D.C. Mar. 9, 2005), where the court stated in dicta that logbooks are "notoriously inaccurate."  However, logbooks represent the best available source of bycatch data because, unlike observer records, they reflect data from the entire pelagic longline fleet.  See Def. Mem. at 23-24.  See also Nat'l Coal. for Marine Conservation, 231 F. Supp. 2d at 129 (holding that provisions of FMP based on logbook data complied with National Standard Two because "logbooks are the best available scientific information").  Thus, NMFS' adoption of a standardized reporting methodology based in part on logbook data was reasonable, and should be upheld.

## III.  NMFS EVALUATED THE EFFECTS OF ITS DECISION IN ACCORDANCE WITH THE NATIONAL ENVIRONMENTAL POLICY ACT.

NMFS complied with NEPA by preparing a detailed environmental impact statement ("EIS") describing the reasonably foreseeable environmental impacts of Plaintiffs' proposed closure and a reasonable range of alternative closures.  See City of Grapevine v. U.S. DOT, 17 F.3d 1502, 1503 (D.C. Cir. 1994).  Thus, NMFS engaged in the necessary procedural steps "to insure a fully informed and well-considered decision. . . ."  Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, 435 U.S. 519, 558 (1978).

A.      **NMFS Considered The Impacts of Plaintiffs' Proposed Closure on Bluefin.**

NMFS fully analyzed the impacts of Plaintiffs' proposed closure on bluefin, as well as

other species.  See supra Section I.B.  See also Def. Mem. at 36-38.  With respect to bluefin,

NMFS explained that Plaintiffs' proposed closure was expected to result in the following

impacts to the stock: (a) with no redistribution of effort, bluefin discards could be reduced up to

21.5 percent; (b) with full redistribution of effort, bluefin discards could increase by 9.8 percent;

and (c) under the detailed redistribution analysis, bluefin discards could decrease by 19.3

percent.  See A.R. E.12 at 4-39.  In considering the impacts of the proposal, NMFS addressed the

significance of the fact that many bluefin killed in the Gulf of Mexico are spawning fish.  See

Def. Mem. at 20-21; contra Pl. Reply at 20-21.  See also A.R. E.12 at 4-39.  However, NMFS

also considered the possibility that adopting Plaintiffs' proposed closure could "increas[e] the

number of discards of [bluefin] in areas outside the Gulf of Mexico," which could have overall

negative impacts on the bluefin stock.  See id.

B.      **NMFS Adequately Discussed Alternatives.**

In the EIS, NMFS analyzed the ecological, social, and economic impacts of eight

closures and three modifications to closures.  See A.R. E.12 at 4-25 – 4-127.  NMFS explained

how it selected the alternatives considered in the petition.  Contra Pl. Reply at 21-22.  As

required by NEPA regulations, 40 C.F.R. § 1502.14(d), NMFS considered the "no action"

alternative.  NMFS reasonably defined this alternative as maintaining existing time/area closures

and not implementing any new time/area closures.  See A.R. E.12 at 4-33.  See also Am. Rivers

v. FERC, 201 F.3d 1186, 1201 (9th Cir. 1999) ("[T]he 'no action' alternative may be thought of

in terms of continuing with the present course of action until that action is changed."), quoting

46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981).  NMFS considered the impacts of existing closures

on bluefin, see A.R. E.12 at 4-81, and concluded that overall bluefin discards had declined by

greater than 30 percent as a result of the existing closures.  Id. at 4-34.

   The remaining alternatives were chosen to "reduce bycatch in HMS fisheries of certain

species including sea turtles, white marlin, and bluefin tuna."  A.R. E.12 at 1-5.  NMFS selected

the locations of the alternatives by plotting observed fishing effort and catches of various HMS

and protected species to determine the areas of highest bycatch concentration.  See A.R. E.12 at

4-27.  Alternative B2(c) was based directly on Plaintiffs' petition.  See id.  The analysis of the

closure alternatives is fully set forth in the EIS.  The tables in the EIS set forth the data that

NMFS examined to determine the effects of Plaintiffs' proposed closure on bluefin and other

species.  See Def. Mem. at 37-38.  NMFS explained the results of its analysis with respect to

each alternative, including Plaintiffs' proposal, in the EIS.  See A.R. E.12 at 4-33 –  4-50.

