UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BLUE OCEAN INSTITUTE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CARLOS M. GUTIERREZ, et al.,<br><br>Defendants. | Civil Action 06-01869 (HHK) |

MEMORANDUM OPINION

Plaintiffs Blue Ocean Institute and Carl Safina (collectively, "Blue Ocean") bring this action against Carlos M. Gutierrez in his official capacity as the Secretary of the United States Department of Commerce (the "Secretary") and the National Marines Fisheries Service (the "NMFS") (collectively, the "Department"). Blue Ocean challenges the Department's decision denying its "Petition for Immediate Rulemaking to Protect Spawning Atlantic Bluefin Tuna in the Gulf of Mexico" ("Petition"). Specifically, Blue Ocean alleges that the Department adopted a Fishery Management Plan ("FMP") for Atlantic Tunas, 71 Fed. Reg. 58058-01 (Oct. 2, 2006) ("2006 FMP"), that is inconsistent with the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801-1884 ("MSA"), and the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370f ("NEPA"), and violates the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"). Before the court are the parties' cross-motions for summary judgment [## 22, 24]. Upon consideration of the motions, the oppositions thereto, and the administrative record of this case, the court concludes that Blue Ocean's motion [#22] should be DENIED and the Department's motion [#24] should be GRANTED.

## I. BACKGROUND

Western Atlantic Bluefin Tunas ("Western BFTs") are a highly-migratory species ("HMS"), meaning that they move throughout the Atlantic Ocean. In light of their range, Western BFTs, like other HMS, are managed through international recommendations as well as national regulations. The International Commission for the Conservation of Atlantic Tunas ("ICCAT") is responsible for the conservation and management of Western BFTs in the Atlantic Ocean and its adjacent seas. ICCAT recommends Western BFT quotas for each member country, including the United States. The United States implements ICCAT recommendations through the Atlantic Tuna Convention Act, 16 U.S.C. §§ 971 *et seq*. ("ATCA"), and manages Western BFTs through the dual authority of the ATCA and the MSA. Pursuant to the MSA, the Secretary has the authority to manage HMS, including Western BFTs, which authority the Secretary has delegated to NMFS. Exercising its delegated authority, NMFS prepares FMPs, like the 2006 FMP challenged in this case, in consultation with numerous interested persons and organizations. *See* 16 U.S.C. § 1854(g)(1)(A).

This controversy concerns the Western BFT spawning grounds in the Gulf of Mexico. Although Western BFTs spend much of their lives in temperate waters, they return to the warm waters of the Gulf of Mexico to spawn. Since 1970, the spawning stock biomass of Western BFTs — the quantity of sexually mature Western BFTs — has decreased significantly. Accordingly, in the early 1980s, ICCAT recommended that catches of Western BFTs be reduced as near to zero as possible and that there be no directed fishery for Western BFT spawning stock in spawning areas such as the Gulf of Mexico. ICCAT continued to recommend measures to prevent further declines in Western BFT stock throughout the 1990s. And in 1998, ICCAT adopted a 20-year rebuilding program intended to rebuild Western BFT stock.

On the domestic front, the Department has adopted FMPs to manage Western BFT since 1999, *see* 64 Fed. Reg. 29090-01 (May 28, 1999) ("1999 FMP"), as required by the MSA, 16 U.S.C. § 1854(g)(1). The MSA requires FMPs to be consistent with ten national standards for fishery conservation and management. *Id*. at § 1851(a) ("National Standards").[1] Blue Ocean alleges that the 2006 FMP is inconsistent with National Standards One, Two, and Nine. The effect of these inconsistencies, according to Blue Ocean, is to make more precarious the already precarious

---

[1] 16 U.S.C. § 1851(a) provides:

Any fishery management plan prepared, and any regulation promulgated to implement any such plan, pursuant to this subchapter shall be consistent with the following national standards for fishery conservation and management:

(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

(2) Conservation and management measures shall be based upon the best scientific information available.

(3) To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.

(4) Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

(5) Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.

(6) Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

(7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

(8) Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

(9) Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

(10) Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

condition of Western BFTs: when this suit was filed Western BFT spawning stock biomass was at its lowest recorded level in history.