NMFS also clearly explained its position that it may not value one species over another.  Contra

Pl. Reply at 22.  This view is derived from the language of the MSA.  See A.R. E.12 at 4-48

("National Standard 1 . . . clearly applies to all species and all fisheries.  Similarly, National

Standard 9 . . . applies to all species and fisheries.").  See also supra note 9.

   Plaintiffs seek a more detailed analysis of their proposed closure, which is not required of

NMFS where, as here, it considered a reasonable range of alternatives in the context of a broad

agency action.  NMFS appropriately considered a broad range of time/area closure alternatives to

address bycatch in the fishery as a whole.  See NRDC v. Morton, 458 F.2d 827, 835 (D.C. Cir.

1972) ("When the proposed action is an integral part of a coordinated plan to deal with a broad

problem, the range of alternatives that must be considered is broadened.").  Plaintiffs' proposed

closure was but one of eight closures evaluated, and the EIS' discussion of its impacts is reasonable in light of the magnitude of the EIS and widely varying subjects addressed therein. See City of Alexandria v. Slater, 198 F.3d 862, 869-70 (D.C. Cir. 1999) (noting that even "terse" discussion of impacts may be appropriate; impacts should be discussed in proportion to their significance to project as a whole).

### C.    NMFS Adequately Discussed Cumulative Impacts.

NMFS examined multiple closures in the Gulf of Mexico, and the EIS discusses the cumulative impacts of all such closures. See A.R. E.12 at 4-299 – 4-300.  NMFS also highlighted the specific impacts of Plaintiffs' proposal. See id. at 4-38 – 4-40.  NMFS discussed increases and decreases of discards that would result from Plaintiffs' proposal, and how it would affect bluefin and other HMS species. See id.; see also id. at 4-66 – 4-67.

NMFS reasonably identified and considered cumulative impacts, and the Court should defer to the agency. See Hammond v. Norton, 370 F. Supp. 2d 226, 245 (D.D.C. 2005) ("The identification of cumulative effects is a task committed 'to the special competency' of the agency preparing [the] EIS."), quoting Kleppe v. Sierra Club, 427 U.S. 390, 413 (1976).  NEPA does not require a more detailed discussion of cumulative impacts. See The Ocean Conservancy, 394 F. Supp. 2d at 164, citing So. Utah Wilderness Alliance v. Norton, 326 F. Supp. 2d 102 (D.D.C. 2004) (emphasis in original).  NMFS complied with NEPA by evaluating an adequate range of alternatives, providing a full opportunity for public comment, addressing all comments received, and clearly explaining the rationale for its decision.  Thus, Defendants are entitled to summary judgment on Plaintiffs' NEPA claim.

IV.    **THE COURT SHOULD DENY THE IMMEDIATE INJUNCTIVE REMEDY SOUGHT BY PLAINTIFFS.**

Plaintiffs ask the Court to issue an injunction requiring NMFS to promulgate, in two weeks, an emergency rule closing a portion of the Gulf of Mexico to all longline fishing, although new scientific data indicate that the area proposed for closure may not actually coincide with the "spawning hot spot" that Plaintiffs seek to protect. As Defendants demonstrated in their opening brief, Plaintiffs' requested remedy should be denied because it would exceed the Court's jurisdiction. Further, the injunction Plaintiffs seek would not address the harm that they allege because a closure based on their petition would not protect a bluefin spawning "hot spot" in the Gulf of Mexico.

A.    **The Injunction That Plaintiffs Seek Would Exceed the Court's Jurisdiction.**

Plaintiffs attempt to circumvent the limitations on the Court's jurisdiction to order their requested relief by arguing that such jurisdictional limitations do not apply where there is a showing of irreparable injury. See Pl. Reply at 24.[12]/ Defendants do not dispute that this Court would have jurisdiction to enter an order remanding the decision to NMFS and directing the agency to issue a new decision on Plaintiffs' petition within a time certain.[13]/ However, it would be an improper constraint on agency discretion for the Court to require NMFS to promulgate an emergency rule embodying the relief requested in Plaintiffs' petition. As a D.C. Circuit case cited by Plaintiffs makes clear, while the Court "may adjust its relief to the exigencies of the

---

[12]/    Defendants do not object to the Court's consideration of the Safina declaration, Pl. Mem. Ex. F., in the limited context of remedy. However, the opinions expressed by the declarant are irrelevant to the issue of whether NMFS' denial of Plaintiffs' petition was arbitrary and capricious. See Def. Mem. at 9, n.4.