In 2003, NMFS announced its intent to prepare an EIS to amend the 1999 FMP governing the management of Western BFTs. In June 2005, Blue Ocean submitted its Petition to the Secretary asking him to adopt an annual closure of a portion of the Gulf of Mexico prohibiting all pelagic longline fishing each year between the months of April and June to protect Western BFTs during their spawning season ("proposed closure"). In August 2005, the Department released a draft of the 2006 FMP. The Department then solicited public comments until March 2006. In the course of preparing the 2006 FMP, the Department considered Blue Ocean's Petition and rejected it. Specifically, the Department concluded that the proposed closure would cause a redistribution of fishing efforts resulting in increased bycatch of other HMS, loggerhead and leatherback turtles protected under the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*. ("ESA"), and possibly of Western BFTs, as well. Therefore, NMFS promulgated a rule preserving the status quo: like the 1999 FMP, the 2006 FMP prohibits directed fishing for Western BFTs in the Gulf but allows fishermen targeting other fish to retain a limited number of Western BFT bycatch. Displeased with the denial of its Petition, Blue Ocean filed this suit.

## II.  STANDARD OF REVIEW

Blue Ocean's complaint raises three MSA claims: first, that the Department has violated National Standard One because rejecting the proposed closure fails to prevent overfishing and fails to promote the rebuilding of the Western BFT population; second, that the Department has violated National Standard Two because its decision to reject the proposed closure is not based on the best scientific information available; and third, that the Department has violated National Standard Nine

because rejecting the proposed closure fails to minimize bycatch and bycatch mortality. Blue Ocean also raises a fourth claim, a NEPA claim, alleging that the Department prepared an inadequate Environmental Impact Statement ("EIS") in support of its decision to reject the proposed closure.

This court reviews Blue Ocean's claims under the APA because the claims challenge the final action of an administrative agency. In conducting its review, this court shall "hold unlawful and set aside agency action, findings, and conclusions found to be -- (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law [(MSA or NEPA)]." 5 U.S.C. § 706(2). Considering Blue Ocean's claims that the 2006 FMP fails to comply with MSA National Standards this court's "task is not to review *de novo* whether the amendment complies with these standards but to determine whether the Secretary's conclusion that the standards have been satisfied is rational and supported by the record." *C & W Fish Co., Inc. v. Fox, Jr.*, 931 F.2d 1556, 1562 (D.C. Cir. 1991); *see North Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007) ("[R]eview of agency action under the MSA is especially deferential."). Similarly, in reviewing claims that the Department failed to prepare an adequate EIS as required by NEPA, "as long as the agency's decision is 'fully informed' and 'well-considered,' it is entitled to judicial deference and a reviewing court should not substitute its own policy judgment." *Natural Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988) (quoting *North Slope Borough v. Andrus*, 642 F.2d 589, 599 (D.C. Cir. 1980)). The court's inquiry is confined to reviewing the administrative record. *N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 79 (MSA) (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.")); *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (NEPA) (citing *Camp*, 411 U.S. at 142).

The parties have filed cross-motions for summary judgment as to all of Blue Ocean's claims. Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review. *Stuttering Foundation of America v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007) (citing *Richards v. INS,* 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977), *cited in Bloch v. Powell*, 227 F. Supp. 2d 25, 31 (D.D.C. 2002), *aff'd*, 348 F.3d 1060 (D.C. Cir. 2003)).  However, this court does not apply typical summary judgment standards when reviewing a final action of an administrative agency under the APA:

> Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In a case involving review of a final agency action under the [APA], however, the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record.  *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006). Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *See Occidental Eng'g Co. v. INS,* 753 F.2d 766, 769-70 (9th Cir. 1985); *see also Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.,* 18 F.3d 1468, 1472 (9th Cir.1994) ("[T]his case involves review of a final agency determination under the [APA]; therefore, resolution of th[e] matter does not require fact finding on behalf of this court.  Rather, the court's review is limited to the administrative record.").

*Stuttering Found.*, 498 F. Supp. 2d at 207.  Accordingly, in reviewing the cross-motions for summary judgment, the court evaluates whether the evidence in the administrative record permitted the Department to deny the Petition and reject the proposed closure as it did in the 2006 FMP.