[13]/    However, in light of the new factual developments discussed below, it would be a waste of agency resources for NMFS to reconsider Plaintiffs' June 8, 2005 petition.

case," it must do so "within the bounds of the statute and without intruding upon the administrative province." Indiana & Michigan Elec. Co. v. FPC, 502 F.2d 336, 346 (D.C. Cir. 1974), quoting Ford Motor Co. v. NLRB, 305 U.S. 364, 373 (1939). Defendants demonstrated in their opening brief that Plaintiffs' requested emergency relief would intrude upon the administrative province. See Def. Mem. at 43-44.

The cases cited by Plaintiffs support NMFS' view that the Court may not limit the agency's discretion on remand in the manner requested by Plaintiffs. For example, in Coastal Conservation Ass'n v. Gutierrez, 512 F. Supp. 2d 896 (S.D. Tex 2007), the court's order required NMFS to approve a rebuilding plan for red snapper "consistent with [its] obligations under the [MSA]," and consider measures to reduce bycatch in the shrimp fishery. Id. at 902. The court did not specify the substance of the rebuilding plan or otherwise constrain NMFS' discretion on remand. In the other cases cited by Plaintiffs, the Environmental Protection Agency ("EPA") was ordered to undertake certain actions in accordance with its statutory responsibilities, but the D.C. Circuit did not foreclose the exercise of agency discretion in carrying out those actions. See NRDC v. Reilly, 983 F.2d 259, 273 (D.C. Cir. 1993) (setting aside EPA's decision and ordering agency to promulgate standards "in compliance with the [Clean Air Act]"); Envtl. Def. Fund v. EPA, 852 F.2d 1316, 1318 (D.C. Cir. 1988) (vacating EPA's decision to withdraw proposed relisting of six hazardous wastes, ordering EPA to relist wastes by date certain and setting schedule for EPA to "complete the rest of its statutory responsibilities under [Resource Conservation and Recovery Act]"); Sierra Club v. EPA, 719 F.2d 436, 439 (D.C. Cir. 1983) (overturning certain provisions of Clean Air Act regulations and remanding provisions to EPA "for further consideration by the agency in light of our discussion

here").

Here, by contrast, Plaintiffs do not merely seek an order requiring NMFS to issue an emergency rule under the MSA; they also ask the Court to dictate the exact substance of the rule. See Doc. No. 22-2 ([Proposed] Order) at 1 (seeking order requiring NMFS to "promulgate an emergency rule closing longline fishing in the Gulf of Mexico in the manner requested by plaintiffs" in their petition); See also Pl. Reply at 23-24 (requesting injunction ordering NMFS to promulgate emergency rule "that prohibits longline fishing in the Gulf of Mexico in the bluefin spawning area during spawning season"). The Court should deny Plaintiffs' request for a remedy that would eliminate NMFS' discretion and predetermine the outcome of a rulemaking.

**B.    The Injunction Sought By Plaintiffs Would Not Address the Alleged Harm.**

Even if NMFS implemented the exact closure proposed by Plaintiffs, it would not adequately address the harm that Plaintiffs claim. The emergency rule that Plaintiffs seek is based solely on their outdated June 8, 2005 petition. See Doc. No. 22-2 ([Proposed] Order) at 1. As explained in Defendants' opening brief, the scientific basis for Plaintiffs' proposed closure, an April 14, 2005 study, has been called into question by a more recent study. See Def. Mem. at 44-45 (discussing June 21, 2007 study). Plaintiffs fail to address the implications of this new study with respect to the remedy that they seek. The Court should decline to impose an injunction that may not even accomplish its stated purpose of protecting a "hot spot" for spawning bluefin in the Gulf of Mexico. See Nebraska HHS v. HHS, 435 F.3d 326, 330 (D.C. Cir. 2006) (D.C. Circuit has long held that "'an injunction must be narrowly tailored to remedy the specific harm shown'"), quoting Aviation Consumer Action Project v. Washburn, 535 F.2d 101, 108 (D.C. Cir. 1976).