## III. ANALYSIS

Blue Ocean raises three contentions in support of its motion for summary judgment: first, that the Department's decision to reject Blue Ocean's Petition was arbitrary and capricious because the Department failed to articulate a rational basis for its decision; second, that the Department violated the MSA — specifically National Standards One, Two, and Nine — because its decision to reject the proposed closure does not prevent overfishing or minimize bycatch or bycatch mortality, nor does it rely on the best scientific information available; and third, that the Department violated NEPA by preparing an inadequate EIS. The court addresses each in turn.[2]

### A.   Blue Ocean's Petition

The Department denied Blue Ocean's Petition, which asked the Department to close a portion of the Gulf of Mexico to all pelagic longline fishing between April and June each year to protect Western BFTs during their spawning season. Blue Ocean contends that this denial was arbitrary and capricious because the Department ignored the Petition's purpose — to protect Western BFTs — by focusing on the proposed closure's likely impacts on other HMS and ESA-protected sea turtles. Blue Ocean also argues that the Department failed to consider key facts about Western BFTs and their Gulf of Mexico spawning grounds, namely that the Petition exclusively seeks to protect Western BFTs (as opposed to Eastern Atlantic Bluefin Tuna) of spawning age, which are critical because such spawning-age fish are essential to the recovery of this rapidly disappearing species. Additionally, Blue Ocean argues that allowing fishermen to retain bycatch is creating a *de facto* directed fishery for Western BFTs in the Gulf of Mexico, including during their spawning season.

---

[2] In addition to countering each of plaintiffs' contentions, the Department asserts that this court should deny Blue Ocean's request for an injunction, even if this court grants summary judgment in favor of Blue Ocean. Because the court finds in favor of the Department on all claims, the court need not address this issue.

Finally, Blue Ocean argues that the Department relied on a flawed model to predict redistribution of fishing efforts caused by the proposed closure and that the Department failed to explain how that model informed its decision.[3]

The Department counters that it fully considered the proposed closure, conducted a thorough analysis of its possible effects, and clearly explained the rational basis for its decision to reject the Petition. The Department also contends that it prepared an adequate EIS that supports its decision to reject the Petition. In conducting its analysis, the Department asserts that it considered all relevant facts about Western BFT biology and status, including differences between western and eastern bluefins, the importance of spawning-age fish to the population, and the significance of the Gulf of Mexico spawning grounds. The Department further argues that it employed a scientifically-sound redistribution of efforts model to predict where fishermen would redirect their efforts if faced with the proposed closure and that this model relied on reliable bycatch rates and reasonable relocation approximations. All of this, the Department contends, was done with due regard for its duty to protect Western BFTs and other HMS and the need to minimize bycatch of ESA-protected turtles.

Based on its review of the administrative record, the court agrees with Blue Ocean that the condition of Western BFTs does not appear to have improved under the 1999 FMP, at least not significantly. Thus, it is difficult to see how the condition of Western BFTs will improve under the 2006 FMP, which largely preserves the same management measures for Western BFTs in the Gulf. Nevertheless, the court cannot agree that the Department failed to conduct a full and fair evaluation

---

[3] Blue Ocean notes that the 1999 FMP adopted a limited area time-area closure "for the purpose of reducing bluefin bycatch." To the extent Blue Ocean raises this issue to highlight purported deficiencies in the Department's consideration of the proposed closure, the court will address those alleged deficiencies below. Otherwise, the court fails to see how the 1999 time-area closure, standing alone, is relevant to the issues at hand.

both of the Petition and of the plight of Western BFTs more broadly. Nor can the court find that the Department failed to articulate a rational basis for its conclusions.

To reiterate, the court does not review the conclusions of the Department *de novo*; the task before the court is merely to determine whether the conclusions set forth in the 2006 FMP are "rational and supported by the record." *C & W Fish Co.*, 931 F.2d at 1562. Having closely examined the administrative record, the court finds that the Department properly considered the key facts about Western BFT status, history, and biology, and the Gulf of Mexico spawning grounds. The Department also considered several scenarios concerning whether, where, and the extent to which commercial fishermen would redistribute their fishing efforts in light of the proposed closure. The Department evaluated each scenario and explained each fully. Indeed, the Department agreed with Blue Ocean that the proposed closure standing alone ("no redistribution of effort scenario") likely would reduce Western BFT bycatch. However, the Department found it more likely that some or all vessels currently fishing in the proposed closure area would redirect their efforts to other areas in the Gulf of Mexico or elsewhere in the Atlantic Ocean ("redistribution of effort" scenarios). Under these redistribution of effort scenarios, the Department concluded that the proposed closure likely would result in increased bycatch of other HMS and ESA-protected sea turtles and actually could result in increased bycatch of Western BFT as well. Thus, the Department found that the proposed closure probably would do more harm than good to Western BFTs, other HMS, and the ESA-protected sea turtles. Blue Ocean identifies no error in the redistribution model that refutes the Department's conclusions. Nor does the court have any trouble discerning the basis of those conclusions from the administrative record. Accordingly, the court finds that the Department has

articulated a basis for its decision to reject Blue Ocean's petition, and that basis is rational and supported by the record.[4]  *See C & W Fish Co.*, 931 F.2d at 1562.