Moreover, even if the Court were to find that such injunctive relief is appropriate, two

weeks is an insufficient amount of time to permit NMFS to promulgate a scientifically sound

rule.  Before promulgating an emergency rule closing a portion of the Gulf of Mexico to all

longline fishing for several months NMFS would have to consider new data, including the June

21, 2007 study, to determine the appropriate location of any such closure.  Under these

circumstances, it would be patently unreasonable to require NMFS to promulgate a rule within

two weeks.

## CONCLUSION

Plaintiffs have failed to show that NMFS lacked a rational basis for its decision to deny

their petition, or that the decision is contrary to applicable law.  Thus, the Court should grant

Defendants' cross-motion for summary judgment, deny Plaintiffs' motion for summary

judgment, and dismiss Plaintiffs' Complaint with prejudice.

Respectfully submitted this 22nd day of January, 2008,

RONALD J. TENPAS, Assistant Attorney General
JEAN E. WILLIAMS, Section Chief
LISA LYNNE RUSSELL, Assistant Chief

/s/ Kristen Byrnes Floom
KRISTEN BYRNES FLOOM, Trial Attorney
DC Bar No. 469615
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife and Marine Resources Section
Ben Franklin Station
P.O. Box 7369
Washington, D.C. 20044-7369
Telephone: (202) 305-0340
Facsimile: (202) 305-0275
Email: Kristen.Floom@usdoj.gov

OF COUNSEL:
Megan Walline
NOAA Office of General Counsel
1315 East-West Highway
Silver Spring, MD 20910

Attorneys for Defendants

Source: Report of the 2006 BFT assessment
Available at http://www.iccat.int/Documents/CVSP/CV060_2007/no_3%5CCV060030652.pdf, page 811

| Year | SSB* | Percent change per year | since 70 |
|------|------|-------------------------|----------|
| 1970 | 56257 | | |
| 1971 | 51016 | -9.31617 | -9.31617 |
| 1972 | 51329 | 0.613533 | -8.7598 |
| 1973 | 48712 | -5.09848 | -13.4117 |
| 1974 | 49139 | 0.876581 | -12.6526 |
| 1975 | 41880 | -14.7724 | -25.5559 |
| 1976 | 39593 | -5.46084 | -29.6212 |
| 1977 | 33913 | -14.346 | -39.7177 |
| 1978 | 31007 | -8.56899 | -44.8833 |
| 1979 | 24627 | -20.576 | -56.2241 |
| 1980 | 23083 | -6.26954 | -58.9687 |
| 1981 | 20441 | -11.4457 | -63.665 |
| 1982 | 19314 | -5.51343 | -65.6683 |
| 1983 | 18872 | -2.2885 | -66.454 |
| 1984 | 16125 | -14.556 | -71.3369 |
| 1985 | 12925 | -19.845 | -77.0251 |
| 1986 | 12391 | -4.13153 | -77.9743 |
| 1987 | 11175 | -9.81357 | -80.1358 |
| 1988 | 10671 | -4.51007 | -81.0317 |
| 1989 | 9969 | -6.57858 | -82.2795 |
| 1990 | 9814 | -1.55482 | -82.5551 |
| 1991 | 9153 | -6.73528 | -83.73 |
| 1992 | 9028 | -1.36567 | -83.9522 |
| 1993 | 9730 | 7.775809 | -82.7044 |
| 1994 | 10228 | 5.118191 | -81.8192 |
| 1995 | 11193 | 9.434885 | -80.1038 |
| 1996 | 10759 | -3.87742 | -80.8753 |
| 1997 | 11678 | 8.541686 | -79.2417 |
| 1998 | 12100 | 3.613632 | -78.4916 |
| 1999 | 11387 | -5.89256 | -79.759 |
| 2000 | 11263 | -1.08896 | -79.9794 |
| 2001 | 10238 | -9.10059 | -81.8014 |
| 2002 | 9274 | -9.4159 | -83.5149 |
| 2003 | 8769 | -5.44533 | -84.4126 |
| 2004 | 8025 | -8.48443 | -85.7351 |

* SSB = Spawning Stock Biomass