**B. MSA National Standards**

Blue Ocean's claims under the MSA challenge the Department's interpretation of a statute that the Department administers. Accordingly, the court analyzes the claims under the two-step process of *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Only Blue Ocean, however, mentions *Chevron*, and it gives the case a nod of the head at best. Neither party explains how *Chevron* should inform the court's analysis. Their likely reasons for brushing aside *Chevron* are obvious: this is not a case where the parties disagree as to the statutory language, its meaning, or its purpose. The only real dispute concerns whether the Department fulfilled its obligations to conduct a thorough analysis and to explain its analysis and conclusions adequately to the public.

Under *Chevron*, the court first asks "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id*. Absent a clear command from Congress, the second step of the *Chevron* analysis requires this court to accord

---

[4] The Department acknowledges that it weighed the adverse economic effects on fishing communities against the proposed closure. This was error. It is true, as the Department points out, that the MSA requires that "[c]onservation and management measures shall, consistent with the conservation requirements of this chapter . . . , take into account the importance of fishery resources to fishing communities by utilizing economic and social data . . . in order to . . . to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8). However, the Department "must give priority to conservation measures. It is only when two different plans achieve similar conservation measures that the [Department] takes into consideration adverse economic consequences." *Natural Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000). Because none of the scenarios that the Department evaluated "achieved similar conservation measures," it should not have considered the adverse economic effects on the proposed closure on fishing communities. Nevertheless, this error does not affect the court's holding because the Department's decision to deny the Petition turned not on the economic impact of the proposed closure but rather on its conclusion that the 2006 FMP advanced the best interests of all affected species, including Western BFTs.

deference to the Department if its interpretation of the MSA "is based on a permissible construction of the statute," *id*. at 843-44, meaning that its interpretation "'is reasonable and consistent with the statutory purpose and legislative history.'" *Natural Res. Def. Council, Inc. v. Daley*, 209 F3d 747, 752 (D.C. Cir. 2000) (quoting *GTE Serv. Corp. v. FCC*, 205 F.3d 416, 421 (D.C. Cir. 2000) (internal citations and quotations omitted)). The court will not uphold the Department's interpretation if it "diverges from any realistic meaning of the [MSA]." *Massachusetts v. Dep't of Transp.*, 93 F.3d 890, 893 (D.C. Cir. 1996); *see Natural Res. Def. Council*, 209 F.3d at 753; *GTE Serv. Corp.*, 205 F.3d at 421. Although the MSA speaks of conservation goals, it does not does speak directly to the "precise question" here: whether the MSA requires the Department to implement the proposed closure. Accordingly, the court proceeds to the second step of the *Chevron* analysis below.

**1.    National Standard One**

National Standard One requires that "[c]onservation and management measures shall *prevent overfishing* while achieving, on a continuing basis, the *optimum yield* from each fishery for the United States fishing industry." 16 U.S.C. §1851(a)(1) (emphases added). Similar to the 1999 FMP, the 2006 FMP allows longline fishing for other species in Western BFT spawning grounds in the Gulf of Mexico during spawning season and allows fishermen targeting other species there to retain a limited number of incidentally caught Western BFTs as bycatch.

Blue Ocean argues that the Department's decision to reject the proposed closure is inconsistent with National Standard One's requirement to "prevent overfishing" while achieving "optimum yield" because it preserves the status quo despite the fact that the Western BFT population has declined steadily for more than twenty years. Blue Ocean points out that the Department has acknowledged that Western BFTs are "overfished" and that "overfishing is continuing."

Nevertheless, Blue Ocean alleges that through the 1999 FMP and 2006 FMP, the Department has established a *de facto* directed fishery for Western BFTs in their Gulf of Mexico spawning grounds.[5]

The Department counters that, consistent with ICCAT recommendations for rebuilding Western BFT stock and obligations under ATCA and MSA, it analyzed a range of alternatives, and carefully selected certain alternatives, including quotas and size restrictions. In addition, the Department asserts that it is continuing to research and evaluate how changes in fishing practices may reduce overfishing and bycatch. Finally, the Department contends that it chose to maintain existing closures in the Atlantic Ocean rather than adopt the proposed closure in light of analyses reflecting that existing closures have been effective in reducing bycatch and its conclusion that the proposed closure actually may increase Western BFT bycatch.

The parties do not dispute that Western BFT are overfished nor that overfishing is occurring. The dispute here concerns whether the Department's decision to reject the proposed closure is consistent with the MSA's mandate that it prevent overfishing. This is where Blue Ocean's argument goes awry. Rather than focusing on the proposed closure, Blue Ocean sets forth a litany of grievances against the Department for its alleged continuing failure to prevent overfishing. However, none of Blue Ocean's arguments prove the essential point: that adopting the proposed closure will prevent overfishing whereas failing to adopt it will not. It is not enough for Blue Ocean to say that Western BFT populations are dropping and that the Department's efforts to prevent overfishing have been ineffective; Blue Ocean must show the Department's error in refusing to adopt the proposed closure. Blue Ocean has not. Simply put, the Department rejected the proposed

---

[5] Blue Ocean does, however, acknowledge that the Department prohibits directed fishing for Western BFTs in the Gulf of Mexico.

closure because it concluded that the proposed closure would harm other protected species and could increase Western BFT bycatch. This determination is supported by the record and reflects reasoned decision making. *See N. C. Fisheries Ass'n*, 518 F. Supp. at 80 (quoting *The Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 157 (D.D.C. 2005), *aff'd*, 488 F.3d 1020 (D.C. Cir. 2007)). Blue Ocean has provided the court with no basis to refute this determination. More precisely, the court has no grounds to find that the proposed closure would prevent overfishing; indeed, the administrative record suggests the contrary. Accordingly, the Department did not violate National Standard One. *See The Ocean Conservancy*, 394 F. Supp. 2d at 157 ("Courts defer to NMFS decisions that are supported in the record and reflect reasoned decision making, especially where, as here, the dispute involves technical issues that implicate substantial agency expertise.")

### 2. National Standard Two

National Standard Two requires that "[c]onservation and management measures shall be based upon the *best scientific information* available." 16 U.S.C. § 1851(a)(2) (emphasis added). "Scientific information includes, but is not limited to, information of a biological, ecological, economic, or social nature." 50 C.F.R. § 600.315(b)(1). The Department based its decision to reject the proposed closure in large part on a redistribution of efforts model. That model sought to predict if and where fishermen would relocate their fishing efforts in light of Blue Ocean's proposed closure and what effect, if any, their relocation would have on Western BFTs, other HMS, and certain ESA-protected sea turtles.

Blue Ocean contends that the Department's decision to reject the proposed closure is not based on the "best scientific information available" as required by National Standard Two, but rather on a series of conclusory statements. In particular, Blue Ocean takes issue with the Department's

redistribution of efforts model, the assumptions upon which it relies, and the Department's purported failure to explain how the model and the various scenarios set forth therein informed its analysis. Finally, Blue Ocean argues that the Department should not have rejected the proposed closure simply because its effects likely would vary among HMS — benefitting some and harming others.

The Department counters that the redistribution of efforts model is the best scientific method available for predicting the effects of the proposed closure and the resulting change in bycatch. Therefore, according to the Department, it was prudent for it to rely on the redistribution model. The Department also notes that its analysis was subject to public scrutiny and reviewed by outside scientists. Although the Department acknowledges that the redistribution of efforts model is not foolproof and that it could have employed other methods, it maintains that the redistribution model is the best scientific model available.

National Standard Two "requires that rules issued by NMFS be based on a thorough review of all the relevant information available at the time the decision was made, and insures that the NMFS does not 'disregard superior data' in reaching its conclusion." *The Ocean Conservancy*, 394 F. Supp. 2d at 157 (citations omitted). This "standard is a 'practical' one 'requiring only that fishery regulations be diligently researched and based on sound science,' such that the NMFS is not obliged 'to rely upon perfect or entirely consistent data.'" *N. C. Fisheries Ass'n*, 518 F. Supp. 2d at 85 (quoting *The Ocean Conservancy*, 394 F. Supp. 2d at 157). Courts consistently uphold agency action "based on the 'best available' science, recognizing that some degree of speculation and uncertainty is inherent in agency decisionmaking." *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 219 (D.D.C. 2005). Unless the court has some "indication that superior or contrary data was available and that the [Department] ignored such information, a challenge to the [Department's] collection of and

reliance on scientific information will fail." *N. C. Fisheries Ass'n*, 518 F. Supp. 2d at 85 (citing *Building Indus. Ass'n of Superior Cal. v. Norton*, 247 F.3d 1241, 1246-47 (D.C. Cir. 2001); *accord Oregon Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1120 (9th Cir. 2006); *The Ocean Conservancy*, 394 F. Supp. 2d at 157; *Nat'l Coalition for Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 130 (D.D.C. 2002)).

Blue Ocean does not come close to making the requisite showing. Indeed, Blue Ocean concedes as much in its reply brief in which its argument focuses not on the validity of the redistribution model but rather on the Department's purported failure to explain "how it used its model to conclude that granting the Plaintiff's petition was not warranted." This argument, that the Department failed to explain its conclusion, is specious at best. The 2006 FMP plainly sets forth the proposed closure as one of the alternatives that the Department considered and rejected based on its redistribution of efforts model. Moreover, the Department adequately described its assessment, based on the model, that the proposed closure likely would have an adverse effect on other HMS and ESA-protected sea turtles, and that it could have an adverse effect on Western BFTs, as well. The law requires nothing more of the Department; "the [2006] FMP [met its obligation to] inform its audience of the actual scientific basis supporting it." *Hadaja, Inc. v. Evans*, 263 F. Supp. 2d 346, 354 (D.R.I. 2003) (observing that National Standard Two prohibits an agency from creating a rule based on a mere political compromise rather than on a reasoned scientific endeavor). Accordingly, the court cannot find that the Department's decision to reject the proposed closure is inconsistent with its duties under National Standard Two.

### 3.     National Standard Nine

National Standard Nine requires that "[c]onservation and management measures shall, *to the extent practicable*, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." 16 U.S.C. § 1851(a)(3) (emphasis added). In rejecting the Petition, the Department acknowledged its duties under National Standard Nine and concluded that the 2006 FMP struck the best balance between its competing duties to minimize bycatch of Western BFTs and that of other species whose bycatch likely would increase as a result of the proposed closure.

Blue Ocean asserts that the Department knows that bycatch in the Gulf of Mexico is increasing Western BFT discard and waste. Nevertheless, the Department rejected its Petition, and the 2006 FMP does nothing to reduce this bycatch. According to Blue Ocean, such bycatch is especially harmful because it predominantly affects spawning Western BFTs. Moreover, Blue Ocean contends that the Department's failure to establish a standardized bycatch-reporting methodology exacerbates the problem by allowing it to evade close scrutiny. Finally, Blue Ocean acknowledges that National Standard Nine requires the Department to minimize bycatch of Western BFTs in addition to that of other HMS, but it argues that the Department must better explain why the proposed closure's negative effects on other species outweigh its putative positive effects for Western BFTs.

The Department counters that its mandate is not to eliminate all bycatch but rather to minimize bycatch "to the extent practicable." 16 U.S.C. § 1851(a)(9). To that end, the Department points out that it has implemented a number of effective management measures to reduce bycatch: annual fishing closures in two areas of the Atlantic Ocean during the month of June, prohibitions on live bait in the Gulf of Mexico, daily retention limits, minimum size limits, open and closed seasons,

16

restricted fishing days for recreational anglers, and target catch requirements for the retention of Western BFT bycatch. The Department also emphasizes its need for flexibility in adopting FMPs that will safeguard all protected species, not just Western BFTs. Consistent with its broad mandate, the Department asserts that it has adopted a standardized bycatch-reporting methodology for all HMS, not for Western BFTs alone, which methodology includes the use of logbooks, on-board observers, and fisherman surveys.

Blue Ocean's argument that the Department violated National Standard Nine makes sense if one reads that standard in a vacuum — as applying only to Western BFTs in the Gulf of Mexico. The MSA is not so limited. Its purpose is to protect all HMS in all United States coastal fisheries. That is exactly what the Department endeavored to accomplish through the 2006 FMP. As described more fully in Section II.A, *supra*, the Department considered the effects of the proposed closure on Western BFTs, other HMS, and ESA-protected sea turtles throughout the Atlantic Fishery. After evaluating various scenarios reflecting the possible redistributions of fishing efforts caused by the proposed closure, the Department adequately explained its conclusion that the proposed closure would increase bycatch of other protected species and that it may increase bycatch of Western BFT. Thus, even considering Western BFTs alone, the proposed closure could run contrary to the goals of the MSA. Blue Ocean seems to advocate a more facile investigation — asking the Department to ignore redistribution of fishing efforts and to jettison its duties to other species. The MSA does not condone such a results-oriented analysis. Nor does the MSA require the Department to adopt a standardized bycatch-reporting methodology more sophisticated than the logbooks, on-board observers, and fishermen surveys the Department currently employs. *See The Ocean Conservancy*, 394 F. Supp. at 159 (holding that existing on-board observer requirements comported with the

requirements of National Standard Nine); *see also Nat'l Coalition for Marine Conservation*, 231 F. Supp. 2d at 139 (same). Accordingly, the court finds that the Department has not acted inconsistently with its duties under National Standard Nine.

## C.  NEPA Requirements

NEPA requires the Secretary to prepare an EIS before adopting a FMP. 42 U.S.C. § 4332(c); 16 U.S.C. § 1853(a)(1)(C). NMFS did prepare an EIS before adopting the 2006 FMP. That EIS considered Blue Ocean's proposed closure along with a range of other possible alternatives for managing Western BFTs and evaluated the environmental and economic effects of each alternative. The issue before the court is the adequacy of the EIS.

Blue Ocean contends that the EIS ignores the fundamental challenge set forth in its Petition: ending the decline of the Western BFT population. Specifically, Blue Ocean alleges that the EIS does not recognize that the 2006 FMP perpetuates a *de facto* directed fishery for Western BFTs in the Gulf of Mexico by allowing fishermen to continue to retain Western BFTs as bycatch. Further, Blue Ocean argues that the Department failed to consider a reasonable range of alternatives that could end overfishing, minimize bycatch, and rebuild Western BFT stock. Moreover, Blue Ocean alleges that the Department failed to provide a full, fair, and clear discussion of its analysis and of the environmental impacts accompanying the denial of the Petition. Nor, according to Blue Ocean, did the Department directly confront whether the proposed closure would minimize bycatch and thus significantly reduce the overfishing of Western BFTs. Finally, Blue Ocean contends that the Department failed to consider the cumulative effect and long-term impact of allowing fishing and bycatch retention to continue in Western BFT spawning grounds.

The Department counters that the EIS considered a reasonable range of alternatives, including Blue Ocean's proposed closure and a "no-action" alternative that would maintain existing closures without adopting additional closures, and made all information and findings available to the public in a detailed and intelligible form. After carefully considering the environmental and economic impacts of each alternative as well as public comments, the Department asserts that the 2006 FMP adopted the best alternative, the "no action" alternative, for protecting Western BFT and other HMS. As outlined above, the Department thus contends it followed the necessary process to reach a fully-informed decision, as required by NEPA. Moreover, according to the Department, it squarely addressed the issues of Western BFT bycatch in the Gulf of Mexico, Blue Ocean's Petition, and the proposed closure, including the cumulative and long-term effects of denying the Petition.

"NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). The purpose of NEPA is to make certain the agency has made "a fully informed and well-considered decision." *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 558 (1978). Blue Ocean's arguments with respect to NEPA are more of the same. In essence, Blue Ocean contends that the Department failed to conduct a full and fair analysis of the proposed closure and failed to consider the Petition's fundamental purpose — reversing the decline of the Western BFT population. Not so. As discussed in Sections II.A-B, *supra*, the Department thoroughly analyzed the effects of the proposed closure on Western BFTs as well as on other HMS and ESA-protected sea turtles. It weighed various alternatives, and articulated a rational basis for its conclusion. The EIS is an integral part of that analysis, which the Department adequately described in the 2006 FMP. Accordingly, the court cannot find that the Department has violated its obligations under NEPA.

### III.  CONCLUSION

For the foregoing reasons, it is hereby ORDERED that plaintiff Blue Ocean's motion for summary judgment [#22] is DENIED and defendant Department's motion for summary judgment [#24] is GRANTED.  The court will enter a FINAL JUDGMENT in accordance with this Memorandum Opinion.

                                                Henry H. Kennedy, Jr.
                                                United States District Judge